HOLLAND & KNIGHT LLP
Michael J. Frevola
Chiara Kalogjera-Sackellares
787 Seventh Avenue
New York, New York 10019
michael.frevola@hklaw.com
chiara.sackellares@hklaw.com
Telephone: 212.513.3200
Fax: 212.385.9010

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Pennantia, LLC,<br><br>          Plaintiff,<br><br>    v.<br><br>Rose Cay Maritime, LLC, and<br>Dove Cay, LLC,<br><br>          Defendants. | In Admiralty<br><br>Case No.  - CV - _____<br><br>**COMPLAINT** |

Plaintiff Pennantia, LLC ("Pennantia" or "Plaintiff"), by and through its attorneys Holland & Knight LLP, files this Complaint against Rose Cay Maritime, LLC ("RCM" or "RCM Defendant") and Dove Cay, LLC ("DC" or "DC Defendant") (collectively "Defendants"). Plaintiff respectfully alleges as follows:

### INTRODUCTION

The evidence in this proceeding overwhelmingly establishes that Defendants engaged in ongoing and escalating interference with Pennantia's business operations, breach of contract, breach of fiduciary obligations as an agent charged with managing the assets of Pennantia – specifically Pennantia's fleet of eighteen (18) U.S. registered commercial vessels – all in a concerted effort to delay and obstruct Pennantia's efforts to market and sell its vessels.

But Defendants' most recent escalation now presents an urgent and grave threat to the continuing viability of Pennantia's business, the contemplated sale of its vessels, and the safety of the ports, waterways, and the environment. Specifically, the evidence establishes that: (1) Defendant RCM has threatened to imminently order the crew of the vessels to stop all work, an anticipatory repudiation of its contract, unless its unlawful demands are met by Friday, July 18, 2025; (2) Defendant DC has unlawfully filed fabricated and improper claims of maritime liens in a staggering amount of $29.4 million against every vessel in the Pennantia fleet, clouding the title of the vessels and restraining transfer of title, which even if legitimate, would only have arisen from Defendant RCM's beach of its contract with Pennantia; (3) Defendants continue to prevent Pennantia from accessing its own vessels, vessel records, and current operational information about the Vessels, which are critical to the contemplated sale of the vessels; and (4) Defendant RCM manipulated the financial accounts funded by Pennantia for payment and reimbursement of legitimate vessel operational expenses to fabricate the appearance of a near zero balance and improperly demand that Pennantia advance funding to RCM in excess of $14 million.

The combined assertions that Pennantia owes payments or funding of a combined total of $43.4 million – which RCM demands that Pennantia pay in full by July 18, 2025 and which appears triggered by Defendants' knowledge that Pennantia is close to finalizing a sale of the Pennantia Fleet – is an outrageous fabrication and plainly an improper strategy to obstruct Pennantia from selling its vessels. As a result, Pennantia is compelled to seek a declaratory judgment to remove the invalid claims of maritime liens, and amongst other relief sought herein, Pennantia will contemporaneously seek immediate injunctive relief to prevent imminent and irreparable damage that would result from RCM's threat to order all vessel crew to stop work, which would prevent the sale of the vessels, and likely end Pennantia's ability to operate as a going concern.

## JURISDICTION AND THE PARTIES

1.      This is a case of admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, federal question jurisdiction pursuant to 46 U.S.C. § 31343, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.      Venue is proper in this District as to RCM pursuant to the ship management agreement dated August 8, 2021 between Pennantia and RCM (the "Ship Management Agreement").  The Ship Management Agreement is a maritime contract and provides for venue in federal court in the County of New York in the State of New York.

3.      Venue further is proper in this District as to DC pursuant to 46 U.S.C. § 31343(c)(2) with respect to those Vessels (as that term is defined below in Paragraph 12 of this Complaint) subject to the above-referenced improper maritime liens asserted and notices of claims of maritime liens filed with the U.S. Coast Guard National Vessel Documentation Center ("NVDC") that currently are located within the permitted geographic scope of this Court, at present, the *Tank Barge RCM 250*, the *Tank Barge RCM 252*, the *Tank Barge RCM 225*, the *Tug JORDAN ROSE*, the *Tug ANNA ROSE*, and the *Tug SUSAN ROSE*.  Upon information and belief, the *Tank Barge RCM 260* the *Tank Barge RCM 262* likewise are within the permitted geographic scope of this Court, but do not have AIS transponders on board such that Pennantia can definitively confirm this fact.  Venue is furthermore proper in this District as to DC to the extent that the Ship Management Agreement's choice of venue may be applied to DC.

4.      At all times material herein, Plaintiff Pennantia was and is a business entity organized and existing under the laws of the State of Delaware with a principal place of business located at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830.

5.     At all times material herein, RCM was and is a business entity organized and existing under the laws of the State of Texas with a principal place of business located at 1321 Upland Drive, Suite 20183, Houston, TX 77043.

6.     Upon information and belief, at all times material herein, DC was and is a business entity organized and existing under the laws of the State of Texas with a principal place of business located at 1321 Upland Drive, Suite 20183, Houston, TX 77043.

7.     Upon information and belief, DC is a subsidiary, affiliate, and/or alter ego of RCM. RCM and DC have the same office and suite, RCM's Principal—Alex J. Parker—executes documents for DC as its "Authorized Person," RCM's Chief Legal Officer—Ellen T. Arthur— likewise represents herself as DC's Chief Officer, and Pennantia has never had any communications or dealings with any principal purporting to act on behalf of DC that was not also an RCM principal.

## **FACTUAL BACKGROUND**

### **Ownership of the Vessels**

8.     In 2021, the fleet of Bouchard Transportation ("Bouchard") was sold as part of that company's administration in the U.S. Bankruptcy Court for the Southern District of Texas.

9.     Plaintiff Pennantia purchased approximately half of the Bouchard fleet, which vessels consisted of ten (10) barges and eight (8) tugs (the "Pennantia Fleet"). The eight tugs and eight of the barges are generally mated together as articulated tug/barge ("ATB") pairings, with two additional stand-alone wire barges.

10.     The beneficial interests of Pennantia are held by an investment entity managed by Contrarian Capital Management, L.L.C. ("CCM"), which holds 86.25% of the aggregate beneficial

interests. Pennantia engaged RCM to manage the Pennantia Fleet pursuant to the terms of the Ship Management Agreement.

11.     Pursuant to the Ship Management Agreement, in addition to monthly cash payments, RCM (a) received an Initial Equity Award of Pennantia beneficial Interests, and (b) had the right to co-invest to obtain additional beneficial interests in Pennantia, which RCM exercised and which in total represent the remaining 13.75% of the aggregate beneficial interests of Pennantia.

12.     The eighteen vessels in the Pennantia Fleet[1] are the tugs *ANNA ROSE*, *LYNNE ROSE*, *JORDAN ROSE*, *REBEKAH ROSE*, *SUSAN ROSE*, *CINDY ROSE*, *JESSE ROSE*, and *JOAN ROSE* and the tank barges *RCM 210*, *RCM 225*, *RCM 242*, *RCM 245*, *RCM 250*, *RCM 252*, *RCM 260*, *RCM 262*, *RCM 270*, and *RCM 295* (each a "Vessel" and collectively the "Vessels").

13.     As is common in the maritime industry, title to each Vessel is owned by a single vessel-owning LLC, each of which are a single member limited liability company, each 100% owned and controlled by Pennantia as the sole member.

