HOLLAND & KNIGHT LLP
Michael J. Frevola
Chiara Kalogjera-Sackellares
787 Seventh Avenue
New York, New York 10019
michael.frevola@hklaw.com
chiara.sackellares@hklaw.com
Telephone: 212.513.3200
Fax: 212.385.9010

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Pennantia, LLC, | In Admiralty |
| Plaintiff, | |
| v. | Case No.  1:25-CV-05904-SHS |
| Rose Cay Maritime, LLC, and Dove Cay, LLC, | **DECLARATION OF JOSHUA TRUMP** |
| Defendants. | |

I, JOSHUA TRUMP, declare as follows:

1.     I am the managing director of Contrarian Capital Management, L.L.C. ("CCM"), which holds 86.25% of the aggregate beneficial interests in the Plaintiff, Pennantia, LLC ("Pennantia"), in this proceeding.  Pennantia is the owner of *ANNA ROSE*, *LYNNE ROSE*, *JORDAN ROSE*, *REBEKAH ROSE*, *SUSAN ROSE*, *CINDY ROSE*, *JESSE ROSE*, and *JOAN ROSE* and the tank barges *RCM 210*, *RCM 225*, *RCM 242*, *RCM 245*, *RCM 250*, *RCM 252*, *RCM 260*, *RCM 262*, *RCM 270*, and *RCM 295* (the "Vessels" and each a "Vessel," which Vessels comprise the "Pennantia Fleet").

2.      I make this declaration in support of Pennantia's emergency application to this Court for injunctive relief to:

  a.   Prevent the Defendant Rose Cay Maritime, LLC ("RCM") from issuing a stop work order to the crews on board the Vessels currently managed by RCM;

  b.   Order Defendant RCM to allow Pennantia and its representatives, including but not limited to potential purchasers of the Vessels, full and unencumbered access to the Pennantia Fleet; and

  c.   Order that the Notices of Claims of Liens filed by Dove Cay, LLC ("DC") against the Vessels be removed, as those Notices are void, invalid, and of no effect, and order the removal of these encumbrances from the record of the U.S. Coast Guard's National Vessel Documentation Center.

## Ownership of the Vessels

3.      In 2021, the fleet of Bouchard Transportation ("Bouchard") was sold as part of that company's administration in the U.S. Bankruptcy Court for the Southern District of Texas.

4.      Plaintiff Pennantia purchased approximately half of the Bouchard fleet, which vessels are the Pennantia Fleet referenced in Paragraph 1.  The eight tugs and eight of the barges are generally mated together as articulated tug/barge ("ATB") pairings, with two additional stand-alone wire barges.  Pennantia engaged RCM to manage the Pennantia Fleet pursuant to the terms of a ship management agreement dated August 8, 2021 (the "Agreement").  A true and correct copy of the Agreement is annexed as Exhibit 1.

5.      Pursuant to the Agreement, in addition to monthly cash payments, RCM (a) received an Initial Equity Award of Pennantia beneficial Interests, and (b) had the right to co-invest

to obtain additional beneficial interests in Pennantia, which RCM exercised and which in total represent the remaining 13.75% of the aggregate beneficial interests of Pennantia.

6.      As is common in the maritime industry, title to each Vessel is owned by a single vessel-owning LLC, each of which are a single member limited liability company, each 100% owned and controlled by Pennantia as the sole member.

<u>**The Agreement and RCM's Performance**</u>

7.      Pursuant to the Agreement, Pennantia contracted with RCM to provide technical management (which, amongst other things, entails supervising maintenance, upkeep, documentation and provisioning of the vessels); crew management (which, amongst other things, entails procuring, training, paying, and caring for the vessels' crews); and commercial management (which, amongst other things, entails procuring engagements for the vessels, supervising the financial performance of the vessels, and managing the loading and discharging operations of the vessels).

8.      From CCM's knowledge of events, RCM was initially comprised of two persons: Alex J. Parker and John Parrott.  Upon commencement of the Agreement, it was understood that technical management and crewing management (which initially was almost entirely comprised of substantial work to get the Vessels back into service after a period of neglect and inoperative status) would be performed via a qualified subcontractor.  As Vessels became available for commercial operations, RCM would then directly perform commercial management of the Vessels.

