UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Pennantia, LLC, | In Admiralty |
| Plaintiff, | |
| v. | Case No. 1:25-CV -05904-SHS |
| Rose Cay Maritime, LLC, and Dove Cay, LLC, | |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**HOLLAND & KNIGHT LLP**

Michael J. Frevola
Chiara Kalogjera-Sackellares
787 Seventh Avenue
New York, New York 10019
michael.frevola@hklaw.com
chiara.sackellares@hklaw.com
Telephone: 212.513.3200
Fax: 212.385.9010

*Attorneys for Plaintiff Pennantia, LLC*

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ............................................................................................3

The Agreement............................................................................................................4

Funding of Vessel Management Under the Agreement.................................................5

The Credit Receivables Arrangement .........................................................................6

RCM's Wrongful Obstruction of the Marketing and Sale of the Vessels .....................7

DC's Notice of Claims of Liens..................................................................................8

The July 14 Demand Letter and Stop Work Order Threat............................................9

ARGUMENT ..............................................................................................................12

I.    This Court Has Jurisdiction To Challenge DC's Maritime Lien Claims and Breach of Maritime Contract.................................................................12

II.    Preliminary Injunctive Relief Is Appropriate Here .......................................12

   A.    Plaintiff Is Likely to Succeed on the Merits of its Claims .......................13

      1.    Defendants' "Stop Work" Threats Raise Federal Shipping Law Violations ......13

         a.    The Threatened "Stop Work" Order Would, at a Minimum, Cease All Commercial Operations....................................................................14

         b.    Leaving the Vessels Without the Required Working Crew Would Create and Unsafe and/or Hazardous Condition........................................14

         c.    Stopping Crew Work Would Likely Result in Negligent and/or Grossly Negligent Operations by "Interference" and Violate Applicable Vessel Security Requirements ..............................................................15

      2.    DC Does Not Have Cognizable Maritime Liens on the Vessels........................16

         a.    DC Could Not Rely Upon the Presumption That RCM Had the Authority To Procure the Requested Necessaries ...........................................17

         b.    Ship Management Services Do Not Give Rise To Maritime Liens...............20

         c.    Entities with an Ownership Interest in a Vessel Cannot Assert a Maritime Lien ..........................................................................................20

         d.    DC's Maritime Lien Claim for the DC Credit Receivables, if Allowed, Should Exclude or Reduce DC's Claimed Interest........................................23

      3.    Pennantia is Entitled to an Order Directing RCM to Specifically Perform the Agreement ...................................................................................23

   B.    Plaintiff Faces Irreparable Harm Absent Injunctive Relief.....................................24

   C.    The Balance of Equities and Public Interest Both Favor Injunctive Relief ............27

CONCLUSION...........................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beech v. FV WISHBONE*,
113 F.Supp.3d 1203 (S.D. Ala. 2015)...............................................................21, 22

*Belcher Oil Co. v. M/V GARDENIA*,
766 F.2d 1508 (11th Cir. 1985) ............................................................................19

*Brenntag Int'l Chemicals, Inc. v. Bank of India*,
175 F.3d 245 (2d Cir. 1999)..................................................................................25

*Cal Dive Offshore Contractors, Inc. v. M/V SAMPSON*,
245 F.Supp.3d 473 (S.D.N.Y. 2017)......................................................................19

*Cantieri Navali Riuniti v. M/V SKYPTRON*,
621 F. Supp. 171 (W.D. La. 1985)....................................................................20, 21

*Cardinal Shipping Corp. v. M/S SEISHO MARU*,
744 F.2d 461 (5th Cir. 1984) ................................................................................19

*Chiquita Int'l Ltd. v. Liverpool & London S.S. Protection & Indemn. Ass'n Ltd.*,
124 F.Supp.2d 158 (S.D.N.Y. 2000)......................................................................24

*Collier v. Hodge*,
Civ. Act. No. 15-CV-2119, 2015 WL 5016485 (W.D. La. Aug. 21, 2015) ............25

*Comar Marine, Corp. v. Raider Marine Logistics, L.L.C.*,
792 F.3d 564 (5th Cir. 2015) ................................................................................20

*Farrell Lines Inc. v. Ceres Terminals Inc.*,
161 F.3d 115 (2d Cir. 1998)..................................................................................24

*In re Feit & Drexler, Inc.*,
760 F.2d 406 (2d Cir. 1985)..................................................................................25

*Gelfand v. Stone*,
727 F. Supp. 98 (S.D.N.Y. 1989).....................................................................25, 26

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999)..............................................................................................25

*Levy v. Young Adult Inst., Inc.*,
13-CV-2861 JPO, 2015 WL 170442 (S.D.N.Y. Jan. 13, 2015)..............................13

*New Terminal Stevedoring Co. v. M/V BELNOR*,
   Civ. No. 86-0274, 1988 WL 71731498 (D. Mass. Apr. 15, 1988) ..........................................23

*The OSWEGO NO. 2*, 23 F. Supp. 311 (W.D.N.Y. 1938) ...............................................................23

*Port of Portland v. M/V PARALLA*,
   892 F.2d 825 (9th Cir. 1989) ...........................................................................................17

*Seide v. Crest Color, Inc.*,
   835 F. Supp. 732 (S.D.N.Y. 1993) ............................................................................13, 25

*Tucker Anthony Realty Corp. v. Schlesinger*,
   888 F.2d 969 (2d Cir. 1989) .............................................................................................25

*U.S. Oil Trading LLC v. M/V VIENNA EXPRESS*,
   911 F.3d 652 (2d Cir. 2018)..............................................................................................17

*Weaver v. Shiavo*,
   750 F. App'x 59 (2d Cir. 2019) ........................................................................................13

*The YANKEE BLADE*, 60 U.S. 82, 89 (1856) .............................................................................20

**Statutes**

28 U.S.C. § 1333 ......................................................................................................................12

33 U.S.C. Ch. 3 .........................................................................................................................15

46 U.S.C. § 31341(a) ...............................................................................................................17

**Other Authorities**

33 C.F.R. Part 104....................................................................................................................16

33 C.F.R. § 104.105(a)(11).......................................................................................................16

33 C.F.R. § 104.200(b)(16).......................................................................................................16

46 C.F.R. Part 15.......................................................................................................................14

46 C.F.R. § 15.105(b) ...............................................................................................................14

46 C.F.R. § 35.01-50..................................................................................................................15

# INTRODUCTION

Plaintiff Pennantia, LLC ("Pennantia") moves this Court for a temporary restraining order and preliminary injunction enjoining Defendants Rose Cay Maritime, LLC ("RCM") and Dove Cay, LLC ("DC") from: (1) RCM's ordering the crews of Pennantia's vessels to stop work; (2) DC's pursuing its Notices of Claim of Maritime Lien ("Notices") filed with the U.S. Coast Guard ("USCG") National Vessel Documentation Center ("NVDC") against those vessels; and (3) RCM's obstruction of Pennantia's access to its own vessels and records as Pennantia seeks to conclude an imminent sale of its vessels and further interfering with Pennantia's business operations.

