UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PENNANTIA, LLC,

    Plaintiff,

- against-.

ROSE CAY MARITIME, LLC,
AND DOVE CAY, LLC,

    Defendants.

Case No. 25-cv-5904-SHS

## DECLARATION OF ALEX J. PARKER

Pursuant to 28 U.S.C. § 1746 I, Alex J. Parker, hereby declare under penalty of perjury:

1. I am an individual of sound mind and body, and have never been accused, let alone convicted, of a crime of moral turpitude.

2. This declaration is respectfully submitted in support of Defendant Dove Cay, LLC's ("Dove Cay") Opposition to the Plaintiff's Application for a Temporary Restraining Order and Preliminary Injunction.

3. I am a citizen of the United States and a resident of New York City.

4. I am the authorized representative of Dove Cay. I make this declaration based upon my personal knowledge, official company records, my own investigation, and discussions with Dove Cay's legal advisors.

5. I am also the managing member of Defendant Rose Cay Maritime, LLC ("RCM").

6. I share the following information to inform the Court on relevant background and history of the parties to this dispute and the subject Vessels beneficially owned by Plaintiff Pennantia, LLC ("Pennantia") through eighteen (18) single purpose entity subsidiaries, i.e. one (1) entity for each vessel in the Pennantia Fleet, as defined below in Paragraph 18.

1

**Bouchard Transportation Co., Inc.**

7.Bouchard Transportation Co., Inc. ("Bouchard") was a multi-generational vessel owner and operator based in Long Island, which owned and operated a fleet oil tanker barges and tugs engaged in the U.S. Jones Act trade (the "Bouchard Fleet").

8.On or about September 28, 2020, following numerous operational and safety issues, including a catastrophic casualty with loss of life, which led to the loss of ABS classification and the rescission of U.S. Coast Guard issued Certificates of Inspection, Bouchard filed for Chapter 11 bankruptcy protection in Houston, Texas. *In re Bouchard Transportation Co., Inc.*, 20-34682.

9.With the recission of the Coast Guard Certificates of Inspection, the Bouchard Fleet ostensibly became commercially unviable as the vessels could not commercially operate and each vessel a distressed and deteriorating asset each day it sat idle.

10.After conducting extensive market research and study, RCM was formed the summer of 2021, for the purpose of, *inter alia*, establishing a business to return the Bouchard Fleet to life and commercially operate the vessels in a safe and profitable manner.

11.I worked tirelessly with Josh Trump ("Trump") of Pennantia to establish a business plan, negotiate the Shipman 2009, and raise necessary capital to present the competitive bid in the Bouchard bankruptcy proceeding before the U.S. Bankruptcy Court in the Southern District of Texas.

12.Trump and I communicated regularly and extensively on a daily basis and jointly developed a strategy for returning the vessels to commercial operations, dealing with other interested parties, including but not limited to Wells Fargo, which held various liens and/or ship mortgages against the Bouchard vessels.

**The Need for a Technical Operator**

13. In addition, we worked very closely and developed an agreed strategy to engage with an established technical manager, Foss Maritime Company, LLC ("Foss"), to return a portion of the Bouchard Fleet to active service and then manage and operate the vessels pursuant to the Foss Document of Compliance ("DOC") if RCM and Pennantia's bankruptcy bid were successful.

14. In short, a DOC is a certificate that verifies a company's adherence to certain minimum and specific safety standards, regulations, and codes promulgated by the International Safety Management ("ISM") Code. The DOC confirms that the company's Safety Management System ("SMS"), meets the requirements of the ISM Code, will specify the types of vessels the company is authorized to operate and is valid for a period of five (5) years.

15. Without a company holding a valid DOC assigned to technically manage the vessels in the fleet, the vessels are unable to trade or otherwise commercially operate.

16. The secured lenders in the Bouchard bankruptcy, *i.e.* Wells Fargo, were unwilling to support any bid from prospective purchasers that did not identify a recognized and respected DOC-holding company with specialized knowledge, expertise, sufficient personnel, and a commitment to time & cost-effectively return the vessels to active service in a workmanlike manner, as well as to subsequently technically manage and operate the vessels safely in a cost-efficient manner.

