UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Pennantia, LLC, <br><br> Plaintiff, <br><br> v. <br><br> Rose Cay Maritime, LLC, and Dove Cay, LLC, <br><br> Defendants. | In Admiralty <br><br> Case No.  1:25-CV -05904-SHS |

# PLAINTIFF'S REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**HOLLAND & KNIGHT LLP**

Michael J. Frevola
F. Robert Denig
Chiara Kalogjera-Sackellares
787 Seventh Avenue
New York, New York 10019
michael.frevola@hklaw.com
robert.denig@hklaw.com
chiara.sackellares@hklaw.com
Telephone: 212.513.3200
Fax: 212.385.9010

*Attorneys for Plaintiff Pennantia, LLC*

# **TABLE OF CONTENTS**

**Page**

SUMMARY OF FACTS ................................................................................................................ 1

    A.    The DC Receivables ............................................................................................... 1

    B.    The Management Fees Claim ................................................................................ 2

ARGUMENT .................................................................................................................................. 3

    A.    The Current Dispute is Not About Necessaries .................................................... 3

    B.    DC's Monetary Claims are Manufactured and Contradicted by Multiple Agreements to Which it is a Party ........................................................................................... 4

        1.    DC's Alex Parker "Created" DC's Maritime Liens a Few Months Ago .......................... 4

        2.    Even Without Manufactured Charges, DC's Allocations Were Improper ...................... 5

        3.    DC's 36% Interest Rate Likewise is Manufactured ......................................................... 7

    C.    DC Waived Its Arrest and Lien Notice Rights Until Certain Currently Unsatisfied Conditions Are Fulfilled ........................................................................................ 8

    D.    Even Should This Court Address the Merits of DC's Lien Claims, Those Claims Fall Within Known Exceptions .................................................................................... 9

        1.    The Manager Exception ..................................................................................................... 9

        2.    The Owner Exception ...................................................................................................... 10

    E.    The Contractual Interest Rates Do Not Receive Maritime Lien Status ........................... 11

    F.    Should Amendment 8 Not Apply, Most of DC's Claims Are Barred By Laches ............ 12

    G.    The Other Injunction Factors Likewise Support Pennantia's Application ...................... 13

CONCLUSION ............................................................................................................................. 15

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*9352 Cranesbill Trust v. Wells Fargo Bank, N.A.*,
   459 P.3d 227 (Nev. 2020)..................................................................................................6

*Beech v. FV WISHBONE*,
   113 F. Supp. 3d 1203 (S.D. Ala. 2015)..............................................................................10

*The CENTAURUS*, 291 F. 751 (4th Cir. 1923)..........................................................................9

*Christiana Marine Serv. Corp. v. The HERCULES*,
   CIV. A. No. 90-3963, 1990 WL 145556 (E.D. Pa. Sept. 28, 1990) .........................................6

*F.H. McGraw & Co. v. Milcor Steel Co.*,
   149 F.2d 301 (2d Cir. 1945)................................................................................................6

*Frieslander v. Mahon*,
   400 So.2d 41 (Fla. 2d DCA 1981) .....................................................................................7

*The GYDA*, 235 F. 266 (D. Me. 1916)....................................................................................10

*Hamilton Factors Corp. v. Winston*,
   132 N.Y.S.2d 458 (Sup. Ct. N.Y. Cty. 1954) ....................................................................6

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,
   596 F.2d 70 (2d Cir. 1979)................................................................................................14

*Janmort Leasing, Inc. v. Econo-Car International, Inc.*,
   475 F. Supp. 1282 (E.D.N.Y. 1979) ................................................................................14

*Korea Trade Ins. Corp. v. Neema Clothing, Ltd.*,
   No. 11-CV-8980 (JMF), 2015 WL 363569 (S.D.N.Y. Jan. 28, 2015) .....................................5

*L & T East 22 Realty Co. v. Earle*,
   192 Misc.2d 75 (2d Dep't 2002)........................................................................................6

*Leopard Marine & Trading, Ltd. v. Easy Street Ltd.*,
   896 F.3d 174 (2d Cir. 2018)........................................................................................3, 12

*Liverpool & London S.S. Prot. & Indemn. Ass'n Ltd. v. M/V ABRA*,
   295 F. Supp. 2d 674 (M.D. La. 2003)..............................................................................11

*N. Am. Fisheries & Cold Storage, Ltd. v. Green*,
   195 A.D. 250 (1st Dep't 1921) ..........................................................................................6

*Norton Lilly Int'l, Inc. v. M/V IGUAZU*,
    Civ. A. No. 91-2828, 1992 WL 314979 (E.D. La. Oct. 19, 1992) ..................................12, 13

