HOLLAND & KNIGHT LLP
Michael J. Frevola
F. Robert Denig
Chiara Kalogjera-Sackellares
787 Seventh Avenue
New York, New York 10019
michael.frevola@hklaw.com
robert.denig@hklaw.com
chiara.sackellares@hklaw.com
Telephone: 212.513.3200
Fax: 212.385.9010

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Pennantia, LLC, <br><br> Plaintiff, <br><br> v. <br><br> Rose Cay Maritime, LLC, and Dove Cay, LLC, <br><br> Defendants. | In Admiralty <br><br> Case No. 1:25-CV-05904-SHS <br><br> **SECOND DECLARATION OF JOSHUA TRUMP** |

I, JOSHUA TRUMP, declare as follows:

1. I am the managing director of Contrarian Capital Management, L.L.C. ("CCM"), which holds 86.25% of the aggregate beneficial interests in the Plaintiff, Pennantia, LLC ("Pennantia"), in this proceeding. Pennantia is the owner of *ANNA ROSE*, *LYNNE ROSE*, *JORDAN ROSE*, *REBEKAH ROSE*, *SUSAN ROSE*, *CINDY ROSE*, *JESSE ROSE*, and *JOAN ROSE* and the tank barges *RCM 210*, *RCM 225*, *RCM 242*, *RCM 245*, *RCM 250*, *RCM 252*, *RCM 260*, *RCM 262*, *RCM 270*, and *RCM 295* (the "Vessels" and each a "Vessel," which Vessels comprise the "Pennantia Fleet").

2. I make this Second Declaration in further support of Pennantia's emergency application to this Court for injunctive relief to:

   a. Order that the Notices of Claims of Liens filed by Dove Cay, LLC ("DC") against the Vessels be removed, as those Notices are void, invalid, and of no effect, and order the removal of these encumbrances from the record of the U.S. Coast Guard's National Vessel Documentation Center; and

   b. Order DC to terminate the Panama *in rem* arrest of the *Tug LYNNE M. ROSE* and the *Tank Barge RCM 270*.

**The Crew and Technical Management Agreement**

3. On Monday, August 4, 2025, for the first time since Pennantia and RCM entered into the Ship Management Agreement dated August 8, 2021 (the "Ship Management Agreement"), Pennantia was made aware of the existence of a one-page document entitled "Crew and Technical Management Agreement" ("CTMA") entered into between RCM and DC  A copy of the CTMA as produced by DC's counsel in this proceeding is attached as Exhibit 1.  Pennantia became aware of the existence of the CTMA when it saw reference to the CTMA having been submitted as "prima facie evidence" in support of the vessel arrest in Panama.  The CTMA was not provided to Pennantia with the arrest papers, and Pennantia saw the CTMA itself for the first time on August 5, 2025 after seeking the Court's assistance in obtaining it, and it was provided by counsel to DC in this proceeding.

4. The CTMA appears to have been executed on April 14, 2022, and was signed by Alex Parker as signatory for both RCM and DC.

5. Pennantia was not a party to the CTMA.

6. The CTMA has few if any terms of its own, and instead, expressly incorporates the terms of a Letter of Agreement Concerning Rose Cay Fleet, dated August 3, 2021 and Appendix A ("LOA") as well as any subsequent extensions and amendments thereto. *See* Ex. 1.

7. The CTMA, paragraph 4, specifically provides that:

> It is mutually agreed between the parties that this Agreement and the terms and conditions of the [LOA], including the Acceptance Certificate for vessels listed on Annex "A" as well as nay subsequent extensions and amendments to the LOA with their respective Appendices are hereby incorporated by reference in to this Agreement and shall be considered part of this Agreement and shall be performed subject to the terms and conditions contained therein.

8. Based on information and belief, although the CTMA was submitted to the court in Panama in support of the arrest, the LOA was not provided to the court in Panama.

9. The LOA is comprised of the August 3, 2021 technical management agreement between RCM and Foss Maritime Company, LLC ("Foss") and includes eight (8) subsequent amendments to the LOA. True and correct copies of the LOA and its Amendments are attached as Exhibit 2.[1]

10. Pennantia was not a party to the LOA.

11. The final LOA amendment, Amendment 8, was executed on or about April 8, 2022, six days before the purported execution date of the CTMA. A true and correct copy of the email dated April 8, 2022 announcing the execution of Amendment 8 – on which email I was copied – is annexed as Exhibit 3.