**The Ship Management Agreement**

14.     To manage the Pennantia Fleet, Pennantia entered into the Ship Management Agreement with Defendant RCM. A true and correct copy of the Ship Management Agreement is attached hereto as Exhibit 1.

15.     Pursuant to the Ship Management Agreement, Pennantia contracted with RCM to provide technical management (which, amongst other things, entails supervising maintenance, upkeep, documentation and provisioning of the vessels); crew management (which, amongst other things, entails procuring, training, paying, and caring for the vessels' crews); and commercial

---

[1] Of the 18 vessels in the Pennantia Fleet, currently seven barges and five tugs are in commercial service, while three barges and three tugs remain in layup status.

management (which, amongst other things, entails procuring engagements for the vessels, supervising the financial performance of the vessels, and managing the loading and discharging operations of the vessels).  Ex. 1, Part I, Boxes 6, 7 & 8.

16.    RCM's possession and control of the Pennantia Fleet pursuant to the Ship Management Agreement is for the purpose of "carry[ing] out the Management Services in respect of the Vessel as agents for and on behalf of [Pennantia]."  Ex. 1, Part II, Clause 3 ("Authority of Managers").

17.    With respect to commercial management, RCM's authority and responsibility as Pennantia's agent is to provide commercial management services "in accordance with [Pennantia's] instructions."  Ex. 1, Part II, Clause 8 ("Commercial Management").

18.    In exchange for providing management services, Pennantia pays RCM a Management Fee comprised of four components: a Fixed Management Fee, a Variable Commission Fee, Profit Sharing Incentives, and Equity Incentive Awards.  Ex. 1, Annex "E" ("Fee Schedule").

19.    In order to cover operating expenses associated with RCM's management of the Pennantia Fleet, the Ship Management Agreement provides that

> [Pennantia] shall reimburse [RCM], on a direct pass-through basis, **_and without markup_**, for the actual direct expenses incurred by [RCM] for performance of the Crewing and Technical Management Services provided for the Vessels pursuant to Clauses 4, 5, and 7 of this Agreement, which, without limiting the generality of the preceding phrase and so long as incurred pursuant to Clauses 4, 5 or 7 or the advance written consent of [Pennantia], shall include: (i) inspection and maintenance of the Vessels, (ii) parts, supplies, and repairs for Vessels (iii) Vessel dry docking, (iii) [*sic*] fuel, lubes, and grease, (iv) insurance premium and broker fees; (v) crewing costs; (vi) dockage fees and port charges; (vii) lay up costs; (viii) security costs (ix) costs of professional services approved in advance by Owner (accounting, tax, legal), and (x) reimbursable pass through costs of the foregoing services performed and charged by a subcontractor approved in advance by Owner ("_Management Reimbursement_").

Ex. 1, Annex "C," Clause (a) (emphasis added).

20.     Annex "C" further sets out the intent and mechanics for estimating and providing advance funding for anticipated reimbursable expenses in the Vessel Operating Account, which provided, after an initial deposit period, that "it is the intent of the parties that the funds in the Vessel Operating Account at the time each Estimated Reimbursement Payment is made as described below should approximate sixty (60) days of estimated Management Reimbursement based the average of the most recent Actual Reimbursable Expenses and current Estimated Reimbursement, or such other formula from time to time mutually agreeable to the parties."  Ex. 1, Annex "C," Clause (e).

21.     The Ship Management Agreement further specifies the content and timing of the reporting and documentation required to calculate the Estimated Reimbursement Payments, which required RCM to reconcile the previous month's actual expenses within five (5) Business Days after the end of each month by rendering to Pennantia "a written statement for the preceding month showing actual expenses for the preceding month together with all supporting invoices or documents, with a true up of the actual expenses versus the Estimated Reimbursement."  Ex. 1, Annex "C," Clause (g).  Additionally, "[t]he next Monthly Funding Request shall also include a reconciliation of each prior month's activity."  *Id*.

22.     The "next Monthly Funding Request" prepared by RCM, including the supporting reconciliation, was to be provided "no fewer than five (5) Business Days prior to the first day of each calendar month, following receipt of which Pennantia was to deposit the Estimated Reimbursement requested into the Vessel Operating Account.  Ex. 1, Annex "C," Clause (e).

23.     Pursuant to Part II, Clause 19, Pennantia may inspect any Vessel "for any reason [Pennantia] consider[s] necessary."  Ex. 1, Part II, Clause 19.

24.     Pursuant to Part II, Clause 18(e) of the Ship Management Agreement, RCM must "in a timely manner, make available, all documentation, information and records in respect of the matters covered" by the Ship Management Agreement.  Ex. 1, Part II, Clause 18(e).

25.     The Ship Management Agreement further requires that "[RCM] shall give [Pennantia] reasonably prompt notice and copies of all tax notices, reports or inquiries, claims of liens, and of any damage, loss, seizure attachment or judicial process which may effect the use, maintenance, operation, possession or ownership of the Vessels . . . ."  Ex. 1, Annex "C," Clause (l).

26.     Nothing in the Ship Management Agreement restricts Pennantia from selling any Vessel(s) in the Pennantia Fleet, or selling Pennantia itself, both of which are expressly contemplated and permitted in the Ship Management Agreement:  in the event that one of the Vessels is sold, the Ship Management Agreement terminates as to such Vessel, (Ex. 1, Part II, Clause 22(c)), and in the event of a sale of Pennantia, or all or substantially all of the assets of Pennantia, the Ship Management Agreement terminates entirely. (*Id.*, Clause 22(e)).

### RCM's Provision of Technical and Crewing Management Services

27.     Under the Ship Management Agreement, RCM is obliged to:

[U]ndertake to use their best endeavours [*sic*] to provide the Management Services as agents for and on behalf of the Owners [i.e., Pennantia] ***in accordance with sound ship management practice* and to *protect and promote the interests of [Pennantia]*** in all matters relating to the provision of services hereunder.

Ex 1, Part II, Clause 8 (emphasis added).

28.     Upon information and belief, RCM was initially comprised of two persons:  Alex J. Parker and John Parrott.  Upon commencement of the Ship Management Agreement, it was understood that technical management and crewing management (which initially was almost entirely comprised of substantial work to get the Vessels back into service after a period of neglect

and inoperative status) would be performed via a qualified subcontractor. As Vessels became available for commercial operations, RCM would then directly perform commercial management of the Vessels.

29.     An initial technical and crewing sub-manager was selected and engaged by RCM in 2021 for the Pennantia Fleet improvement/return to service project. However, the Pennantia Fleet improvement/return to service project managed by RCM far exceeded its budget, fell far behind the originally contemplated schedule, and ultimately resulted in RCM's sub-contracted technical and crewing manager ceasing its performance for RCM in March 2022.

30.     RCM was responsible for finding a new crewing and technical management sub-contractor. Instead of sub-contracting a replacement technical and crewing manager pursuant to its obligations under the Ship Management Agreement, RCM advised Pennantia that none of the sub-contractors that it interviewed would be suitable for their technical and crewing manager needs. RCM instead proposed performing the technical and crewing management in-house, using, DC, which Pennantia understands is a subsidiary, affiliate, and/or alter ego of RCM.

31.     The Ship Management Agreement expressly prohibits RCM from sub-contracting "Management Services or obligations hereunder without the prior written consent of [Pennantia], which may be withheld or granted in [Pennantia's] reasonable discretion." The Ship Management Agreement further provides that "[i]n the event of such a sub-contract [RCM] shall not be relieved of their obligations to perform under this Agreement." Ex. 1, Part II, Clause 16 ("Managers' Right to Sub-Contract").