9.      An initial technical and crewing sub-manager was selected and engaged by RCM in 2021 for the Pennantia Fleet improvement/return to service project.  However, the Pennantia Fleet improvement/return to service project managed by RCM far exceeded its budget, fell far

behind the originally contemplated schedule, and ultimately resulted in RCM's sub-contracted technical and crewing manager ceasing its performance for RCM in March 2022.

10.     RCM was responsible for finding a new crewing and technical management sub-contractor.  Instead of sub-contracting a replacement technical and crewing manager pursuant to its obligations under the Agreement, RCM advised Pennantia that none of the sub-contractors that it interviewed would be suitable for their technical and crewing manager needs.  RCM instead proposed performing the technical and crewing management in-house, using, DC, which Pennantia understands is a subsidiary, affiliate, and/or alter ego of RCM.  Upon information and belief, in addition to sharing common office space, RCM and DC share ownership, management, personnel, commingle assets (including interchangeably invoicing for services provided to Pennantia and collectively discussing settlement of the parties' disputes at issue in this proceeding), and RCM's and DC's email communications utilize only RCM domain email addresses of RCM personnel.

11.     The Agreement expressly prohibits RCM from sub-contracting "Management Services or obligations hereunder without the prior written consent of [Pennantia], which may be withheld or granted in [Pennantia's] reasonable discretion."  The Ship Management Agreement further provides that "[i]n the event of such a sub-contract [RCM] shall not be relieved of their obligations to perform under this Agreement." Ex. 1, Part II, Clause 16 ("Managers' Right to Sub-Contract").

12.     Pennantia never provided any written consent or agreed for RCM to provide technical or crewing management utilizing DC on terms that permitted additional mark-up of invoices for a pass-through service that essentially was being provided by the same entity with a different name.

13.     Pennantia never entered into any written management agreement with DC.  Any oral understanding with RCM and/or DC with respect to DC's services was that the provision of the services would be consistent with the terms of the Agreement, including that there would be no mark-up of invoices for a pass-through service that essentially was being provided in house by RCM using a subsidiary, affiliate, or alter ego entity with a different name, i.e., DC.

14.     Despite the Agreement requiring that RCM "shall in a timely manner make available, all documentation, information and records in respect of the matters covered by this Agreement," *see* Ex. 1, Part II, Clause 18(e), and despite specific and repeated requests from and on behalf of Pennantia for RCM to provide any agreements between RCM and DC relating to Pennantia Vessels, RCM never provided any such agreements.

15.     Absent a written contract between RCM and DC (or written approval of any such agreement by Pennantia), RCM performed its technical and crewing management obligations using DC (essentially the same entity using a different name) pursuant to the terms and conditions of the Agreement and not under a separate agreement or sub-contracting.  As discussed below, it is the marked-up costs of DC – marked up notwithstanding the clear prohibition against the same under the Agreement – together with fabricated amounts purportedly owed to DC as sub-contractor, that form the basis of RCM's anticipatory breach.

16.     The Agreement obligates Pennantia to pay for permitted Vessel operating expenses incurred by or on behalf of RCM, and to do so, the Agreement provides for a Vessel Operating Account from which RCM is permitted to pay or reimburse legitimate vendor expenses.

17.     Annex "C" of the Agreement set forth a framework and formula for funding the Vessel Operating Account, based on a combination of actual reconciled charges for each proceeding month and estimated expenses for each subsequent month utilizing specific monthly

reports and certifications from RCM resulting in an Estimated Reimbursement Payment, or on "such other formula from time to time mutually agreeable to the parties." Ex. 1, Annex "C," Clause (e).

18.     RCM has not complied with the express provisions of the Estimated Reimbursement Payment provisions in Annex C. RCM has not provided monthly Reimbursement Statements with details and reconciliation of Actual Reimbursable Expenses provided under Annex C(g), which would be required to substantiate Estimated Reimbursement Payments pursuant to Annex C(e).

19.     Furthermore, RCM has never provided the required monthly certification signed by a Responsible Officer in connection with actual invoices submitted for reimbursement required by Annex C(h), nor the quarterly certifications required by Annex C(i).