# PRELIMINARY STATEMENT

Defendants have engaged in ongoing and escalating interference with Pennantia's business operations in a concerted effort to delay and obstruct Pennantia's marketing and sale of its vessels. Defendants' most recent escalation presents an urgent and grave threat to the continuing viability of Pennantia's business, the contemplated sale of its vessels, and the safety of the ports, waterways, and the environment. Specifically, (1) RCM has threatened to order the vessels' crews to stop all work, an anticipatory repudiation of its contract, and would violate numerous federal laws and regulations, unless its unlawful demands were met by Friday, July 18, 2025, which threat may materialize at any time; (2) DC has unlawfully filed fabricated and improper claims of maritime liens in a staggering amount of $29.4 million against the entire Pennantia Fleet, clouding the title of the vessels and restraining transfer of title which, even if legitimate, would only have arisen from RCM's beach of its contract with Pennantia; (3) both Defendants continue to prevent Pennantia from accessing its own vessels, their records, and their current operational information, which are critical to their contemplated sale; and (4) RCM manipulated financial accounts funded

by Pennantia for payment/reimbursement of vessel operational expenses to fabricate a near zero balance and then improperly demand Pennantia advance funding to RCM in excess of $14 million.

The combined assertions that Pennantia owes payments or funding of collectively $43.4 million – which RCM demanded late in the day on July 14, 2025 that Pennantia pay in full in four (4) days by July 18, 2025 – is an outrageous fabrication and plainly an improper strategy to obstruct Pennantia from selling its vessels. As a result, Pennantia seeks immediate injunctive relief to prevent imminent and irreparable damage that would result from RCM's threat to order all vessel crew to stop work, prevent the sale of the vessels, and likely end Pennantia's ability to operate as a going concern.

In this motion, Pennantia seeks a temporary restraining order and preliminary injunction to enjoin Defendants from seeking to cease crew work onboard Pennantia's vessels in violation of the parties' agreement (and federal laws and regulations), from pursuing the invalid and fabricated claims of maritime liens and to require Defendant DC to withdraw said claims of maritime liens filed against the titles of the vessels with the USCG NVDC, and from obstructing Pennantia's efforts to sell its vessels.

Plaintiff is likely to succeed on the merits of its claims. Ordering the vessel crew to stop work is unlawful, the purported reasons for stopping work are fabricated, the threat to do so is an anticipatory repudiation of contract, and the purported maritime lien claims are similarly fabricated – comprised of newly concocted charges invented out of whole cloth, a grossly inflated loan-type balance that is not currently due and payable, and in all events, none of which would constitute cognizable maritime liens under well-established precedent.

Plaintiff will likely face irreparable harm in the absence of preliminary relief sought, because Defendants' threatened and ongoing conduct present grave and material threats to

Pennantia's ability to continue as a going concern; threaten public safety and risks to the environment (including exposing Pennantia as owner to strict statutory environmental liability as a result); continue to obstruct Pennantia's sale of its vessels, including potential loss of sale opportunities and significant diminution in value; for which Pennantia would have no likely recourse from judgement-proof Defendants.

The balance of equities and the public interest tips decidedly in favor of the moving party here. Should the Court grant the requested injunctive relief, RCM merely would be required to cease threats to breach the Agreement, and as such would merely continue to perform as originally intended, and DC would continue to have the DC Credit Receivables claim that it already possessed. In contrast, if the requested relief is denied, RCM following through on its stop work order would violate federal law and regulations, unnecessarily expose state and federal waterways to environmental risks and liability, seriously threaten if not cease Pennnatia's ability to continue as a going concern, and further delay, or cause the loss of, Pennantia's contemplated sale of its vessel (thereby rewarding Defendants' inequitable conduct).

In short, the requested injunctive relief is urgently needed and it is appropriate here.

### STATEMENT OF FACTS[1]

Pennantia owns ten (10) barges and eight (8) tugs (the "Pennantia Fleet"). Trump Decl., ¶ 1. Pennantia engaged RCM to manage the Pennantia Fleet under a ship management agreement dated August 8, 2021 (the "Agreement"). *Id.* ¶ 4 & Ex. 1. The majority of Pennantia's ownership is held by an entity managed by Contrarian Capital Management, L.L.C. ("CCM"), with RCM obtaining the remainder of ownership through its rights under the Agreement. *Id.* ¶¶ 1, 5. Under

---

[1] Pennantia refers the Court to the Declaration of Joshua Trump dated July 21, 2025 ("Trump Decl.") for additional facts related to this dispute.

the Agreement, RCM undertook the technical, crewing, and commercial management of the Pennantia Fleet. *See id.*, Ex. 1, Part I, Boxes 6-8. As discussed below, RCM has specific obligations under the Agreement of which it is in breach.

## The Agreement

The Agreement provides as follows regarding RCM's management operating expenses:

> [Pennantia] shall reimburse [RCM], on a direct pass-through basis, ***and without markup***, for the actual direct expenses incurred by [RCM] for performance of the Crewing and Technical Management Services provided for the Vessels . . . .

*Id.*, Ex. 1, Annex "C," Cl. (a) (emphasis added).

RCM initially was comprised of two persons: Alex J. Parker and John Parrott. The initial plan under the Agreement was for a qualified subcontractor to return the Vessels to operation, with RCM commercially managing the Vessels once reactivated. *Id.* ¶ 8. The qualified contractor did not work out and RCM was responsible for finding a new crew/technical manager. Rather than finding a replacement, RCM advised Pennantia none of the sub-contractor candidates was satisfactory. RCM proposed instead that it perform the crew/technical management in-house using DC, its subsidiary, affiliate, and/or alter ego. *Id.* ¶¶ 9-10. The Agreement provides that "[i]n the event of such a sub-contract [RCM] shall not be relieved of their obligations to perform under this Agreement." *Id.*, Ex. 1, Part II, Cl. 16.

While the Agreement expressly prohibits RCM from sub-contracting "Management Services or obligations hereunder without the prior written consent of [Pennantia]," RCM did not obtain that written consent. *Id.* Further, Pennantia never entered into any written agreement with DC. *Id.* ¶ 12. Despite the Agreement requiring that RCM "shall in a timely manner make available, all documentation, information and records in respect of the matters covered by this Agreement," *see id.*, Ex. 1, Part II, Clause 18(e), and despite repeated requests from Pennantia for

4

RCM to provide any agreements between RCM and DC relating to Pennantia Vessels, RCM never provided such agreements. *Id.* ¶ 14. Absent a written contract between RCM and DC (or Pennantia's written approval of any such agreement), RCM performed its technical and crewing management duties using DC (essentially the same entity using a different name) under the terms and conditions of the Agreement and not under a separate agreement or sub-contracting. *Id.* ¶ 15. As discussed below, it is DC's marked-up costs – marked up notwithstanding the clear prohibition against the same under the Agreement – together with fabricated amounts purportedly owed to DC as sub-contractor, that form the basis of RCM's anticipatory breach.