17. Foss was identified as a company which represented that it had the ability, capacity, resources, and personnel to handle the safe, time & cost-effective return to service, operation, and technical management of the vessels. Foss participated in pre-auction meeting(s) with Wells Fargo, along with RCM and Pennantia to discuss the plan for the post-acquisition technical

management of the portion of the Bouchard Fleet incumbered by Wells Fargo's liens and/or ship mortgages.

18.     Pennantia, RCM, Foss and Wells Fargo agreed on a business plan to return 18 vessels from the Bouchard Fleet to commercial service. To that end, Pennantia and RCM executed a BIMCO Shipman 2009 agreement that named Foss as the crewing and technical manager. See, Exhibit 1, Shipman at p. 1, Box 5.

19.     On or about August 3, 2021, RCM and Foss executed a Letter of Agreement that outlined the scope of services, terms and conditions, and the manner and rate that Foss would be compensated for services rendered and necessaries provided.

20.     Pennantia, RCM, Wells Fargo, and Foss were aware and agreed to invest in and enter into the bid to purchase eighteen (18) vessels from the Bouchard Fleet on this basis.

**The Successful Bid**

21.     In early August of 2021 Pennantia and RCM, with Foss as the disclosed technical managers and DOC-holder successfully bid to acquire a portion of the Bouchard fleet, which were encumbered by Wells Fargo.  Specifically, RCM, acting on behalf of Pennantia and its vessel owning LLCs were successful and acquired ten (10) barges and eight (8) tugs (the "Pennantia Fleet").

**The Vessels**

22.     The newly acquired Pennantia Fleet was comprised of eight (8) sets of heavily specialized, high value ATBs, as well as two (2) standalone wire barges.

23.     ATB is an acronym which stands for Articulated Tug Barges. ATBs are a specialized vessel configuration used for towing and transporting cargo. They consist of a tank vessel, known as a barge, and a high-powered tugboat. The unique feature of ATBs is the presence

of a notch in the stern of the barge, into which the tugboat fits. This arrangement allows the tug to effectively propel and maneuver the barge. ATBs utilize an articulated or "hinged" connection system, providing flexibility and enhanced maneuverability between the tug and barge.

24.     All of the Pennantia Fleet are U.S. Flagged.  This means that the vessels are registered in the United States and are subject to U.S. laws and regulations wherever the vessel may operate, specifically relating to safety and crewing.  U.S. Flagged vessels also require that ownership, operation, and crewing of the vessels are done by U.S. citizens.

25.     The transportation of oil in a Jones Act fleet of ATBs is a highly regulated industry requiring substantial technical expertise to ensure safe operations.

**The Contractual Arrangements between Pennantia and RCM**

26.     Pennantia and RCM entered into a BIMCO Standard Ship Management Agreement (SHIPMAN 2009) on August 8, 2021 to manage and operate the acquired Pennantia Fleet (the "Shipman").  A copy of the Shipman is attached hereto as Exhibit 1.

27.     Clause 3 of Part II of the Shipman Agreement states: "The Managers shall carry out the Management Services in respect of the Vessel as agents for and on behalf of the Owners. The Managers shall have authority to take such actions as they may from time to time in their absolute discretion consider to be necessary to enable them to perform the Management Services…" *Id*.

28.     This broad delegation of authority includes the right of RCM to delegate and/or subcontract any of the required management services, including technical management.

29.     On July 24, 2025, due to Pennantia's continuing material breaches of the Shipman, including its persistent under funding of the Pennantia Fleet's vessel operating account, RCM

exercised its authority pursuant to the Shipman and has terminated its commercial relationship with Pennantia effective August 1, 2025.