*Orlopp v. Willardson Co.*,
    232 Cal.App.2d 750 (DCA 5th Dist. 1965) ................................................................................6

*The OSWEGO No. 2*, 23 F. Supp. 311 (W.D.N.Y. 1938) ...............................................................12

*The PORTCHESTER*, 56 F.2d 579 (2d Cir. 1932) .......................................................................13

*Reconstruction Finance Corp. v. The WILLIAM D. MANGOLD*,
    99 F. Supp. 651 (E.D.N.Y. 1951) ..............................................................................................3

*Shahmoon Indus., Inc. v. Peerless Ins. Co.*,
    16 A.D.2d 716 (3d Dep't 1962) ................................................................................................5

*Standard Surety & Cas. Co. v. U.S.*,
    154 F.2d 335 (10th Cir. 1946) ..................................................................................................6

*Tayloe v. T. & S. Sandiford*,
    20 U.S. 13 (1822) ......................................................................................................................5

*Todd Shipyards Corp. v. THE CITY OF ATHENS*,
    83 F. Supp. 67 (D. Md. 1949) .................................................................................................10

*U.S. Oil Trading LLC v. M/V VIENNA EXPRESS*,
    911 F.3d 652 (2d Cir. 2018) ......................................................................................................3

*W.A. Marshall & Co. v. The PRESIDENT ARTHUR*,
    279 U.S. 564 (1929) ..................................................................................................................8

**Statutes**

28 U.S.C. § 1961(a) .......................................................................................................................12

N.Y. Lien Law § 83 .................................................................................................................12, 13

**Other Authorities**

70 C.J.S. § 39 ..................................................................................................................................6

**SUMMARY OF FACTS**

Pennantia[1] summarizes key facts here, with the accompanying Declaration of Joshua Trump ("Trump Decl.") and Christopher Crescenzo ("Crescenzo Decl.") providing amplifying facts to those asserted below.

**A. The DC Receivables**

DC's assertion it is owed over $13 million on this claim is flawed in multiple respects.

First, the parties agreed 12% interest would accrue ***after*** April 1, 2024. Trump Decl., ¶ 33 & Ex. 5. DC now asserts 36% interest accruals since June 2022, seemingly adopting the Ship Management Agreement's interest rate despite not being a party. Nothing exists to support that claim.

Second, if the "Crew and Technical Management Agreement" ("CTMA") between RCM and DC – first disclosed this week – is valid and governs Defendants' relationship, DC overcharged RCM (and Pennantia) by as much as $650,000/month, all while not disclosing the CTMA or its associated contractual payment caps. The CTMA expressly incorporates the original technical management agreement between RCM and Foss Maritime Company, LLC ("Foss"), titled "Letter of Agreement Concerning Rose Cay Fleet" dated August 3, 2021 and Appendix A ("LOA"), as well as ***any subsequent extensions and amendments thereto***. *See* Trump Decl., ¶¶ 6-7, & Ex. 1. As discussed below, LOA Amendment 8 capped charges that could be assessed Pennantia by DC. Those overcharges, to the extent included as principal in the asserted DC Receivables Claim, must be deducted.

---

[1] Defined terms in Pennantia's initial memorandum [Doc. 10] are used consistently herein.

Finally, DC recently appropriated $4.7 million in Pennantia's operating account, Crescenzo Decl., ¶ 81, and applied it to the DC Receivables Claim, which amount must be deducted from that claim.

**B. The Management Fees Claim**

Having seen the one-page CTMA, it is unsurprising that DC did not introduce that document willingly, as it exposes weaknesses DC's maritime lien claims and DC's inability to even presently assert those liens. As mentioned above, the CTMA incorporates the LOA "***as well as any subsequent extensions and amendments to the LOA*** . . . ." Trump. Decl., ¶ 4 (emphasis added). LOA Amendment 8 specifically provides that ***DC waived its right to bring court actions, arrest the Vessels, or to assert liens on the Vessels unless a multiple-step process ending in an arbitration award first was completed***. See id., Ex. 2, Amendment 8, ¶¶ 5-7, 12.[2]

LOA Amendment 8, as executed by Alex Parker days before the CTMA, established a final Foss/RCM pricing structure superseding prior pricing for the Pennantia Fleet. *Id.* ¶ 12 & Ex. A. It sets daily rates for identified Vessels and pairs, with no charge for the remaining six covered vessels in Exhibit A, all of which were laid up then and remain so today. *Id.* The CTMA/LOA do not provide for the Management Fees now sought by DC. The amended LOA's day rates are thrice defined as "all-inclusive rates," and "not to [be] exceed[ed]." *Id.* Under that pricing, monthly charges would be $1.65 million. Over 40 months, DC's monthly overcharges to, and amounts paid by, Pennantia cumulatively amount to approximately $15 million, now owed by DC to Pennantia. *See* Crescenzo Decl., ¶¶ 61-63. Nothing, by contrast, is owed to DC.