12. Amendment 8 to the LOA was executed by Alex Parker, supersedes all prior agreements as to all terms set forth therein, and expressly establishes a flat monthly pricing

---

[1] Amendments 1-7 to the LOA are merely temporal extensions of the LOA, and are included here in the interest of providing the Court with a complete record of the LOA. In contrast, as discussed below, Amendment 8 of the LOA contains material terms which amended the original LOA.

structure covering all vessels listed on Exhibit A thereto. *See* Ex. 2, Amend. 8, ¶¶ 10, 12. Day rates for each applicable vessel in paragraph 10 are as follows.

| Vessel(s) | Day Rate |
|---|---|
| RCM 252 & Susan Rose | $7,898.20/day |
| RCM 270 & Lynne M. Rose | $16,652.83/day |
| RCM 252 & Anna Rose | $8,165.26/day |
| RCM 262 | $1,547.40/day |
| RCM 245 & Rebekah Rose | $12,335.90/day |
| RCM 250 & Jordan Rose | $8,060.33/day |
| RCM 260 | $1,547.40/day |

Despite not being listed in the foregoing table, six vessels in laid up status were listed in Exhibit A and, therefore, remained under Foss' management. The six vessels have remained in layup status under entirety of RCM's management of the Pennantia Fleet under the Ship Management Agreement and, consequently, under the entirety of the time that DC participated in management of the Pennantia Fleet. Pursuant to Amendment 8, the six vessels in layup status do not have separate fees but rather are included in the fees outlined in Amendment 8 for the other vessels.

13. The LOA day rates (as amended by LOA Amendment 8) are all-inclusive, expressly not subject to upward revision and including wages, fringe benefits, travel, lodgings, and meals of all contractor employees, including administrative personnel. *See id.* ¶ 10. Those rates approximate to $1,650,000 per month.

14. The LOA (as amended by LOA Amendment 8) further requires that DC undertake a multi-step dispute resolution process culminating in a final arbitration award prior to pursuing

any counterclaims, arresting the Vessels, or asserting any liens on the Vessels. *See id.* ¶¶ 5-7. These provisions apply to any dispute arising under or relating to the LOA and its Amendments.

15.     When the Foss LOA terminated under contentious circumstances with Foss claiming damages against RCM, Foss and RCM followed this multi-step process of dispute resolution during mediation (which took place in 2023) and arbitration (which took place in early 2025). Throughout the mediation and arbitration process, Foss did not arrest or attach assets of RCM nor file notices of liens on the Vessels.

16.     Upon information and belief, if the one-page CMTA is genuine, it represents the only written contract governing DC's services, obligations and rights to payment and enforcement. Despite Pennantia making multiple requests over the course of RCM's and DC's management of the Pennantia Fleet for any agreements entered into between RCM and DC related to the management of the Pennantia Fleet, no document ever was produced by either RCM or DC until this past week.

17.     Furthermore, during May and June 2022, during the transition from Foss to RCM providing crewing and technical management inhouse utilizing DC, RCM and Pennantia engaged in multiple discussions with RCM in which RCM sought Pennantia's agreement to certain terms and conditions related to RCM and DC's management of the Pennantia Fleet. Among other things, RCM sought certain amendments to the Shipmanagement Agreement that would have permitted a markup on passthrough reimbursements, and additional management fees. Those discussions never culminated in either an amendment to the Shipmanagement Agreement or any separate written agreement with respect to the terms and conditions of RCM's use of DC for crewing and technical management services. True and correct copies of communications between RCM and Pennantia during May/June 2022 memorializing these discussions are annexed as Exhibit 4.

18. At no point during those discussions did RCM notify Pennantia of the existence of the CTMA.

19. Neither RCM nor DC identified or produced the CTMA even when proposing modifications to the existing Ship Management Agreement related to the same issues.

20. At best, the CTMA was intentionally withheld from Pennantia by RCM and DC. At worst, the CTMA was fraudulently executed well after April 8, 2022 and backdated by RCM and DC.

21. Unlike the LOA and its Amendments which were executed via DocuSign, because the CTMA was signed in pen by Alex Parker as signatory for both RCM and DC, there is less ability to verify the authenticity of the execution of the CTMA.