32.     To the best of Pennantia's knowledge, Pennantia never provided any written consent for RCM to sub-contract technical or crewing management to DC.

33.     Pennantia definitely never entered into any management agreement with DC.

34.     Despite the Ship Management Agreement requiring that RCM "shall in a timely manner make available, all documentation, information and records in respect of the matters covered by this Agreement," *see* Ex. 1, Part II, Clause 18(e), and despite specific requests from and on behalf of Pennantia for RCM to provide any agreements between RCM and DC relating to Pennantia Vessels, RCM never provided any such agreements.

35.     Upon information and belief, RCM performed its technical and crewing management obligations using DC, pursuant to the terms and conditions of the Ship Management Agreement and not under a separate agreement or sub-contracting. As discussed below, it is the marked-up costs of DC – marked up notwithstanding the clear prohibition against the same under the Ship Management Agreement – together with fabricated amounts purportedly owed to DC as sub-contractor, that form the basis of RCM's anticipatory breach.

36.     RCM has not complied with the express provisions of the Estimated Reimbursement Payment provisions in Annex C. RCM has not provided monthly Reimbursement Statements with details and reconciliation of Actual Reimbursable Expenses provided under Annex C(g), which would be required to substantiate Estimated Reimbursement Payments pursuant to Annex C(e).

37.     Furthermore, RCM has never provided the required monthly certification signed by a Responsible Officer in connection with actual invoices submitted for reimbursement required by Annex C(h), nor the quarterly certifications required by Annex C(i).

38.     Despite RCM's failure to comply with these provisions of the Ship Management Agreement, Pennantia approved or permitted reimbursements for RCM's claimed reimbursable expenses without requiring additional detail in order to ensure management of the Pennantia Fleet continued and Pennantia could continue to conduct business.

39.     With respect to the funding of the Vessel Operating Account, Annex "C," Clause (e) provides that, in the alternative to the specific mechanics and formula for funding based on actual reconciled charges and one-month estimates, funding may follow "such other formula from time to time mutually agreeable to the parties."  Ex. 1, Annex "C," Clause (e).

40.     Since at least early 2022, the process for funding the Vessel Operating Account has, in relevant part, been based on RCM providing a 13-week cash flow forecast on a weekly basis, and Pennantia depositing operating funds into the Vessel Operating Account on a periodic basis sufficient to meet current expenses.  The practice ***has not*** been to provide a two-month lump sum deposit on the basis of RCM's prepared 13-week cash flow forecast.

## Credit Receivables Arrangements

41.     In early 2022, to address liquidity concerns relating to the over budget return to service project, the beneficial owners of Pennantia agreed to, in effect, provide incremental funding to the enterprise in the amount of approximately $12.5 million, with both CCM and RCM agreeing to a credit receivables purchase arrangement in the principal amounts of $6.5 million (the "CCM Credit Receivables") and $5.5 million, respectively (the "DC Credit Receivables") (collectively, the "Credit Receivables").

42.     The parties agreed that the Credit Receivables would not be treated as currently due or owing, and that repayment would be deferred until either sufficient operating revenue became available after current expenses, or in connection with the sale of Vessels.  A written agreement between DC and Pennantia, dated March 31, 2024, signed by Alex J. Parker on behalf of DC, sets forth the terms of interest accrual on the DC Credit Receivables (described in the agreement by DC as "vendor financing," then listed as $4.9 million), representing that "Pennantia . . . has not

been charged any financing charge or interest," and agreeing that "on April 1, 2024, Dove Cay will begin charging" interest "at a rate of 1% per month."

43.     Since the inception of the Credit Receivables, none of the parties to the Credit Receivables ever treated either the CCM or the DC Credit Receivables' balances as currently due or owing expenses, or operating disbursements, until late November/early December 2024 when RCM, for the first time, unilaterally added a new operating disbursement line item for "Dove Cay Payables," in the amount of $9,489,869 in RCM's 13-week cash flow forecast.

44.     The "Dove Cay Payables" amount asserted by RCM was comprised of a then $5.5 million stated principal balance of the DC Credit Receivables and RCM's erroneous calculation of interest at a rate of 3% per month, as opposed to the 1% per month interest rate agreed to by the parties in writing.

45.     On or about February 11, 2025, Pennantia's auditor calculated the balance and accrued interest based on the interest rate reflected in DC's agreement as $6,082,126.  On March 7, 2025, Pennantia made a good faith payment on this debt in the amount of $608,769.

46.     Pennantia promptly contested, and has continued to contest, the assertion that the DC Credit Receivables is currently due and owing, and the inflated calculation of interest accrual.

### RCM's Wrongful Obstruction of the Marketing and Sale of the Vessels

47.     Meanwhile, in approximately March 2024, Pennantia engaged an investment banker to market the sale of Pennantia.

48.     In autumn 2024, shortly before RCM unilaterally altered the arrangements of the Credit Receivables, Pennantia identified three potential bidders (the "Bidders") interested in purchasing portions of the Pennantia Fleet.

49.     As part of engaging in negotiations related to the purchase of the Vessels, each of these Bidders requested access to the relevant Vessels as well as the Vessels' documents.

50.     Throughout the winter of 2024-2025, RCM repeatedly rejected Pennantia's and the Bidders' requests to allow representatives from Pennantia and/or the Bidders onto the Vessels of the Pennantia Fleet, citing a variety of pretextual disputes running the gamut from safety concerns, to fear of the visitors poaching crew members, to fear that the visitors merely wanted to inspect Pennantia's assets.

51.     RCM similarly limited Pennantia's and the Bidders' access to documents required to assess the value of the Vessels and other aspects necessary to pursue offers and/or purchase agreements.

52.     Over the last few months of 2024, it became clear that RCM did not have Pennantia's – or the Pennantia Fleet's – best interests at heart, engaging in a pattern of misconduct aimed at interfering with Pennantia's potential sale:

   a.   RCM refused to allow a Bidder access to the Vessels to survey and inspect Vessels of interest;

   b.   RCM stonewalled Pennantia's efforts to obtain information to allow Bidders to conduct due diligence; and

   c.   Despite Pennantia having a ready, willing, and able buyer for some of the Vessels, RCM provided endless excuses as to why it could not respond to the diligence requests, citing vacation schedules, limitations on staff, confidentiality, trade secrecy, and the demand that they will keep access to the Vessels' information hostage until the deferred DC invoices (in other words, its subsidiary's invoices) were paid.

53.     RCM's misconduct became more egregious in the new year.  Beginning in January 2025, RCM repeatedly violated its obligations under the Ship Management Agreement with respect to allowing Pennantia access to Pennantia's own Vessels and providing documentation regarding the Vessels in response to Pennantia's repeated requests, in each case raising the alleged monies owed to DC.

54.     To wit, in February 2025, in response to a lender asking if RCM intended to hold in requested information "hostage" until RCM was paid greatly inflated financial demands, RCM responded, "you can call it what you want, we will not provide information until we get paid."

55.     Shortly thereafter, RCM revealed an ulterior motive behind its misconduct and improper withholding of Pennantia's assets and documents:  RCM had been separately negotiating with third-parties for RCM to purchase the Pennantia Fleet.

56.     RCM has no authority – under the Ship Management Agreement or otherwise – to sell Pennantia or any assets of Pennantia.