20.     Despite RCM's failure to comply with these provisions of the Agreement, in order to keep its fleet operating in the ordinary course, Pennantia approved or permitted reimbursements for RCM's claimed reimbursable expenses without requiring additional detail in order to ensure management of the Pennantia Fleet continued and Pennantia could continue to conduct business. In total, Pennantia has paid or reimbursed RCM over $78 million for work purportedly performed by DC from June 15, 2022 to the present, which does not include payment or reimbursements to RCM for maintenance, repairs, fuel and supplies.

21.     Since at least early 2022, the process for funding the Vessel Operating Account has, in relevant part, been based on RCM providing a 13-week cash flow forecast on a weekly basis, and Pennantia depositing operating funds into the Vessel Operating Account on a periodic basis sufficient to meet current expenses. The practice ***has not*** been to provide a two-month lump sum deposit on the basis of RCM's prepared 13-week cash flow forecast.

**Credit Receivables Arrangements**

22.     In early 2022, to address liquidity concerns relating to the over budget return to service project, the beneficial owners of Pennantia agreed to, in effect, provide incremental funding to the enterprise via a credit receivables purchase arrangement with DC.  Between 2022 to 2024 CCM and DC respectively, agreed to purchase $6.5 million (the "CCM Credit Receivables") and $5.5 million, (the "DC Credit Receivables") of credit receivables (collectively, the "Credit Receivables").  These Credit Receivables were funded as they became necessary for further company liquidity in several transactions during the time period from and ultimately totaled approximately $12.5 million.  The purpose of this arrangement was twofold: (a) it allowed DC to be able retain sufficient capital to pay the crew of the Pennantia Fleet, and (b) it provided Pennantia liquidity for its own activities.

23.     CCM paid the balance of the CCM Credit Receivables in cash to DC, and RCM was to similarly pay DC the balance of the DC Credit Receivables (or otherwise defer payment the balance of the DC Credit Receivables to DC).

24.     The parties agreed that the Credit Receivables would not be treated as currently due or owing from Pennantia, and that repayment from Pennantia would be deferred until either sufficient operating revenue became available after current expenses, or in connection with the sale of Vessels.

25.     A written agreement between DC and Pennantia, dated March 31, 2024, signed by Alex J. Parker on behalf of DC, sets forth the terms of interest accrual on the DC Credit Receivables (described in the agreement by DC as "vendor financing," then listed as $4.9 million), representing that "Pennantia . . . has not been charged any financing charge or interest," and

agreeing that "on April 1, 2024, Dove Cay will begin charging" interest "at a rate of 1% per month."

26.     Since the inception of the Credit Receivables, none of the parties to the Credit Receivables ever treated either the CCM or the DC Credit Receivables' balances as currently due or owing expenses, or operating disbursements due from Pennantia, until late November/early December 2024 when RCM, for the first time, unilaterally added a new operating disbursement line item for "Dove Cay Payables," in the amount of $9,489,869 in RCM's 13-week cash flow forecast.

27.     The "Dove Cay Payables" amount asserted by RCM was comprised of a then $5.5 million stated principal balance of the DC Credit Receivables and RCM's erroneous calculation of interest at a rate of 3% per month, as opposed to the 1% per month interest rate agreed to by the parties in writing.

28.     On or about February 11, 2025, Pennantia's auditor calculated the balance and accrued interest based on the interest rate reflected in DC's agreement as $6,082,126.

29.     On March 7, 2025, Pennantia made a good faith payment on this debt in the amount of $608,769.

30.     Pennantia promptly contested, and has continued to contest, the assertion that the DC Credit Receivables is currently due and owing, and the inflated calculation of interest accrual.

**RCM's Wrongful Obstruction of the Marketing and Sale of the Vessels**

31.     Meanwhile, in approximately March 2024, Pennantia engaged an investment banker to market the sale of Pennantia.

32.     In autumn 2024, shortly before RCM unilaterally declared the DC Credit Receivables financing amounts immediately due and payable, Pennantia identified three potential bidders (the "Bidders") interested in purchasing portions of the Pennantia Fleet.

33.     As part of engaging in negotiations related to the purchase of the Vessels, each of these Bidders requested access to the relevant Vessels as well as the Vessels' documents.