## Funding of Vessel Management Under the Agreement

The Agreement intends for Pennantia to fund RCM's management activities, with Annex C reciting the process for estimating and providing advance funding for anticipated reimbursable expenses in the Vessel Operating Account. This Account was to be funded by Pennantia, however, RCM never provided (1) the required documentation to reconcile RCM's reimbursements as per Annex C(g), and (2) the monthly and quarterly certifications from a Responsible Officer of RCM as per Annex C(h) and C(i), respectively. *Id.* ¶¶ 16-19 & Ex. 1, Annex C. Despite RCM's failure to provide required information, Pennantia allowed reimbursements for RCM's claimed reimbursable expenses without requiring additional detail in order to ensure management of the Pennantia Fleet continued and Pennantia could continue to conduct business, paying or reimbursing RCM over $78 million for work purportedly performed by DC since 2022. The parties resorted to using an alternative funding process based on RCM providing a 13-week cash flow forecast on a weekly basis, and Pennantia depositing operating funds into the Vessel Operating Account on a periodic basis sufficient to meet current expenses. The parties' practice ***has not*** been

to provide a two-month lump sum deposit on the basis of RCM's unilaterally prepared 13-week cash flow forecast.  *Id.* ¶¶ 20-21.

## The Credit Receivables Arrangement

In early 2022, to address liquidity concerns relating to the over budget reactivation project, Pennantia's beneficial owners agreed to, in effect, provide incremental funding to the enterprise via a credit receivables purchase arrangement with DC.  Between 2022 to 2024, CCM and DC respectively, agreed to purchase $6.5 million (the "CCM Credit Receivables") and $5.5 million, (the "DC Credit Receivables") of credit receivables (collectively, the "Credit Receivables").  *Id.* ¶ 22.

The parties agreed the Credit Receivables were not currently due or owing and repayment would be deferred until either sufficient operating revenue became available or upon the sale of Vessels.  An agreement between DC and Pennantia, dated March 31, 2024 and signed by Alex J. Parker for DC, memorializes interest accrual on the DC Credit Receivables (described by DC as "vendor financing," then listed as $4.9 million), representing "Pennantia . . . has not been charged any financing charge or interest," and agreeing "on April 1, 2024, Dove Cay will begin charging" interest "at a rate of 1% per month."  *Id.* ¶¶ 24-25.  Since the inception of the Credit Receivables, none of the parties ever treated either the CCM or the DC Credit Receivables' balances as currently due or owing expenses, or operating disbursements, until late last year when RCM, for the first time, unilaterally added a new operating disbursement line item for "Dove Cay Payables," in the amount of $9,489,869 in RCM's 13-week cash flow forecast.  *Id.* ¶ 26.[2]

---

[2] The "Dove Cay Payables" amount asserted by RCM was comprised of a then $5.5 million stated principal balance of the DC Credit Receivables and RCM's erroneous calculation of interest.  Trump Decl., ¶ 27.

On February 11, 2025, Pennantia's auditor calculated the balance and accrued interest based on the interest rate reflected in DC's agreement as $6,082,126. On March 7, 2025, Pennantia made a good faith payment on this debt in the amount of $608,769. Pennantia promptly contested, and has continued to contest, the assertion that the DC Credit Receivables is currently due and owing, and the inflated calculation of interest accrual. *Id.* ¶¶ 28-30.

### RCM's Wrongful Obstruction of the Marketing and Sale of the Vessels

Meanwhile, in March 2024, Pennantia engaged an investment banker to market its sale. In autumn 2024, Pennantia identified three potential bidders (the "Bidders") interested in purchasing all or some Vessels. Each Bidder requested access to the Vessels and their records. Throughout the winter of 2024-2025, RCM repeatedly rejected Pennantia's requests to allow inspections of the Vessels needed for Bidder diligence, citing a variety of pretextual disputes. *Id.* ¶¶ 31-34. RCM committed these repeated obstructions to the sale process despite Pennantia's explicit right under the Agreement to inspect any Vessel "***for any reason [Pennantia] consider[s] necessary.***" *Id.*, Ex. 1, Part II, Cl. 19 (emphasis added).

RCM similarly limited Pennantia's access to documents required by Pennantia for Bidders to assess the Vessels' value and related aspects for potential purchase. Over the last few months of 2024, it became clear that RCM did not have Pennantia's – or the Pennantia Fleet's – best interests at heart, engaging in a pattern of misconduct aimed at interfering with Pennantia's potential sale:

- RCM refused to allow Pennantia's access to the Vessels to survey and inspect Vessels of interest;

- RCM stonewalled Pennantia's efforts to obtain information to allow Pennantia to conduct due diligence necessary for Bidder consideration; and

7

- Despite Pennantia having ready, willing, and able buyers for Pennantia assets, RCM provided endless excuses as to why it could not respond to the requests for access to the Vessels and Vessel information necessary for diligence purposes.

*Id.* ¶ 36.

RCM's misconduct became worse. Starting in January 2025, RCM repeatedly violated its duties under the Agreement as to Pennantia's access to its Vessels and their records in response to Pennantia's repeated requests, in each case raising the alleged monies owed to DC. *Id.* ¶ 37. RCM did so despite its obligation under the Agreement to "to use their best endeavours [*sic*] to provide the Management Services as agents for and on behalf of [Pennantia] ***in accordance with <u>sound ship management practice</u>*** and to <u>***protect and promote the interests of [Pennantia]***</u> in all matters relating to the provision of services hereunder." *Id.*, Ex. 1, Part II, Cl. 8 (emphasis added). In February 2025, in response to a lender asking if RCM intended to hold requested Vessel information "hostage" until RCM was paid greatly inflated financial demands, RCM responded, "you can call it what you want, we will not provide information until we get paid." *Id.* ¶ 38.

Shortly thereafter, RCM revealed an ulterior motive behind its misconduct: RCM had been separately negotiating with third-parties for RCM to purchase the Pennantia Fleet, even though it has no authority to sell Pennantia or its assets. RCM's refusal to provide access to the Vessels and the Vessels' documents hinders Pennantia from advancing its negotiations to sell the Vessels, but furthers RCM's efforts to ultimately obtain title to the Pennantia Vessels for itself. *Id.* ¶ 39.

### DC's Notices of Claims of Liens

On July 8, 2025, DC alerted Pennantia that DC had filed Notices of Claims of Maritime Liens against the entire Pennantia Fleet ("DC Notices of Claims of Liens"). The DC Notices of Claims of Liens were recorded with the USCG NVDC on July 7, 2025. They recorded liens

purporting to total in aggregate $29,409,943, comprised of filings against each individual Vessel, each of which included a declaration purportedly attesting to the truth and accuracy of claimed maritime liens signed by Alex Parker, as Authorized Signatory for DC. *Id.* ¶¶ 53-57 & Ex. 2.