30. Furthermore, on August 26, 2021, Pennantia issued a Power of Attorney to RCM to act in the capacity of authorized representative of Pennantia and conferring upon it powers which are listed in pertinent part below, including:

> (i) bind Pennantia with respect to contracts, agreements and undertakings related to the operations of Pennantia, including but not limited to charter agreements, repairs and maintenance, bunker fuel, ship yard agreements, insurance and other standard day-to-day requirements of the business;
>
> (ii) … make, execute and deliver all Contracts on behalf of Pennantia; and
>
> (iii) to do and perform generally all such acts and things that shall be necessary or convenient in order to carry out the foregoing.

A copy of the Power of Attorney is attached as Exhibit 2.

31. Under the Power of Attorney myself and John Parrott are authorized to act on Pennantia's behalf. *Id*., at Exhibit A thereto.

32. By its own terms, the Power of Attorney remained in full force and effect indefinitely, unless expressly revoked by Pennantia. *Id*. The Power of Attorney has never been revoked.

### Return to Service and Technical Management of the Vessels

33. Following the acquisition of the vessels in August of 2021, Foss held the responsibility to return the vessels to service, and then to begin technically managing the vessels.

34. By November of 2021, it started to become clear that Foss was struggling to perform all of the required services in a time and cost-efficient manner in order to return the Pennantia Fleet to commercial service and safely operate the Pennantia Fleet.

35. By January 2022, it was determined that it had become necessary to explore a change in both the return to service program and technical management of the Vessels.

36. Ultimately on February 2, 2022 Foss would terminate its role as technical manager of the Pennantia Fleet citing Pennantia's chronic underfunding of the Vessel Operating Account and safety concerns as the primary reasons.

37. Despite additional measures and guardrails imposed, Foss was unable to timely and safely return the fleet to active service. Foss continuously asked for more funding to hire more resources, but Pennantia did not believe that Foss was a prudent steward of capital, and was unimpressed with Foss' results. The delays placed a heavy financial burden on Pennantia, as the Pennantia Fleet was not commercially operating, and therefore not generating critical revenue.

38. As the relationship with Foss deteriorated, several other potential technical managers were contacted by myself and members of the RCM management team and board, including the former Maritime Administrator Rear Admiral Mark Buzby and former Assistant Secretary of the Air Force Kevin Billings.

39. The firms that I and other RCM management contacted included Crowley, Moran, Vane, Buffalo Marine, Patriot, McAllister, and Poling & Cutler. Nearly all of these potential technical managers showed little interest in taking over as the Pennantia Fleet's technical management, nor did they have the resources required to do so. The few operators that were interested, such as Crowley, wanted to charge substantially higher rates than Foss, who was also

consistently asking for more, and demanded a 180-day operational shutdown, and refused to assume any liability for the Pennantia Fleet's performance.

40. An existing third-party technical manager would not be unable to take over the technical management without significant fleet interruption and/or delay, cost, and uncertainty.

41. Accordingly, RCM and Pennantia chose to pursue a direction. Dove Cay, LLC would be formed to take on the Foss scope of work outlined in the Foss LOA with more oversight and purpose built to ensure better outcomes with limited, to no, operational down time during the transition of the Pennantia Fleet's technical management.

42. On a parallel path, RCM carried out the necessary steps to obtain its own U.S. Coast Guard DOC.

43. Throughout May and June 2022, Foss transitioned the portion of the Pennantia Fleet that it was technically managing from the Foss DOC to the RCM DOC, under Dove Cay's crewing and technical management. This solution enabled the Pennantia Fleet to continue trading seamlessly and earning significant revenue for Pennantia, avoiding the catastrophic effects of a full fleet shutdown.

44. Josh Trump on behalf of Pennantia, was intimately involved in the decision-making process to end the contractual relationship with Foss and transition the Pennantia Fleet to Dove Cay, LLC. Trump and Contrarian Capital wanted both performance and improved economic outcome, despite Pennantia's systemic underfunding, that was so severe that Pennantia could not afford to pay current, undisputed invoices.

**Dove Cay Maritime, LLC**

45.     Dove Cay was incorporated in the Spring of 2022.

46.     Dove Cay employed all marine and shoreside personnel falling within Foss LOA scope of services and served as crewing manager and employer for the crew that were onboard the Vessels.