---

[2] Because of the Court's word limit on this brief, the Amendment 8 clauses are not quoted in full herein but are included as accompanying Appendix 1.

# ARGUMENT

DC's ultimate burden is to prove that it is entitled to maritime liens on the Vessels. *U.S. Oil Trading LLC v. M/V VIENNA EXPRESS*, 911 F.3d 652, 661-62 (2d Cir. 2018). As described above, DC's claims are divided into two discrete categories: (1) DC Receivables, and (2) Management Fees. Each claim has significant flaws and should be rejected.

### A. The Current Dispute is Not About Necessaries

Services provided to a vessel – such as repair services or provision of supplies – qualify as necessaries giving the provider a maritime lien. *Leopard Marine & Trading, Ltd. v. Easy Street Ltd.*, 896 F.3d 174, 179 (2d Cir. 2018). But none of DC's claims are necessaries. Pennantia paid over $77 million to DC through RCM during the years that DC acted as the Vessels' technical manager, which amounts paid all necessaries charges submitted to Pennantia during that time period. Crescenzo Decl., ¶¶ 15-17, 63.[3] For vendor services such as repairs, fuel, supplies, etc., invoices were provided directly to Bill.com by DC and paid by Pennantia. DC did not advance funds for those invoices. Trump Decl., ¶¶ 24-28. Hence, DC's contention that it seeks reimbursement for advances to necessaries providers is false, per the independent third-party who supervised Pennantia's finances. To the extent that Pennantia (a) never was invoiced for claimed services, or (b) provided funds to pay necessaries invoices and those funds were misapplied by Defendants, those actions do not create necessaries claims. *Reconstruction Finance Corp. v. The WILLIAM D. MANGOLD*, 99 F. Supp. 651, 652-53 (E.D.N.Y. 1951) (person advancing money to

---

[3] The manner in which DC documented its pending Receivables was to keep amounts owed ostensibly connected to invoices to Pennantia dating less than 90 days old. This did not mean that these invoices were left unpaid, but rather was the manner by which the DC Receivables debt was memorialized. With the exception of the DC Receivables, concerning which an agreement existed as to their delayed payment, no other payments to DC were delayed or left outstanding. Trump Decl., ¶¶ 36-37; Crescenzo Decl., ¶¶ 26-27.

3

pay mortgage without owner's knowledge was "mere volunteer" not entitled to maritime lien) (citations omitted).[4]

### B. DC's Monetary Claims are Manufactured and Contradicted by Multiple Agreements to Which it is a Party

DC apparently has retroactively manipulated its accounts to create the financial narrative now presented to this Court. Review of Parker Declaration Exhibit 3 [Doc. 33-3] reveals this process. The Exhibit 3 header states "Allocation of Payments – Interest First" and "Interest Rate – 3% per month." DC received payments from RCM – which payments were authorized and released through the Bill.com platform for specific invoices and paid in the exact amount of those invoices. Yet, it now attempts to (1) allocate the payments as it sees fit, and (2) charge a 36% interest rate on resulting outstanding balances. As explained by Mr. Crescenzo, DC's lien claims are based on retroactively manufactured data. Even were that not true, and Defendants had not doctored the invoices in question, its present positions would fail nonetheless.

#### 1. DC's Alex Parker "Created" DC's Maritime Liens a Few Months Ago

DC's inflated claims originated in 2025, not 2022. DC retroactively constructed its financial allocations after Mr. Parker inquired with Mr. Crescenzo in February 2025 regarding (a) "what DC would have charged if DC's charges had been based on the [LOA]", (b) adding the Management Fees and re-allocating earlier payments to repay the DC Credit Receivables, and (c) interest accruals under a 36% rate rather than the agreed 12% rate. Crescenzo Decl., ¶¶ 43-55. Citrin Cooperman subsequently generated these figures. Mr. Crescenzo further explains that he

---

[4] DC references in its opposition papers a Power of Attorney dated August 26, 2021 between Pennantia and RCM (the "POA"). Doc. 32, at 7 (arguing POA empowered RCM to bind Vessels and incur necessaries); Doc. 33 (Parker Declaration), ¶¶ 30-32. The sole point for which DC relies on the POA in its opposition is for the general principle that DC could procure necessaries for day-to-day operation of the Vessels. That is a non sequitur here, where DC's claims are not for necessaries or even legitimate charges. Pennantia therefore has no need to address the POA here, but reserves the right to challenge DC's characterization of the POA in future submissions to the extent the issue is relevant.