## The Parties' Course of Performance

22. As detailed in Pennantia's pleadings and in my first declaration in support thereof executed on July 21, 2025 [Doc. 9], upon DC's assuming crewing and technical management services for RCM, Pennantia agreed to pay certain new categories and amounts for DC's crewing and technical management services of the Pennantia Fleet.

23. Specifically, the monthly payments that were made to RCM during the Foss management period were modified and increased in the DC invoices paid by Pennantia, which in additional to actual crewing wages and benefits, included significant monthly compensation for DC's provision of shore-side personnel, overhead costs, and a fixed administrative charge, to compensate DC for its management activities. While Pennantia and RCM never reached a written agreement concerning DC's retention, Pennantia agreed to the new categories of charges, which Pennantia, RCM and DC followed in the ordinary course of business for over three years.

24. Pursuant to this course of dealing, RCM and DC proceeded to issue invoices in accordance with the procedures outlined in the Ship Management Agreement, and Pennantia paid such invoices accordingly.

25. In total, Pennantia paid over $77 million to DC, through RCM, for management services over the course of over three years during which DC acted as the Pennantia Fleet crewing and technical manager. That approximates to $2 million per month.

26. Amounts paid to DC covered all crew wages and service provider charges submitted to Pennantia over the course of this time period, and included a monthly administrative fee and personnel costs charges totaling over $100,000 per month.

27. The monthly DC invoices included specific categories of expense line items.

28. No DC monthly invoice that I have seen during the course of my work with RCM and Pennantia – included a charge for either (a) a 10% markup on other vendor invoices or (b) additional fixed management or overhead fees (other than the $55,000 "Admin Fee," the $45,000 "Provision for T&E Expenses," and the various "Shoreside Team" charges that appeared to include office and/or administrative expenses for "Bookkeeper" and undefined "Personnel").

29. Pennantia was invoiced for these charges through the Bill.com platform and arranged to pay those charges as they were presented to Pennantia.

30. None of the charges that Pennantia agreed to, and subsequently paid, ever included any 10% mark-up on all costs or the newly identified "management fee."

31. Pennantia had never previously seen the charges or the invoices before counsel for DC provided them after giving notice to Pennantia of the filing of DC Notices of Claims of Liens.

**Credit Receivables Arrangements[2]**

32. As discussed in detail in my previous declaration, in early 2022, to address liquidity concerns relating to the over budget return to service project, the beneficial owners of Pennantia agreed to, in effect, provide incremental funding to the enterprise via a credit receivables purchase arrangement with DC. From 2022 to 2024, CCM and DC, respectively, agreed to purchase $6.5 million (the "CCM Credit Receivables") and $5.5 million (the "DC Credit Receivables") of credit receivables (collectively, the "Credit Receivables"). These Credit Receivables were funded as they became necessary for further company liquidity in several transactions during the time period from and ultimately totaled approximately $12.0 million. The purpose of this arrangement was twofold: (a) to allow DC to be able retain sufficient capital to pay the crew of the Pennantia Fleet, and (b) to provide Pennantia liquidity for its own activities.

33. CCM paid the balance of the CCM Credit Receivables in cash to DC, and RCM was to similarly pay DC the balance of the DC Credit Receivables (or otherwise defer payment the balance of the DC Credit Receivables to DC).

34. The parties agreed that the Credit Receivables would not be treated as currently due or owing from Pennantia, and that repayment from Pennantia would be deferred until either sufficient operating revenue became available after current expenses, or in connection with the sale of Vessels.

35. A written agreement between DC and Pennantia, dated March 31, 2024, signed by Alex J. Parker on behalf of DC, sets forth the terms of interest accrual on the DC Credit Receivables (described in the agreement by DC as "vendor financing," then listed as $4.9 million),

---

[2] To refresh the Court's recollection of events and in an effort to provide the most comprehensive declaration, this section repeats many statements previously asserted in my declaration dated July 21, 2025 [Doc. 9] accompanying Pennantia's Motion for Temporary Restraining Order and Preliminary Injunction.

8

representing that "Pennantia . . . has not been charged any financing charge or interest," and agreeing that "on April 1, 2024, Dove Cay will begin charging" interest "at a rate of 1% per month." A true and correct copy of the Letter Agreement between DC and Pennantia dated March 31, 2024, is attached as Exhibit 5.