57.     RCM's past and continued refusal to provide access to the Vessels and the Vessels' documents hindered (and continues to hinder) Pennantia from advancing its negotiations to sell the Vessels.

58.     Based on information and belief, RCM's past and continued refusal to provide access to the Vessels and the Vessels' documents was intended (and is intended) to facilitate RCM's negotiation of its own, unauthorized, proposed purchase or other schemes to ultimately obtain title to the Pennantia Vessels.

## Pennantia's Admiralty Rule D Vessel Arrest Actions

59.     In a last-ditch effort to access its own Vessels in the face of RCM's continued refusal to allow Pennantia and the Bidders access, Pennantia (and the respective subsidiary owners of six of the Vessels in the Pennantia Fleet) commenced a proceeding on March 26, 2025, in the United States District Court for the Eastern District of New York titled *Pennantia, LLC et al. v. Tank Barge RCM 252 (Official #1292046) et al., Case No. 25-CV-01711 (OEM) (MMH)* (the "New York Vessel Arrest Action")[2], in which the plaintiffs requested the arrest of certain Vessels[3] pursuant to Rule D of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure.

60.     Pennantia sought to arrest its own Vessels so that it could exercise its rightful access to those Vessels for their inspection as well as to obtain vessel documentation for the purposes of marketing the Vessels.

61.     On May 1, 2025, the U.S. Marshals Service effected arrest of the *Tug JORDAN ROSE* and the *Tank Barge RCM 250* pursuant to the New York Arrest Action.[4]

62.     During the arrest of the *Tug JORDAN ROSE* and the *Tank Barge RCM 250*, RCM's employees on board these vessels were non-cooperative to the point of requiring intervention by the Deputy U.S. Marshal in charge of the arrest operation to avoid a potential breach of the peace.

63.     Once RCM learned of the arrest of the *Tug JORDAN ROSE* and the *Tank Barge RCM 250*, the *Tug SUSAN ROSE* and the *Tank Barge RCM 252* departed their berths and sailed

---

[2] The New York Vessel Arrest Action was filed under seal—including the court temporarily withholding the very existence of the lawsuit from the court's ECF docket—so as to avoid publicizing the dispute between Pennantia and RCM, which dispute could serve to potentially deter interested purchasers of the Vessels and which would certainly draw intense media scrutiny.

[3] The New York Vessel Arrest Action requested the arrest of the *Tank Barge RCM 250*, the *Tank Barge RCM 252*, the *Tank Barge RCM 260*, the *Tank Barge RCM 262*, the *Tug JORDAN ROSE*, and the *Tug SUSAN ROSE*.

[4] In an effort to cooperate with RCM, Pennantia recently released those vessels from custody, but RCM immediately increased its truculent behavior shortly after the departure of the substitute custodian from the arrested vessels.

into New York harbor, where, according to the *Tug SUSAN ROSE*'s vessel AIS reports, the vessels merely circled within the harbor without a destination. Upon information and belief, RCM directed the *Tug SUSAN ROSE* and the *Tank Barge RCM 252* to depart their berths in order to evade arrest by the U.S. Marshal and to thwart the plaintiffs' efforts to carry out the inspections and document procurement efforts that are their right as the owners of those vessels.

64. Due to RCM's continued failure to allow inspection of the above named vessels, on May 7, 2025, Pennantia and the respective owners of six other vessels in the Pennantia Fleet were forced to commence a second proceeding in the United States District Court for the Southern District of Texas titled *Pennantia, LLC et al. v. Tank Barge RCM 270 (Official #1257373) et al., Case No. 25-CV-00137* (the "Texas Vessel Arrest Action")[5], in which the plaintiffs requested the arrest of six additional vessels in the Pennantia Fleet.[6] Pennantia sought similar relief in the Texas Vessel Arrest Action as it sought in the New York Vessel Arrest Action.

65. As a result of Pennantia's having commenced the aforementioned arrest actions, RCM conceded to inspection surveys on the Vessels by an independent marine surveyor, but RCM continued to obstruct the process by demanding onerous and unnecessary restrictions on access, the identity of who could access the Vessels, refusing to permit surveyors to discuss vessel condition matters with on-board crew, and with respect to the documentation sought by Pennantia, providing copies of some, but not all, of the Vessels' documentation.

66. Further, after agreeing to RCM's request to release the *Tug JORDAN ROSE* and the *Tank Barge RCM 250* from custody in an effort to cooperate with RCM's request to move the

---

[5] Pennantia and its co-plaintiffs in the Texas Vessel Arrest Actions sought to commence that proceeding under seal for the same reasons discussed above pertaining to the New York Vessel Arrest Action. Due the exigent and grave circumstances Pennantia is now facing, despite the risks of commercial and transactional harm, Pennantia has had to forgo a similar sealing order in this proceeding.

[6] The Texas Vessel Arrest Action requested the arrest of the vessels the *Tank Barge RCM 270*, *Tug LYNNE ROSE*, *Tank Barge RCM 245*, *Tug REBEKAH ROSE*, *Tank Barge RCM 225*, and *Tug ANNA ROSE*.

Vessels, RCM almost immediately recommenced refusing to provide critical Vessel information to Pennantia, including refusing reasonable requests to provide preliminary information on the scope of a fire that then occurred in the engine room of the *Tug JORDAN ROSE* until completion of a formal surveyor's report on the fire. Based on the date of the surveyor's report that ultimately was conveyed to Pennantia, RCM apparently withheld the surveyor's report regarding the *Tug JORDON ROSE* fire for two weeks before finally sending to Pennantia.

67. RCM also recommenced refusing to provide access to the Vessels for requested inspections, including requests to schedule limited inspections on certain Vessels necessary for the contemplated sale of the Vessels, pending since July 1, 2025, which despite repeated requests and providing specific proposed dates and providing information requested by RCM (which is not required for access to Vessels for inspection under the Management Agreement), RCM has to date refused to confirm any of the requested inspections as of the date of this Complaint.

### DC's Notice of Claims of Liens

68. Several months following, and likely as retaliation against, the New York and Texas Vessel Arrest Actions, on July 8, 2025, counsel for DC provided notice to Pennantia and others that DC had filed Notices of Claims of Maritime Liens pursuant to 46 U.S.C. § 31343(a) and 46 C.F.R. § 67.250 against all 18 Vessels in the Pennantia Fleet ("DC Notices of Claims of Liens").

69. The DC Notices of Claims of Liens were dated July 4, 2025, and recorded with the NVDC on July 7, 2025. A true and correct copy of the DC Notices of Claims of Liens is attached hereto as Exhibit 2.