34.     Throughout the winter of 2024-2025, RCM repeatedly rejected Pennantia's requests to inspect the Vessels to allow representatives from Pennantia and/or the Bidders onto the Vessels of the Pennantia Fleet, citing a variety of pretextual disputes running the gamut from safety concerns, to fear of the visitors poaching crew members, to fear that the visitors merely wanted to inspect Pennantia's assets.

35.     RCM similarly limited Pennantia's access to documents required by Pennantia for its Bidders' to assess the value of the Vessels and other aspects necessary to pursue offers and/or purchase agreements.

36.     Over the last few months of 2024, it became clear that RCM did not have Pennantia's – or the Pennantia Fleet's – best interests at heart, and certainly that RCM was not acting in good faith in its capacity as agent for Pennantia, engaging in a pattern of misconduct aimed at interfering with Pennantia's potential sale:

    a.  RCM refused to allow Pennantia access to the Vessels to survey and inspect Vessels of interest;

    b.  RCM stonewalled Pennantia's efforts to obtain information to allow Pennantia to conduct due diligence necessary for Bidder consideration; and

    c.  Despite Pennantia having ready, willing, and able buyers for Pennantia assets, RCM provided endless excuses as to why it could not respond to the  requests for access to

the Vessels and Vessel information necessary for diligence purposes, citing vacation schedules, limitations on staff, confidentiality, trade secrecy, and the demand that RCM would keep access to the Vessels' information hostage until the DC Credit Receivable, and claimed interest (in other words, its subsidiary's invoices) were paid.

37.     RCM's misconduct became more egregious in the new year.  Beginning in January 2025, RCM repeatedly violated its obligations under the Agreement with respect to allowing Pennantia access to Pennantia's own Vessels and providing documentation regarding the Vessels in response to Pennantia's repeated requests, in each case raising the alleged monies owed to DC.

38.     In February 2025, in response to a lender asking if RCM intended to hold in requested information "hostage" until RCM was paid greatly inflated financial demands, RCM responded, "you can call it what you want, we will not provide information until we get paid."

39.     Shortly thereafter, RCM revealed an ulterior motive behind its misconduct and improper withholding of Pennantia's assets and documents:  RCM had been separately negotiating with third-parties for RCM to purchase the Pennantia Fleet.  Providing Pennantia access to the Vessels and Vessel information, as required by the terms of the Agreement, stood in direct conflict with RCM's ulterior objective of purchasing the Pennantia Fleet itself.

40.     Upon information and belief, the sole (or materially principal) business of Defendants is managing Pennantia's Vessels and Defendants have no other significant business assets.  As such, upon the sale of the Pennantia Fleet to a third party, Defendants will no longer have sufficient business to continue operations and will have no material assets of significant value.  Indeed, in discussions between CCM and Defendants as to resolving these disputes RCM has raised the issues of, and sought compensation for, winding down the business in addition to seeking severance expenses for terminating crew contracts, at least to the extent that crew

severance is not mitigated by cooperating to arrange follow-on employment for the crews of the Vessels by a buyer of the Vessels.

41.     RCM has no rights or authority – under the Agreement or otherwise – to sell or buy Pennantia or any assets of Pennantia.

42.     RCM's past and continued refusal to provide access to the Vessels and the Vessels' documents hindered (and continues to hinder) Pennantia from advancing its negotiations to sell the Vessels.

43.     Based on information and belief, RCM's past and continued refusal to provide access to the Vessels and the Vessels' documents was intended (and is intended) to facilitate RCM's negotiation of its own, unauthorized, proposed purchase or other schemes to ultimately obtain title to the Pennantia Vessels.

**Pennantia's Admiralty Rule D Vessel Arrest Actions**

44.     In a last-ditch effort to access its own Vessels in the face of RCM's continued refusal to allow Pennantia access, Pennantia (and the respective subsidiary owners of six of the Vessels in the Pennantia Fleet) commenced a proceeding on March 26, 2025, in the United States District Court for the Eastern District of New York titled *Pennantia, LLC et al. v. Tank Barge RCM 252 (Official #1292046) et al., Case No. 25-CV-01711 (OEM) (MMH)* (the "New York Vessel Arrest Action") in which the plaintiffs requested the arrest of certain of their Vessels.[1]

45.     Pennantia sought to arrest its own Vessels so that it could exercise its rightful access to those Vessels for their inspection as well as to obtain vessel documentation for the purposes of marketing the Vessels.