DC's counsel subsequently provided invoices purporting to support the DC Notices of Claims of Liens. *Id.* ¶ 58 & Ex. 3. Over half of claimed amounts ($16,405,586) are described as "Annual Technical Management Services & Necessaries," which are comprised of purported (1) "technical management services" fees from DC to Pennantia, and (2) a 10% "cost plus" markup for "necessaries." *Id.* ¶ 59. DC has no contract with Pennantia. DC never invoiced Pennantia for these new charges or claims that purportedly go as far as three years back. DC provides no support for these magically manifested charges for purported additional management fees or for the 10% markups. *Id.* ¶ 60. And, as noted above, markups on pass through reimbursables are expressly prohibited under the Agreement. DC has actual knowledge that markups are prohibited under the Agreement because Alex Parker is the principal of both Defendants. Further, the actual underlying "expenses" claimed as "necessaries" appear to have all been paid – ***the entirety of this $16,405,586 claim is for additional charges for services already paid***. Pennantia knows of no unpaid crew wages or necessaries supplied to the Vessels. And Pennantia did not authorize RCM or DC to charge these additional charges. *Id.* ¶¶ 62-64.

Besides the claimed management and markups, the only other maritime lien claims relate to the unmatured DC Credit Receivables, which, as invoiced, appear to be stated as $4,891,231 and asserted interest on that principal of $8,113,125.

### The July 14 Demand Letter and Stop Work Order Threat

On July 14, 2025, RCM advised Pennantia that:

- DC had filed its lien notices against the Pennantia Fleet for over $29 million;

- The Vessel Operating Account was purportedly underfunded and needed a $14 million deposit;

- RCM required this roughly $43 million combined amount be fully funded by Friday, July 18, 2025; and

- If Pennantia did not comply with RCM's payment and account funding demands, that RCM would "order the crews of the [Pennantia] vessels stop work."

*Id.* ¶ 66 & Ex. 4. Pennantia's counsel opposed RCM's position and wrote to its counsel demanding adequate assurances from RCM that, *inter alia*, it would not order the crews to stop work. RCM never responded to that letter. *Id.* ¶¶ 67-68 & Ex. 5.

As discussed above, RCM fabricated the appearance of imminent funding concerns through manipulation of the Vessel Operating Account, which it controls. But for RCM's manipulation of the account, the true balance of the Vessel Operating Account on July 14, 2025 should have been in excess of $2.6 million, not, as RCM asserted, "$7,230." *Id.* ¶¶ 69-72.

As to the demand that the Vessel Operating Account must be currently funded with reserves in excess of $14 million, RCM's demand is unfounded for multiple reasons. First, that figure is premised on RCM demanding a lump sum deposit of two-months of advance funding, which does not reflect the parties' agreed practice whereby Pennantia funds the Vessel Operating Account on an as needed basis to pay current expenses utilizing RCM's weekly 13-week cashflow forecast to time necessary payments. Second, the $14 million figure is itself materially overstated. RCM represents that its "in excess of $14 million" demand is supported by a February 11, 2025 calculation by Pennantia's independent auditor of an RCM 13-week cashflow forecast of the same date. The calculation includes RCM's line item for immediate payment of $6,082,126 for the "Dove Cay Payables," which reflects the DC Credit Receivables amount as calculated by the

auditor, but which is not currently due and payable. The RCM forecast at that time also understated the balance in the Vessel Operating Account and omitted the balance of the Revenue Account. Third, with respect to funding requirements today, RCM has not provided a cash flow forecast since June 23, 2025, which is currently four weeks out of date. Without a current and accurate cash flow forecast there is no basis for RCM to demand specific amounts of advance Vessel Operating Account funding levels from Pennantia. *Id.* ¶¶ 74-80.

Of the amounts claimed as due and owing to DC, $16,405,586 of the invoices—described as "Annual Technical Management Services & Necessaries"–are comprised of purported (1) "technical management services" fees from DC to Pennantia, and (2) a 10% "cost plus" markups for "necessaries" from DC to Pennantia. There is no contractual or other basis for DC to invoice Pennantia for either "technical management services" or a 10% markup on expenses Pennantia previously paid other vendors since 2022. *Id.* ¶¶ 82-83. Indeed, the Agreement specifically provides that "[Pennantia] shall reimburse [RCM], on a ***direct pass-through basis***, and ***without markup***, for the ***actual direct expenses incurred by [RCM] for performance of the Crewing and Technical Management Services*** provided for the Vessels . . ." *Id.*, Ex. 1, Annex C(a) (emphasis added).

The Agreement requires RCM to "give [Pennantia] reasonably prompt notice and copies of all . . . claims of liens, and of any damage, loss, seizure attachment or judicial process which may affect the . . . Vessels . . . ," *id.*, Annex C, Clause (l). Yet Pennantia had never previously seen the charges or the invoices – which claim to be for over three and a half years of services, all of which are now claimed to be liens against the Vessels – before counsel for DC provided them after giving notice to Pennantia of the filing of DC Notices of Claims of Liens.

The underlying invoices, upon information and belief, appear to have been generated for the purpose of filing the DC Notices of Claims of Liens. Although the invoices purport that charges have been due and owing going back to 2022, and state "Invoice Dates" and "Due Dates" of 12/31/2022, 12/31/2023 and 12/31/2024, those invoices were never presented on those dates.

DC, for its part, never charged Pennantia for the "technical management services" fees or 10% markups, nor did Pennantia agree to any such charges. Furthermore, as the quoted language above makes clear, no mark-ups for the charges now claimed were authorized under the Agreement – only actual direct expenses, which all were paid to the underlying vendors.

## **ARGUMENT**

### I. **This Court Has Jurisdiction To Challenge DC's Maritime Lien Claims and Breach of Maritime Contract**

Under the Commercial Instruments and Maritime Lien Act ("CIMLA"), federal district courts have subject matter jurisdiction over maritime lien challenges where a purported lienor has filed a notice of claim of lien with the U.S. Coast Guard. 46 U.S.C. § 31343(c)(2) ("Venue in such an action [to declare that a vessel is not subject to a lien] shall be in the district where the vessel is found"). Hence, even if this Court rules it does not have jurisdiction to decide the entirety of DC's lien claims, it certainly has jurisdiction to decide those liens on the Vessels situated within the geographic confines of this District. As to the breach of contract claims, this Court further has subject matter jurisdiction pursuant to 28 U.S.C. § 1333 as the Agreement is a maritime contract.

### II. **Preliminary Injunctive Relief Is Appropriate Here**

Defendants' repeated and continuous misconduct against Pennantia warrants injunctive relief. A preliminary injunction will be issued if the party requesting relief can show (1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation; (2) a likelihood of irreparable harm in the absence of preliminary

12

relief; and (3) that the balance of equities tips decidedly in favor of the moving party. *See Weaver v. Shiavo*, 750 F. App'x 59, 60 (2d Cir. 2019); *Seide v. Crest Color, Inc.*, 835 F. Supp. 732, 734-35 (S.D.N.Y. 1993). The "serious questions" test is also the standard for a temporary restraining order. *Levy v. Young Adult Inst., Inc.*, 13-CV-2861 JPO, 2015 WL 170442, at *4 (S.D.N.Y. Jan. 13, 2015). These factors support Pennantia's request for injunctive relief in this case.