47.     As of April 14, 2022, RCM, exercising its authorities under the Shipman and POA, retained Dove Cay the day-to-day technical management of the Pennantia Fleet.

48.     Throughout the past three (3) years, Dove Cay has provided critical necessaries and technical management services to the Vessels, including but not limited to, retaining and training crew, paying crew wages and operational expenses, providing food and supplies, overseeing vessel maintenance and upgrades, regulatory dry dockings, and providing regulatory and crew transportation —each a critical component to the maintenance, navigation, and safety of the Pennantia Fleet.

49.     Within the maritime technical management industry, it is customary for the technical manager and other maritime vendors to mark-up reimbursement of direct expenses, i.e., parts, supplies, labor and other necessaries between 20 and 25%, and occasionally more due to market scarcity. Accordingly, the Foss LOA, and Dove Cay's uplift of 10% on reimbursable necessaries expenses is well within, if not below the industry norm.

50.     Pennantia accepted the services rendered by Dove Cay and benefited from the same.

51.     Pennantia further ratified Dove Cay's services by remitting payment on open invoices and charges, at least in part, over the past three (3) years. *See*, Exhibit 3.

52. Dove Cay was authorized by Pennantia, the Owner of the Vessels to provide these services to the Vessels, did actually supply the necessaries to the Vessels, and has not been paid.

53. The services provided by Dove Cay are essential to functional operation of the Vessels and enabled the Vessels to continue their journey and trade.

54. Pursuant to the Shipman, Pennantia was obligated to deposit 60 days of estimated Management Reimbursement into the Pennantia Fleet's Vessel Operating Account. Nevertheless, Pennantia and Contrarian Capital have intentionally underfunded the Vessel Operating Account and sought to operate the Pennantia Fleet in an "artificially capital constrained environment" Per Josh Trump.

55. While Pennantia's decision to starve the Pennantia Fleet of necessary capital, leading to the present dispute, it previously led to Ledio Meta, a controller in RCM's accounting team to resign based on his explicit concern for the future of the Pennantia Fleet.

56. Josh Trump and I tried to convince Mr. Meta to stay at the time, and Trump even said that Pennantia would invest sufficient capital to return the RCM 242 and the tug Jesse Rose to commercial service in order to improve the Pennantia Fleet's cash flows, as it was always Pennantia, RCM, and Wells Fargo's plan to utilize the full Pennantia Fleet, not two-thirds.

57. At present, Dove Cay's maritime liens total over $29 million on the eighteen (18) Vessels, and is comprised of two main categories of claims:

   a. $16.4 million for technical and crewing services and necessaries; and

   b. $13 million in Dove Cay crew wages. A copy of the Pennantia's statement of unpaid invoices, as of July 1, 2025 is attached as Exhibit 3.

58. At all material times, Pennantia had knowledge of Dove Cay's role and the services, and were and are complementary of them, it was providing to the Vessels. Copies of all of Dove Cay's invoices to Pennantia are attached as Exhibit 4.

59. In direct reliance on the individual vessel's credit within the Pennantia Fleet and for Pennantia's benefit, Dove Cay deferred invoices for its technical management services and the supply of necessaries such as shipyard and other vessel maintenance, spares, and other necessary supplies and services.

60. Dove Cay would not have relied on Pennantia, or its parent company Contrarian Capital, to provide payment for Dove Cay's technical management services and the reimbursement of necessaries.

61. In fact, on April 26, 2024, Jennifer Diagonale, identified as an "authorized signatory" on behalf of Pennantia "acknowledged and agreed" to Dove Cay's right to charge a 3% finance charge, but that in yet another accommodation Dove cay was willing to accept only 1% for prompt payment, while expressly not waiving any rights to collect the full 3% on the principle balance of "approximately $4.9MM of accounts payable owed to Dove Cay." A copy of Pennantia's acknowledgement and agreement to Dove Cay's financing charge is attached hereto as Exhibit 5.

I hereby declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and accurate to the best of my knowledge.

Dated: August 4, 2025



Alex J. Parker