4

calculated these numbers applying the rates contained in the unamended LOA. *Id.* ¶¶ 45-46. Mr. Parker failed to tell Mr. Crescenzo of Amendment 8's re-setting the pricing structure. Mr. Crescenzo now has applied the amended LOA rates and, using that pricing, has calculated that Pennantia actually has **_overpaid DC by approximately $12.3 million_** during DC's management. *Id.* ¶¶ 61-63.

Simply stated, all of the legal arguments regarding necessaries and maritime liens are secondary to this primary issue. As verified by a director of the independent financial controller used by the parties, DC used incorrect contractual rates and retroactively reapplied funds received to create its current "liens" on the Pennantia Fleet.

### 2. Even Without Manufactured Charges, DC's Allocations Were Improper

"[W]hen a debtor owes multiple debts to the same creditor, the **_debtor_** 'has the initial right to specify which obligation he wishes the payment to be applied to.'" *Korea Trade Ins. Corp. v. Neema Clothing, Ltd.*, No. 11-CV-8980 (JMF), 2015 WL 363569, at *3 n.2 (S.D.N.Y. Jan. 28, 2015) (emphasis in original) (citations omitted).

> A debtor in making payment to a creditor to whom he owes more than one obligation **_has the right to direct application of the payment to a specific debt_** and it is only where the debtor has made no specific allocation that the creditor can then allocate the payment as he wishes.

*Shahmoon Indus., Inc. v. Peerless Ins. Co.*, 16 A.D.2d 716, 717 (3d Dep't 1962) (emphasis added) (citations omitted). For over 200 years, it has been accepted a debtor may indicate application of payment through conduct:

> A payment may be attended by circumstances which demonstrate its application as completely as words could demonstrate it. A positive refusal to pay one debt, and an acknowledgement of another, with a delivery of the sum due upon it would, we think, be such a circumstance.

*Tayloe v. T. & S. Sandiford*, 20 U.S. 13, 20-21 (1822).

5

Payment of an amount matching an open invoice is viewed as a direction to pay the invoice it exactly matches. *L & T East 22 Realty Co. v. Earle*, 192 Misc.2d 75, 76-77 (2d Dep't 2002); *Orlopp v. Willardson Co.*, 232 Cal.App.2d 750, 758 (DCA 5th Dist. 1965) (citing cases); *see also* 70 C.J.S. § 39 (stating that "payment of the exact sum due on one of two claims indicates that the sum was intended in payment of the claim it would exactly pay.") (citing cases); *Hamilton Factors Corp. v. Winston*, 132 N.Y.S.2d 458, 459 (Sup. Ct. N.Y. Cty. 1954).

The Restatement (Second) of Contracts makes clear that DC's asserted allocations are unsupportable as a matter of law:

> (2) **_A creditor cannot apply such a payment to a debt if_** . . . (c) **_the debt is disputed_** or is unenforceable on grounds of public policy. . . .

Restatement (Second) of Contracts § 259(2)(c) (1981) (emphasis added); *accord Christiana Marine Serv. Corp. v. The HERCULES*, CIV. A. No. 90-3963, 1990 WL 145556, at *6 (E.D. Pa. Sept. 28, 1990) (citation omitted); *Standard Surety & Cas. Co. v. U.S.*, 154 F.2d 335, 337 (10th Cir. 1946).

Furthermore, comment (a) to this section of the Restatement provides that the creditor cannot apply payments to a debt "**_that is not matured at the time of payment_**." *See, e.g.*, *F.H. McGraw & Co. v. Milcor Steel Co.*, 149 F.2d 301, 306 (2d Cir. 1945) (emphasis added) (citation omitted); *see also N. Am. Fisheries & Cold Storage, Ltd. v. Green*, 195 A.D. 250, 253-54 (1st Dep't 1921) (reversing trial court judgment where issue existed as to whether funds were applied to unmatured debt).

Even where a debtor does not specifically allocate its payments, a creditor must make a timely allocation of funds received and cannot do so after a dispute has arisen between the parties. *Standard Surety & Cas. Co.*, 154 F.2d at 337; *9352 Cranesbill Trust v. Wells Fargo Bank, N.A.*,

6

459 P.3d 227, 231 (Nev. 2020) (citation omitted); *Frieslander v. Mahon*, 400 So.2d 41, 42 (Fla. 2d DCA 1981) (citation omitted).