36. Since the inception of the Credit Receivables, none of the parties to the Credit Receivables ever treated either the CCM or the DC Credit Receivables' balances as currently due or owing expenses or operating disbursements due from Pennantia on RCM's 13-week cashflow forecasts until RCM unilaterally started listing a new operating disbursement line item for "Dove Cay Payables," in the amount of $9,489,869 in RCM's 13-week cash flow forecast. True and correct copies of RCM's last 13-week cashflow forecast from June 23, 2025, listing an "Operating Disbursement" line item for "Dove Cay Payables" of $9,816,307 is attached as Exhibit 6, and RCM's 13-week cashflow forecast from November 13, 2024, not listing any "Dove Cay Payables" line item, is attached as Exhibit 7.

37. The "Dove Cay Payables" amount asserted by RCM as due to DC was comprised of a then-$5.5 million stated principal balance of the DC Credit Receivables plus an erroneous calculation of interest at a rate of 3% per month (apparently carried back all the way to the inception of the Credit Receivables arrangement in 2022 ), as opposed to the 1% per month interest rate agreed to by the parties in writing, which interest calculation was agreed to commence as of April 1, 2024.

38. CCM and DC memorialized their respective credit receivables in different bookkeeping fashions. CCM documented its credit receivables through CCM formally purchasing and transferring the DC receivables it purchased using a "Receivables Purchase Agreement" which was rolled every 2-3 months by creating a new RPA with that would pay-off the old receivables

9

purchased by CCM and sell new ones to CCM in a cashless transaction to keep more current payables owing from Pennantia perspective rather than allowing the old invoices to age. In contrast, the manner by which DC documented the DC Credit Receivables was far more informal. DC ostensibly would memorialize the DC Credit Receivables amounts owed as being less than 90 days, with the method by which DC did so being the leaving of DC invoices to Pennantia dating less than 90 days old open on its records.

39. To be clear, DC's method of documenting the DC Credit Receivables did not mean that these invoices were left unpaid. Rather, this merely was the manner by which the DC Credit Receivables debt was memorialized to keep the debt at less than 90 days past due.

40. On or about February 11, 2025, Pennantia's auditor calculated the balance and accrued interest owing to DC – based principal amount of the DC Receivables plus interest at the 1% per month interest rate reflected in the DC/Pennantia March 31, 2024 agreement (*see* Exhibit 5) – as $6,082,126.

41. On March 7, 2025, Pennantia made a good faith payment on this debt in the amount of $608,769.

42. Pennantia promptly contested, and has continued to contest, the assertion that the DC Credit Receivables is currently due and owing, and the inflated calculation of interest accrual.

### **RCM's and DC's Improper Allocation of Pennantia's Payments**

43. All of Pennantia's payments made through the Bill.com platform were for specific amounts to pay specific invoices. Those payments paid in full all invoices for necessaries providers that were loaded onto the Bill.com platform.

44. Yet, instead of paying outstanding accounts, DC apparently allocated Pennantia's payments however it saw fit – a process that was not agreed to by Pennantia and which was in disregard to Pennantia's specifically directed payments for specific invoices.

45. Pennantia has come to learn since this proceeding began that DC has applied payments received from RCM on Pennantia's behalf to DC's own receivables debts rather than to invoices for which payment was made. *See* Declaration of Alex Parker dated August 4, 2025 ("Parker Decl."), ¶¶ 51, 52.

46. In addition, DC attempted to charge 36% interest rate (3% per month) instead of the 1% per month interest rate agreed to by and between Pennantia and DC.

47. During the regular course of my work with Pennantia I typically contemporaneously downloaded copies of the DC invoices from Bill.com. Pennantia's review of DC's invoices contemporaneously issued over the past three years shows no interest rate; however, those same exact historical invoices have been reloaded onto the Bill.com platform by RCM within the last several weeks to include the purported 36% interest rate, apparently derived from the late charge fees under RCM's Ship Management Agreement with Pennantia to which DC is not a party.

48. Specifically, within the last several weeks, RCM uploaded re-issued new versions of DC invoices and statements of account (from months and even years ago) with additional allocation language added, including as follows: "Please note, if any invoices are past due, all payments received will be applied first to accrued late fees and interest, then to the outstanding principal balance on past due invoices." As examples, new versions of Invoice DC20240301, dated due on March 1, 2024, and Invoice DC20240701, dated due on July 1, 2024, from Bill.com, contain the new language not on the original versions. True and correct copies of the referenced revised invoices are attached as Exhibits 8 and 9.