70. The claimed value and reason as stated on the notices is as follows:

| Alleged DC Maritime Liens | | | |
|---|---|---|---|
| **VESSEL** | **Official No.** | **Reason** | **Amount** |
| ANNA ROSE | 1139762 | Crew wages and necessaries | $2,407,166.09 |
| CINDY ROSE | 1086926 | Necessaries | $327,347.12 |
| JESSE ROSE | 1154328 | Necessaries | $347,311.88 |
| RCM 295 | 955449 | Crew wages and necessaries | $490,956.82 |
| JOAN ROSE | 955450 | Necessaries | $327,173.76 |
| JORDAN ROSE | 1234828 | Crew wages and necessaries | $2,135,023.94 |
| RCM 260 | 1210060 | Crew wages and necessaries | $1,502,038.05 |
| LYNNE M. ROSE | 1257372 | Crew wages and necessaries | $3,220,752.29 |
| RCM 210 | 1037844 | Necessaries | $416,970.06 |
| RCM 245 | 1050073 | Crew wages and necessaries | $3,701,433.44 |
| RCM 225 | 1139764 | Crew wages and necessaries | $2,184,379.02 |
| RCM 242 | 1154327 | Necessaries | $470,030.04 |
| RCM 250 | 1235496 | Crew wages and necessaries | $1,252,356.96 |
| RCM 252 | 1292046 | Crew wages and necessaries | $1,169,457.61 |
| RCM 262 | 1216336 | Crew wages and necessaries | $2,116,933.57 |
| RCM 270 | 1257373 | Crew wages and necessaries | $1,358,858.52 |
| REBEKAH ROSE | 1053010 | Crew wages and necessaries | $3,871,077.31 |
| SUSAN ROSE | 1282121 | Crew wages and necessaries | $2,110,676.52 |

71.     The total value of these liens amounts to $29,409,943.

72.     Each of the notices includes a declaration attesting to the truth and accuracy of claimed maritime liens, signed by Alex J. Parker, as Authorized Signatory for DC.

73.     Following further communications with DC's counsel, DC's counsel provided invoices purporting to support the DC Notices of Claims of Liens by email on July 13, 2025.  True and correct copies of DC's invoices purporting to support the DC Notices of Claims of Liens are attached hereto as Exhibit 3.

74.     More than half of the aggregate claims ($16,405,586) are described as "Annual Technical Management Services & Necessaries," and are comprised of purported (1) "technical management services" fees from DC to Pennantia, and (2) a 10% "cost plus" markup for "necessaries."

75.     DC has no contractual basis to charge or invoice Pennantia, and for which Pennantia was never previously charged, for the additional management fee or the 10% markups. Indeed, as noted above, markups are expressly prohibited under the Ship Management Agreement.

76.     The remainder of the aggregate claimed maritime liens are for inflated amounts not due and owing based on the DC Credit Receivables, which, as invoiced, appear to be stated as $4,891,231 and asserted interest on that principal of $8,113,125.

77.     Even if the charges claimed on the notices were legitimate or actually due and payable, which they are not, they do not constitute cognizable maritime liens.  Specifically, management fees and "cost plus" markups to a vessel manager, regardless of whether they are legitimate contractual obligations (which they are not), do not give rise to maritime liens for crew wages or necessaries.

78.     Furthermore, the actual "expenses" reported in the line items as "necessaires" appear to have all been paid (and indeed, the invoices are not claiming that the underlying "expenses" line item amounts are due or unpaid).

79.     Moreover, for the vast majority of the underlying expenses, DC is not even the named party on the invoices from the underlying vendors.

80.     Pennantia is further unaware of any unpaid crew wages or necessaries supplied to the Vessels.

81.     Pennantia did not authorize RCM or DC to charge a second fixed management fee or a 10% markup on the purchase of necessaries paid or remining unpaid for any of the Vessels against which DC issued a notice of claim of maritime lien.

82.     On information and belief, the only unpaid sums that Pennantia owes to Defendants – in any manner whatsoever – are in connection with the unmatured debt reflected in the DC Credit Receivables arrangement, which is ***not*** a basis for a maritime lien.

83.     Furthermore, RCM is an equity holder in Pennantia and therefore has ownership interests in the Vessels.

84.     As such, RCM and DC are, upon information and belief, common controlled entities with an interest in the Vessels and, are therefore unable to place a maritime lien on the Vessels.

### The July 14 Demand Letter and Stop Work Order Threat

85.     On July 14, 2025, at 4:20 p.m. EDT, counsel for RCM delivered to counsel for Pennantia a letter purporting to give notice and demanding, among other things, that:

(a) RCM's affiliate and/or subcontractor and/or alter ego DC (which RCM has described as RCM's "special crewing agent") has filed notices of claims of purported maritime liens against all of the Vessels in the Pennantia Fleet in the aggregate amount "in excess of $29 million" (referring to the DC Notice of Claims of Liens);

(b) RCM claims that the Vessel Operating Account under the Ship Management Agreement is underfunded, claiming current account funding "is approximately $7,230" and that the account funding should be "in excess of $14 million per Pennantia's independent auditor" on February 11, 2025;

(c) "RCM demands payment of all amounts due to the various vendors and that the Vessel Operating Account is fully funded in accordance with the previously provided budget by Friday, July 18, 2025"; and

(d) If Pennantia does not comply with RCM's payment and account funding demands, that RCM would "order the crews of the [Pennantia] vessels stop work." (the "Stop Work Letter").  The Stop Work Letter is attached hereto as Exhibit 4.

86.     Counsel for Pennantia responded on July 15, 2025, contesting the demands and basis for the threat to stop work and demanding adequate assurances from RCM by 5:00 p.m. EDT on July 16, 2025 that RCM will comply with the Ship Management Agreement, rescind its baseless

demands, and confirm that RCM would not order the crew of the Vessels to stop work (the "Adequate Assurance Demand"). The Adequate Assurance Demand is attached hereto as Exhibit 5.

87. RCM did not provide such assurances in the time provided, and indeed, did not reply to the Adequate Assurance Demand letter at all.

88. In reality, the balances of the Vessel Operating Account cited by RCM in the Stop Work Letter were manipulated to create the appearance of a lack of funding.

89. As a result, the Stop Work Letter's assertions that "lack of funding jeopardizes the safety to the vessels, environment and, most importantly, the seafarers," which is in turn the basis for RCM's threat to stop work, are fabricated.

90. RCM directly controls the payments and timing of payments out of the Vessel Operating Account and should have full knowledge of the actual figures.

91. With respect to the assertion in the Stop Work Letter that the balance on July 14, 2025, was "approximately $7,230" when the letter was sent, the letter omitted that a payment to the account earlier that day of $350,000, such that the actual balance of the Vessel Operating Account at the time the Stop Work Letter was sent approximately $357,000, and the actual balance of the Revenue Account was approximately $245,000, in total approximately $600,000.

92. The true balance of the Vessel Operating Account on July 14, 2025 should have been in excess of $2.6 million.

93. However, on July 11, 2025, RCM directed a payment of $2.3 million to DC two weeks early. The typical monthly payments to DC are made towards the end of each month, and specifically, the last weekly 13-week cash flow forecast that Pennantia received from RCM, on

June 23, 2025, shows that payment was scheduled to go out the week of July 28, 2025, consistent with past practice.

94.    Yet RCM made that payment on July 11, 2025, apparently in an effort to manufacture the purported liquidity crisis asserted in the Stop Work Letter.  In further financial manipulation, RCM moved the July 14, 2025 $350,000 deposit out of the operating account the following day, presumably to maintain the artificially low balance in the Vessel Operating Account.

95.    Furthermore, RCM's claim that the operating account balances should be "in excess of $14 million per independent auditor" calculation on February 11, 2025 is fabricated.

96.    The stated $14 million funding figure referred to on February 11, 2025 is based on the DC Credit Receivables listed by RCM in its 13-week cash flow forecast from RCM, dated February 11, 2025.  That forecast is not current, and the calculation from the auditor on February 11, 2025 reported the Operating Disbursement line item in the amount of $6,082,126, not $14 million.

97.    Moreover, the $14 million funding demand is also premised on RCM's erroneous demands for lump sum advance funding of 60 days of cash flow estimates based on RCM's 13-week cash flow forecast, which (i) included the asserted balance of the DC Credit Receivable, and (ii) understated the available funds in the Vessel Operating Account and Revenue Account.