---

[1] The New York Vessel Arrest Action requested the arrest of the *Tank Barge RCM 250*, the *Tank Barge RCM 252*, the *Tank Barge RCM 260*, the *Tank Barge RCM 262*, the *Tug JORDAN ROSE*, and the *Tug SUSAN ROSE*.

46.    During the arrest of the *Tug JORDAN ROSE* and the *Tank Barge RCM 250*, RCM's employees on board these vessels were non-cooperative to the point of requiring intervention by the Deputy U.S. Marshal in charge of the arrest operation to avoid a potential breach of the peace.

47.    Once RCM learned of the arrest of the *Tug JORDAN ROSE* and the *Tank Barge RCM 250*, the *Tug SUSAN ROSE* and the *Tank Barge RCM 252* departed their berths and sailed into New York harbor, where, according to the *Tug SUSAN ROSE*'s vessel AIS reports, the vessels merely circled within the harbor without a destination. Upon information and belief, RCM directed the *Tug SUSAN ROSE* and the *Tank Barge RCM 252* to depart their berths in order to evade arrest by the U.S. Marshal and to thwart the plaintiffs' efforts to carry out the inspections and document procurement efforts that are their right as the owners of those vessels.

48.    Due to RCM's continued failure to allow inspection of the above named vessels, on May 7, 2025, Pennantia and the respective owners of six other vessels in the Pennantia Fleet were forced to commence a second proceeding in the United States District Court for the Southern District of Texas titled *Pennantia, LLC et al. v. Tank Barge RCM 270 (Official #1257373) et al., Case No. 25-CV-00137* (the "Texas Vessel Arrest Action"), in which the plaintiffs requested the arrest of six additional vessels in the Pennantia Fleet.[2] Pennantia sought similar relief in the Texas Vessel Arrest Action as it sought in the New York Vessel Arrest Action.

49.    As a result of Pennantia's having commenced the aforementioned arrest actions, RCM conceded to inspection surveys on the Vessels by an independent marine surveyor, but RCM continued to obstruct the process by demanding onerous and unnecessary restrictions on access, the identity of who could access the Vessels, refusing to permit surveyors to discuss vessel

---

[2] The Texas Vessel Arrest Action requested the arrest of the vessels the *Tank Barge RCM 270*, *Tug LYNNE ROSE*, *Tank Barge RCM 245*, *Tug REBEKAH ROSE*, *Tank Barge RCM 225*, and *Tug ANNA ROSE*.

condition matters with on-board crew, and with respect to the documentation sought by Pennantia, providing copies of some, but not all, of the Vessels' documentation.

50.     Further, after agreeing to RCM's request to release the *Tug JORDAN ROSE* and the *Tank Barge RCM 250* from custody in an effort to cooperate with RCM's request to move the Vessels, RCM almost immediately recommenced refusing to provide critical Vessel information to Pennantia, including refusing reasonable requests to provide preliminary information on the scope of a fire that then occurred in the engine room of the *Tug JORDAN ROSE* until completion of a formal surveyor's report on the fire.  Based on the date of the surveyor's report that ultimately was conveyed to Pennantia, RCM apparently withheld the surveyor's report regarding the *Tug JORDQN ROSE* fire for two weeks before finally sending to Pennantia.  While the scope of the fire damage proved to be very limited, RCM's refusal to keep Pennantia promptly informed, including after multiple requests, continued to evidence RCM's failure to carry out its duties under the Agreement.

51.     RCM also recommended refusing to provide access to the Vessels for requested follow-up inspections, including refusal to confirm requests to schedule limited inspections on specific Vessels necessary for the contemplated sale of the Vessels.

52.      The foregoing inspection requests have been pending since July 1, 2025, and despite repeated requests and providing specific proposed dates and providing additional information requested by RCM (which is not required for access to Vessels for inspection under the Agreement), RCM has refused to confirm any of the requested inspections as of the date of this Declaration.

## DC's Notice of Claims of Liens

53.     Several months following, and likely as retaliation against the New York and Texas Vessel Arrest Actions and/or in a continued effort to obstruct the contemplated sale of the Vessels, on July 8, 2025, counsel for DC provided notice to Pennantia and others that DC had filed Notices of Claims of Maritime Liens against all 18 Vessels in the Pennantia Fleet ("DC Notices of Claims of Liens").