### A. Plaintiff Is Likely to Succeed on the Merits of its Claims

Pennantia is likely to succeed with respect to the three subjects for which it seeks injunctive relief: (1) Defendants' "stop work" threats present material risks to public health and environmental safety and jeopardize the continued viability of Pennantia as a going concern; (2) DC's filing of unfounded notices of claim of liens are unlawfully obstructing the impending sale of Pennantia's assets, and may result in material and substantial liability and losses without meaningful recourse; and (3) Pennantia's right to demand that RCM perform its obligations under the Agreement without willfully breaching the Agreement. Obtaining provisional relief to maintain the status quo on these issues is critical to avoid irreparable harm to Pennantia and equity supports the issuance of the requested injunctive relief.

### 1. Defendants' "Stop Work" Threats Raise Federal Shipping Law Violations

Generally, a vessel's master and crew are directly responsible for its safety and operational compliance. The master must ensure adherence to the Vessel's USCG certificate of inspection ("COI"), compliance with all applicable regulations, and supervision of all persons onboard. The Vessels are engaged in the transportation of petroleum cargos, which necessarily involves heightened safety and environmental concerns and legal obligations. If the crew is ordered to stop work as threatened, these responsibilities cannot be fulfilled, creating unsafe conditions for the Vessels and remaining personnel or cargo, would likely violate federal law and regulations,

13

increases risks of accidents, environmental incidents, and property damage. The foregoing would necessarily result in cessation not just of "crew work" – but because of the regulated nature of the vessel business – it would stop the entire operation of the Vessels, which would in effect stop Pennantia's ability to continue operating as a going concern.

<blockquote>

a. *The Threatened "Stop Work" Order Would, at a Minimum, Cease All Commercial Operations*

</blockquote>

The navigation and shipping laws state that a vessel may not be operated unless, among other things, detailed minimum manning requirements are maintained whether underway, at anchor, moored, or handling cargo. Here, it is RCM's responsibility as the Vessels' manager to ensure that appropriate personnel are carried to meet the requirements of the applicable navigation and shipping laws and regulations. *See* 46 C.F.R. Part 15; 46 C.F.R. § 15.105(b). If RCM ordered the crew of the Vessels to stop work, the result would be a complete shut down of all commercial operations of the Vessels, which cannot lawfully operate without required manning, *i.e.*, working crew. *See also, e.g.,* 46 U.S.C. § 8101(e)(f) (authorizing penalties for violations and manning deficiencies).

<blockquote>

b. *Leaving the Vessels Without the Required Working Crew Would Create an Unsafe and/or Hazardous Condition*

</blockquote>

Commercial vessels are subject to extensive safety laws and regulations, *e.g.,* pursuant to Titles 33 and 46 of the U.S. Code incorporating the Ports and Waterways Safety Act and related regulations. Not only would it be unlawful to operate the Vessels without required crew, various manning requirements continue to apply even when the Vessels are inactive. For example, barges carrying dangerous cargoes generally must be under constant surveillance, with a crew watch maintained from the towing vessel or a designated watchman. When a moored tank barge is not gas-free (meaning it still contains dangerous cargo), it must be under the observation of a

#524999060_v1

watchman, who may be a member of the towing vessel's crew, a terminal employee, or another designated person. 46 C.F.R. § 35.01-50. If a Vessel is at anchor, it would require a lookout under the Inland Navigation Rules (Rule 5), which states "Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." It is unlawful for any person to operate a vessel in violation of Inland Navigation Rules and Regulations. 33 U.S.C. Ch. 3. Thus, RCM's threat to order crew to stop work would implicate RCM's care and custody of every Vessel in service, not only stopping the Vessels with current commercial cargo operations.

       *c.* *Stopping Crew Work Would Likely Result in Negligent and/or Grossly Negligent Operations by "Interference" and Violate Applicable Vessel Security Requirements*

46 U.S.C. § 2302 prohibits negligent and grossly negligent operation of vessels and provides that it is unlawful for any person to: (1) operate a vessel; (2) in a negligent or grossly negligent manner; or (3) interfere with the safe operation of a vessel so as to endanger the life, limb, or property of a person. The term "operate" normally includes vessels underway, at anchor, or pier side. "Negligence" implies the failure to exercise that degree of care a reasonable person under like circumstances would demonstrate. Negligent operation may be the result of an operator's ignorance, inattention, or general carelessness. Gross negligence implies a conscious or voluntary act or omission with reckless disregard of consequences. 46 U.S.C. § 2302 provides for both civil and criminal penalties.

Here, RCM's "stop work" order should be seen as "interfering" with the safe operation of the Vessels by unilaterally removing the crew (or directing them to cease their work) which would

#524999060_v1

*de facto* create a manifestly unsafe environment that could endanger others (e.g., a breakaway barge or any accident that cannot be adequately responded to by crew, etc.).

The absence of requisite working crew would also create a security risk. Vessel owners or operators must ensure their vessels are operating in compliance with 33 C.F.R. Part 104 that governs maritime security for certain vessels. Those security regulations apply to towing vessels greater than eight meters in registered length that is engaged in towing a barge or barges, such as the Vessels here. 33 C.F.R. § 104.105(a)(11). Such measures include ensuring restricted areas, deck areas, and areas surrounding the vessel are monitored. 33 C.F.R. § 104.200(b)(16). The regulations require implementation of security measures to: (1) deter the unauthorized introduction of dangerous substances and devices, including any device intended to damage or destroy persons, vessels, facilities, or ports; (2) secure dangerous substances and devices that are authorized by the owner/manager to be on board; (3) control access to the vessel; and (4) prevent an unauthorized individual from entering a designated secure area of the vessel. All of these requirements would be impacted, or prevented, by ordering the vessel crew to stop work. *See, also, e.g.,* 46 U.S.C. § 70119(a) (authorizing penalties for violations of port security measures).

For all of the foregoing reasons, Pennantia is likely to succeed on its claims to preclude RCM from issuing its "stop work" order to the Vessels' crew.

## 2. DC Does Not Have Cognizable Maritime Liens on the Vessels

DC claims that it has provided necessaries to the Vessels and that this gives it maritime liens to on the Vessels. *See* 46 U.S.C. § 31342(a) (providing that "a person providing necessaries to a vessel on the order . . . of a person authorized by the owner (1) has a maritime lien on the vessel; (2) may bring a civil action in rem to enforce the lien; and (3) is not required to allege or prove in the action that credit was given to the vessel."). Under the Commercial Instruments and

Maritime Lien Act ("CIMLA"), "a person entrusted with the management of the vessel at the port of supply," 46 U.S.C. § 31341(a)(3), is "presumed to have authority to procure necessaries for a vessel." *Id.* § 31341(a).

Taking DC's claim at face value, DC claims that:

- RCM was a person entrusted with the Vessels' management under the Agreement;

- DC provided necessaries to the Vessels at RCM's request; and

- DC has a maritime lien as a result of having provided those necessaries.

DC's claim – while perhaps having some surface appeal – cannot withstand close scrutiny.