Here, all of Pennantia's payments made through the Bill.com platform were for specific amounts to pay specific invoices – invoices for necessaries providers loaded onto the platform. Trump Decl., ¶ 41. DC specifically has admitted that it re-directed payments received from RCM on Pennantia's behalf to its own debts, including unmatured and disputed claims, rather than to pay outstanding accounts. *See id.* ¶¶ 41-43. DC has no legal right to take exact payments for open invoices, apply them as it sees fit, and then assert a maritime lien for the resulting amounts owed. That such application to pay DC Receivables debt purportedly was performed in July 2025, *id.* ¶¶ 46-49 – well after a controversy had arisen over claimed amounts due to DC – compounds the legal infirmity. As explained by Mr. Trump, both the Pennantia deferred claims and the DC Receivables were treated as unmatured debts that would not be paid until Pennantia was in a strong financial condition or when the Pennantia Fleet was sold. Trump Decl., ¶¶ 32, 34. Unmatured debts cannot be the subject of allocation by a creditor. DC's claim that the DC Receivables were owing does not alter that conclusion; it makes the debt disputed, and hence incapable of re-allocation by the creditor. Simply stated, there is no variation of facts where the Parker Exhibit 3 account table is applicable.

### 3. DC's 36% Interest Rate Likewise is Manufactured

DC's claim figures in Parker Exhibit 3 purport to charge a 36% interest rate, versus the 12% interest rate commencing on April 1, 2024 agreed by Mr. Parker. The CTMA has no "late" interest rate. Nor does the LOA, its Amendments, or Pennantia's internal financial statements, as maintained by RCM and Citrin Cooperman. To establish DC's asserted claim, DC retroactively doctored its invoices to show an amount owed. Review of DC's invoices contemporaneously issued over the past three years show no interest rate. Yet, those exact same invoices have been

7

reloaded on Bill.com within the last several weeks to include a purported 36% interest rate. Trump Decl., ¶¶ 45-49 & Exs. 1-4. This is blatant fraud, and DC is using it to either torpedo the Pennantia Fleet sale or extort an unconscionable settlement. Hence, even if DC was entitled to allocate payments that it received, it could not magically summon a 36% interest rate and allocate funds to pay that "interest" first. But review of Parker Exhibit 3 shows that is precisely what DC has done.

### C. DC Waived Its Arrest and Lien Notice Rights Until Certain Currently Unsatisfied Conditions Are Fulfilled

The Facts section explains the CTMA/LOA relationship, including that DC agreed to "**_refrain from pursuing_** ancillary relief to obtain security or countersecurity **_and/or to arrest, attach or assert liens on each other's tangible or intangible property_**" throughout a multi-tiered mediation and arbitration process. Trump Decl., Ex. 2, Amendment 8, ¶¶ 5-7 (emphasis added).[5]

A party possessing a maritime lien unquestionably may waive it. *W.A. Marshall & Co. v. The PRESIDENT ARTHUR*, 279 U.S. 564, 568-72 (1929). Amendment 8 makes clear DC cannot commence dispute resolution (such as an arrest proceeding), arrest the Vessels, "or assert liens" on the Vessels before first mediating and, thereafter, **_completing_** arbitration. *See* Trump Decl., Ex. 2, Amendment 8, ¶¶ 5-7. DC waived its right to assert the liens otherwise. No evidence exists Defendants have completed the required mediation/arbitration process. Yet DC filed its Notices of Claim of Lien with the USCG NVDC as well as arrested the *Tug LYNNE ROSE* and *Tank Barge RCM 270* in Panama last weekend. These actions are in direct violation of the very contract that DC claims controls its lien claims.

**_All_** of DC's maritime lien claims originate out of its role as the technical manager of the Pennantia Fleet of which RCM is a part owner. According to DC, the CTMA (as well as the LOA,

---

[5] Any argument that paragraphs 4-7 of Amendment No. 8 do not apply because they only implicate RCM property fails because RCM is a part owner of Pennantia.

8

as amended) governs its performance of its services for RCM. Hence, all of DC's rights are governed by the amended LOA. Amendment 8 contains a waiver of DC's right to arrest the Vessels or to assert a lien over them, which only is extinguishable through DC satisfying the aforementioned conditions precedent. Therefore, without need for further examination, this Court should hold that DC has waived its right to arrest any of the Vessels or to assert liens on those Vessels unless, and until, DC fulfilled the condition precedents provided in Amendment 8.

### D. Even Should This Court Address the Merits of DC's Lien Claims, Those Claims Fall Within Known Exceptions

The exceptions below bar DC's lien claims, each based on an estoppel theme, which deny liens to those intimately connected to the vessel. Here, as Mr. Parker admits he was involved with the Pennantia Fleet even before it was purchased, *see* Doc. 33, ¶¶ 4, 7-12, DC arguably falls into each of these exceptions.