49. RCM did not advise Pennantia that it was uploading revised or reissued invoices, or that it was retroactively purporting to permit increases in its vendor's charges in a manner not consistent with RCM's capacity as Pennantia's agent.

50. This additional language only appeared on statements issued well after the instant dispute arose between the parties, and was applied retroactively to statements and invoices previously issued to, and paid by, Pennantia (in many cases, long ago).

51. The late charge fee is not the correct rate to be applied to the above invoices, and Pennantia has never agreed to allow DC to arbitrarily allocate funds to pay off that interest prior to paying any principal balance. Review of the Ship Management Agreement, the Foss LOA (and amendments), and the CTMA show that none of those documents contain a late charge provision or an allocation provision.

## Arrest of the *LYNNE ROSE* and *RCM 270* in Panama

52. On Saturday, August 2, 2025, DC arrested the vessels *LYNNE M. ROSE* and *RCM 270* in Panama.

53. The documents submitted with the arrest application included the CTMA. The inclusion of the CTMA between RCM and DC in the exhibits submitted to the Panamanian court was the first time Pennantia was made aware of the existence of the CTMA and (subsequently) was the first time that Pennantia ever has seen the CTMA.

54. As discussed above, Amendment 8 to the LOA, dated April 8, 2022 and executed by Alex Parker, precludes DC from pursuing any counterclaims, arresting the Vessels, or asserting any liens on the Vessels without first undertaking a multi-step dispute resolution process culminating in a final arbitration award. *See* Ex. 2, Amend. 8, ¶¶ 5-7.

55. DC, through RCM and their joint authorized person Alex Parker, had actual knowledge of this dispute resolution requirement through a previous dispute involving Foss and the LOA, during which Foss refrained from asserting any liens or arresting any vessels pursuant to the LOA.

56. Despite such actual knowledge, DC did not undertake any of the steps in the dispute resolution process required under Amendment 8 to the LOA prior to submitting Notices of Claims of Liens to the U.S. Coast Guard National Vessel Documentation Center.

57. Similarly, DC did not undertake any of the steps in the dispute resolution process required under Amendment 8 to the LOA prior to arresting the *LYNNE M. ROSE* and *RCM 270* in Panama on August 2, 2025.

58. With respect to the status of the current dispute, the evidence submitted in support of DC's arrest in Panama did not include any reference to Pennantia's Complaint currently pending in the instant proceeding, nor did it mention that the issue of the legitimacy of DC's maritime liens currently was pending before this Court.

59. Despite not referring to the dispute currently pending in New York in the Panama arrest submissions, the action and subsequent arrest in Panama are based on the same maritime lien arguments as those at issue in the New York dispute and relate to the same disputed sums as those at issue in the New York proceeding, including the "technical management services" fees from DC to Pennantia and the 10% "cost plus" markups for "necessaries" from DC to Pennantia.

60. On July 25, 2025, I attended the initial conference before this Court. At that conference, DC and RCM, through their respective counsel, represented to this Court that RCM and DC would undertake to complete the *LYNNE M. ROSE*'s voyage to discharge the cargo onboard in California pursuant to the relevant Discharge Orders.

61. The arrest of the Vessels in Panama will prevent the timely delivery of the cargo, in direct contravention of DC's and RCM's representations to this Court. A true and correct copy of the Declaration of Keith Long dated August 6, 2025 is attached as Exhibit 10.

62. As such, and pursuant to the representations made by counsel for RCM and DC, on August 6, 2025, Pennantia proposed to DC's counsel that DC release the *LYNNE M. ROSE* and *RCM 270* so that the vessels could complete delivery of the cargo. In exchange, Pennantia agreed to consent to jurisdiction in California to allow DC to re-arrest the Vessels, should DC deem it necessary to do so. A true and correct copy of the email string between Pennantia's counsel and DC's counsel regarding this proposal is attached as Exhibit 11.

63. DC's counsel's response to Pennantia's request was that the Panamanian arrest would only be vacated upon Pennantia paying all sums claimed due and outstanding by DC (i.e., over $29 millon). *See* Ex. 11.

64. Just as RCM and DC denied Pennantia access to its own Vessels earlier this year, RCM and DC continue to hold Pennantia's assets hostage on the basis of invalid maritime liens in an attempt to extort an exorbitant severance payoff from Pennantia.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Greenwich, Connecticut, this 10th day of August 2025.

_____
JOSHUA TRUMP