98.    As stated above, the demand 60 days of lump sum advance funding is also not consistent with the agreed course of conduct of the parties under the Ship Management Agreement to provide sufficient funds to pay estimated expenses on a rolling basis when due.

99.    With respect to funding requirements today, RCM has not provided a cash flow forecast since June 23, 2025, which is currently three weeks out of date.  Without a current and

accurate cash flow forecast there is no basis for RCM to demand specific amounts of advance Vessel Operating Account funding levels from Pennantia.

100.    With respect to the all of amounts claimed in the Stop Work Letter, there are no amounts due under the Agreement.

101.    Of the amounts claimed as due and owing to DC, $16,405,586 of the invoices— described as "Annual Technical Management Services & Necessaries"–are comprised of purported (1) "technical management services" fees from DC to Pennantia, and (2) a 10% "cost plus" markups for "necessaries" from DC to Pennantia.

102.    There is no contractual or other basis for DC to invoice Pennantia for either "technical management services" or a 10% markup on expenses Pennantia previously paid other vendors since 2022.  Indeed, the Agreement specifically provides that "[Pennantia] shall reimburse [RCM], on a ***direct pass-through basis***, and ***without markup***, for the ***actual direct expenses incurred by [RCM] for performance of the Crewing and Technical Management Services provided for the Vessels*** . . ." (emphasis added).

103.    Pennantia had never previously seen the charges or the invoices before counsel for DC provided them after giving notice to Pennantia of the filing of DC Notices of Claims of Liens.

104.    The underlying invoices, upon information and belief, appear to have been generated for the purpose of filing the DC Notices of Claims of Liens.

105.    Although the invoices purport that charges have been due and owing going back to 2022, and state "Invoice Dates" and "Due Dates" of 12/31/2022, 12/31/2023 and 12/31/2024, those invoices were never presented on those dates.

106.    DC, for its part, never charged Pennantia for the "technical management services" fees or 10% markups, nor did Pennantia agree to any such charges.  Furthermore, as the quoted

language above makes clear, no mark-ups for the charges now claimed were authorized under the Agreement – only actual direct expenses, which all were paid to the underlying vendors.

107. The balance of the amount claimed in the DC Notices of Claims of Liens, $13,004,356, relates to the (i) the DC Credit Receivables, in a principal amount that was originally $5.5 million, and as now invoiced appears to be stated as $4,891,231 and (ii) asserted interest on that principal of $8,113,125.

108. As stated above, the DC Credit Receivables principal is not currently due and payable, rather, the principal was to be paid either if sufficient operating revenue became available after current expenses, or in connection with the sale of Vessels, and the accrued interest, which is also not currently due and payable, is not $8,113,125.

### DC's Allegations of Arrangements or Agreements with or Authorized by RCM in Breach of the Ship Management Agreement

109. In the meantime, on July 15, 2025, counsel for Pennantia challenged the veracity of the DC Claims of Liens by writing DC's counsel.

110. On July 16, 2025, counsel for DC responded to Pennantia counsel, claiming in relevant part that DC had been directed by RCM, purportedly under the authority of RCM as Manager, to provide crewing and technical management services on terms and conditions that allegedly permitted DC to charge an additional management fee and a 10% markup on all RCM reimbursements paid by Pennantia.

111. RCM did not have authority under the Ship Management Agreement to agree to financial obligations and terms in breach of the Ship Management Agreement.

112. DC had actual knowledge of the terms of the Ship Management Agreement, because Alex J. Parker is the principal of both RCM and DC, and therefore DC has actual knowledge that RCM did not have authority to bind Pennantia as its agent.

## COUNT I:  BREACH OF CONTRACT

### Imminent Stop Work Order and Anticipatory Repudiation

113.     Pennantia repeats and realleges Paragraphs 1 thorough 112 as if set forth fully herein.

114.     The Ship Management Agreement is a valid maritime contract between Plaintiff Pennantia and Defendant RCM.

115.     The Ship Management Agreement requires, amongst other things, that RCM provide crew management, technical management, and commercial management for Pennantia, which among other things, includes that "[t]he Managers shall provide suitably qualified Crew" to operate the Vessels, Ex. 1, Part II, Clause 5(a); "[a]rranging for other provisions or services pertaining to the Vessel or Vessel operations as requested by Owners," *id*. Clause 4(j); providing commercial management "in accordance with the Owners' Instructions," *id*. Clause 6(a); and that overall, RCM "shall carry out the Management Services in respect of the Vessel as agents for and on behalf of the Owners," *id*. Clause 3.

116.     The Ship Management Agreement does not permit RCM to unilaterally order the crew to stop work, and even if RCM's asserted bases for doing so in the Stop Work Letter were substantiated, which they are not, if they constituted an Owner's Default under Clause 22 of the Ship Management Agreement, RCM's remedy would be to terminate the Ship Management Agreement or file suit alleging breach, neither of which RCM has done.

117.     Pennantia promptly responded in detail to RCM's Stop Work Letter, explaining in detail the reasons why RCM's claims and demands were improper and unfounded, including but not limited to, RCM's manipulations of the operating account to fabricate the appearance of a depleted Vessel Operating Account balance of $7,230 instead of over $2.6 million in funding from

Pennantia that should have at that time been available, which is specifically addressed in Count IV herein. *See* Ex. 5 (Adequate Assurances Demand) attached hereto.

118. Pennantia advised RCM that its manipulation of the Vessel Operating Account and underfunding claims; RCM's threat to order the crews of the Pennantia Vessels to stop work; RCM's demand that Pennantia pay over $29 million in changes either never owed or not currently due; RCM's refusal to provide all documentation, information and records regarding the Vessels as requested; and RCM's refusal to provide Pennantia access to its Vessels, caused Pennantia serious concerns whether RCM will continue to perform under the Ship Management Agreement going forward, and that its actions and threats were tantamount to an anticipatory repudiation of the Ship Management Agreement, and therefore Pennantia formally requested that RCM provide Pennantia adequate assurance by 5:00 PM EDT the following day, July 16, 2025, that RCM would continue to perform its obligations  in compliance the terms of the Ship Management Agreement. *Id*.

119. Pennantia's specific requests for adequate assurances included that RCM confirm that it: "will not 'order the crews of the [Pennantia] vessels stop work' on Friday, July 18, 2025; withdraw its related demands for reimbursements or funding of amounts allegedly due;  withdraw its improper demand for in excess of $14 million in advance Vessel Operating Account funding; and confirm that it will provide access to the Vessels for inspections, and remaining Vessel documentation, as requested by Pennantia. *Id*.

120. RCM did not provide any assurances in response to Pennantia's Adequate Assurance Demand, and indeed to date RCM has not responded to the letter at all.

121. As a result, Pennantia has even greater concerns that RCM indeed does not intend to continue to perform its obligations under the Ship Management Agreement and that RCM's

stated intentions and failure to provide adequate assurances constitutes an anticipatory repudiation of the Ship Management Agreement.

122.    Moreover, RCM's threatened actions would not only further breach the Ship Management Agreement, but Pennantia is gravely concerned that ordering the Vessels' crews to stop work would in effect constitute abandoning the Vessels, and expose the vessels, waterways of the United States and the environment, to imminent and substantial danger, as well as functionally further obstruct meaning full access to and inspection of the Vessels without on-board crew to operate the Vessels and their equipment.