54.     The DC Notices of Claims of Liens were dated July 4, 2025, and recorded with the U.S. Coast Guard's National Vessel Documentation Center on July 7, 2025.  A true and correct copy of the DC Notices of Claims of Liens is attached hereto as Exhibit 2.

55.     The claimed value and reason as stated on the notices is as follows:

| Alleged DC Maritime Liens | | | |
|---|---|---|---|
| **VESSEL** | **Official No.** | **Reason** | **Amount** |
| ANNA ROSE | 1139762 | Crew wages and necessaries | $2,407,166.09 |
| CINDY ROSE | 1086926 | Necessaries | $327,347.12 |
| JESSE ROSE | 1154328 | Necessaries | $347,311.88 |
| RCM 295 | 955449 | Crew wages and necessaries | $490,956.82 |
| JOAN ROSE | 955450 | Necessaries | $327,173.76 |
| JORDAN ROSE | 1234828 | Crew wages and necessaries | $2,135,023.94 |
| RCM 260 | 1210060 | Crew wages and necessaries | $1,502,038.05 |
| LYNNE M. ROSE | 1257372 | Crew wages and necessaries | $3,220,752.29 |
| RCM 210 | 1037844 | Necessaries | $416,970.06 |
| RCM 245 | 1050073 | Crew wages and necessaries | $3,701,433.44 |
| RCM 225 | 1139764 | Crew wages and necessaries | $2,184,379.02 |
| RCM 242 | 1154327 | Necessaries | $470,030.04 |
| RCM 250 | 1235496 | Crew wages and necessaries | $1,252,356.96 |
| RCM 252 | 1292046 | Crew wages and necessaries | $1,169,457.61 |
| RCM 262 | 1216336 | Crew wages and necessaries | $2,116,933.57 |
| RCM 270 | 1257373 | Crew wages and necessaries | $1,358,858.52 |
| REBEKAH ROSE | 1053010 | Crew wages and necessaries | $3,871,077.31 |
| SUSAN ROSE | 1282121 | Crew wages and necessaries | $2,110,676.52 |

56.     The total value of these liens amounts to $29,409,943.

57.     Each of the notices includes a declaration purportedly attesting to the truth and accuracy of claimed maritime liens, signed by Alex J. Parker, as Authorized Signatory for DC.

58.     Following further communications with DC's counsel, DC's counsel provided invoices purporting to support the DC Notices of Claims of Liens by email on July 13, 2025. True and correct copies of DC's invoices purporting to support the DC Notices of Claims of Liens are attached hereto as Exhibit 3. These invoices, which purportedly reflect three and a half years of charges for "services," appear to all have been manufactured within the last few weeks as the sale of the Pennantia Fleet has become more imminent, and appear deliberately targeted to either interfere with that sale or to leverage the imminent sale into a extortionate windfall.

59.     More than half of the aggregate claims ($16,405,586) are described as "Annual Technical Management Services & Necessaries," and are comprised of purported (1) "technical management services" fees from DC to Pennantia, and (2) a 10% "cost plus" markup for "necessaries."

60.     DC has no contractual basis to charge or invoice Pennantia for the additional management fees or the 10% markups claimed; Pennantia was never previously charged for the newly claimed fees, and indeed, as noted above, markups are expressly prohibited under the Agreement.

61.     The remainder of the aggregate claimed maritime liens are for inflated amounts not due and owing based on the DC Credit Receivables, which, as invoiced, appear to be stated as $4,891,231 and asserted interest on that principal of $8,113,125.

62.     Furthermore, the actual "expenses" reported in the line items as "necessaires" appear to have all been paid (and indeed, the invoices are not claiming that the underlying "expenses" line item amounts are due or unpaid).

63.     Pennantia is further unaware of any unpaid crew wages or necessaries supplied to the Vessels.

64.     Pennantia did not authorize RCM or DC to charge a second fixed management fee or a 10% markup on the purchase of necessaries paid or remaining unpaid for any of the Vessels against which DC issued a notice of claim of maritime lien.