### a. DC Could Not Rely Upon the Presumption That RCM Had the Authority To Procure the Requested Necessaries

It is well-settled that "'[s]ubcontractors who deal with a contractor or a middle-man lack a direct connection to the vessel,' and that 'there is a considerable body of law . . . that a subcontractor cannot assert a maritime lien.'" *U.S. Oil Trading LLC v. M/V VIENNA EXPRESS*, 911 F.3d 652, 662 (2d Cir. 2018) (citations omitted). While an exception exists to the "subcontractor rule," that "sole exception . . . will occur where the subcontractor has been engaged by a general contractor in circumstances ***where the general contractor was acting as an agent at the direction of the owner to engage specific subcontractors***." *Id.* at 662-63 (citation omitted) (emphasis in original). The owner's specific designation of a sub-contractor is required; the "[m]ere knowledge that a particular subcontractor will be used 'has never been held to be sufficient to establish a lien.'" *Id.* at 663 (quoting *Port of Portland v. M/V PARALLA*, 892 F.2d 825, 828 (9th Cir. 1989) (citation omitted)).

Moreover, over half of the maritime lien amounts claimed by DC ($16,405,586) are described as "Annual Technical Management Services & Necessaries," which are comprised of purported (1) "technical management services" fees from DC to Pennantia, and (2) a 10% "cost

plus" markup for "necessaries." These are management fees that – as a matter of law – should be excluded from any maritime lien analysis. Pennantia previously (and timely) paid the underlying services that would qualify as necessaries. The charges sought to be paid by DC are markups on the baseline charges that Pennantia was paying for these services under Pennantia's Agreement with RCM, which specifically provides:

> [Pennantia] shall reimburse [RCM], **_on a direct pass-through basis_**, and **_without markup_**, for the **_actual direct expenses incurred by [RCM] for performance of the Crewing and Technical Management Services provided for the Vessels_** . . . .

RCM had no authority to incur charges other than "actual direct expenses" "without markup." DC knew this when it chose to perform its services for the Vessels. With Alex Parker (the head of RCM) as DC's "authorized signatory" and Defendants having the same Chief Legal Officer, DC had actual knowledge that RCM had no authority to incur the markups claimed by DC.

It is well-settled that a vessel owner may defeat the lien of a party presumed to have maritime lien for necessaries where the supplier of purported necessaries has actual knowledge that the person ordering the necessaries lacked the authority to bind the vessel:

> The [maritime lien] statute is clear that **_a lien will not arise_** when necessaries are ordered by one **_without the authority to bind the vessel_**. Although a charterer is presumed to have authority to bind the vessel, the lien does not vest absolutely as a matter of law, but rather, "the burden is upon the owner to show that the supplier of necessaries had actual knowledge of the existence of any lack of authority relied upon as a defense." [citation omitted]. This was made even clearer in the case of _Belcher Co. of Alabama, Inc. v. M/V MARATHA MARINER_, 724 F.2d 1161 (5th Cir. 1984) in which it is stated, "This lien [under the maritime lien statute] attaches when necessaries are ordered by and supplied to the charterer, **_unless the supplier has notice_** _that the person who orders the necessaries_ **_lacked authority to do so_**."

> Gilmore & Black, in the 2nd Edition of _The Law of Admiralty_ at page 685, give a very interesting discussion on the effect of the 1971 amendment to [46 U.S.C.] § 973 [i.e., the former version of CIMLA]. Among other things, Gilmore and Black state, "If the person who orders the services **_is not authorized by the owner to create liens_** and if the furnisher of the services **_has notice of the lack of authority, it is entirely clear that no lien will arise._**"

18

*Belcher Oil Co. v. M/V GARDENIA*, 766 F.2d 1508, 1512 (11th Cir. 1985) (emphasis added) (internal footnote omitted); *see also Cardinal Shipping Corp. v. M/S SEISHO MARU*, 744 F.2d 461, 469-70 (5th Cir. 1984) (noting that vessel owners may shield themselves against liens if they "sufficiently bring[ ] the [party securing services'] lack of authority home to the [lien claimant].").

A judge of this District recently recognized the foregoing principle:

> "[W]hen necessaries are ordered by one without authority to bind the vessel," and when the vessel owner can "show that the supplier of necessaries had actual knowledge of the existence of any lack of authority relied upon as a defense," no lien arises . . . . Because "[a]ctual knowledge of a prohibition of lien clause is . . . one way of obtaining actual knowledge of one's lack of authority to bind a vessel," a vessel owner may defeat a maritime lien by establishing "that the supplier of necessaries either had actual knowledge that the person ordering the supplies lacked the authority to bind the vessel *or had knowledge of a prohibition of lien clause in the charter*" . . . . Actual knowledge "defeats a maritime lien because '[t]he supplier is then in a position to make an informed business decision, and may refuse to supply the vessel, make other arrangements for payment, or assume the risk.'"

*Cal Dive Offshore Contractors, Inc. v. M/V SAMPSON*, 245 F.Supp.3d 473, 481 (S.D.N.Y. 2017) (internal citations omitted).

Here, RCM proposed that it would perform crewing and technical management in-house under the Agreement using its subsidiary, affiliate, and/or alter ego DC. While Pennantia knew of RCM using DC, it did not direct RCM to hire or use DC. Even if RCM claims that it was using DC as a "sub-contractor," RCM never obtained written consent from Pennantia to do so, nor as to the newly asserted charges, and RCM never provided any evidence of any management agreements with DC despite specific requests to do so if they existed. Therefore, DC cannot qualify as a subcontractor which may possess maritime liens on **_any_** of its claims. Moreover, from the start, DC knew that the Agreement clearly bars the markups it seeks to claim, which invalidates DC's liens against the Vessels for the $16,405,586 in claimed "Annual Technical Management Services & Necessaries." Hence, this Court should invalidate **_all_** of DC's claimed liens or, at the

very least, the $16 million in claimed "Annual Technical Management Services & Necessaries" should be invalidated on this basis alone.

### b. Ship Management Services Do Not Give Rise To Maritime Liens

For nearly two hundred years, the U.S. Supreme Court has made clear that maritime liens are a closed class of claims that should not be expanded as they are "secret" liens:

> [T]his privilege or lien, though adhering to the vessel, is a secret one; it may operate to the prejudice of general creditors and purchasers without notice; it is therefore '*stricti juris*,' and cannot be extended by construction, analogy, or inference.

*The YANKEE BLADE*, 60 U.S. 82, 89 (1856).

Courts have rejected the notion that breach of a ship management agreement gives rise to a maritime lien. In *Comar Marine, Corp. v. Raider Marine Logistics, L.L.C.*, 792 F.3d 564, 570-71 (5th Cir. 2015), the Fifth Circuit held that a management agreement quite similar to the Agreement here was not the functional equivalent of a bareboat charter and did not create maritime liens for breach, even though the manager had full possession and control of the vessels, carried insurance, and used its own crews. *See id.* The court noted the manager (like Defendants here) was reimbursed by owner for expenses and received management fees, did not owe the owners periodic hire payments and performed services for the owners' benefit.