#### 1. The Manager Exception

Tellingly, DC's opposition fails to address Point II(A)(2)(b) of Pennantia's initial brief, titled "*Ship Management Services Do Not Give Rise To Maritime Liens*." That section specifically stated that "[c]ourts have rejected the notion that breach of a ship management agreement gives rise to a maritime lien." *See* Doc. 10, at 20. This proposition has a substantial pedigree:

> Has a general agent, as such, in the admiralty, the right to a lien for payments made by it in due course of its business? ***The general rule that such lien does not exist under the laws of the United States is too well settled to admit of serious controversy.***

*The CENTAURUS*, 291 F. 751, 752 (4th Cir. 1923) (citations omitted) (emphasis added).

> In delineating between a "general agent" and a "special agent," one court stated:
>
> "A general agent is an agent authorized to conduct a series of transactions involving a continuity of service . . . . A special agent is an agent authorized to conduct a single transaction or a series of transactions not involving continuity of service." The facts in the *Centaurus* clearly showed ***continuity of service of the agent who continuously for many years represented the owner with respect to a whole fleet***

9

> *of ships*; while in *The Ascutney*. . . the special agent was employed only in one port on one occasion.

*Todd Shipyards Corp. v. THE CITY OF ATHENS*, 83 F. Supp. 67, 88 (D. Md. 1949) (emphasis added) (quoting Restatement of Agency § 3); *accord The GYDA*, 235 F. 266, 269 (D. Me. 1916) (citations omitted).

DC's was a general agent of the Pennantia Fleet managing all Vessel crews as well as performing technical management for the Vessels. It acted in this capacity for years. As described above, DC was not "employed only in one port on one occasion," but rather was employed for many years with respect to the whole Pennantia Fleet. Because DC acted as a general agent for the Pennantia Fleet, this Court should find DC's claims do not give rise to liens.

### 2. The Owner Exception

DC counters Pennantia's "owner exception" argument, *see* Doc. 10, at 20-23, by arguing "[m]aritime law only denies liens to owners or part-owners of vessels." Doc. 32, at 11 (citing *Beech v. FV WISHBONE*, 113 F. Supp. 3d 1203, 1211-12 (S.D. Ala. 2015)). The *Beech* decision is more expansive than DC suggests, opining that "persons who own ***or otherwise have the ability to control or influence the affairs of a vessel***" are not entitled to a lien for their services. *Id.* at 1212 (emphasis added). The footnote provided at the end of the preceding quote further explains:

> "The purpose of a maritime lien, therefore, is to encourage the provision of goods and services, especially in distant ports, by providing an *in rem* claim against the vessel itself **should the *party controlling the vessel's affairs* abscond** . . . . Since owners ***are the ones that control the vessel's affairs***, they do not require such a mechanism."

*Id.* at 1212 n.10 (emphasis added) (citations omitted)).

The Panamanian arrest provides a perfect example of this proposition. Despite Defendants – both run by Alex Parker – having full operational control of the Vessels arrested, DC seized those Vessels claiming to be essentially an outside trade creditor needing security for its claims. Having

10

employed the Vessels' crews for years, and being intimately affiliated with the Pennantia Fleet, DC cannot claim to be a "stranger to the vessel." Hence, DC should not be entitled to assert the liens that it seeks to enforce.

DC argues it is a "bona fide necessary supplier[ ]." Doc. 32, at 11. This simply is not the case. DC has shifted monies received to game the system and claim necessaries have been unpaid. DC's true claims are price markups and management fees (with exorbitant manufactured interest), similar exorbitant interest rates on the DC Credit Receivables claim, and whatever modest amount – in all probability less than $1 million[6] – that might remain on the DC Receivables Claim itself.[7]

### E. The Contractual Interest Rates Do Not Receive Maritime Lien Status

It is well-settled that contractual interest does not receive maritime lien status. *Liverpool & London S.S. Prot. & Indemn. Ass'n Ltd. v. M/V ABRA*, 295 F. Supp. 2d 674, 692 (M.D. La. 2003). In *The OSWEGO No. 2*, 23 F. Supp. 311 (W.D.N.Y. 1938), the court denied the award of any interest whatsoever "because of the delay in asserting the lien." *Id.* at 312.

Other than the 12% rate under the DC March 31, 2024 letter, no interest rate should govern DC's claims, and that rate should not apply to DC's claimed liens. Rather, should any of DC's claims be entitled to maritime lien status, those claims at most should receive statutory interest (on

---

[6] As explained in the Crescenzo Declaration, the balance on monies owed DC at the end of July 2025 should be approximately $4.7 million in Pennantia's favor. Crescenzo Decl., ¶ 81. Applying the $608,000 good faith payment made by Pennantia to DC in March 2025 against the $5.5 million in principal and approximate $508,000 in interest at 1% per month that was pending on the DC Credit Receivables at that juncture, Pennantia should have owed approximately $5.4 million in principal in March 2025 on the DC Credit Receivables with all interest fully paid. Even disregarding the very real possibility that DC has overbilled Pennantia – and Pennantia has overpaid DC – an approximate amount of $12.3 million over the last three-plus years, applying the $4.7 million in overcharges from July 2025 against the DC's Credit Receivables claim leaves that claim (even with the 1% monthly interest running from March 2025) at less than $1 million.