123.    Therefore, Pennantia requests that the Court find that Pennantia's threatened actions and failure to provide adequate assurance of continued performance constitutes an anticipatory repudiation of the Ship Management Agreement, breach of the Ship Management Agreement, and order RCM to cease and desist from continuing, and from taking, such actions in breach of its obligations.

## COUNT II:  BREACH OF CONTRACT

### Filings of Notices of Claims of Liens Alleging Maritime Liens Against Vessels Arising from Breach of Manager's Contractual Obligations

124.    Pennantia repeats and realleges Paragraphs 1 thorough 123 as if set forth fully herein.

125.    Pursuant to Clause 4 (Technical Management) of the Ship Management Agreement, RCM is obligated to provide personnel to supervise maintenance of the Vessels, arrange for maintenance and repair of the Vessels, procure materials and parts, supplies, fuel, etc. for the Vessels, *see e.g.,* Ex. 1, Part II, Clause 4, and pursuant to Clause 5 (Crew Management), RCM is required to provide crew for the Vessels, *id*. Clause 5.

126.    Pursuant to Clause 16, RCM is not permitted to sub-contract the management services without the written consent of Pennantia, and even if consented, RCM remains obligated to the terms and conditions of the Ship Management Agreement.  Ex. 1, Part II, Clause 16 ("Managers' Right to Sub-Contract").

127.    The Ship Management Agreement specifically provides that "[Pennantia] shall reimburse [RCM], ***on a <u>direct pass-through basi</u>s, and without markup, for the <u>actual direct</u> <u>expenses</u>*** incurred by [RCM] for performance of the Crewing and Technical Management Services provided for the Vessels . . ." Ex. 1, Annex "C," Clause (a) (emphasis added).

128.    Annex "C" also requires that RCM provide reasonably prompt notice of, among other things, any "claims of liens."  *Id*. Annex "C" (Budget), Clause (l).

129.    The DC Notices of Claims of Liens in the total aggregate amount of $29,409,945 include $16,405,586 in charges that are described in the subject lines of the purported underlying invoices from DC as "Annual Technical Management Services & Necessaries," for purported "technical management services" fees from DC to Pennantia, and a 10% "cost plus" markup for "necessaries."

130.    Pennantia does not have any management agreement with DC for management services to the Vessels.

131.    Upon information and belief, and based on the representation of DC's counsel, DC's management services, and the contested charges, were provided at the direction of RCM under its purported authority as manager of the Vessels under the Ship Management Agreement.

132.    Pennantia never consented to RCM sub-contracting management services to DC, and upon information and belief, DC performed management services for RCM, which RCM

described as its "special crewing agent," but in reality was RCM's alter ego with no true separate corporate financial or managerial independence.

133. Pennantia specifically requested from RCM in December 2024, pursuant to its rights under the Ship Management Agreement, of any records of arrangements or agreement relating to DC's provision of services relating to the Vessels, and none were provided by RCM and to date none have been provided.

134. The invoices for the contested charges were never provided to Pennantia until after the filing of the Notice of Claims of Liens, and upon information and belief, were recently created with false "Invoice Dates" going back three years to 2022.

135. To the extent that Pennantia consented via performance of DC's services to RCM, Pennantia never consented to or agreed to the alleged financial terms that would provide a second management fee for the same services RCM receives the management fees in the Ship Management Agreement, Ex. 1, Annex "E," or the 10% cost markups.

136. RCM did not have authority to act as agent for Pennantia to agree on behalf of Pennantia to financial terms for an additional administrative management fees and 10% cost markups, which are expressly prohibited and would breach the Ship Management Agreement.

137. DC had actual or constructive knowledge of the lack of RCM's authority to agree to such financial terms at a minimum because Alex J. Parker, who acted as principal for both RCM and DC, had actual knowledge of the Ship Management Agreement provisions.

138. If, as alleged by DC, RCM arranged or agreed to DC's contested charges, if the charges were legitimate, the assessment of the charges on Pennantia and/or as claims against the Vessels, would be the direct result of RCM's breach of the Ship Management Agreement.

139.     As also described below, the remainder of the aggregate claimed maritime liens is for inflated amounts not due and owing based on the DC Credit Receivables, which as invoiced appears to be stated as $4,891,231 and asserted interest on that principal of $8,113,125.

140.     As set forth in the allegations above, the DC Credit Receivables are not currently due and owing, nor is accruing interest currently due and owing, and the amount of accrued interest claimed in the Notices of Claims of Liens is materially overstated.

141.     RCM had actual or constructive knowledge that none of the DC Notices of Claims of Liens represent legitimate maritime lien claims, at a minimum because the principal of RCM, Alex J. Parker, is the also the declarant on behalf of DC for each of the DC Notice of Claims of Liens.

142.     Therefore, Pennantia requests that this Court find that RCM has breached and remains in breach of the Ship Management Agreement by permitting, or suffering to permit, its "special crewing agent's" filing of the DC Notices of Claims of Liens.

## COUNT III:  BREACH OF CONTRACT

### Preventing Access to Vessels for Inspections and Access to Books, Records, and Vessel Information and Frustration of Pennantia's Rightful Pursuit of Sale of Vessels

143.     Pennantia repeats and realleges Paragraphs 1 thorough 142 as if set forth fully herein.

144.     As alleged above, the Ship Management Agreement expressly requires RCM to keep and provide access to books and records of its performance of the Ship Management Agreement, of the Vessels, and to provide access to the Vessels for inspection for any reason.

145.     As alleged above, RCM has reportedly engaged in a pattern of obstruction, preventing Pennantia access to the Vessels, Vessel documents and Vessel and management

information pursuant to Pennantia's reasonable requests, all of which it is required to provide pursuant to the Ship Management Agreement.

146.    As a result of RCM  obstruction, Pennanatia was compelled to institute the Rule D actions to compel RCM to provide access to the Vessels.

147.    Despite some cooperation resulting from the Rule D actions, RCM has reverted to obstruction, is currently refusing reasonable inspection requests now pending since July 1, 2025, and outstanding Vessel information requests pending for many months, and as alleged above, RCM and DC have now dramatically escalated efforts to obstruct the sale of the Vessels.

148.    RCM's obstruction is a material impediment to the contemplated sale of the Vessels, in particular, preventing Pennantia from accommodating specific diligence requests from a potential, and otherwise likely, purchaser.

149.    A this juncture, it is very foreseeable that continued obstruction may result in loss of the contemplated sale, and other damages.

150.    Therefore, Pennantia requests that the Court find that foregoing actions and inactions are breaches of the Ship Management Agreement, order RCM to cease and desist in their breach of the Ship Management Agreement, order RCM to produce the records demanded without further obstruction, and order such other and further relief that may be just and appropriate in the premises.

## COUNT IV:  BREACH OF CONTRACT

**Intentional Account Manipulation and Improper Advance Funding Demand of $14 million**

151.    Pennantia repeats and realleges Paragraphs 1 thorough 150 as if set forth fully herein.

152.    The principal basis for the threat to order the Vessels' crews to stop work in the Stop Work Letter is RCM's assertion that there are insufficient funds to safely operate the Vessels, because (i) RCM claimed that the Vessel Operating Account, which RCM controls, is nearly depleted, and (ii) that $14 million in advance funding is required from Pennantia for the Vessel Operating Account by Friday, July 18, 2025.

153.    As alleged above, RCM manipulated the Vessel Operating Account to create the appearance of a funding crisis that did not, and does not, exist.

154.    Instead of a balance of $7,230, the Vessel Operating Account should have had a balance in excess of  $2.6 million, which, based on belief and reasonable suspicion, was the result of intentional and improper manipulations of the Vessel Operating Account funds by RCM.