65.     On information and belief, the only unpaid sums that Pennantia owes to Defendants – in any manner whatsoever – are in connection with the unmatured debt reflected in the DC Credit Receivables arrangement.

## The July 14 Demand Letter and Stop Work Order Threat

66.     On July 14, 2025, at 4:20 p.m. EDT, counsel for RCM delivered to counsel for Pennantia a letter purporting to give notice and demanding, among other things, that:

(a) RCM's affiliate and/or subcontractor and/or alter ego DC (which RCM has described as RCM's "special crewing agent") has filed notices of claims of purported maritime liens against all of the Vessels in the Pennantia Fleet in the aggregate amount "in excess of $29 million" (referring to the DC Notice of Claims of Liens);

(b) RCM claims that the Vessel Operating Account under the Agreement is underfunded, claiming current account funding "is approximately $7,230" and that the account funding should be "in excess of $14 million per Pennantia's independent auditor" on February 11, 2025;

(c) "RCM demands payment of all amounts due to the various vendors and that the Vessel Operating Account is fully funded in accordance with the previously provided budget by Friday, July 18, 2025"; and

(d) If Pennantia does not comply with RCM's payment and account funding demands, that RCM would "order the crews of the [Pennantia] vessels stop work." (the "Stop Work Letter"). The Stop Work Letter is attached hereto as Exhibit 4.

67.     Counsel for Pennantia responded on July 15, 2025, contesting the demands and basis for the threat to stop work and demanding adequate assurances from RCM by 5:00 p.m. EDT on July 16, 2025 that RCM will comply with the Agreement, rescind its baseless demands, and confirm that RCM would not order the crew of the Vessels to stop work (the "Adequate Assurance Demand").  The Adequate Assurance Demand is attached hereto as Exhibit 5.

68.     RCM did not provide such assurances in the time provided, and indeed, did not reply to the Adequate Assurance Demand letter at all.

69.     Regarding the assertions about the depleted Vessel Operating Account, in reality, the balances of the Vessel Operating Account cited by RCM in the Stop Work Letter were manipulated to create the appearance of a lack of funding.

70.     As a result, the Stop Work Letter's assertions that "lack of funding jeopardizes the safety to the vessels, environment and, most importantly, the seafarers," which is in turn the basis for RCM's threat to stop work, are fabricated.

71.     RCM directly controls the payments and timing of payments out of the Vessel Operating Account and should have full knowledge of the actual figures.

72.     With respect to the assertion in the Stop Work Letter that the balance on July 14, 2025, was "approximately $7,230" when the letter was sent, the letter omitted a payment to the account earlier that day of $350,000, such that the actual balance of the Vessel Operating Account at the time the Stop Work Letter was sent approximately $357,000, and the actual balance of the Revenue Account was approximately $245,000, in total approximately $600,000.

73.     Moreover, the true balance of the Vessel Operating Account on July 14, 2025 should have been in excess of $2.6 million.

74. However, on July 11, 2025, RCM directed a payment of $2.3 million to DC two weeks early. The typical monthly payments to DC are made towards the end of each month, and specifically, RCM represented in the last weekly 13-week cash flow forecast that Pennantia received from RCM on June 23, 2025, that the of $2.3 million payment to DC was scheduled to go out the week of July 28, 2025, consistent with past practice, not two weeks earlier.

75. Yet RCM made that payment on July 11, 2025, apparently in an effort to manufacture the purported liquidity crisis asserted in the Stop Work Letter. In further financial manipulation, RCM moved the July 14, 2025 deposit of $350,000 out of the Vessel Operating Account the following day, presumably to maintain the artificially low balance in the Vessel Operating Account.

76. Furthermore, RCM's claim that the operating account balances should be "in excess of $14 million per independent auditor" calculation on February 11, 2025 is fabricated.

77. The stated $14 million funding figure referred to on February 11, 2025 is based on the DC Credit Receivables listed by RCM in its 13-week cash flow forecast from RCM, dated February 11, 2025. That forecast is not current, and the calculation from the auditor on February 11, 2025 reported the Operating Disbursement line item in the amount of $6,082,126, not $14 million.