Therefore, the $16,405,586 described as "Annual Technical Management Services & Necessaries" fails to constitute maritime liens on the applicable Vessels for this basis as well and should be excluded from any maritime lien analysis, and this Court should order their invalidation.

### c. Entities with an Ownership Interest in a Vessel Cannot Assert a Maritime Lien

"It is well-settled law that a vessel owner, part-owner, or joint venturer cannot hold a maritime lien on the vessel in which he enjoys such an interest." *Cantieri Navali Riuniti v. M/V SKYPTRON*, 621 F. Supp. 171, 186 (W.D. La. 1985) (citing G. Gilmore & C. Black, *The Law of Admiralty* § 9–20 (2d ed. 1975); *Fathom Expeditions, Inc. v. M/T GAVRION*, 402 F. Supp. 390,

397 (M.D. Fla. 1975); *The ODYSSEUS, III*, 77 F. Supp. 297, 298 (S.D. Fla. 1948)). "This doctrine is founded in the equitable notion that those who share responsibility for incurring the debts of the vessel ought not to be reimbursed out of that vessel's proceeds to the detriment of other lienholders." *Id.* (citing *Medina v. Marvirazon Compania Naviera, S.A.*, 709 F.2d 124 (1st Cir. 1983); *The KONGO*, 155 F.2d 492 (6th Cir. 1946); *Security Pacific Nat'l Bank v. PACIFIC PRIDE*, 549 F. Supp. 53 (W.D. Wash. 1982)). This preclusion is based on equitable considerations:

> But when the seas get rough one who looks, thinks, acts, and profits like an owner cannot retreat to the relatively safe harbor of a maritime lienor, who of course has a claim against the ship itself.

*Id.* (quoting *Sasportes v. M/V SOL DE COPACABANA*, 581 F.2d 1204, 1209 (5th Cir. 1978)).

RCM and DC are corporate doppelgangers. Alex Parker is the principal person of both companies. Ellen T. Arthur, Esq. is the Chief Legal Officer of both companies. As RCM and DC have this close relationship, DC cannot rely on the presumption that it believed that RCM was authorized to procure the purported necessaries on behalf of Pennantia, or authorized to incur the newly asserted management charges and fees. *See*, *e.g.*, *Beech v. FV WISHBONE*, 113 F.Supp.3d 1203, 1211 (S.D. Ala. 2015) (noting that "[a]n important limitation to this general rule [that a person providing necessaries to a vessel at the order of a person authorized by the owner has a maritime lien on the vessel] is that it applies only to strangers to the vessel."). As the *Beech* court explained:

> From a policy standpoint, in the maritime lien system, "[t]he overarching goal is keeping the channels of maritime commerce open – by ensuring that people who service vessels have an efficient way of demanding reimbursement for their labor and are thus willing to perform the services necessary to keep vessels in operation." *Mullane v. Chambers*, 438 F.3d 132, 138 (1st Cir. 2006). ***That objective is simply not promoted <u>by conferring maritime liens upon persons who own or otherwise have the ability to control or influence the affairs of a vessel</u>.*** Furthermore, the "strangers to the vessel" prerequisite for maritime liens "is justified because of the equities involved; that is, those who share the responsibility for incurring the debts

21

of the vessel ought not to be reimbursed out of that vessel's proceeds to the detriment of other lienholders." *Hinson v. M/V CHIMERA*, 661 F.Supp.2d 614, 619 (E.D. La. 2009) (citation and internal quotation marks omitted); *see also Ridinger v. 33' Speedboat, Hull ID Number: EMO0331169A89*, 2009 WL 2030237, *3 (S.D. Fla. July 9, 2009) (similar).

*Beech*, 113 F.Supp.3d at 1212 (internal footnote omitted) (emphasis added).

RCM is of course not a stranger to the Vessels. Pennantia and RCM entered into the Agreement before Pennantia closed the purchase of the Vessels from the bankruptcy court auctions, and RCM obtained beneficial interests in Pennantia by virtue of the Agreement. As to DC, as discussed above in Section II(A)(2)(a), under the Agreement RCM was not permitted to markup reimbursed expenses nor did the Agreement provide for extra management fees not agreed by Pennantia. The common principals of RCM and DC knew this. Hence, while strangers to a vessel might be able to claim ignorance as to a vessel manager's authority to pledge the credit of a managed vessel, here DC can claim no such ignorance – the key personnel for both companies ***are the same people***. Indeed, for all intents and purposes, RCM and DC appear to be the same entity, or alter egos, and DC should be considered to have similar beneficial interests in Pennantia that RCM has.

The CCM and DC Credit Receivables arrangements further exemplify why CCM, RCM and DC are not "strangers to the vessel" as required for valid maritime liens, because the purpose of the Credit Receivables was precisely to "share the responsibility for incurring the debts of the vessel[s]" by treating the underlying receivables as debt obligations of the beneficial owners, not as obligations secured by the credit of the Vessels.

DC knows – and always has known – that the charges it now claims as liens were unauthorized under the Agreement. Indeed, while RCM and DC go by separate names, as the key personnel are the same DC should be treated as non-strangers to the Vessels and their claimed

maritime liens invalidated. Therefore, both the $16,405,586 in claimed charges for "Annual Technical Management Services & Necessaries" as well as the purported maritime liens totaling $13,004,356, comprised of the DC Credit Receivables (stated as $4,891,231 in principal and inflated claimed interest of $8,113,125), should be invalidated as liens on the respective Vessels on this basis alone.

> d. *DC's Maritime Lien Claim for the DC Credit Receivables, if Allowed, Should Exclude or Reduce DC's Claimed Interest*

Should this Court decide to invalidate DC's $16,405,586 described as "Annual Technical Management Services & Necessaries" (as discussed above) but choose to leave the DC Credit Receivables claim as a maritime lien (which Pennantia disputes), the quantum of DC's maritime lien claim should be for the principal of that claim and not any interest, *The OSWEGO NO. 2*, 23 F. Supp. 311, 312 (W.D.N.Y. 1938) (holding that "[i]nterest will not be allowed because of the delay in asserting the lien"), or at most limited to interest from the time when the maritime lien demand was asserted. *New Terminal Stevedoring Co. v. M/V BELNOR*, Civ. No. 86-0274, 1988 WL 71731498, at *1 (D. Mass. Apr. 15, 1988). The DC Credit Receivables invoices state that principal as $4,891,231. While the parties can later adjudicate what the proper amount of interest may be (and when the DC Credit Receivables and any interest is due and owing), regardless of the calculation of interest, none is cognizable as a maritime lien on the Vessels and should form no part of any Notices of Claims of Liens remaining against the Vessels.

> 3. Pennantia is Entitled to an Order Directing RCM to Specifically Perform the Agreement

It is well-settled that courts sitting in admiralty may award equitable relief under the proper circumstances. *Farrell Lines Inc. v. Ceres Terminals Inc.*, 161 F.3d 115, 116-17 (2d Cir. 1998). Included in this range of equitable relief – in the proper circumstances – is the remedy of specific

performance. *See, e.g.*, *Chiquita Int'l Ltd. v. Liverpool & London S.S. Protection & Indemn. Ass'n Ltd.*, 124 F.Supp.25 158, 161 (S.D.N.Y. 2000). In *Chiquita International*, District Judge Sweet of the Southern District of New York held that a claimant could demand that the marine insurer which had provided a letter of undertaking on the claimant's claim instead switch to posting a bond to secure that claimant's claim and that the claimant could sue to obtain specific performance of that promise contained in the parties' maritime contract. *Id.* at 169.