[7] Pennantia also argued in its initial brief that the (1) subcontractor and (2) knowledge of lack authority to bind vessels to liens exceptions also might apply. *See* Doc. 10, at 17-20. While Pennantia does not waive those arguments, in light of the production of the CTMA, the subcontractor argument and the pricing limitations on the CTMA make these issues potentially less pertinent for this application. Should discovery show the CTMA to not be enforceable, however, Pennantia reserves its right to reassert these arguments later in these proceedings.

its lien claim) pursuant to 28 U.S.C. § 1961(a), and (in Pennantia's view) should receive no interest credit whatsoever for failing to raise its claim until years after the fact.

### F. Should Amendment 8 Not Apply, Most of DC's Claims Are Barred By Laches

Should the LOA not govern, most of DC's claims should be barred by laches. "Liens should be enforced with a 'high degree of diligence,' and failure to use such diligence subjects the creditor to the defense of laches." *Norton Lilly Int'l, Inc. v. M/V IGUAZU*, Civ. A. No. 91-2828, 1992 WL 314979, at *1 (E.D. La. Oct. 19, 1992). "Laches . . . . is an equitable defense that bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Leopard Marine*, 896 F.3d at 193 (citation omitted). Laches examines whether (1) claimant has inexcusably delayed exercising its lien, and (2) the opposing party will suffer prejudice. *Id.* at 194 (citation omitted). To decide whether claims are barred by laches, "courts of admiralty will use local limitations statutes as a rule-of-thumb." *Id.* at 195 (quoting *Larios v. Victory Carriers, Inc.*, 316 F.2d 63, 66 (2d Cir. 1963)).

> When the suit has been brought after the expiration of the state limitation period, a court applying maritime law asks why the case ***should*** be allowed to proceed; when the suit, although perhaps long delayed, has nevertheless been brought within the state limitation period, the court asks why it ***should not*** be.

*Id.* (emphasis in original) (quoting *Larios*, 316 F.2d at 66).

For nearly a century, the Second Circuit has held "the relevant local statute of limitations is Section 83 of the New York Lien Law," *id.*, which statute provides vessel lien claims are time barred "***at the expiration of twelve months after the debt was contracted.***" *Id.* (emphasis in original) (quoting N.Y. Lien Law § 83); *accord The PORTCHESTER*, 56 F.2d 579, 579-80 (2d Cir. 1932). Here, should the amended LOA not be a temporary waiver by DC of its right to enforce against the Vessels until after its conditions precedent are satisfied – i.e., an excuse as to why DC

12

had not promptly acted on its purported liens – then all of DC's claimed liens older than one year should be barred by laches.

First, DC's delay in providing any notice to Pennantia was inexcusable. *Norton Lilly*, 1992 WL 314979, at *1 (E.D. La. Oct. 19, 1992) (lien claimant's failure to enforce lien within analogous limitations period constituted *per se* inexcusable delay) (citations omitted).

Second, DC's failure to notify Pennantia of its purported liens for years as they purportedly accrued has prejudiced Pennantia. Pennantia asked repeatedly for years to see any DC/RCM contract. Pennantia negotiated with RCM regarding these very issues mere weeks after the CTMA purportedly was executed by Alex Parker for both RCM and DC. DC claims the CTMA has governed for years, and that millions of dollars in charges and interest have accrued. Had Pennantia known of these claimed charges, it could have acted to terminate the DC relationship or contest the purported liens years ago. Instead, DC has slept on these issues for years, and only now raises them when Pennantia seeks to sell its fleet.

Hence, if the amended LOA's forbearance provisions are inapplicable, laches should govern and all of DC's claims older than a year from the date that DC filed its Notices of Claim of Lien therefore should be barred.