155.    There are sufficient funds available for legitimate current disbursements and Pennantia has continued, and will continue, to fund the Vessel Operating Account consistent with past practice to ensure the continued safe operations of the Vessels.

156.    As alleged above, RCM's related demand for $14 million in advance-lump sum funding for the Vessel Operating Account is a figure not based on the express funding mechanics and formula for funding in the Ship Management Agreement, which RCM never complied with, the calculation based on an RCM 13-week cash flow forecast from February 2025 included the entire DC Credit Receivables contested principal and interest accrual, which is not currently due,

as an operating expense line item to be paid in full, and under-stated the then current balances of the Vessel Operating and Revenue Accounts.

157.     Even if the February 2025 forecast was accurate, the actual funding practice is not, and has never been, for Pennantia to advance fund a lump sum amount of 60-days of expenses on the basis of RCM's unilateral 13-week cash flow forecast.

158.     The 13-week cash flow forecast is used by Pennantia to estimate expected and scheduled outflows on a weekly basis to enable Pennantia to periodically deposit funds to cover the legitimate expected expenses as they become due.  There is no reason or legitimate basis for RCM to need $14 million on hand to ensure the safe operation of the Vessels.

159.     The only current problems with the actual process of funding the Vessel Operating Account are being caused by RCM: (i) RCM's manipulation of the account funds as alleged above, and upon information and belief, other misconduct, including reimbursement of itself and/or DC for expenses not permitted under the Ship Management Agreement that are suspected and would be revealed in discovery; and (ii) RCM's failure to provide an updated weekly 13-week cash flow forecast since June 25, 2025, now three weeks out of date, the absence of which increasingly makes it more difficult for Pennantia to ensure timely deposits of sufficient funds for scheduled and expected disbursements.

160.     Therefore, Pennantia respectfully requests that the Court find the foregoing actions and inactions to be in breach of the Ship Management Agreement and further request that this court order Defendants to immediately cease and desist all aforementioned actions and inactions in breach of the Ship Management Agreement, including ceasing its demands for $14 million or other lump-sum advance deposits, and provide a current and accurate 13 week cash flow forecast.

## COUNT V:  DECLARATORY JUDGMENT

161.     Pennantia repeats and realleges Paragraphs 1 thorough 160 as if set forth fully herein.

162.     Defendant DC filed the DC Notices of Claims of Liens, which were recorded by the U.S. Coast Guard – National Vessel Documentation Center on July 7, 2025, asserting the existence of maritime liens against all of the Pennantia Fleet Vessels in an aggregate amount in excess of $29.4 million.

163.     Counsel for DC provided the invoices purporting to support the maritime lien claims against the Vessels by email on July 13, 2025.

164.     None of the asserted expenses and charges constitute valid maritime liens against the Vessels for the multiple reasons set forth and alleged above.

165.     Even if any of the claimed charges were legitimate and currently due and owing, they would still not constitute cognizable maritime liens because: they are contractual management fees, not crew wages or expenses for necessaries; upon information and belief, all crew wages and necessaries that are currently payable and not overdue have been paid; it is apparent that neither RCM nor DC relied on the credit of any Vessel in connection with the provision of the claimed expenses; both RCM and DC had actual or constructive knowledge that Pennantia did not authorize the charges claimed as maritime liens, and DC had actual or constructive knowledge that RCM lacked the authority of the owner to authorize the charges claimed as maritime liens; and because, through the Ship Management Agreement, RCM acquired beneficial ownership interests in Pennnatia, RCM cannot maintain a maritime lien on the Vessels, and upon information and belief, DC is in common ownership and control of RCM, DC is in effect an alto ego of RCM and should be similarly prevented from maintaining liens on the Vessels.

166.     Pennantia seeks a declaration from this Court pursuant to 46 U.S.C § 31343(c)(2) that the maritime liens asserted against the Vessels subject to the jurisdiction of this court are invalid and that the Vessels are not subject to the asserted lien claims, an order directing Defendant DC to withdraw or discharge the DC Notices of Claims of Liens from the title of the Vessels with the NVDC, and for prevailing party attorney's fees, as provided in 46 U.S.C. § 31343(c)(2).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays:

1.      That process and due form of law according to the practices of this Court in admiralty and maritime jurisdiction be issued against the Defendants;

2.      That this Court declare that Defendant RCM's actions constitute an anticipatory repudiation of the Ship Management Agreement and that the stop work order constitutes a breach of the Ship Management Agreement, and enjoin Defendant RCM from issuing the stop work order;

3.      That this Court order Defendants to allow Pennantia and its representatives, including the Bidders and any other party authorized by Pennantia, full and unencumbered access to the Vessels;

4.      That this Court declare pursuant to 46 U.S.C. § 31343(c)(2) that the DC Notices of Claims of Liens filed of record against the Vessels subject to the jurisdiction of this court, the *ANNA ROSE*, *LYNNE ROSE*, *JORDAN ROSE*, *REBEKAH ROSE*, *SUSAN ROSE*, *CINDY ROSE*, *JESSE ROSE*, and *JOAN ROSE* and the tank barges *RCM 210*, *RCM 225*, *RCM 242*, *RCM 245*, *RCM 250*, *RCM 252*, *RCM 260*, *RCM 262*, *RCM 270*, and *RCM 295*, are void, invalid, and of no effect, and order the removal of the encumbrance from the record of the National Vessel Documentation Center;

5. In the alternative, declare that the total value of $29,409,943 asserted by the Notices of Claims of Liens filed of record against all the Vessels is unsupported by facts or record and that the total amount asserted by the notices of claim of maritime liens against all Vessels cannot exceed $6,082,126 (adjusted for any payments made and the 1% monthly interest added), the only overdue amount of any kind asserted by Defendants that could possibly be a basis for a maritime lien;

6. That this Court declare that Defendant RCM's permission, engagement, action or failure to act in connection with Defendant DC's invoicing for purported charges without contractual basis, and in all events not currently due and owing by Pennantia to DC, constitutes a breach of the Ship Management Agreement and to enjoin Defendants' from taking action to collect any (i) DC management fees; (ii) any 10% markups on prior invoices from third parties previously paid or reimbursed by Pennantia from 2022 to date; and (iii) any principal or interest owing but not yet matured with respect to the DC Credit Receivables/Dove Cay Payables;

7. That this Court grant Pennantia declaratory judgment pursuant to 46 U.S.C. § 31343(c)(2) that the maritime liens asserted against the Vessels are invalid and that the Vessels are not subject to the asserted lien claims, an order directing Defendant DC to withdraw or discharge the notice of claims from the title of the Vessels with the NVDC, and for prevailing party attorney's fees, as provided in 46 U.S.C. § 31343(c)(2);

8. That after due proceedings, judgment be entered in favor of Plaintiffs and due awarding of compensatory damages, costs, attorneys' fees, *custodia legis* expenses, and disbursements for this case; and

9.     That this Court grant Plaintiff such other and further relief as may be just and proper.

Dated:  New York, New York
        July 18, 2025

HOLLAND & KNIGHT LLP

_s/ Michael J. Frevola_
Michael J. Frevola
Chiara Kalogjera-Sackellares
787 Seventh Avenue
New York, New York 10019
michael.frevola@hklaw.com
chiara.sackellares@hklaw.com
Telephone: 212.513.3200
Fax: 212.385.9010

*Attorneys for Plaintiffs*