78. Moreover, the $14 million funding demand is also premised on RCM's erroneous demands for lump sum advance funding of 60 days of cash flow estimates based on RCM's 13-week cash flow forecast, which (i) included the asserted balance of the DC Credit Receivable, and (ii) understated the available funds in the Vessel Operating Account and Revenue Account.

79.     As stated above, the demand 60 days of lump sum advance funding is also not consistent with the agreed course of conduct of the parties under the Agreement to provide sufficient funds to pay estimated expenses on a rolling basis when due.

80.     With respect to funding requirements today, RCM has not provided a cash flow forecast since June 23, 2025, which is now over three weeks out of date. Without a current and accurate cash flow forecast there is no basis for RCM to demand specific amounts of advance Vessel Operating Account funding levels from Pennantia.

81.     With respect to all of the amounts claimed in the Stop Work Letter, there are no amounts due under the Agreement.

82.     Of the amounts claimed as due and owing to DC, $16,405,586 of the invoices—described as "Annual Technical Management Services & Necessaries"–are comprised of purported (1) "technical management services" fees from DC to Pennantia, and (2) a 10% "cost plus" markups for "necessaries" from DC to Pennantia.

83.     There is no contractual or other basis for DC to invoice Pennantia for either "technical management services" or a 10% markup on expenses Pennantia previously paid other vendors since 2022. Indeed, the Agreement specifically provides that "[Pennantia] shall reimburse [RCM], on a ***direct pass-through basis***, and ***without markup***, for the ***actual direct expenses incurred by [RCM] for performance of the Crewing and Technical Management Services provided for the Vessels*** . . ." (emphasis added).

84.     Pennantia had never previously seen the charges or the invoices before counsel for DC provided them after giving notice to Pennantia of the filing of DC Notices of Claims of Liens.

85.     The underlying invoices, upon information and belief, appear to have been generated for the purpose of filing the DC Notices of Claims of Liens. Furthermore, it appears

that these invoices were created within the last few weeks. Because of the timing of the appearance of these invoices, Defendants' actions appear overtly calculated to threaten a manufactured default under the Agreement as well as to register claimed amounts due that either would scuttle the Pennantia Fleet sale or require exorbitant payouts to Defendants in order for the contemplated sale to be consummated.

86. Although the invoices purport that charges have been due and owing going back to 2022, and state "Invoice Dates" and "Due Dates" of 12/31/2022, 12/31/2023 and 12/31/2024, those invoices were never presented on those dates. Indeed, it appears that these invoices all were generated within the last few weeks.

87. DC, for its part, never charged Pennantia for the "technical management services" fees or 10% markups, nor did Pennantia agree to any such charges. Furthermore, as the quoted language above makes clear, no mark-ups for the charges now claimed were authorized under the Agreement – only actual direct expenses, which all were paid to the underlying vendors. Mr. Parker omitted this from his signed declaration.

88. The balance of the amount claimed in the DC Notices of Claims of Liens, $13,004,356, relates to the (i) the DC Credit Receivables, in a principal amount that was originally $5.5 million, and as now invoiced appears to be stated as $4,891,231 and (ii) asserted interest on that principal of $8,113,125.

89. As stated above, the DC Credit Receivables principal is not currently due and payable, rather, the principal was to be paid either if sufficient operating revenue became available after current expenses, or in connection with the sale of Vessels, and the accrued interest, which is also not currently due and payable, is not $8,113,125.

**DC's Allegations of Arrangements or Agreements with or
Authorized by RCM in Breach of the Agreement**

90.     In the meantime, on July 15, 2025, counsel for Pennantia challenged the veracity of the DC Claims of Liens by writing DC's counsel.

91.     On July 16, 2025, counsel for DC responded to Pennantia counsel, claiming in relevant part that DC had been directed by RCM, purportedly under the authority of RCM as Manager, to provide crewing and technical management services on terms and conditions that allegedly permitted DC to charge an additional management fee and a 10% markup on all RCM reimbursements paid by Pennantia.

92.     RCM did not have authority under the Agreement to agree to financial obligations and terms in breach of the Agreement.

93.     DC had actual knowledge of the terms of the Agreement, because Alex J. Parker is the principal of both RCM and DC, and therefore DC has actual knowledge that RCM did not have authority to bind Pennantia as its agent.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Greenwich, Connecticut, this 21st day of July 2025.

JOSHUA TRUMP