Here, the Agreement contains the following unambiguous provisions:

- Pursuant to Part II, Clause 18(e), RCM must "in a timely manner, ***make available, all documentation, information and records*** in respect of the matters covered" by the Ship Management Agreement; and

- Pursuant to Part II, Clause 19, "the Owners [i.e., Pennantia] ***may at any time after giving reasonable notice to the Managers [i.e., RCM] inspect the Vessel for any reason they consider necessary***."

Even after the Rule D arrest actions brought by Pennantia seeking to use the federal courts and the U.S. Marshals Service to obtain access to its Vessels, RCM continues to be obstructive in that it is not allowing the necessary Vessel access and documentary access for Pennantia to complete the contemplated sale of the Vessels and/or Pennantia itself. Hence, Pennantia now seeks an affirmative court order directing RCM to specifically perform the foregoing provisions of the Agreement, failing which Pennantia will be entitled to obtain an order of contempt from this Court on the basis of RCM's refusal to follow this Court's order.

## B. Plaintiff Faces Irreparable Harm Absent Injunctive Relief

Pennantia faces irreparable harm absent injunctive relief because Defendants' threatened and ongoing conduct present grave and material threats to Pennantia's ability to continue as a

going concern; threaten public safety and risks to the environment (and expose Pennantia as owner to strict statutory liability as a result); continue to obstruct Pennantia's sale of its Vessels, including potential loss of sale opportunities and significant diminution in value; for which Pennantia would have no likely recourse from judgement-proof Defendants.

Although monetary damages typically do not raise irreparable harm issues, *see, e.g., Collier v. Hodge*, Civ. Act. No. 15-CV-2119, 2015 WL 5016485, at *2 (W.D. La. Aug. 21, 2015) (citation omitted), courts **_will_** find irreparable harm where the moving party provides evidence of damages that cannot be rectified by financial compensation alone. *See Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989). Specifically, a risk of monetary harm is considered irreparable where the harm alleged is either uncountable or involves insolvency or willful attempts to avoid paying a judgment. *See Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319-20 (1999); *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999) ("[C]ourts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents."); *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985) (holding that a monetary preliminary injunction was appropriate where the defendant had repeatedly demonstrated intent to frustrate any judgment on the merits by making it uncollectable); *Gelfand v. Stone*, 727 F. Supp. 98, 100-01 (S.D.N.Y. 1989) (holding that a demonstration of intent to frustrate a judgment will satisfy the requirement for a preliminary injunction showing of irreparable harm). The issue is not whether a harm may be monetized, but rather whether a money judgment standing by itself will be sufficient to provide a movant with relief. *See Seide v. Crest Color, Inc.*, 835 F. Supp. 732, 735 (SDNY 1993). Here, it is not.

The circumstances at hand meet these exceptional standards. Defendants' misconduct – including but not limited to the following: (1) refusing Pennantia access to its Vessels to facilitate

the imminent sale of the Vessels and/or Pennantia outright; (2) refusing to produce the Vessels' documentation for use by the intended purchasers to conduct due diligence; (3) filing invalid maritime liens with the USCG; (4) manipulating financial data to concoct claims that have no basis in reality; and (5) threatening to issue a "stop work" order to the Vessels' crews – threatens to frustrate the imminent potential nine-figure sale of Pennantia and/or its assets. At this juncture it is t is impossible to quantify Pennantia's damages because its value if as a practical matter a function of the sale value, which RCM is obstructing Pennantia from realizing.

Even if quantifying Pennantia's damages is possible, Defendants' past conduct shows their likelihood to frustrate any judgment on the merits. Defendants' repeatedly have breached the Agreement and have knowingly and intentionally preferred their own interests over those of Pennantia for their own gain, despite RCM's obligation under the Agreement "to protect and promote the interests of [Pennantia] in all matters relating to the provision of services [under the Agreement]." What started as preventing inspection and due diligence efforts escalated to attempts to extort Pennantia by withholding its assets until extortionist payment demands were met, and eventually the filing of the invalid liens. This predilection for deceptive acts is highly suggestive of future misconduct absent injunctive relief. *See*, *e.g.*, *Gelfand*, 727 F. Supp. at 100-02 (totality of the circumstances, including defendant's past fraudulent activity, attempts to hide assets, and deceptive practices, supported a finding of irreparable harm).

Moreover, to the extent that Pennantia recovers a judgment of any significance against Defendants, there is evidence that Defendants would be judgment proof, if not driven into insolvency by any such a judgment. Other than the Agreement and management of the Vessels, Defendants have no other material business or material assets of any significance from which to satisfy a judgement awarded against Defendants. Trump Decl., ¶ 40.

### C. The Balance of Equities and Public Interest Both Favor Injunctive Relief

Both the balance of equities and the public interest in this matter weigh in favor of granting injunctive relief to Pennantia.

Should the Court grant the requested injunctive relief, RCM merely would be required to perform the Agreement as originally intended and DC would have the Credit Receivables claim that it always possessed. In contrast, if the requested relief is denied, the Vessels may wind up unmanned in violation of federal regulations and could cause a marine or environmental hazard, and Pennantia could lose their pending sale (thereby rewarding Defendants' inequitable conduct.

As for the public interest, it weighs in Pennantia's favor as it is in the public interest to ensure that (1) vessels are manned in accordance with applicable federal regulations, and (2) parties to a contract comply with their contractual obligations. The public interest is always served by requiring compliance with the statutes of Congress. Denying relief where the Vessels may be unmanned, and where DC's invalid Notices are on file with the USCG to interfere with Pennantia's imminent sale, would reward illegal threats and false filings to the government (which clearly are contrary to public policy). As such, both the balance of equities and the public interest favor granting Pennantia's request for injunctive relief.

### CONCLUSION

For the foregoing reasons, Pennantia respectfully requests the Court grant its Motion for a Temporary Restraining Order and Preliminary Injunction enjoining Defendants from (1) RCM's ordering the Vessels' crews to stop work; (2) DC's pursuing its Notices filed with the USCG NVDC against those Vessels; and (3) RCM's obstruction of access to the Vessels and records and from further interfering with Pennantia's business operations.

Dated:  New York, New York
      July 21, 2025

                              HOLLAND & KNIGHT LLP

                              *s/ Michael J. Frevola*
                              Michael J. Frevola
                              Chiara Kalogjera-Sackellares
                              787 Seventh Avenue
                              New York, New York 10019
                              michael.frevola@hklaw.com
                              chiara.sackellares@hklaw.com
                              Telephone: 212.513.3200
                              Fax: 212.385.9010

                              *Attorneys for Plaintiff*
                              *Pennantia, LLC*

#524999060_v1