### G. The Other Injunction Factors Likewise Support Pennantia's Application

DC argues Pennantia will not suffer irreparable harm absent injunctive relief or is not entitled to injunctive relief. Doc. 32, at 16 (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)). In *Janmort Leasing, Inc. v. Econo-Car International, Inc.*, 475 F. Supp. 1282 (E.D.N.Y. 1979), the court distinguished the *Jackson Dairy* non-monetary irreparable injury prong by noting that "loss or destruction of a going business constitutes irreparable harm," *id.* at 1294 (citations omitted), and losses "which cannot be reduced to monetary value with

13

'sufficient accuracy to make damages an adequate substitute' for injunctive relief." *Id.* (citations omitted). Here, as prior filings with this Court demonstrate, Defendants' actions are intended to wreck the Pennantia Fleet sale that has progressed to the point of an executed Letter of Intent and vessel due diligence inspections. The interference now has further progressed, with DC now interfering with the most valuable intangible asset Pennantia has – the long term time charter of the *Tug LYNNE M. ROSE* and *Tank Barge RCM 270* with PBF Holding Company LLC ("PBF") – by (1) arresting those vessels in a foreign country after representing to the Court that these vessels would be delivered to California, (2) arresting the vessels where a waiver provision precludes such an arrest (and not advising the Panamanian court of such a provision, nor including the relevant contractual provision in their court filings), and (3) adding a further *in personam* maritime attachment claim for approximately $24 million – making posting security to release the vessels impossible – where such a claim is frivolous as a matter of law.

Because of Jones Act regulatory restrictions, the possible suitors for a fleet of U.S. flag tugs and barges are few. Should Defendants' interference in Pennantia's sale of the Vessels succeed, it well may destroy Pennantia or make the losses arising out of such a sale difficult to ascertain. Indeed, if the PBF charter is terminated, that asset (an important part of the possible fleet sale) will be lost and will have a knock on effect as to the sale value of the fleet, one which well may be difficult or impossible to quantify.

With respect to the balance of harms, ordering the withdrawal of the Notices of Claims of Lien do not impact any legitimate lien right that DC has against the Vessels. Should DC defeat Pennantia's declaratory judgment application seeking a determination that DC does not possess maritime liens on the Vessels, DC will have what it always had – maritime liens against a fleet of

14

U.S. flag vessels. But if the Notices of Claims of Lien remain and ruin the sale of the Pennantia Fleet, the resulting damage may not be capable of being rectified.

Finally, as shown by the maritime lien statute itself, public policy favors parties not filing false lien claims, to the extent that a party defeating such a claim is entitled to recover its attorneys' fees. Hence, ordering the withdrawal of such lien claims – especially in light of their magnitude – until such time as they are determined to be valid serves the public interest.

## CONCLUSION

For the foregoing reasons, Pennantia respectfully requests the Court grant its application, and (1) order DC to withdraw its Notices filed with the USCG NVDC against the Vessels unless it proves its liens, (2) order DC to terminate the Panama *in rem* arrest of the *Tug LYNNE M. ROSE* and the *Tank Barge RCM 270*, (3) order Defendants to comply with Pennantia's orders regarding the Vessels, and (4) order Defendants to turnover all documents/records and crew information for the Vessels, and for such other relief as the Court may deem appropriate.

Dated: New York, New York
August 10, 2025

HOLLAND & KNIGHT LLP

 *s/ Michael J. Frevola*
Michael J. Frevola
F. Robert Denig
Chiara Kalogjera-Sackellares
787 Seventh Avenue
New York, New York 10019
michael.frevola@hklaw.com
robert.denig@hklaw.com
chiara.sackellares@hklaw.com
Telephone: 212.513.3200
Fax: 212.385.9010
*Attorneys for Plaintiff*
*Pennantia, LLC*

# APPENDIX 1

## Selected LOA Amendment 8 Clauses

5. Any and all disputes between [Foss] and [RCM] . . . are to be submitted to confidential mediation . . . before resorting to other dispute resolution ***and before pursuing ancillary relief to obtain security or countersecurity and/or to arrest, attach or assert liens on each other's tangible or intangible property*** . . . . The parties further agree that they retain and do not waive any rights, claims and defenses, including the right to pursue pre-judgment security, but have agreed to refrain and stay all such actions pending resolution of mediation.

6. Should any dispute remain outstanding at the conclusion of the mediation, the parties will meet and confer . . . ***and further agree to continue to refrain from pursuing ancillary relief to obtain security or countersecurity and/or to arrest, attach or assert liens on each other's tangible or intangible property***.

7. Should any dispute remain outstanding at the conclusion of such meet and confer, the parties agree to continue to refrain from pursuing ancillary relief to obtain security or countersecurity and/or arrest, attach or assert liens on each other's tangible or intangible property and further agree that any remaining matter in dispute shall be referred to [arbitration] at New York . . . . ***Following the issuance of the arbitration award***, if the award remains unsatisfied as of the due date set therein, either party may pursue appropriate relief to recognize and/or enforce the arbitration award, ***including but not limited to obtaining security or countersecurity and/or to arrest, attach or assert liens on each other's tangible or intangible property***.

\* \* \*

12. In the event of a conflict between the terms of this Amendment 8 and the LOA, this Amendment 8 shall supersede and control.

LOA Amendment 8 (emphasis added).

16