**From:**         Alex Parker <AJPARKER@rcmaritime.com> <AJPARKER@rcmaritime.com>
**Sent:**         Thursday, February 24, 2022 9:11 AM
**To:**           Josh Trump
**Subject:**      Fwd: Foss Proposal
**Attachments:**  stacked3x3_dfdbfe66-2bc6-4a4f-9fa5-de1c43f9c7c3.png; rcmlogolines_d5f8818d-69cd-48fb-
                  b8df-237b15294fd0.png; image002.png; image003.png; image004.jpg; stacked3x3
                  _dfdbfe66-2bc6-4a4f-9fa5-de1c43f9c7c3.png; rcmlogolines_d5f8818d-69cd-48fb-
                  b8df-237b15294fd0.png


See below

_____

Alex J. Parker
+1 (508) 524-0331


[cid:stacked3x3_dfdbfe66-2bc6-4a4f-9fa5-de1c43f9c7c3.png]
[cid:rcmlogolines_d5f8818d-69cd-48fb-b8df-237b15294fd0.png]      Alex Parker, Managing
Partner
1321 Upland Drive, Ste. 20183
Houston, TX 77043
www.rcmaritime.com<https://protect-
us.mimecast.com/s/c9BbCZ6pA3FP61v9fjICeB?domain=rcmaritime.com>
AJPARKER@rcmaritime.com<mailto:AJPARKER@rcmaritime.com>
M: +1 (508) 524-0331


[http://citrincooperman.mobi/grnprint.gif]


Begin forwarded message:

From: Andrew McAllister <APMcAllister@rcmaritime.com>
Date: February 24, 2022 at 03:32:31 PST
To: Alex Parker <AJPARKER@rcmaritime.com>
Subject: Fwd: Foss Proposal



From iPhone - please excuse typos.

[cid:stacked3x3_dfdbfe66-2bc6-4a4f-9fa5-de1c43f9c7c3.png]
[cid:rcmlogolines_d5f8818d-69cd-48fb-b8df-237b15294fd0.png]      Andrew McAllister, Chief
Financial Officer
1321 Upland Drive, Ste. 20183
Houston, TX 77043
www.rcmaritime.com<https://protect-
us.mimecast.com/s/qgBxC2kOy3SKYLrzS2Zq6B?domain=nam10.safelinks.protection.outlook.com>
APMcAllister@rcmaritime.com<mailto:APMcAllister@rcmaritime.com>
M: +1 (347) 452-9133


[http://citrincooperman.mobi/grnprint.gif]

_____
From: William Roberts <wroberts@foss.com>
Sent: Wednesday, February 23, 2022 11:31:17 PM
To: Andrew McAllister <APMcAllister@rcmaritime.com>
Cc: Jeff Horst <jhorst@foss.com>; Sloane Perras <sperras@saltchukmariness.com>
Subject: RE: Foss Proposal

Andy,


Sorry for the late reply this evening.  Last week our negotiations hit an impasse and our
leadership were brought in to the mix.  Foss made a very good and straightforward offer
and it was accepted by RCM as a basis for further discussion and you and I re-engaged in
negotiations, with our cancellation extended one week.   The pushback from RCM was for
90 days to go out to 180 days – I accepted that increase.  You also asked for Foss to
have skin in the game and I told you that I would not be accepting risk beyond that which
is typical for vessel managers.  I thought for the first time in months that we may be on
the right path.  However, RCM is stepping away from this agreed path.  This SHIPMAN is a
180-day contract to help RCM either find a new partner or build our relationship.  We
cannot and will not perform this work for free—which appears to be RCM's goal.


On the topic of employee pay, RCM has complained about manning while at the same time
refusing to pay market salaries in a very competitive labor market.  Marine and shoreside
labor is tight for the entire industry and it is resulting in operational delay and
disruption throughout the industry.  Even though RCM is well aware of this fact, RCM
continues to press for salaries that are below market and sure to result in disruption.
RCM is also myopically focused on fringe benefits for the employee salaries in an attempt
to further reduce labor costs.  We have tried to encourage RCM to pay a market rate and
we have agreed to be 100% transparent on fringe to address your concerns.  We assume that
if RCM can achieve full manning with lower salaries and less fringe, it would do so
itself on March 11th.  However, RCM has asked Foss to continue this work to see whether
we can build a better relationship or until RCM can find someone else to do the job.
Foss is not stepping back into a bad labor situation for the next 180 days.


RCM is paying a management fee for access to Foss above and beyond the direct costs.  RCM
is paying for use of our SMS and management systems and leadership.  Boats that have crew
are covered by our SMS and DPA. Foss does not agree to accept the risk that comes with
short staffing and not earning our management fee on this work.  On that last point, our
margins are already low on this project, we cannot agree to terms that risk this project
being a loss for Foss.  That is not how businesses operate.  We cannot make concessions
beyond what we have currently proposed in our response to the Annex XX.


There is also the outstanding issue of resolving Foss's claim for LOA invoices and RCM's
continued threat of a bogus lost profits claim.  We provided our proposed release for
your consideration and we have not received a response.  We cannot go forward with RCM
without addressing and closing the LOA issue.


As always, we want to see RCM successful, but I cannot continue to see Foss's financial
and operational risks increase.  The financials provided yesterday, and the details
outlined in the SHIPMAN and our LOA resolution, are as close to a "best and final" as we

see.  Ship Management contracts are based on trust and transparency which is what we are offering.  In good faith, we extended our 30 day cancellation by 1 week, but we are now back to the starting point again.



Thanks,


Will Roberts | wroberts@foss.com<mailto:wroberts@foss.com>

M: +1 206-427-5085



From: Andrew McAllister <APMcAllister@rcmaritime.com>
Sent: Wednesday, February 23, 2022 7:09 AM
To: Loan Do <ldo@saltchukmariness.com>
Cc: William Roberts <wroberts@foss.com>; Jeff Horst <jhorst@foss.com>; Sloane Perras <sperras@saltchukmariness.com>
Subject: RE: Foss Proposal


Caution: External Email

GM Loan,


I appreciate the full transparency and I am very impressed with the spread sheet you have created.  It allows me to follow the story of what needs to be prefunded and is a great baseline for further discussions.  With that, I have a few comments, and to be frank I have voiced my opinion on them numerous times so they should not be a surprise to anyone on this email.


   1.  38% for DO Health and Welfare for crew is a number I just do not understand.  Please do not make me explain again that is not my first time doing this.  Even Jeff had mentioned to me that the team was researching this number and he anticipated that they were going to come in much lower for crew.  I was expecting to see that new number in this budget.

      *   I have also mentioned numerous times how I will not be paying $1.38 for every $1.00 raise that goes to a crew member, and everyone I have spoken to at Foss agrees with that logic.  There is no correlation between day rate and benefits other than a budgeting exercise to make it simpler to see in the spreadsheet.

   1.  Shoreside is also incredibly heavy for a company that will only have 4 tugs and 5 barges operating in the near term (the REBEKAH/ RCM 245 and RCM 260 are going to be awhile).  You are requesting 1.6 shore side personnel/ per vessel.  Or basically, 3+ per ATB.  That is an overhead that is not only expensive, but I am not sure what they would do for 40 hrs a week.  I am also surprised that the salaries are so high.  NYH rates are not near these rates for operating a 15 tug fleet that does both harbor assist and towing – But Jeff has told me this is their W2 so it is what it is.  To be honest, I thought these salaries had the Health and Welfare baked in.  As you are aware we have also brought on staff to help with the transition, and I believe these professional mariners are in a good position to assist the Foss team to fill in any gaps if they arise.  Below

is my estimate for a proper compliment of shoreside personnel to manage RCM equipment in active service:

Position

Salary

Count

12

Fleet Engineer

$193,200.00

1

$16,100.00

Ops/ Crewing Manager

$165,600.00

1

$13,800.00

Port Captain

$184,120.00

1

$15,343.33

Tank Barge Manager

$165,600.00

1

$13,800.00

Dispatcher

$117,500.00

2

$19,583.33

Safety & Compliance

$149,100.00

1

$12,425.00

$975,120.00

7

$91,051.67

   1.   The Management Fee of $600 on top of a such a large shoreside compliment is not
something we can accept. I have mentioned to Will that we can look at the Fee two ways;
1) Foss either eats the shore side costs and RCM pays a larger but market rate management
fee; or 2) Foss dramatically reduces the Management Fee and RCM pays the pass thru for
the shoreside team.  Over the course of the contract paying $1.3 for Executive Oversight
is not acceptable and is not market.  Plus, since RCM is charged with managing the RTS
why are we paying for boats that are not in service?

Hopefully, I was able to explain how I see things and please let me know when and how you
would like to proceed.

Regards,

Andy

[cid:image002.png@01D828D9.CAC21180]          [cid:image003.png@01D828D9.CAC21180]


Andrew McAllister, Chief Financial Officer
1321 Upland Drive, Ste. 20183
Houston, TX 77043
www.rcmaritime.com<https://protect-
us.mimecast.com/s/qgBxC2kOy3SKYLrzS2Zq6B?domain=nam10.safelinks.protection.outlook.com>
APMcAllister@rcmaritime.com<mailto:APMcAllister@rcmaritime.com>
M: +1 (347) 452-9133




[http://citrincooperman.mobi/grnprint.gif]


IMPORTANT NOTICE: This transmission and any attachments are intended solely for the use
of the individual or entity to which it is addressed and may contain information that is
privileged, confidential, proprietary, or otherwise protected from disclosure. If you are
not the intended recipient, you are hereby notified that any dissemination, distribution,
copying or other use of this transmission or its attachments is strictly prohibited. If
you have received this transmission in error, please notify the sender immediately and
permanently delete this transmission and any attachments from your system. Any views or
opinions presented are solely those of the author and do not necessarily represent those
of Rose Cay Maritime or any of its affiliates.


From: Loan Do <ldo@saltchukmariness.com<mailto:ldo@saltchukmariness.com>>
Sent: Tuesday, February 22, 2022 11:11 PM
To: Andrew McAllister <APMcAllister@rcmaritime.com<mailto:APMcAllister@rcmaritime.com>>
Cc: William Roberts <wroberts@foss.com<mailto:wroberts@foss.com>>; Jeff Horst
<jhorst@foss.com<mailto:jhorst@foss.com>>; Sloane Perras
<sperras@saltchukmariness.com<mailto:sperras@saltchukmariness.com>>
Subject: Foss Proposal


Hi Andy,


On behalf of Jeff Horst, attached please find the full financial data file commencing
March 7th outlining the operating budget that is to be prefunded by RCM:


  1.  Mariner and shoreside wage and fringe for a fully crewed fleet and fully staffed
operation.
  2.  Deck supplies, engine supplies, commissary, and M&R for each vessel.
  3.  Management fee for each vessel operating under the Foss Safety Management System.


This financial data file outlines the personnel rates and only those vessels specified in
the Shipman Contract that Foss is to manage.

These vessel assumptions are based on a full compliment of crew operating the vessels. We do not have enough history related to the Rose Cay vessels in operating state to change the key assumptions related to general operating supplies.  However, as these are pass through and pre-funded expenses per the agreement, the true expenses will be trued up at the end of the month and reflective of actual operating costs.

One deviation is that the intended salary for the Operations Manager was inaccurate in our original assumptions and has been increased by $ 20,000 annually.  Crew wages reflect current state and may change due to labor market conditions.

Foss is committed to complete expense transparency in a pre-funded environment.

For your review and our continued discussion this week.

Best Regards,

Loan Do, Director of Finance

ldo@salchukmariness.com<mailto:ldo@salchukmariness.com>

Saltchuk Marine Shared Services, 450 Alaskan Way South, Suite #706, Seattle, WA 98104

T: +1 206-270-4866 M: +1 206-412-0656

www.saltchukmarine.com<https://protect-us.mimecast.com/s/eAxWC4x4A5sYVZPKHMrCSn?domain=nam10.safelinks.protection.outlook.com>

[cid:image004.jpg@01D828D9.CAC21180]

**From:**        Alex Parker <AJPARKER@rcmaritime.com> <AJPARKER@rcmaritime.com>
**Sent:**        Tuesday, May 3, 2022 9:36 AM
**To:**          Josh Trump
**Cc:**          Joel Fine <JJFine@rcmaritime.com>
**Subject:**     Re: SHIPMAN
**Attachments:** image001.png; image001.png


2:30 or so central should work for me but in a meeting that may run long. Will call then!


Alex Parker
Managing Partner | Rose Cay Maritime
1321 Upland Drive, Ste. 20183, Houston, TX 77043
T: +1 (833) ROSE-ATB; M: +1 (508) 524-0331
E: AJPARKER@rcmaritime.com<mailto:%7BE-mail%7D>;  www.rcmaritime.com<https://protect-us.mimecast.com/s/B7tNCqxDgGsLMEQPSXolT9?domain=rcmaritime.com/>


Please consider the environment before printing this email
On May 3, 2022, at 10:51, Josh Trump <jtrump@contrariancapital.com> wrote:

 I will be tied up until 1:30 central available until 3 central.

Sent from my iPhone

On May 3, 2022, at 10:20 AM, Alex Parker <AJPARKER@rcmaritime.com> wrote:


Josh - we have some good news and would like to update our documents to reflect current state of play.

Probably prudent to adjust but do have Lynne on for another 14days.

Happy to have a call to address with a simple 1 page amendment or as counsel advises.

My best, AJP



Alex Parker
Managing Partner | Rose Cay Maritime
1321 Upland Drive, Ste. 20183, Houston, TX 77043
T: +1 (833) ROSE-ATB; M: +1 (508) 524-0331
E: AJPARKER@rcmaritime.com<mailto:%7BE-mail%7D>;  www.rcmaritime.com<https://protect-us.mimecast.com/s/lNEmCrkXjJSwBkq0h4E622?domain=nam10.safelinks.protection.outlook.com>

IMPORTANT NOTICE: This transmission and any attachments are intended solely for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise protected from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying or other use of this transmission or its attachments is strictly prohibited. If you have received this transmission in error, please notify the sender immediately and permanently delete this transmission and any attachments from your system.

_____

Please consider the environment before printing this email

Begin forwarded message:

From: Joel Fine <JJFine@rcmaritime.com>
Date: May 3, 2022 at 09:54:07 CDT
To: Alex Parker <AJPARKER@rcmaritime.com>
Subject: SHIPMAN

Alex,

We need to amend the SHIPMAN to reflect RCM as the operator (and remove reference to Foss).
Let me know if you want to discuss.

[image001.png]

Joel Fine
Counsel | Rose Cay Maritime
1321 Upland Drive, Ste. 20183, Houston, TX 77043
T: +1 (833) ROSE-ATB; M: +1 (832) 388-3013
E: JJFine@rcmaritime.com<mailto:%7BE-mail%7D>; www.rcmaritime.com<https://protect-us.mimecast.com/s/lNEmCrkXjJSwBkq0h4E622?domain=nam10.safelinks.protection.outlook.com>


Please consider the environment before printing this email
IMPORTANT NOTICE: Information contained in this transmission and any attachments is private and protected by legal privilege. This transmission and any attachments are intended solely for the use of the individual or entity to which it is addressed and may contain information that is confidential, proprietary, or otherwise protected from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying or other use of this transmission or its attachments is strictly prohibited. If you have received this transmission in error, please notify the sender immediately and permanently delete this transmission and any attachments from your system.

_____


_____


This communication (including any attachments) is intended only for the named recipient(s) above. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this communication in error, please immediately notify the sender and delete the message and any attachment(s) from your system.

# SHIPMAN 2009

Based on the BIMCO STANDARD SHIP
MANAGEMENT AGREEMENT

PART I

| | |
|---|---|
| 1. Place and date of Agreement<br><br>New York, New York, August 8, 2021 | 2. Date of commencement of Agreement (Cls. 2, 12, 21 and 25)<br>The first date on which the Owners obtain court approval and title to one or more vessels from the Bouchard Transportation Co. auction sale in Case No. 20-34682. See also Cl. 2 for conditions precedent to commencement and certain pre-commencement authorizations. |
| 3. Owners (name, place of registered office and law of registry) (Cl. 1)<br><br>(i)  Name:  Pennantia, LLC<br><br>(ii)  Place of registered office: Greenwich, CT<br><br>(iii)  Law of registry: Delaware, United States | 4. Managers (name, place of registered office and law of registry) (Cl. 1)<br><br>(i)  Name: Rose Cay Maritime, LLC<br><br>(ii)  Place of registered office: Houston, TX<br><br>(iii)  Law of registry: Delaware, United States |

| | |
|---|---|
| 5. The Company (with reference to the ISM/ISPS Codes) (state name and IMO Unique Company Identification number.  If the Company is a third party then also state registered office and principal place of business) (Cls 1 and 9(c)(i))<br><br>(i)  Name: <mark>Foss Maritime Company, LLC</mark><br><br>(ii)  IMO Unique Company Identification number: [TO BE PROVIDED]<br><br>(iii)  Place of registered office:<br>450 Alaskan Way S., Suite 706<br>Seattle, WA 98104<br><br>(iv)  Principal place of business: Seattle, WA | 6. Technical Management (state "yes" or "no" as agreed) (Cl. 4)<br>YES |
| | 7. Crew Management (state "yes" or "no" as agreed) (Cl. 5(a))<br>YES |
| | 8. Commercial Management (state "yes" or "no" as agreed) (Cl. 6)<br>YES |

# MANAGEMENT AGREEMENT

PART I

| 1. Place and date of Agreement<br><br>New York, New York, August 8, 2021 | 2. Date of commencement of Agreement (Cls. 2, 12, 21 and 25)<br><br>The first date on which the Owners obtain court approval and title to one or more vessels from the Bouchard Transportation Co. auction sale in Case No. 20-34682. See also Cl. 2 for conditions precedent to commencement and certain pre-commencement authorizations. |
|---|---|
| 3. Owners (name, place of registered office and law of registry) (Cl. 1)<br><br>(i) Name: Pennantia, LLC<br><br>(ii) Place of registered office: Greenwich, CT<br><br>(iii) Law of registry: Delaware, United States | 4. Managers (name, place of registered office and law of registry) (Cl. 1)<br><br>(i) Name: Rose Cay Maritime, LLC<br><br>(ii) Place of registered office: Houston, TX<br><br>(iii) Law of registry: Delaware, United States |
| 5. The Company (with reference to the ISM/ISPS Codes) (state name and IMO Unique Company Identification number. If the Company is a third party then also state registered office and principal place of business) (Cls 1 and 9(c)(i))<br><br>(i) Name: Foss Maritime Company, LLC<br><br>(ii) IMO Unique Company Identification number: [TO BE PROVIDED] | 6. Technical Management (state "yes" or "no" as agreed) (Cl. 4)<br>YES |
| | 7. Crew Management (state "yes" or "no" as agreed) (Cl. 5(a))<br>YES |
| | 8. Commercial Management (state "yes" or "no" as agreed) (Cl. 6)<br>YES |

| **From:** | Joel Fine <JJFine@rcmaritime.com> <JJFine@rcmaritime.com> |
| **Sent:** | Thursday, May 12, 2022 8:32 PM |
| **To:** | Josh Trump |
| **Cc:** | Alex Parker <AJPARKER@rcmaritime.com> |
| **Subject:** | Pennantia - RCM - Shipman |
| **Attachments:** | Pennantia - RCM - Shipman (Draft 5.12.2022) vSEND.docx; BLACKLINE - Pennantia - RCM - Shipman (Draft 5.12.2022).docx |

Your attachments have been security checked by Mimecast Attachment Protection. Files where no threat or malware was detected are attached.
_____

Josh,

Please find attached the draft Shipman Agreement (clean and blackline showing changes against executed version).
For your convenience, copied below is a list of the revisions.

    *   Page 1, Box 1: updated for today's date (May 12, 2022)
    *   Page 1, Box 2: updated for April 30, 2022 (date RCM took over for Foss)
    *   Page 1, Box 5: replaced Foss with RCM
    *   Page 1, Box 9: removed 1-year limitation on charters
    *   Page 2, Box 12: added standard insurances
    *   Page 2, Box 23: updated RCM address (Upland Dr mailing rather than Winston & Strawn office); replaced John Parrott with Joel Fine; replaced Barbara Holland with George Chalos
    *   Date of Agreement updated to today's date on Annexes "A," "B," "C," and "D"
    *   Annex "A": updated list of vessels to reflect new names; all vessels included except Lynne M. Rose and RCM 270
    *   Annex "C": deleted clause (c) and revised clause (e) to make current
    *   Page 10, Part II, Para 2: amended clause (a) to remove references to the bankruptcy and reference Box 2 for the "Commencement Date"; deleted clauses (b) and (c) related to the bankruptcy

Let us know if you have any questions or if you would like to discuss tomorrow.

Thanks,
Joel


Joel Fine
Counsel | Rose Cay Maritime
1321 Upland Drive, Ste. 20183, Houston, TX 77043
T: +1 (833) ROSE-ATB; M: +1 (832) 388-3013
E: JJFine@rcmaritime.com<mailto:%7BE-mail%7D>; www.rcmaritime.com<https://protect-us.mimecast.com/s/ahd4CYE0z2s6LvlNtGvt90?domain=rcmaritime.com/>


Please consider the environment before printing this email
IMPORTANT NOTICE: Information contained in this transmission and any attachments is private and protected by legal privilege. This transmission and any attachments are intended solely for the use of the individual or entity to which it is addressed and may contain information that is confidential, proprietary, or otherwise protected from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying or other use of this transmission or its attachments is strictly prohibited. If you have received this transmission in error, please notify

the sender immediately and permanently delete this transmission and any attachments from
your system.

_____

# SHIPMAN 2009

Based on the BIMCO STANDARD SHIP
MANAGEMENT  AGREEMENT

PART I

| | |
|---|---|
| 1. Place and date of Agreement<br><br>New York, New York, May 12, 2022 | 2. Date of commencement of Agreement (Cls. 2, 12, 21 and 25)<br>April 30, 2022 |
| 3. Owners (name, place of registered office and law of registry) (Cl. 1)<br><br>(i)  Name:  Pennantia, LLC<br><br>(ii)  Place of registered office: Greenwich, CT<br><br>(iii)  Law of registry: Delaware, United States | 4. Managers (name, place of registered office and law of registry) (Cl. 1)<br><br>(i)  Name: Rose Cay Maritime, LLC<br><br>(ii)  Place of registered office: Houston, TX<br><br>(iii)  Law of registry: Delaware, United States |

| | |
|---|---|
| 5. The Company (with reference to the ISM/ISPS Codes) (state name and IMO Unique Company Identification number.  If the Company is a third party then also state registered office and principal place of business) (Cls 1 and 9(c)(i))<br><br>(i)  Name: Rose Cay Maritime, LLC<br><br>(ii)  IMO Unique Company Identification number: 6269351<br><br>(iii)  Place of registered office:  N/A<br><br>(iv)  Principal place of business: N/A | 6. Technical Management (state "yes" or "no" as agreed) (Cl. 4)<br>YES |
| | 7. Crew Management (state "yes" or "no" as agreed) (Cl. 5(a))<br>YES |
| | 8. Commercial Management (state "yes" or "no" as agreed) (Cl. 6)<br>YES |

| | |
|---|---|
| 9. Chartering Services period (only to be filled in if "yes" stated in Box 8) (Cl.6(a))<br><br>N/A | 10.  Crew Insurance arrangements (state "yes" or "no" as agreed)<br><br>(i)      Crew Insurances* (Cl. 5(b)): YES<br><br>(ii)      Insurance for persons proceeding to sea onboard (Cl. 5(b)(i)):YES<br><br>*only to apply if Crew Management (Cl. 5(a)) agreed (see Box 7) |

| | |
|---|---|
| 11. Insurance arrangements (state "yes" or "no" as agreed) (Cl. 7)<br>YES | 12. Optional insurances (state optional insurance(s) as agreed, such as piracy, kidnap and ransom, loss of hire and FD & D) (Cl. 10(a)(iv))<br>Loss of Hire and FD&D insurance |
| 13. Interest (state rate of interest to apply after due date to outstanding sums) (Cl. 9(a))<br><br>3% per month | 14. Management fee (Cl. 12(a))<br><br>See Annex E |
| 15. Manager's nominated account (Cl.12(a))<br><br>**Account Details:**<br>Rose Cay Maritime LLC<br>Account Number: 80009924772<br><br>**Wire Instructions:**<br>Bank Name: First Republic Bank<br>Bank Routing/ASA: 321081669<br>Bank Swift: (for international wires) FRBBUS6S | 16. Daily rate (state rate for days in excess of those agreed in budget) (Cl. 12(c))<br>N/A |
| | 17. Lay-up period/ number of months (Cl.12(d))<br>N/A |
| 18. Minimum contract period (state number of months) (Cl. 21(a))<br><br>See Clause 21 and 22 | 19. Management fee on termination (state number of months to apply)<br><br>See Clause 22(b)(iv) |
| 20. Severance Costs (state maximum amount) .I.Q.L 22(h)(ii))<br><br>At cost (per agreed terms of subcontracting crewing agreement) | 21. Dispute Resolution<br><br>See Clause 23 |
| 22. Notices (state full style contact details for serving notice and communication to the Owners) (Cl. 24)<br><br>Pennantia LLC<br><br>411 West Putnam Avenue<br>Greenwich, CT 06830 Suite 425<br><br>Attention: Josh Trump<br>Email: jtrump@contrariancapital.com<br>Attention: Counsel<br>Email: jweisser@contrariancapital.com | 23. Notices (state full style contact details for serving notice and communication to the Managers) (Cl. 24)<br><br>Rose Cay Maritime, LLC<br><br>1321 Upland Drive Ste. 20183,<br>Houston, TX 77043<br><br>Attention: Alex Parker<br>Email: alex@rosecaycap.com<br>Attention: Joel Fine<br>Email: jlfine@rcmaritime.com<br>Attention: George Chalos<br>Email: gmc@chaloslaw.com |

It is mutually agreed between the party stated in Box 3 and the party stated in Box 4 that this Agreement consisting of PART I and PART II as well as Annexes" A" (Details of Vessel or Vessels)," B" (Details of Crew)," C" (Budget)," D" (Associated Vessels) and" E" (Fee Schedule) attached hereto, shall be performed subject to the conditions contained herein. In the event of a conflict of conditions, the provisions of PART I and Annexes" A" , "B", "C", "D" and "E" shall prevail over those of PART II to the extent of such conflict but no further.

| Signature(s) (Owners) | Signature(s) (Managers) |
|---|---|
| | |

ANNEX "A" (DETAILS OF VESSEL OR VESSELS)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME:  SHIPMAN 2009

Date of Agreement:  May 12, 2022

Name of Vessel(s):

1. Anna Rose
2. Jordan Rose
3. Susan Rose
4. Jesse Rose
5. Joan Rose
6. Rebekah Rose
7. Cindy Rose
8. RCM 225
9. RCM 250
10. RCM 252
11. RCM 262
12. RCM 242
13. RCM 210
14. RCM 260
15. RCM 245
16. RCM 295

ANNEX "B" (DETAILS OF CREW)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME:  SHIPMAN 2009

Date of Agreement:  May 12, 2022

Details of Crew:

Crew complement will be in compliance with applicable law and regulation and will be either (i) crew complement required by COI or (ii) mutual agreement on crew complement required or appropriate for (1) commercial vessel operations, for vessels in commercial operations, or (2) dock-side stand-by service, lay up, or preparation for commercial operations, as the case may be, and as permitted by COI or United States Coast Guard.  Managers will provide crewing information as requested by Owners on a regular basis.

ANNEX "C" (BUDGET)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME:  SHIPMAN 2009

Date of Agreement:  May 12, 2022


(a)      Owner shall reimburse Manager, on a direct pass-through basis, and without markup, for the actual direct expenses incurred by Manager for performance of the Crewing and Technical Management Services provided for the Vessels pursuant to Clauses 4, 5, and 7 of this Agreement, which, without limiting the generality of the preceding phrase and so long as incurred pursuant to Clauses 4, 5 or 7 or the advance written consent of Owner, shall include: (i) inspection and maintenance of the Vessels, (ii) parts, supplies, and repairs for Vessels (iii) Vessel dry docking, (iii) fuel, lubes, and grease, (iv) insurance premiums and broker fees; (v) crewing costs; (vi) dockage fees and port charges; (vii) lay up costs; (viii) security costs; (ix) costs of professional services approved in advance by Owner (accounting, tax, legal), and (x) reimbursable pass through costs of the foregoing services performed and charged by a subcontractor approved in advance by Owner ("*Management Reimbursement*").


(b)      Management Reimbursement shall not include those costs intended to be compensated by the Variable Commission Fees nor the costs of administrative overhead (including office space, utilities, office equipment, office supplies, and office and shore-side employees).


(c)      As soon as practicable following execution of this Agreement and thereafter on or before October 1 of each year for the upcoming calendar year (January 1–December 31), Manager shall prepare and deliver to Owner a budget of anticipated Management Reimbursement (an "*Annual Budget*").  Each Annual Budget shall be subject to review and approval by Owner.  In the event an Annual Budget is not approved prior to the commencement of the applicable calendar year, the Annual Budget in effect for the prior year shall continue to apply for a period of up to six (6) months so long as the parties continue to negotiate in good faith.


(d)      After the date of execution of this Agreement, Manager shall confirm the that the Vessel Operating Account contains at least an amount approximating sixty (60) days of estimated Management Reimbursement (the "*Initial Deposit*"). If not, Owner shall make an Initial Deposit into the Vessel Operating account. The Initial Deposit shall be two (2) times the sum of one twelfth of the initial Annual Budget, or such other sum mutually agreed by the parties. Subsequent to the Initial Deposit period, it is the intent of the parties that the funds in the Vessel Operating Account at the time each Estimated Reimbursement Payment is made as described below should approximate sixty (60) days of estimated Management Reimbursement based the average of the most recent Actual Reimbursable Expenses and current Estimated  Reimbursement, or such other formula from time to time mutually agreeable to the parties.  No fewer than five (5) Business Days prior to the first day of each calendar month of this Agreement, Manager shall prepare and furnish to Owner a funding request (each, a "*Monthly Funding Request*") of estimated Management Reimbursement for the upcoming month (the "*Estimated Reimbursement*").  On or before the first day of each calendar month following each Monthly Funding Request, Owner shall deposit the Estimated Reimbursement requested in each Monthly Funding Request into the Vessel Operating Account for disbursement by Manager in accordance with the Monthly Funding Request and in compliance with this Section (each payment an "*Estimated Reimbursement Payment*").]


Vessel Operating Account
[Dedicated Account Information to be provided
by Managers to Owners prior to
Commencement Date]
[_____]
[_____]

(e)     Manager shall have no authority to, nor shall it spend or commit to spend, an amount in excess of the Monthly Funding Request without the express written authority of Owner unless in the event of an emergency.  Any extraordinary expenses not anticipated by the Monthly Funding Request shall, if approved by Owner in advance, shall be reimbursed to Manager promptly upon receipt of invoice, and, if desired by Owner, such amounts may be funded by Owner directly to the payee with respect thereto.

(f)     As promptly as possible (but not more than five (5) Business Days) after the end of each calendar month Manager shall render to Owner a written statement for the preceding month showing actual expenses for the preceding month together with all supporting invoices or documents, with a true up of the actual expenses versus the Estimated Reimbursement ("*Actual Reimbursable Expenses*" and each such statement, a "*Reimbursement Statement*").  The next Monthly Funding Request shall also include a reconciliation of each prior month's activity.

(g)     Each Monthly Funding Request shall include a certification signed by a Responsible Officer of the Manager that any invoices submitted for reimbursement have been paid when due; a statement listing the Manager's accounts payable for items that are at that time overdue in excess of thirty (30) days (and if applicable, each item outstanding more than sixty (60) days, and so forth for each 30 day period thereafter, specifically identified as such); and the certification that Manager is in material compliance this Agreement.  If any item of disbursement is questioned by Owner, Owner shall reimburse or credit Manager for the portion not in dispute, and the parties shall diligently set about to resolve the questioned item(s) in good faith for a period of up to three months.

(h)     Within 30 days of the end of each fiscal quarter of Manager during this Agreement, Manager shall prepare and deliver to Owner a certification signed by a Responsible Officer of the Manager that:

(i)     in the course of the performance by such Responsible Officer of his or her duties as an officer of Manager, such Responsible Officer would normally obtain knowledge of any default by Manager of its obligations under this Agreement or any agreement between Manager and another party pertaining to the Vessels ("*Management Agreements*");

(ii)     the Manager is in compliance in all material respects with its obligations under all Management Agreements to which it is a party;

(iii)     such Responsible Officer of the Manager has no knowledge of any event of default under any Management Agreement to which it is a party, or of the occurrence of any default under any Management Agreement to which it is a party that, with the passage of time and the failure to cure, would be reasonably likely to breach or become an event of default hereunder or under any Management Agreement to which it is a party; and

(iv)     there are no outstanding Liens on the Vessels other than Permitted Liens, so long as paid within the period provided for Permitted Liens; and

(i)     Manager shall keep proper and detailed books and records of Manager sufficient to demonstrate compliance with the terms of this Agreement, and in compliance bookkeeping and/or accounting standards applicable to Manager as of the date of this Agreement.

(j)     Owner shall have the right to examine and audit the books and records of Manager at any reasonable time, which shall include Vessel records and all records sufficient to substantiate and audit the Manager's compliance with its obligations under this Agreement and any Management Agreement, and to make copies (including electronic copies of computer records) and obtain print-outs of such books and records.

(k)     The Manager shall give Owner reasonably prompt notice and copies of all tax notices, reports or inquiries, claims of liens, and of any damage, loss, seizure, attachment or judicial process which may affect the use, maintenance, operation, possession or ownership of the Vessels; provided, however, that no such notice need be given for any damage or loss which is not required to be reported to the U.S. Coast Guard or other federal or state authority, does not materially affect the use, maintenance or operation of a Vessel and which is repaired or remediated in the ordinary course of business of the Manager.

ANNEX "D" (ASSOCIATED VESSELS)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME:  SHIPMAN 2009

NOTE: PARTIES SHOULD BE AWARE THAT BY COMPLETING THIS ANNEX "D" THEY WILL BE SUBJECT TO
THE PROVISIONS OF SUB-CLAUSE 22(b)(i) OF THIS AGREEMENT.

Date of Agreement:  May 12, 2022

Details of Associated Vessels:


N/A

ANNEX " E" (FEE SCHEDULE)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
<u>CODE NAME:  SHIPMAN 2009</u>


Owners shall pay Managers (or its designee if permitted pursuant to  in paragraph (4)(e)) for the Management Services provided under this Agreement in accordance with Clause 12, comprised of the following four (4) components (Annex E component parts):

<u>(1) Fixed Management Fee</u>

$25,000  per month, per ATB tug/barge set, but no less than the greater of the number of tugs or barges in the managed fleet.  (As an example, provided for illustration purposes only, Annex A shows that there are ten barges and eight tugs. Managers monthly fee would be 10 x $25,000 for a total of $250,000 and an annual total fee of $3,000,000). Such monthly payments shall be made in advance, with an annual inflation adjustment factor of CPI-W, U.S. City Average, All Items, standard reference base, not seasonally adjusted, but not greater than 5%, calculated annually to apply on the first monthly payment following the anniversary date of this Agreement.  The minimum annual aggregate Fixed Management Fee shall be $2.1 million, provided, however, that in the event that Pennantia owns four (4) or fewer pairs of vessels, after three (3) months the minimum annual aggregate Fixed Management Fee shall not apply, and the parties shall use good faith efforts to reduce the aggregate Fixed Management Fee.

<u>(2) Variable Commission Fees</u>

In addition to the Fixed Management Fee, Owner's shall pay Managers for certain vessel chartering and vessel sales services:

|  | | |
|---|---|---|
| a) Chartering Fees: | 1.5% of charter, to be paid out over the applicable term of the charter | |
| | 0.5% if broker used | |
| | | |
| b) Vessel Sale Fees: | Vessel sales in the ordinary course: | |
| | 3.0% of total proceeds commission without broker | |
| | 0.5% of total proceeds commission with broker | |

Chartering Fees and Vessel Sale Fees apply only to arms-length transactions with non-affiliates of either party.


<u>(3) Profit Sharing Incentives</u>

Managers shall be entitled to receive profit sharing incentive payments, calculated annually in arrears, in accordance with the following Investment Rate of Return (IRR) thresholds:

• No incentive fee below 12% IRR hurdle
• 20% of cash flow above a 12% IRR
• No catch-up

Cash flow formula to be determined.

<u>(4) Equity Incentive Awards</u>

Managers shall be entitled to receive equity incentive awards, in accordance with the following thresholds:

a) Initial Equity Award Incentive Fee:          On the Commencement Date, $1.5mm to be divided between (1) $750,000 cash payment and (2) award of 3.75% Class B non-voting equity of Pennantia, with economic rights pari passu with Contrarian Class A stock and anti-dilution protections.

b) Management Equity Awards:      Upon meeting the calendar year EBITDA hurdles below, Manager will be awarded the corresponding Class B equity of Pennantia:

| EBITDA hurdle | Award | Total |
|---|---|---|
| Upon Closing | 3.75% | 3.75% |

| 20,000,000 | 2.25% | 6.00% |
| 30,000,000 | 3.00% | 9.00% |
| 35,000,000 | 3.00% | 12.00% |

Each hurdle, along with its corresponding equity award, shall be "one-time" in nature such that the equity award will be granted following the first year the hurdle is clear.  By way of examples:

1)      If Pennantia generates $20mm of EBITDA in each of its first 3 years Managers will be awarded a single award of 2.25% of Class B stock to correspond with the $20mm hurdle.
2)      If Pennantia generates $40mm of EBITDA in its first year Managers will earn a single award of 3.0% of Class B stock to correspond to the $40mm hurdle.
3)      If Pennantia generates $35mm in EBITDA in each of its first 3 years Managers will earn 3% in Class B shares in year 1 to correspond to the $35mm EBITDA hurdle, 3% in year 2 to correspond to the $30mm hurdle, and 2.25% in year 3 to correspond to the $20mm hurdle:

Pennantia will use reasonable commercial efforts to discuss optimizing the tax and depreciation considerations of Managers.

c) So long as no Manager's event of default has occurred and is continuing, Managers shall be permitted within one hundred twenty (120) days of the Commencement Date, or December 31, 2021, whichever is later, to co-invest up to $2,200,000 in Class B non-voting equity with economic rights of up to ten (10%) of the fully diluted equity of Pennantia pari passu with Contrarian Class A stock.  In the event of co-investment in amounts less than $2,200,000, the associated economic rights shall be calculated on a pro-rata basis.

d) Owners shall provide Managers with no less than the same disclosures and reports as provided to Contrarian investors related to the Pennantia investment.

e) Managers shall have the right to designate an entity other than Rose Cay Maritime, LLC to receive and hold any [Profit Sharing Incentives or Pennantia Class B equity, so long as such entity holding or receiving any Profit Sharing Incentives or such Class B equity is and remains for the duration of this Agreement an affiliate of Rose Cay Maritime, LLC under common control of the holders of the equity interests of Rose Cay Maritime, LLC as of the Commencement Date.  Subject to the requirements of the preceding sentence, upon the award and issuance of Profit Sharing Incentives or Class B equity pursuant to this Agreement, such equity shall be fully vested in the designated holder without regard to any future termination of this Agreement.  Notwithstanding Managers' designation of a holder of Profit Sharing Incentives or Class B equity, Managers agree that Pennantia shall not be required to provide any reporting information concerning the Pennantia investment to any person or entity other than Rose Cay Maritime, LLC.  Managers may provide information provided by Pennantia to such designated holder provided that Managers and such designated holder are parties to a confidentiality and non-disclosure agreement concerning such information on terms materially similar to the confidentiality and non-disclosure obligations of Managers under this Agreement.

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

| Section 1 – Basis of the Agreement |
|---|

1.      **Definitions**
        In this Agreement save where the context otherwise requires, the following words and expressions shall have the meanings hereby assigned to them:

        "Company" (with reference to the ISM Code and the ISPS Code) means the organization identified in Box 5 or any replacement organization appointed by the Owners from time to time (see Sub-clauses 9(b)(i) or 9(c)(ii), whichever is applicable).

        "Crew" means the personnel of the numbers, rank and nationality specified in Annex "B" hereto.

        "Crew Insurances" means insurance of liabilities in respect of crew risks which shall include but not be limited to death, permanent disability, sickness, injury, repatriation, shipwreck unemployment indemnity and loss of personal effects (see Sub-clause 5(b) (Crew Insurances) and Clause 7 (Insurance Arrangements) and Clause 10 (Insurance Policies) and Boxes 10 and 11).

        "Crew Support Costs" means all expenses of a general nature which are not particularly referable to any individual vessel for the time being managed by the Managers and which are incurred by the Managers for the purpose of providing an efficient and economic management service and, without prejudice to the generality of the foregoing, shall include the cost of crew standby pay, training schemes for officers and ratings, cadet training schemes, sick pay, study pay, recruitment and interviews.

        "Flag State" means the State whose flag the Vessel is flying.

        "ISM Code" means the International Management Code for the Safe Operation of Ships and for Pollution Prevention and any amendment thereto or substitution therefor.

        "ISPS Code" means the International Code for the Security of Ships and Port Facilities and the relevant amendments to Chapter XI of SOLAS and any amendment thereto or substitution therefor.

        "Managers" means the party identified in Box 4.

        "Management Services" means the services specified in SECTION 2 - Services (Clauses 4 through 7) as indicated affirmatively in Boxes 6 through 8, 10 and 11, and all other functions performed by the Managers under the terms of this Agreement.

        "Owners" means the party identified in Box 3.

        "Severance Costs" means the costs which are legally required to be paid to the Crew as a result of the early termination of any contracts for service on the Vessel.

        "SMS" means the Safety Management System (as defined by the ISM Code).

        "STCW 95" means the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978, as amended in 1995 and any amendment thereto or substitution therefor.

        "Vessel" means the vessel or vessels, details of which are set out in Annex "A" attached hereto, and shall be, for purposes of Clause 17(b)(i), 1) each combination of tug and barge (which pairing may be changed at Managers' discretion); and 2) the individual barges not paired with a tug.

2.      **Commencement and Appointment**
        With effect from the date stated in Box 2 for the commencement of the Management Services and continuing unless and until terminated as provided herein, the Owners hereby appoint the Managers and the Managers hereby agree to act as the Managers of the Vessels in respect of the Management Services. It is the intent of the Owners and Managers that this Agreement and the services hereunder will commence on April 30, 2022 (the "Commencement Date").

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

3.      **Authority of the Managers**

Subject to the terms and conditions herein provided, during the period of this Agreement the Managers shall carry out the Management Services in respect of the Vessel as agents for and on behalf of the Owners.  The Managers shall have authority to take such actions as they may from time to time in their absolute discretion consider to be necessary to enable them to perform the Management Services in accordance with sound ship management practice, including but not limited to compliance with all relevant rules and regulations.

During the term of this Agreement, the Managers shall have and maintain full control of the Vessels and shall be responsible to ensure the safety and maintenance of the Vessels, its crew, and operations of the Vessels conducted pursuant to this Agreement.

To the extent international or other referenced standards, such as ISM Code, ISPS Code, SMS Code, STCW 95, and the Maritime Labor Convention (Cl. 28), etc. referenced in this Agreement, are not applicable to the Vessels or the operation and trading area of the Vessel, such standards shall not apply; provided, however, that the Vessels shall comply with its Certificate of Documentation, Certificate of Inspection, and laws and regulations applicable to U.S. coastwise vessels in the area of operation of the Vessels.

---

**Section 2 – Services**

---

4.      **Technical Management**

(only applicable if agreed according to Box 6).
The Managers shall provide technical management which includes, but is not limited to, the following services:

(a)      ensuring that the Vessel complies with the requirements of the law of the Flag State;

(b)      ensuring compliance with the ISM Code;

(c)      ensuring compliance with the ISPS Code;

(d)      providing competent personnel to supervise the maintenance and general efficiency of the Vessel;

(e)      arranging and supervising dry-docking, repairs, alterations and the maintenance of the Vessel to the standards agreed with the Owners to ensure that the Vessel will comply with all requirements and recommendations of the classification society, and with the law of the Flag State and of the places where the Vessel is required to trade;

(f)      arranging the supply of necessary fuel, stores, spares and lubricating oil;

(g)      appointing surveyors and technical consultants as the Managers may consider from time to time to be necessary;

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

(h)    arranging for the supply of provisions unless provided by the Owners; and

(i)    arranging for the sampling and testing of bunkers.

(j)    Arranging for other provisions or services pertaining to the Vessel or Vessel operations as requested by Owners.

**5.    Crew Management and Crew Insurances**
(a)    *Crew Management*
(only applicable if agreed according to Box 7)
The Managers shall provide suitably qualified Crew who shall comply with applicable USCG requirements. The provision of such crew management services includes, but is not limited to, the following services:

(i)    selecting, engaging and providing for the administration of the Crew, including, as applicable, payroll arrangements, pension arrangements, tax, social security contributions and other mandatory dues related to their employment payable in each Crew member's country of domicile;

(ii)    ensuring that the applicable requirements of the law of the Flag State in respect of rank, qualification and certification of the Crew and employment regulations, such as Crew's tax and social insurance, are satisfied;

(iii)    ensuring that all Crew have passed a medical examination with a qualified doctor certifying that they are fit for the duties for which they are engaged and are in possession of valid medical certificates issued in accordance with appropriate Flag State requirements or such higher standard of medical examination as may be agreed with the Owners.  In the absence of applicable Flag State requirements the medical certificate shall be valid at the time when the respective Crew member arrives on board the Vessel and shall be maintained for the duration of the service on board the Vessel;

(iv)    ensuring that the Crew shall have a common working language and a command of the English language of a sufficient standard to enable them to perform their duties safely;

(v)    arranging transportation of the Crew, including repatriation;

(vi)    training of the Crew;

(vii)    conducting union negotiations; and

(viii)    if the Managers are the Company, ensuring that the Crew, on joining the Vessel, are given proper familiarization with their duties in relation to the Vessel's SMS and that instructions which are essential to the SMS are identified, documented and given to the Crew prior to sailing.

(ix)    if the Managers are **not** the Company:

(1)    ensuring that the Crew, before joining the Vessel, are given proper familiarization with their duties in relation to the ISM Code; and

(2)    instructing the Crew to obey all reasonable orders of the Company in connection with the operation of the SMS.

(x)    Where Managers are **not** providing technical management services in accordance with Clause 4 (Technical Management):

(1)    ensuring that no person connected to the provision and the performance of the crew management services shall proceed to sea on board the Vessel without the prior consent of the Owners (such consent not to be unreasonably withheld); and

(2)    ensuring that in the event that the Owners' drug and alcohol policy requires measures to be taken prior to the Crew joining the Vessel, implementing such measures;

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

(b)      Crew Insurances
*(only applicable if Sub-clause 5(a) applies* **and** *if agreed according to* Box 10)
The Managers shall throughout the period of this Agreement provide the following services:

(i)      arranging Crew Insurances in accordance with the best practice of prudent managers of vessels of a similar type to the Vessel, with sound and reputable insurance companies, underwriters or associations.  Insurances for any other persons proceeding to sea onboard the Vessel may be separately agreed by the Owners and the Managers (see Box 10);

(ii)     ensuring that the Owners are aware of the terms, conditions, exceptions and limits of liability of the insurances in Sub-clause 5(b)(i);

(iii)    ensuring that all premiums or calls in respect of the insurances in Sub-clause 5(b)(i) are paid by their due date;

(iv)    if obtainable at no additional cost, ensuring that insurances in Sub-clause 5(b)(i) name the Owners as a joint assured with full cover and, unless otherwise agreed, on terms such that Owners shall be under no liability in respect of premiums or calls arising in connection with such insurances.

(v)     providing written evidence, to the reasonable satisfaction of the Owners, of the Managers' compliance with their obligations under Sub-clauses 5(b)(ii), and 5(b)(iii) within a reasonable time of the commencement of this Agreement, and of each renewal date and, if specifically requested, of each payment date of the insurances in Sub-clause 5(b)(i).

**6.      Commercial Management**
*(only applicable if agreed according to* Box 8).
The Managers shall provide the following services for the Vessel in accordance with the Owners' instructions, which shall include but not be limited to:

(a)      seeking and negotiating employment for the Vessel and the conclusion (including the execution thereof) of charter parties or other contracts relating to the employment of the Vessel. If such a contract exceeds the period stated in Box 9, consent thereto in writing shall first be obtained from the Owners;

(b)      arranging for the provision of bunker fuels of the quality specified by the Owners as required for the Vessel's trade;

(c)      voyage estimating and accounting and calculation of hire, freights, demurrage and/or despatch monies due from or due to the charterers of the Vessel; assisting in the collection of any sums due to the Owners related to the commercial operation of the Vessel in accordance with Clause 11  (Income Collected and Expenses Paid on Behalf of Owners);

*If any of the services under Sub-clauses 6(a), 6(b)* and  *6(c)* *are to be excluded from the Management Fee, remuneration for these services must be stated in Annex E (Fee Schedule). See Sub-clause 12(e).*

(d)      issuing voyage instructions;

(e)      appointing agents;

(f)      appointing stevedores; and

(g)      arranging surveys associated with the commercial operation of the Vessel.

Manager shall meet the following minimum performance standards for Commercial Management:

Calendar year 2022:  Minimum charter revenue of $15mm.

Calendar year 2023:  Minimum vessel EBITDA of $5mm.

**7.      Insurance Arrangements**

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

(*only applicable if agreed according to Box 11*).
The Managers shall arrange insurances in accordance with Clause 10 (Insurance Policies), on such terms as the Owners shall have instructed or agreed, in particular regarding conditions, insured values, deductibles, franchises and limits of liability.

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

| Section 3 – Obligations |
| --- |

8.    **Managers' Obligations**
    (a)        The Managers undertake to use their best endeavours to provide the Management Services as agents for and on behalf of the Owners in accordance with sound ship management practice and to protect and promote the interests of the Owners in all matters relating to the provision of services hereunder.

Provided however, that in the performance of their management responsibilities under this Agreement, the Managers shall be entitled to have regard to their overall responsibility in relation to all vessels as may from time to time be entrusted to their management and in particular, but without prejudice to the generality of the foregoing, the Managers shall be entitled to allocate available supplies, manpower and services in such manner as in the prevailing circumstances fair and reasonable.  With respect to management services or business dealings with respect to vessels not affiliated with Pennantia, Manager: (i) shall all times undertake to avoid conflicts of interest with Pennantia vessels and business, (ii), shall not discriminate against or treat Pennantia vessels or business any less favorably than any other managed vessel or business, and (iii) with respect to vessel business commercially suitable to be performed by Pennantia vessels, shall give Pennantia vessels and business first priority for such business.

    (b)        Where the Managers are providing technical management services in accordance with Clause 4 (Technical Management), they shall procure that the requirements of the Flag State are satisfied and they shall agree to be appointed as the Company, assuming the responsibility for the operation of the Vessel and taking over the duties and responsibilities imposed by the ISM Code and the ISPS Code, if applicable.

9.    **Owners' Obligations**
    (a)        The Owners shall pay all sums due to the Managers punctually in accordance with the terms of this Agreement.  In the event of payment after the due date of any outstanding sums the Manager shall be entitled to charge interest at the rate stated in Box 13.

    (b)        Where the Managers are providing technical management services in accordance with Clause 4 (Technical Management), the Owners shall:

(i)        report (or where the Owners are not the registered owners of the Vessel procure that the registered owners report) to the Flag State administration the details of the Managers as the Company as required to comply with the ISM and ISPS Codes;

(ii)        procure that any officers and ratings supplied by them or on their behalf comply with the requirements of STCW 95; and

(iii)        instruct such officers and ratings to obey all reasonable orders of the Managers (in their capacity as the Company) in connection with the operation of the Managers' safety management system.

    (c)        Where the Managers are **not** providing technical management services in accordance with Clause 4 (Technical Management), the Owners shall:

(i)        procure that the requirements of the Flag State are satisfied and notify the Managers upon execution of this Agreement of the name and contact details of the organization that will be the Company by completing Box 5;

(ii)        if the Company changes at any time during this Agreement, notify the Managers in a timely manner of the name and contact details of the new organization;

(iii)        procure that the details of the Company, including any change thereof, are reported to the Flag State administration as required to comply with the ISM and ISPS Codes.  The Owners shall advise the Managers in a timely manner when the Flag State administration has approved the Company; and

(iv)        unless otherwise agreed, arrange for the supply of provisions at their own expense.

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

(d)        Where the Managers are providing crew management services in accordance with Sub-clause 5(a) the Owners shall:

(i)        inform the Managers prior to ordering the Vessel to any excluded or additional premium area under any of the Owners' Insurances by reason of war risks and/or piracy or like perils and pay whatever additional costs may properly be incurred by the Managers as a consequence of such orders including, if necessary, the costs of replacing any member of the Crew.  Any delays resulting from negotiation with or replacement of any member of the Crew as a result of the Vessel being ordered to such an area shall be for the Owners' account.  Should the Vessel be within an area which becomes an excluded or additional premium area the above provisions relating to cost and delay shall apply;

(ii)        agree with the Managers prior to any change of flag of the Vessel and pay whatever additional costs may properly be incurred by the Managers as a consequence of such change.  If agreement cannot be reached then either party may terminate this Agreement in accordance with Sub-clause 22(e); and

(iii)        provide, at no cost to the Managers, in accordance with the requirements of the law of the Flag State, or higher standard, as mutually agreed, adequate Crew accommodation and living standards.

(e)        Where the Managers are **not** the Company, the Owners shall ensure that Crew are properly familiarized with their duties in accordance with the Vessel's SMS and that instructions which are essential to the SMS are identified, documented and given to the Crew prior to sailing.

16

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

| Section 4 - Insurance, Budgets, Income, Expenses and Fees |
| --- |

10.    **Insurance Policies**
The Owners shall procure, whether by instructing the Managers under Clause 7 (Insurance Arrangements) or otherwise, that throughout the period of this Agreement:

(a)    at the Owners' expense, the Vessel is insured for not less than its sound market value or entered for its full gross tonnage, as the case may be for:

(i)    hull and machinery marine risks (including but not limited to crew negligence) and excess liabilities;

(ii)    protection and indemnity risks (including but not limited to pollution risks, diversion expenses and, except to the extent insured separately by the Managers in accordance with Sub-clause 5(b)(i), Crew Insurances;

*NOTE: If the Managers are not providing crew management services under Sub -clause 5(a) (Crew Management) or have agreed not to provide Crew Insurances separately in accordance with Sub -clause 5(b)(i), then such insurances must be included in the protection and indemnity risks cover for the Vessel (see Sub-clause 10(a)(ii) above).*

(iii)    war risks (including but not limited to blocking and trapping, protection and indemnity, terrorism and crew risks); and

(iv)    such optional insurances as may be agreed (such as piracy, kidnap and ransom, loss of hire and FD & D) (see Box 12)

Sub-clauses 10(a)(i) through 10(a)(iv) all in accordance with the best practice of prudent owners of vessels of a similar type to the Vessel, with sound and reputable insurance companies, underwriters or associations ("the Owners' Insurances");

(b)    all premiums and calls on the Owners' Insurances are paid by their due date;

(c)    the Owners' Insurances name the Owners, the Managers and, subject to underwriters' agreement, any third party designated by the Managers as a joint assured, with full cover.  It is understood that in some cases, such as protection and indemnity, the normal terms for such cover may impose on the Managers and any such third party a liability in respect of premiums or calls arising in connection with the Owners' Insurances.  If obtainable at no additional cost, however, the Owners shall procure such insurances on terms such that neither the Managers nor any such third party shall be under any liability in respect of premiums or calls arising in connection with the Owners' Insurances.  In any event, on termination of this Agreement in accordance with Clause 21 (Duration of the Agreement) and Clause 22 (Termination), the Owners shall procure that the Managers and any third party designated by the Managers as joint assured shall cease to be joint assured and, if reasonably achievable, that they shall be released from any and all liability for premiums and calls that may arise in relation to the period of this Agreement; and

(d)    written evidence is provided, to the reasonable satisfaction of the Managers, of the Owners' compliance with their obligations under this Clause 10 within a reasonable time of the commencement of the Agreement, and of each renewal date and, if specifically requested, of each payment date of the Owners' Insurances.

11.    **Income Collected and Expenses Paid on Behalf of Owners**
(a)    Except as provided in Sub-clause 11(c) all monies collected by the Managers under the terms of this Agreement (other than monies payable by the Owners to the Managers) and any interest thereon shall be held to the credit of the Owners in a separate bank account (the "*Vessel Revenue Account*") designated by Owners.

(b)    All monies collected by the Managers under Clause 6 (Commercial Management) shall be paid into the Vessel Revenue Account in the name of the Owners or as may be otherwise advised by the Owners in writing.

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

**12.    Management Fee (Annex E component parts)**

(a)    The Owners shall pay to the Managers (or its designee if permitted pursuant to  Annex E (4)(e)) the management fees and any true ups as stated in Box 14/Annex E for their services as Managers under this Agreement, which shall be payable in accordance with the terms, time and frequency set forth in Annex E.  Payments to the Mangers shall be payable to the Managers' nominated account stated in Box 15, or to such different account as Managers may nominate in writing to Owners from time to time, and payments to a permitted designee pursuant to Annex E(4)(e) shall be to such account as designated by Managers to Owners from time to time.

(b)    The management fee shall be subject to review and audit of expenditures and supporting documentation upon the reasonable request of Owners pursuant to Clause 13.

(c)    The Managers shall, at no extra cost to the Owners, provide their own office accommodation, office staff, facilities and stationery.

(d)    [Intentionally Omitted]

(e)    Save as otherwise provided in this Agreement, all discounts and commissions obtained by the Managers in the course of the performance of the Management Services shall be credited to the Owners.

**13.    Management of Funds**

(a)    The Managers shall at all times maintain and keep true and correct accounts, as detailed in Clause 11, *supra*,  in respect of the Management Services in accordance with GAAP or such other standard as the parties may agree, including records of all costs and expenditure incurred, and produce a summary or breakdown of actual expenditure of the Vessel in such form and at such intervals as shall be mutually agreed.  The Managers shall make such accounts available for inspection and auditing by the Owners and/or their representatives in the Managers' offices or by electronic means, provided reasonable notice is given by the Owners.

(b)    Except as expressly provided for herein, the Managers use or commitment of their own funds to finance the provision of the Management Services shall in no circumstances relieve the Owners of their obligations hereunder to reimburse the Managers.

(c)    Managers shall not commingle funds in the respective accounts required under this Agreement. Excepting the Management Fee Account, all accounts required under this agreement shall be subject to account control agreements at the discretion of Owner and or any lender of Owner.

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

| |
|---|
| **Section 5 – Legal General and Duration of Agreement** |

14.     **Trading Restrictions**
        If the Managers are providing crew management services in accordance with Sub-clause 5(a) (Crew Management), the Owners and the Managers will, prior to the commencement of this Agreement, agree on any trading restrictions to the Vessel that may result from the terms and conditions of the Crew's employment.

15.     **Replacement**
        If the Managers are providing crew management services in accordance with Sub-clause 5(a) (Crew Management), the Owners may require the replacement, at their own expenditure, at the next reasonable opportunity, of any member of the Crew found on reasonable grounds to be unsuitable for service. If the Managers have failed to fulfil their obligations in providing suitable qualified replacement Crew within the meaning of Sub-clause 5(a) (Crew Management), then such replacement shall be at the Managers' expense.

16.     **Managers' Right to Sub-Contract**
        The Managers may not assign this Agreement without the prior written consent of the Owners, which may be withheld or granted in Owners' sole discretion.  The Managers may subcontract Management Services or obligations hereunder with the prior written consent of the Owners, which may be withheld or granted in Owners' reasonable discretion.  In the event of such a sub-contract the Managers shall not be relieved of their obligations to perform under this Agreement.

17.     **Responsibilities**
        *(a)     Force Majeure*
        Neither party shall be liable for any loss, damage or delay due to any of the following force majeure events and/or conditions to the extent that the party invoking force majeure is prevented or hindered from performing any or all of their obligations under this Agreement, provided they have made all reasonable efforts to avoid, minimize or prevent the effect of such events and/or conditions:

        (i)     acts of God;

        (ii)    any Government requisition, control, intervention, requirement or interference;

        (iii)   any circumstances arising out of war, threatened act of war or warlike operations, acts of terrorism, sabotage or piracy, or the consequences thereof;

        (iv)    riots, civil commotion, blockades or embargoes;

        (v)     epidemics/pandemics,  including  COVID-19;

        (vi)    earthquakes, landslides, floods or other extraordinary weather conditions;

        (vii)   strikes, lockouts or other industrial action, unless limited to the employees (which shall not include the Crew) of the party seeking to invoke force majeure;

        (viii)  fire, accident, explosion except where caused by negligence of the party seeking to invoke force majeure; and

        (ix)    any other similar cause beyond the reasonable control of either party.

        *(b)      Liability to Owners*

        (i)     Without prejudice to Sub-clause 17(a), the Managers shall be under no liability whatsoever to the Owners for any loss, damage, delay or expense of whatsoever nature, whether direct or indirect, (including but not limited to loss of profit arising out of or in connection with detention of or delay to the Vessel) and howsoever arising in the course of performance of the Management Services UNLESS same is proved to have resulted solely from the negligence, gross negligence or willful default of the Managers or their

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

employees or agents, or sub-contractors employed by them in connection with the Vessel, in which case (save where loss, damage, delay or expense has resulted from the Managers' personal act or omission committed with the intent to cause same or recklessly and with knowledge that such loss, damage, delay or expense would probably result) the Managers' liability for each incident or series of incidents giving rise to a claim or claims shall never exceed the total of three (3) times the monthly management fee payable hereunder for the individual Vessel involved in the incident.

(ii)        *Acts or omissions of the Crew* - Notwithstanding anything that may appear to the contrary in this Agreement, the Managers shall not be liable for any acts or omissions of the Crew, even if such acts or omissions are negligent, grossly negligent or willful, except only to the extent that they are shown to have resulted from a failure by the Managers to discharge their obligations under Clause 5(a) (Crew Management), in which case their liability shall be limited in accordance with the terms of this Clause 17 (Responsibilities).

(c)        Indemnity
Except to the extent and solely for the amount therein set out that the Managers would be liable under Sub-clause 17(b), the Owners hereby undertake to keep the Managers and their employees, agents and sub-contractors indemnified and to hold them harmless against all actions, proceedings, claims, demands or liabilities whatsoever or howsoever arising which may be brought against them or incurred or suffered by them arising out of or in connection with the performance of this Agreement, and against and in respect of all costs, loss, damages and expenses (including legal costs and expenses on a full indemnity basis) which the Managers may suffer or incur (either directly or indirectly) in the course of the performance of this Agreement.

(d)        "Himalaya"
It is hereby expressly agreed that no employee or agent of the Managers (including every sub-contractor from time to time employed by the Managers) shall in any circumstances whatsoever be under any liability whatsoever to the Owners for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on his part while acting in the course of or in connection with his employment and, without prejudice to the generality of the foregoing provisions in this Clause 17 (Responsibilities), every exemption, limitation, condition and liberty herein contained and every right, exemption from liability, defense and immunity of whatsoever nature applicable to the Managers or to which the Managers are entitled hereunder shall also be available and shall extend to protect every such employee or agent of the Managers acting as aforesaid and for the purpose of all the foregoing provisions of this Clause 17 (Responsibilities) the Managers are or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of all persons who are or might be their servants or agents from time to time (including sub-contractors as aforesaid) and all such persons shall to this extent be or be deemed to be parties to this Agreement.

(e) Shipyard Liability
Managers shall not be liable whatsoever to Owners for claims (including attorneys' fees and costs), and Owners shall indemnify Managers against such claims (including attorneys' fees and costs), arising from pollution, damage to, or loss or destruction of, any vessel or property, as well as for any personal injuries, including death, suffered when a vessel managed under the terms of this Agreement is at a shipyard or other vessel maintenance facility under the control of the operator of such facility.

**18.    General Administration**

(a)        The Managers shall keep the Owners and, if appropriate, the Company informed in a timely manner of any incident of which the Managers become aware which gives or may give rise to delay to the Vessel or claims or disputes involving third parties.

(b)        The Managers shall handle and settle all claims and disputes arising out of the Management Services hereunder, unless the Owners instruct the Managers otherwise.  The Managers shall keep the Owners appropriately informed in a timely manner throughout the handling of such claims and disputes.

(c)        The Owners may request the Managers to bring or defend other actions, suits or proceedings related to the Management Services, on terms to be agreed.

(d)        The Managers shall have power to obtain appropriate legal or technical or other outside expert advice in relation to the handling and settlement of claims in relation to Sub-clauses 18(a) and 18(b) and

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

disputes and any other matters affecting the interests of the Owners in respect of the Vessel, unless the Owners instruct the Managers otherwise.

(e)      On giving reasonable notice, the Owners may request, and the Managers shall in a timely manner make available, all documentation, information and records in respect of the matters covered by this Agreement either related to mandatory rules or regulations or other obligations applying to the Owners in respect of the Vessel (including but not limited to STCW 95, the ISM Code and ISPS Code) to the extent permitted by relevant legislation.

On giving reasonable notice, the Managers may request, and the Owners shall in a timely manner make available, all documentation, information and records reasonably required by the Managers to enable them to perform the Management Services.

(f)      The Owners shall arrange for the provision of any necessary guarantee bond or other security.

(g)      Any direct costs incurred by the Managers in carrying out their obligations according to this Clause 18 (General Administration) shall be reimbursed by the Owners.

**19.    Inspection of Vessel**
The Owners may at any time after giving reasonable notice to the Managers inspect the Vessel for any reason they consider necessary.

**20.    Compliance with Laws and Regulations**
The parties will not do or permit to be done anything which might cause any breach or infringement of the laws and regulations of the Flag State, or of the places where the Vessel trades.

**21.    Duration of the Agreement**
(a)      This Agreement shall come into effect at the date stated in Box 2 and shall continue for so long as Pennantia owns a vessel(s) under management on the Commencement Date, absent the occurrence and continuation of an event of default, unless terminated earlier, in accordance with Clause 22 (Termination).

(b)      Where the Vessel is not at a mutually convenient port or place on the expiry of such period, this Agreement shall terminate on the subsequent arrival of the Vessel at the next mutually convenient port or place.

**22.    Termination**
(a)      *Owners' or Managers' default*
If either party fails to meet their obligations under this Agreement, the other party may give notice to the party in default requiring them to remedy it.  In the event that the party in default fails to remedy it within a reasonable time to the reasonable satisfaction of the other party, that party shall be entitled to terminate this Agreement with immediate effect by giving notice to the party in default.

*(b)      Notwithstanding Sub-clause 22(a):*

(i)      The Managers shall be entitled to terminate the Agreement with immediate effect by giving notice to the Owners if any monies payable by the Owners and/or the owners of any associated vessel, details of which are listed in Annex "D", shall not have been received in the Managers' nominated account within ten days (10) of receipt by the Owners of the Managers' written request, or if the Vessel is repossessed by the Mortgagee(s).

(ii)      If the Owners proceed with the employment of or continue to employ the Vessel in the carriage of contraband, blockade running, or in an unlawful trade, or on a voyage which in the reasonable opinion of the Managers is unduly hazardous or improper, the Managers may give notice of the default to the Owners, requiring them to remedy it as soon as practically possible.  In the event that the Owners fail to remedy it within a reasonable time to the satisfaction of the Managers, the Managers shall be entitled to terminate the Agreement with immediate effect by notice.

(iii)      If either party fails to meet their respective obligations under Sub-clause 5(b) (Crew Insurances) and Clause 10 (Insurance Policies), the other party may give notice to the party in default requiring them to

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

remedy it within ten (10) days, failing which the other party may terminate this Agreement with immediate effect by giving notice to the party in default.

(iv)       In the event of a Liquidity Event or a termination of this Agreement within the first twelve (12) months of this Agreement, Managers shall be paid the balance of the Fixed Management Fee that would have been payable through the 12th month of this Agreement absent such Liquidity Event or termination.   .

*(c)       Extraordinary Termination*
This Agreement shall be deemed to be terminated as to any one vessel in the case of the sale of such Vessel or, if the Vessel becomes a total loss or is declared as a constructive or compromised or arranged total loss or is requisitioned or has been declared missing.

*(d)       For the purpose of Sub-clause 22(c) hereof:*

(i)       the date upon which the Vessel is to be treated as having been sold or otherwise disposed of shall be the date on which the Vessel's owners cease to be the registered owners of the Vessel;

(ii)       the Vessel shall be deemed to be lost either when it has become an actual total loss or agreement has been reached with the Vessel's underwriters in respect of its constructive total loss or if such agreement with the Vessel's underwriters is not reached it is adjudged by a competent tribunal that a constructive loss of the Vessel has occurred; and

(iii)       the date upon which the Vessel is to be treated as declared missing shall be ten (10) days after the Vessel was last reported or when the Vessel is recorded as missing by the Vessel's underwriters, whichever occurs first.  A missing vessel shall be deemed lost in accordance with the provisions of Sub-clause 22(d)(ii).

(e)       This Agreement shall terminate on the sale of Pennantia, or the sale of all or substantially all of the assets of Pennantia (a "*Liquidity Event*").  In the event of a Liquidity Event, and notwithstanding the termination of this Agreement upon such Liquidity Event, the Owner shall calculate and pay Management Fees (including Profit Sharing Incentives) to the extent due and owing as a result of the Liquidity Event.

(f)       This Agreement shall terminate forthwith in the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of the Owner or Manager (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver or administrator is appointed, or if it suspends payment, ceases to carry on business or makes any special arrangement or composition with its creditors.

(g)       In the event of an Owners' default of its obligations under this Agreement resulting in termination, Owners shall pay Managers a sum equivalent to twelve (12) months of the Fixed Management Fee.

(h)       In addition, where the Managers provide Crew for the Vessel in accordance with Clause 5(a) (Crew Management):

       (i) the Owners shall continue to pay Crew Support Costs during the said further period of the number of months stated in Box 19; and (ii) except in the case of termination resulting from default of the Managers, the Owners shall pay Severance Costs which may be incurred.  The Managers shall use their reasonable endeavors to minimize such Severance Costs.

(i)       On the termination, for whatever reason, of this Agreement, the Managers shall release to the Owners, if so requested, the originals where possible, or otherwise certified copies, of all accounts and all documents specifically relating to the Vessel and its operation, per the Severance Costs referenced in Box 20.

(j)       The termination of this Agreement shall be without prejudice to all rights accrued due between the parties prior to the date of termination.

**23.    Dispute Resolution Clause (See Box 21)**

       This Agreement shall be construed and enforced in accordance with and governed by the General Maritime Law of the United States to the extent applicable and by the laws of the state of New York without giving effect to the conflicts of laws provisions thereof.

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

Any action or proceeding arising from, related to, under, or in connection with this Agreement must be brought solely and exclusively in the federal courts, and state courts only when federal courts are not available for such action or proceeding, located in the County of New York in the State of New York.  Each party hereto irrevocably (i) submits to the exclusive jurisdiction of such New York courts, and (ii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum.  The parties irrevocably and unconditionally waive any right they have to a trial by jury in respect of any legal action arising out of or relating to this Agreement.

The parties may agree, however, at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Agreement:

(i)      In the case of a dispute in respect of which litigation has been commenced the following shall apply:

(ii)      Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(iii)      The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator may be appointed promptly by the court ("the Tribunal") or such person as the Tribunal may designate for that purpose.  The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, in New York County in the State of New York.

(iv)      If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal.

(v)      The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(vi)      Either party may advise the Tribunal that they have agreed to mediation.  The litigation procedure shall continue during the conduct of the mediation, subject to the discretion of the Tribunal, and the Tribunal may take the mediation timetable into account when setting the timetable for steps in the litigation.

(vii)      Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(viii)      The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the litigation.

*(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.)*

**24.**    **Notices**

   (a)      All notices given by either party or their agents to the other party or their agents in accordance with the provisions of this Agreement shall be in writing and shall, unless specifically provided in this Agreement to the contrary, be sent to the address for that other party as set out in Boxes 22 and 23 or as appropriate or to such other address as the other party may designate in writing.

A notice may be sent by registered or recorded mail, facsimile, electronically or delivered by hand in accordance with this Sub-clause 24(a).

   (b)      Any notice given under this Agreement shall take effect on receipt by the other party and shall be deemed to have been received:

(i)      if posted, on the third (3rd) day after posting;

(ii)      if sent by facsimile or electronically, on the day of transmission; and

23

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

(iii)      if delivered by hand, on the day of delivery.

And in each case proof of posting, handing in or transmission shall be proof that notice has been given, unless proven to the contrary.

**25.      Entire Agreement**
This Agreement constitutes the entire agreement between the parties and no promise, undertaking, representation, warranty or statement by either party prior to the date stated in Box 2 shall affect this Agreement. Any modification of this Agreement shall not be of any effect unless in writing signed by or on behalf of the parties.

**26.      Third Party Rights**
Except to the extent provided in Sub-clauses 17(c) (Indemnity) and 17(d) (Himalaya), no third parties may enforce any term of this Agreement.

**27.      Partial Validity**
If any provision of this Agreement is or becomes or is held by any arbitrator or other competent body to be illegal, invalid or unenforceable in any respect under any law or jurisdiction, the provision shall be deemed to be amended to the extent necessary to avoid such illegality, invalidity or unenforceability, or, if such amendment is not possible, the provision shall be deemed to be deleted from this Agreement to the extent of such illegality, invalidity or unenforceability, and the remaining provisions shall continue in full force and effect and shall not in any way be affected or impaired thereby.

**28.      Interpretation**
In this Agreement:

*(a)      Singular/Plural*
The singular includes the plural and vice versa as the context admits or requires.

*(b)      Headings*
The index and headings to the clauses and appendices to this Agreement are for convenience only and shall not affect its construction or interpretation.

*(c)      Day*
"Day" means a calendar day unless expressly stated to the contrary.

**29.      MLC Clause for SHIPMAN 2009**
For the purposes of this Clause:

"MLC" means the International Labour Organisation (ILO) Maritime Labour Convention (MLC 2006) and any amendment thereto or substitution thereof.

"Shipowner" shall mean the party named as "shipowner" on the Maritime Labour Certificate for the Vessel.

(a)      Subject to Clause 3 (Authority of the Managers), the Managers shall, to the extent of their Management Services, assume the Shipowner's duties and responsibilities imposed by the MLC for the Vessel, on behalf of the Shipowner.

(b)      The Owners shall ensure compliance with the MLC in respect of any crew members supplied by them or on their behalf.

(c)      The Owners shall procure, whether by instructing the Managers under Clause 7 (Insurance Arrangements) or otherwise, insurance cover or financial security to satisfy the Shipowner's financial security obligations under the MLC.

**30.      MISCELLANEOUS RIDER PROVISIONS**

(a)      Each of Owners and Managers represent and warrant that it is a citizen of the United States for the purpose of engaging in Coastwise Trade within the meaning of 46 U.S.C. § 50501 (a "Coastwise

24

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

Citizen"), and covenants that during the term of this Agreement it shall remain a Coastwise Citizen, qualified (as to citizenship) for the purpose of operation of Vessels in the Coastwise Trade, and Manager shall not suffer or permit anything to be done which might injuriously affect the entitlement of the Vessels under the laws and regulations of the United States to be so documented for use in the Coastwise Trade.

(b)      Publicity and Confidentiality

    (i)    Release of Information.  Manager agrees it will not divulge information concerning this Agreement to anyone without the Owners' prior written consent, which shall not be unreasonably withheld, provided that Manager may disclose information as necessary to the appropriate governmental authority in an application for a permit, approval or clearance.  Manager will retain all information belonging to Owners in the strictest confidence and will neither use it nor disclose it to others without the prior written consent of Owners. Manager will require any sub consultant engaged by it pursuant to this Agreement to comply with the terms and provisions of this Clause.  These requirements will survive the termination or expiration of this Agreement.

    (ii)    Confidentiality/No Promotion.  Manager agrees that it or its employees may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is proprietary or confidential to Owner.  Any and all non-public information of any form obtained by Manager and its subcontractors, and their respective employees, in the performance of this Agreement will be deemed confidential and proprietary information.

    (iii)   Confidentiality. Each party agrees to hold such information in strict confidence and not to disclose such information to third parties or to use such information for any purpose whatsoever during the Term of this Agreement and for a period of five (5) years thereafter without the written consent of the other party except as necessary for: (a) the performance of the services under this Agreement; (b) to advise each of its employees who may be exposed to such proprietary and confidential information of their obligations to keep such information confidential; (c) compliance with professional standards of conduct for the performance of the services and/or related matters; (d) compliance with any law, regulation, ordinance, court order or governmental directive or other legal mandate; and/or (e) protection of the parties against claims or liabilities arising from the performance of services under this Agreement.  In the event of any disclosure by a party under subparagraphs (c), (d) or (e), the disclosing party will give the other party fourteen (14) days advance notice of such disclosure.  This obligation will not apply to information previously in a party's possession or in the public domain, or information lawfully acquired on a non-confidential basis from others.  This provision will survive termination of this Agreement.

    (iv)   Manager agrees that it will review the terms and conditions of Clause 30(b) of this Agreement with all subcontractors it engages and that it will obtain the written agreement of each subcontractor to comply with the terms of this Clause.

# SHIPMAN 2009

Based on the BIMCO STANDARD SHIP
MANAGEMENT  AGREEMENT

PART I

| 1. Place and date of Agreement | 2. Date of commencement of Agreement (Cls. 2, 12, 21 and 25) |
|---|---|
| New York, New York, May 12, 2022 | April 30, 2022 |

**Deleted:** The first date on which the Owners obtain court approval and title to one or more vessels from the Bouchard Transportation Co. auction sale in Case No. 20-34682. See also Cl. 2 for conditions precedent to commencement and certain pre-commencement¶ authorizations.

**Deleted:** August 8, 2021

| 3. Owners (name, place of registered office and law of registry) (Cl. 1) | 4. Managers (name, place of registered office and law of registry) (Cl. 1) |
|---|---|
| (i)  Name:  Pennantia, LLC | (i)  Name: Rose Cay Maritime, LLC |
| (ii)  Place of registered office: Greenwich, CT | (ii)  Place of registered office: Houston, TX |
| (iii)  Law of registry: Delaware, United States | (iii)  Law of registry: Delaware, United States |

| 5. The Company (with reference to the ISM/ISPS Codes) (state name and IMO Unique Company Identification number.  If the Company is a third party then also state registered office and principal place of business) (Cls 1 and 9(c)(ii)) | 6. Technical Management (state "yes" or "no" as agreed) (Cl. 4) |
|---|---|
| | YES |
| | 7. Crew Management (state "yes" or "no" as agreed) (Cl. 5(a)) |
| (i)  Name: Rose Cay Maritime, LLC | YES |
| | 8. Commercial Management (state "yes" or "no" as agreed) (Cl. 6) |
| (ii)  IMO Unique Company Identification number: 626935 | YES |
| (iii)  Place of registered office:  N/A | |
| (iv)  Principal place of business:  N/A | |

**Deleted:** Foss Maritime Company, LLC

**Deleted:** [TO BE PROVIDED]

**Deleted:** 450 Alaskan Way S., Suite 706¶ Seattle, WA 98104¶

**Deleted:** Seattle, WA

| 9. Chartering Services period (only to be filled in if "yes" stated in Box 8) (Cl.6(a)) | 10.  Crew Insurance arrangements (state "yes" or "no" as agreed) |
|---|---|
| N/A | (i)     Crew Insurances* (Cl. 5(b)): YES |
| | (ii)    Insurance for persons proceeding to sea onboard (Cl. 5(b)(i)):YES |
| | *only to apply if Crew Management (Cl. 5(a)) agreed (see Box 7) |

**Deleted:** One (1) Year

| 11. Insurance arrangements (state "yes" or "no" as agreed) *(Cl. 7)*<br>YES | 12. Optional insurances (state optional insurance(s) as agreed, such as piracy, kidnap and ransom, loss of hire and FD & D) *(Cl. 10(a)(iv))*<br>Loss of Hire and FD&D insurance |
|---|---|
| 13. Interest (state rate of interest to apply after due date to outstanding sums) *(Cl. 9(a))*<br><br>3% per month | 14. Management fee *(Cl. 12(a))*<br><br>See Annex E |
| 15. Manager's nominated account *(Cl.12(a))*<br><br>**Account Details:**<br>Rose Cay Maritime LLC<br>Account Number: 80009924772<br><br>**Wire Instructions:**<br>Bank Name: First Republic Bank<br>Bank Routing/ASA: 321081669<br>Bank Swift: (for international wires) FRBBUS6S | 16. Daily rate (state rate for days in excess of those agreed in budget) *(Cl. 12(c))*<br>N/A |
| | 17. Lay-up period/ number of months *(Cl.12(d))*<br>N/A |
| 18. Minimum contract period (state number of months) *(Cl. 21(a))*<br><br>See Clause 21 and 22 | 19. Management fee on termination (state number of months to apply)<br><br>See Clause 22(b)(iv) |
| 20. Severance Costs (state maximum amount) *.I.Q.I. 22(h)(ii))*<br><br>At cost (per agreed terms of subcontracting crewing agreement) | 21. Dispute Resolution<br><br>See Clause 23 |
| 22. Notices (state full style contact details for serving notice and communication to the Owners) *(Cl. 24)*<br><br>Pennantia LLC<br><br>411 West Putnam Avenue<br>Greenwich, CT 06830 Suite 425<br><br>Attention: Josh Trump<br>Email: jtrump@contrariancapital.com<br>Attention: Counsel<br>Email: jweisser@contrariancapital.com | 23. Notices (state full style contact details for serving notice and communication to the Managers) *(Cl. 24)*<br><br>Rose Cay Maritime, LLC<br><br>1321 Upland Drive Ste. 20183,<br>Houston, TX 77043<br><br>Attention: Alex Parker<br>Email: alex@rosecaycap.com<br>Attention: Joel Fine<br>Email: jfine@rcmaritime.com<br>Attention: George Chalos<br>Email: gmc@chaloslaw.com |

It is mutually agreed between the party stated in Box 3 and the party stated in Box 4 that this Agreement consisting of PART I and PART II as well as Annexes" A" (Details of Vessel or Vessels)," B" (Details of Crew)," C" (Budget)," D" (Associated Vessels) and" E" (Fee Schedule) attached hereto, shall be performed subject to the conditions contained herein.  In the event of a conflict of conditions, the provisions of PART I and Annexes" A" ,"B", "C", "D" and "E" shall prevail over those  of PART II to the extent of such conflict but no further.

| Signature(s) (Owners) | Signature(s) (Managers) |
|---|---|
| | |

**Deleted:** None

**Deleted:**

**Deleted:** 800 Capitol Street¶
Suite 2400¶
Houston, TX 77002-2925…

**Deleted:** John Parrott

**Deleted:** parrott@rosecaycap.com

**Deleted:** Barbara Holland

**Deleted:** barbara.holland@cwn-law.com

ANNEX "A" (DETAILS OF VESSEL OR VESSELS)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME:  SHIPMAN 2009

Date of Agreement:  May 12, 2022

| | Deleted: August 8, 2021 |

Name of Vessel(s):

1.    Anna Rose
2.    Jordan Rose
3.    Susan Rose
4.    Jesse Rose
5.    Joan Rose
6.    Rebekah Rose
7.    Cindy Rose
8.    RCM 225
9.    RCM 250
10.   RCM 252
11.   RCM 262
12.   RCM 242
13.   RCM 210
14.   RCM 260
15.   RCM 245
16.   RCM 295

**Deleted:** One or more of the following purchased from the Bouchard Transportation Co. auction sale in Case No. 20-34682, subject to court approved transfer of title to Owners.¶
¶
TUG BOUCHARD GIRLS/ B. 295¶
TUG BRENDAN J. BOUCHARD/ B. 210 TUG DANIELLE M. BOUCHARD/ B. 245 TUG EVENING BREEZE/ B. 252¶
TUG EVENING STAR/ B. 250¶
TUG JANE A. BOUCHARD/ B. 225 TUG KIM M. BOUCHARD/ B. 270¶
TUG MORTON S. BOUCHARD IV/ B. 242 B. NO. 260 (n/t)¶
B. NO. 262 (n/t)...

ANNEX "B" (DETAILS OF CREW)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME:  SHIPMAN 2009

Date of Agreement:  May 12, 2022

Details of Crew:

Crew complement will be in compliance with applicable law and regulation and will be either (i) crew complement required by COI or (ii) mutual agreement on crew complement required or appropriate for (1) commercial vessel operations, for vessels in commercial operations, or (2) dock-side stand-by service, lay up, or preparation for commercial operations, as the case may be, and as permitted by COI or United States Coast Guard.  Managers will provide crewing information as requested by Owners on a regular basis.

**Deleted:** August 8, 2021

ANNEX "C" (BUDGET)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME: SHIPMAN 2009

Date of Agreement: May 12, 2022.

      (a)     Owner shall reimburse Manager, on a direct pass-through basis, and without markup, for the actual direct expenses incurred by Manager for performance of the Crewing and Technical Management Services provided for the Vessels pursuant to Clauses 4, 5, and 7 of this Agreement, which, without limiting the generality of the preceding phrase and so long as incurred pursuant to Clauses 4, 5 or 7 or the advance written consent of Owner, shall include: (i) inspection and maintenance of the Vessels, (ii) parts, supplies, and repairs for Vessels (iii) Vessel dry docking, (iii) fuel, lubes, and grease, (iv) insurance premiums and broker fees; (v) crewing costs; (vi) dockage fees and port charges; (vii) lay up costs; (viii) security costs; (ix) costs of professional services approved in advance by Owner (accounting, tax, legal), and (x) reimbursable pass through costs of the foregoing services performed and charged by a subcontractor approved in advance by Owner ("*Management Reimbursement*").

      (b)     Management Reimbursement shall not include those costs intended to be compensated by the Variable Commission Fees nor the costs of administrative overhead (including office space, utilities, office equipment, office supplies, and office and shore-side employees).

      (c)     As soon as practicable following execution of this Agreement and thereafter on or before October 1 of each year for the upcoming calendar year (January 1–December 31), Manager shall prepare and deliver to Owner a budget of anticipated Management Reimbursement (an "*Annual Budget*"). Each Annual Budget shall be subject to review and approval by Owner. In the event an Annual Budget is not approved prior to the commencement of the applicable calendar year, the Annual Budget in effect for the prior year shall continue to apply for a period of up to six (6) months so long as the parties continue to negotiate in good faith.

      (d)     After the date of execution of this Agreement, Manager shall confirm the that the Vessel Operating Account contains at least an amount approximating sixty (60) days of estimated Management Reimbursement (the "*Initial Deposit*"). If not, Owner shall make an Initial Deposit into the Vessel Operating account. The Initial Deposit shall be two (2) times the initial Annual Budget, or such other sum mutually agreed by the parties. Subsequent to the Initial Deposit period, it is the intent of the parties that the funds in the Vessel Operating Account at the time each Estimated Reimbursement Payment is made as described below should approximate sixty (60) days of estimated Management Reimbursement based the average of the most recent Actual Reimbursable Expenses and current Estimated Reimbursement, or such other formula from time to time mutually agreeable to the parties. No fewer than five (5) Business Days prior to the first day of each calendar month of this Agreement, Manager shall prepare and furnish to Owner a funding request (each, a "*Monthly Funding Request*") of estimated Management Reimbursement for the upcoming month (the "*Estimated Reimbursement*"). On or before the first day of each calendar month following each Monthly Funding Request, Owner shall deposit the Estimated Reimbursement requested in each Monthly Funding Request into the Vessel Operating Account for disbursement by Manager in accordance with the Monthly Funding Request and in compliance with this Section (each payment an "*Estimated Reimbursement Payment*").]

Vessel Operating Account
[Dedicated Account Information to be provided
by Managers to Owners prior to
Commencement Date]
[              ]
[              ]

**Deleted:** August 8, 2021

**Deleted:** <#>As soon as practicable following execution of this Agreement Manager shall prepare and provide to Owner an initial start-up budget projected to be approximately $250,000 ($50,000 of which has previously been advanced) for the first six (6) months of this Agreement (the "*On-boarding Period*"), for agreed upon itemized on-boarding and one-time items ("*On-boarding Items*"). Upon Manager's request, Owner will pay Manager during the On-boarding Period for additional requested On-boarding Items over the initial projected budget acceptable to and approved by Owner in its sole discretion. Such requests shall be supported by appropriate explanation, itemization, and supporting documentation.¶

**Deleted:** and prior to the Commencement Date, Owner shall make an initial deposit into the

**Deleted:** of

**Deleted:** .

(e)      Manager shall have no authority to, nor shall it spend or commit to spend, an amount in excess of the Monthly Funding Request without the express written authority of Owner unless in the event of an emergency.  Any extraordinary expenses not anticipated by the Monthly Funding Request shall, if approved by Owner in advance, shall be reimbursed to Manager promptly upon receipt of invoice, and, if desired by Owner, such amounts may be funded by Owner directly to the payee with respect thereto.

(f)      As promptly as possible (but not more than five (5) Business Days) after the end of each calendar month Manager shall render to Owner a written statement for the preceding month showing actual expenses for the preceding month together with all supporting invoices or documents, with a true up of the actual expenses versus the Estimated Reimbursement ("*Actual Reimbursable Expenses*" and each such statement, a "*Reimbursement Statement*").  The next Monthly Funding Request shall also include a reconciliation of each prior month's activity.

(g)      Each Monthly Funding Request shall include a certification signed by a Responsible Officer of the Manager that any invoices submitted for reimbursement have been paid when due; a statement listing the Manager's accounts payable for items that are at that time overdue in excess of thirty (30) days (and if applicable, each item outstanding more than sixty (60) days, and so forth for each 30 day period thereafter, specifically identified as such); and the certification that Manager is in material compliance this Agreement.  If any item of disbursement is questioned by Owner, Owner shall reimburse or credit Manager for the portion not in dispute, and the parties shall diligently set about to resolve the questioned item(s) in good faith for a period of up to three months.

(h)      Within 30 days of the end of each fiscal quarter of Manager during this Agreement, Manager shall prepare and deliver to Owner a certification signed by a Responsible Officer of the Manager that:

(i)      in the course of the performance by such Responsible Officer of his or her duties as an officer of Manager, such Responsible Officer would normally obtain knowledge of any default by Manager of its obligations under this Agreement or any agreement between Manager and another party pertaining to the Vessels ("*Management Agreements*");

(ii)      the Manager is in compliance in all material respects with its obligations under all Management Agreements to which it is a party;

(iii)      such Responsible Officer of the Manager has no knowledge of any event of default under any Management Agreement to which it is a party, or of the occurrence of any default under any Management Agreement to which it is a party and the failure to cure, would be reasonably likely to breach or become an event of default hereunder or under any Management Agreement to which it is a party; and

(iv)      there are no outstanding Liens on the Vessels other than Permitted Liens, so long as paid within the period provided for Permitted Liens; and

(i)      Manager shall keep proper and detailed books and records of Manager sufficient to demonstrate compliance with the terms of this Agreement, and in compliance bookkeeping and/or accounting standards applicable to Manager as of the date of this Agreement.

(j)      Owner shall have the right to examine and audit the books and records of Manager at any reasonable time, which shall include Vessel records and all records sufficient to substantiate and audit the Manager's compliance with its obligations under this Agreement and any Management Agreement, and to make copies (including electronic copies of computer records) and obtain print-outs of such books and records.

(k)      The Manager shall give Owner reasonably prompt notice and copies of all tax notices, reports or inquiries, claims of liens, and of any damage, loss, seizure, attachment or judicial process which may affect the use, maintenance, operation, possession or ownership of the Vessels; provided, however, that no such notice need be given for any damage or loss which is not required to be reported to the U.S. Coast Guard or other federal or state authority, does not materially affect the use, maintenance or operation of a Vessel and which is repaired or remediated in the ordinary course of business of the Manager.

Deleted:

ANNEX "D" (ASSOCIATED VESSELS)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME:  SHIPMAN 2009

NOTE: PARTIES SHOULD BE AWARE THAT BY COMPLETING THIS ANNEX "D" THEY WILL BE SUBJECT TO
THE PROVISIONS OF SUB-CLAUSE 22(b)(i) OF THIS AGREEMENT.

Date of Agreement:  May 12, 2022

Details of Associated Vessels:

N/A

**Deleted:** August 8, 2021

ANNEX " E" (FEE SCHEDULE)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
<u>CODE NAME:  SHIPMAN 2009</u>

Owners shall pay Managers (or its designee if permitted pursuant to  in paragraph (4)(e)) for the Management
Services provided under this Agreement in accordance with Clause 12, comprised of the following four (4)
components (Annex E component parts):

(1) <u>Fixed Management Fee</u>

$25,000  per month, per ATB tug/barge set, but no less than the greater of the number of tugs or barges in the
managed fleet.  (As an example, provided for illustration purposes only, Annex A shows that there are ten barges and
eight tugs. Managers monthly fee would be 10 x $25,000 for a total of $250,000 and an annual total fee of
$3,000,000). Such monthly payments shall be made in advance, with an annual inflation adjustment factor of CPI-W,
U.S. City Average, All Items, standard reference base, not seasonally adjusted, but not greater than 5%, calculated
annually to apply on the first monthly payment following the anniversary date of this Agreement.  The minimum
annual aggregate Fixed Management Fee shall be $2.1 million, provided, however, that in the event that Pennantia
owns four (4) or fewer pairs of vessels, after three (3) months the minimum annual aggregate Fixed Management Fee
shall not apply, and the parties shall use good faith efforts to reduce the aggregate Fixed Management Fee.

(2) <u>Variable Commission Fees</u>

In addition to the Fixed Management Fee, Owner's shall pay Managers for certain vessel chartering and vessel sales
services:

|  | |
|---|---|
| a) Chartering Fees: | 1.5% of charter, to be paid out over the applicable term of the charter |
|  | 0.5% if broker used |
| b) Vessel Sale Fees: | Vessel sales in the ordinary course: |
|  | 3.0% of total proceeds commission without broker |
|  | 0.5% of total proceeds commission with broker |

Chartering Fees and Vessel Sale Fees apply only to arms-length transactions with non-affiliates of either
party.

(3) <u>Profit Sharing Incentives</u>

Managers shall be entitled to receive profit sharing incentive payments, calculated annually in arrears, in
accordance with the following Investment Rate of Return (IRR) thresholds:

• No incentive fee below 12% IRR hurdle
• 20% of cash flow above a 12% IRR
• No catch-up

Cash flow formula to be determined.

(4) <u>Equity Incentive Awards</u>

Managers shall be entitled to receive equity incentive awards, in accordance with the following thresholds:

a) Initial Equity Award Incentive Fee:    On the Commencement Date, $1.5mm to be divided between
(1) $750,000 cash payment and (2) award of 3.75% Class B non-voting equity of Pennantia, with economic rights pari
passu with Contrarian Class A stock and anti-dilution protections.

b) Management Equity Awards:    Upon meeting the calendar year EBITDA hurdles below, Manager will
be awarded the corresponding Class B equity of Pennantia:

| EBITDA hurdle | Award | Total |
|---|---|---|
| Upon Closing | 3.75% | 3.75% |

| | | |
|---|---|---|
| 20,000,000 | 2.25% | 6.00% |
| 30,000,000 | 3.00% | 9.00% |
| 35,000,000 | 3.00% | 12.00% |

Each hurdle, along with its corresponding equity award, shall be "one-time" in nature such that the equity award will be granted following the first year the hurdle is clear.  By way of examples:

1)        If Pennantia generates $20mm of EBITDA in each of its first 3 years Managers will be awarded a single award of 2.25% of Class B stock to correspond with the $20mm hurdle.
2)        If Pennantia generates $40mm of EBITDA in its first year Managers will earn a single award of 3.0% of Class B stock to correspond to the $40mm hurdle.
3)        If Pennantia generates $35mm in EBITDA in each of its first 3 years Managers will earn 3% in Class B shares in year 1 to correspond to the $35mm EBITDA hurdle, 3% in year 2 to correspond to the $30mm hurdle, and 2.25% in year 3 to correspond to the $20mm hurdle:

Pennantia will use reasonable commercial efforts to discuss optimizing the tax and depreciation considerations of
    Managers.

c) So long as no Manager's event of default has occurred and is continuing, Managers shall be permitted within one hundred twenty (120) days of the Commencement Date, or December 31, 2021, whichever is later, to co-invest up to $2,200,000 in Class B non-voting equity with economic rights of up to ten (10%) of the fully diluted equity of Pennantia pari passu with Contrarian Class A stock.  In the event of co-investment in amounts less than $2,200,000, the associated economic rights shall be calculated on a pro-rata basis.

d) Owners shall provide Managers with no less than the same disclosures and reports as provided to Contrarian investors related to the Pennantia investment.

e) Managers shall have the right to designate an entity other than Rose Cay Maritime, LLC to receive and hold any [Profit Sharing Incentives or Pennantia Class B equity, so long as such entity holding or receiving any Profit Sharing Incentives or such Class B equity is and remains for the duration of this Agreement an affiliate of Rose Cay Maritime, LLC under common control of the holders of the equity interests of Rose Cay Maritime, LLC as of the Commencement Date.  Subject to the requirements of the preceding sentence, upon the award and issuance of Profit Sharing Incentives or Class B equity pursuant to this Agreement, such equity shall be fully vested in the designated holder without regard to any future termination of this Agreement.  Notwithstanding Managers' designation of a holder of Profit Sharing Incentives or Class B equity, Managers agree that Pennantia shall not be required to provide any reporting information concerning the Pennantia investment to any person or entity other than Rose Cay Maritime, LLC.  Managers may provide information provided by Pennantia to such designated holder provided that Managers and such designated holder are parties to a confidentiality and non-disclosure agreement concerning such information on terms materially similar to the confidentiality and non-disclosure obligations of Managers under this Agreement.

---

9

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

Section 1 – Basis of the Agreement

1.  **Definitions**

    In this Agreement save where the context otherwise requires, the following words and expressions shall have the meanings hereby assigned to them:

    "Company" (with reference to the ISM Code and the ISPS Code) means the organization identified in Box 5 or any replacement organization appointed by the Owners from time to time (see Sub-clauses 9(b)(i) or 9(c) (ii), whichever is applicable).

    "Crew" means the personnel of the numbers, rank and nationality specified in Annex "B" hereto.

    "Crew Insurances" means insurance of liabilities in respect of crew risks which shall include but not be limited to death, permanent disability, sickness, injury, repatriation, shipwreck unemployment indemnity and loss of personal effects (see Sub-clause 5(b) (Crew Insurances) and Clause 7 (Insurance Arrangements) and Clause 10 (Insurance Policies) and Boxes 10 and 11).

    "Crew Support Costs" means all expenses of a general nature which are not particularly referable to any individual vessel for the time being managed by the Managers and which are incurred by the Managers for the purpose of providing an efficient and economic management service and, without prejudice to the generality of the foregoing, shall include the cost of crew standby pay, training schemes for officers and ratings, cadet training schemes, sick pay, study pay, recruitment and interviews.

    "Flag State" means the State whose flag the Vessel is flying.

    "ISM Code" means the International Management Code for the Safe Operation of Ships and for Pollution Prevention and any amendment thereto or substitution therefor.

    "ISPS Code" means the International Code for the Security of Ships and Port Facilities and the relevant amendments to Chapter XI of SOLAS and any amendment thereto or substitution therefor.

    "Managers" means the party identified in Box 4.

    "Management Services" means the services specified in SECTION 2 - Services (Clauses 4 through 7) as indicated affirmatively in Boxes 6 through 8, 10 and 11, and all other functions performed by the Managers under the terms of this Agreement.

    "Owners" means the party identified in Box 3.

    "Severance Costs" means the costs which are legally required to be paid to the Crew as a result of the early termination of any contracts for service on the Vessel.

    "SMS" means the Safety Management System (as defined by the ISM Code).

    "STCW 95" means the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978, as amended in 1995 and any amendment thereto or substitution therefor.

    "Vessel" means the vessel or vessels, details of which are set out in Annex "A" attached hereto, and shall be, for purposes of Clause 17(b)(i), 1) each combination of tug and barge (which pairing may be changed at Managers' discretion); and 2) the individual barges not paired with a tug.

2.  **Commencement and Appointment**

    With effect from the date stated in Box 2 for the commencement of the Management Services and continuing unless and until terminated as provided herein, the Owners hereby appoint the Managers and the Managers hereby agree to act as the Managers of the Vessels in respect of the Management Services. It is the intent of the Owners and Managers that this Agreement and the services hereunder will commence on April 30 2022 (the "Commencement Date").

    > **Deleted:** at the date and time upon which the Owners obtain court approval and transfer of title to one or more vessels from the Bouchard Transportation Co. auction sale in Case No. 20-34682 (or such earlier time that the

PART II
SHIPMAN 2009
Standard ship management agreement

**3.    Authority of the Managers**
Subject to the terms and conditions herein provided, during the period of this Agreement the Managers shall carry out the Management Services in respect of the Vessel as agents for and on behalf of the Owners.  The Managers shall have authority to take such actions as they may from time to time in their absolute discretion consider to be necessary to enable them to perform the Management Services in accordance with sound ship management practice, including but not limited to compliance with all relevant rules and regulations.

During the term of this Agreement, the Managers shall have and maintain full control of the Vessels and shall be responsible to ensure the safety and maintenance of the Vessels, its crew, and operations of the Vessels conducted pursuant to this Agreement.

To the extent international or other referenced standards, such as ISM Code, ISPS Code, SMS Code, STCW 95, and the Maritime Labor Convention (Cl. 28), etc. referenced in this Agreement, are not applicable to the Vessels or the operation and trading area of the Vessel, such standards shall not apply; provided, however, that the Vessels shall comply with its Certificate of Documentation, Certificate of Inspection, and laws and regulations applicable to U.S. coastwise vessels in the area of operation of the Vessels.

**Section 2 – Services**

**4.    Technical Management**
(only applicable if agreed according to Box 6).
The Managers shall provide technical management which includes, but is not limited to, the following services:

(a)    ensuring that the Vessel complies with the requirements of the law of the Flag State;

(b)    ensuring compliance with the ISM Code;

(c)    ensuring compliance with the ISPS Code;

(d)    providing competent personnel to supervise the maintenance and general efficiency of the Vessel;

(e)    arranging and supervising dry-docking, repairs, alterations and the maintenance of the Vessel to the standards agreed with the Owners to ensure that the Vessel will comply with all requirements and recommendations of the classification society, and with the law of the Flag State and of the places where the Vessel is required to trade;

(f)    arranging the supply of necessary fuel, stores, spares and lubricating oil;

(g)    appointing surveyors and technical consultants as the Managers may consider from time to time to be necessary;

**Deleted:** Owners are required to take delivery or become responsible for care or risk of loss of such vessels and Owners request commencement in writing) (the "*Commencement Date*"), to the extent possible pursuant to the scope of services under this Agreement, taking possession, custody and care directly from the prior title holder and/or custodial manager. without any gap in time or possession.

**Deleted:** It is an express condition precedent to the commencement of this agreement that Owners take title to at least one (1) vessel from the Bouchard Transportation Co. auction sale in Case No. 20-34682 on or before September 1, 2021, and in the event that does not occur, this agreement shall be null and void and have no further effect.

**Deleted:** In the event that Owners have one or more winning and accepted bids in Case No. 20-34682, upon the written request of Owners, Managers are authorized as agents of Owners to take such advance actions as requested by Owners as may be reasonably required for arranging and procuring Management Services for the Vessel(s) required to be effective as of the Commencement Date, including, but not limited to, arrangements to price and place insurances to become effective as of the Commencement Date, and make provisional arrangements for Crew to take possession of the Vessel on the Commencement Date ("*Pre-commencement Authorizations*").

11

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

(h)        arranging for the supply of provisions unless provided by the Owners; and

(i)        arranging for the sampling and testing of bunkers.

(j)        Arranging for other provisions or services pertaining to the Vessel or Vessel operations as requested by Owners.

**5.        Crew Management and Crew Insurances**
     (a)      *Crew Management*
(only applicable if agreed according to Box 7)
The Managers shall provide suitably qualified Crew who shall comply with applicable USCG requirements. The provision of such crew management services includes, but is not limited to, the following services:

(i)        selecting, engaging and providing for the administration of the Crew, including, as applicable, payroll arrangements, pension arrangements, tax, social security contributions and other mandatory dues related to their employment payable in each Crew member's country of domicile;

(ii)       ensuring that the applicable requirements of the law of the Flag State in respect of rank, qualification and certification of the Crew and employment regulations, such as Crew's tax and social insurance, are satisfied;

(iii)      ensuring that all Crew have passed a medical examination with a qualified doctor certifying that they are fit for the duties for which they are engaged and are in possession of valid medical certificates issued in accordance with appropriate Flag State requirements or such higher standard of medical examination as may be agreed with the Owners.  In the absence of applicable Flag State requirements the medical certificate shall be valid at the time when the respective Crew member arrives on board the Vessel and shall be maintained for the duration of the service on board the Vessel;

(iv)      ensuring that the Crew shall have a common working language and a command of the English language of a sufficient standard to enable them to perform their duties safely;

(v)       arranging transportation of the Crew, including repatriation;

(vi)      training of the Crew;

(vii)     conducting union negotiations; and

(viii)    if the Managers are the Company, ensuring that the Crew, on joining the Vessel, are given proper familiarization with their duties in relation to the Vessel's SMS and that instructions which are essential to the SMS are identified, documented and given to the Crew prior to sailing.

(ix)      if the Managers are **not** the Company:

     (1)        ensuring that the Crew, before joining the Vessel, are given proper familiarization with their duties in relation to the ISM Code; and

     (2)        instructing the Crew to obey all reasonable orders of the Company in connection with the operation of the SMS.

(x)       Where Managers are **not** providing technical management services in accordance with Clause 4 (Technical Management):

     (1)        ensuring that no person connected to the provision and the performance of the crew management services shall proceed to sea on board the Vessel without the prior consent of the Owners (such consent not to be unreasonably withheld); and

     (2)        ensuring that in the event that the Owners' drug and alcohol policy requires measures to be taken prior to the Crew joining the Vessel, implementing such measures;

12

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

(b)    Crew Insurances
*(only applicable if Sub-clause 5(a) applies* **and** *if agreed according to Box 10)*
The Managers shall throughout the period of this Agreement provide the following services:

(i)    arranging Crew Insurances in accordance with the best practice of prudent managers of vessels of a similar type to the Vessel, with sound and reputable insurance companies, underwriters or associations.  Insurances for any other persons proceeding to sea onboard the Vessel may be separately agreed by the Owners and the Managers (see Box 10);

(ii)    ensuring that the Owners are aware of the terms, conditions, exceptions and limits of liability of the insurances in Sub-clause 5(b)(i);

(iii)    ensuring that all premiums or calls in respect of the insurances in Sub-clause 5(b)(i) are paid by their due date;

(iv)    if obtainable at no additional cost, ensuring that insurances in Sub-clause 5(b)(i) name the Owners as a joint assured with full cover and, unless otherwise agreed, on terms such that Owners shall be under no liability in respect of premiums or calls arising in connection with such insurances.

(v)    providing written evidence, to the reasonable satisfaction of the Owners, of the Managers' compliance with their obligations under Sub-clauses 5(b)(ii), and 5(b)(iii) within a reasonable time of the commencement of this Agreement, and of each renewal date and, if specifically requested, of each payment date of the insurances in Sub-clause 5(b)(i).

**6.    Commercial Management**
*(only applicable if agreed according to Box 8).*
The Managers shall provide the following services for the Vessel in accordance with the Owners' instructions, which shall include but not be limited to:

(a)    seeking and negotiating employment for the Vessel and the conclusion (including the execution thereof) of charter parties or other contracts relating to the employment of the Vessel. If such a contract exceeds the period stated in Box 9, consent thereto in writing shall first be obtained from the Owners;

(b)    arranging for the provision of bunker fuels of the quality specified by the Owners as required for the Vessel's trade;

(c)    voyage estimating and accounting and calculation of hire, freights, demurrage and/or despatch monies due from or due to the charterers of the Vessel; assisting in the collection of any sums due to the Owners related to the commercial operation of the Vessel in accordance with Clause 11 (Income Collected and Expenses Paid on Behalf of Owners);

*If any of the services under Sub-clauses 6(a), 6(b) and 6(c) are to be excluded from the Management Fee, remuneration for these services must be stated in Annex E (Fee Schedule). See Sub-clause 12(e).*

(d)    issuing voyage instructions;

(e)    appointing agents;

(f)    appointing stevedores; and

(g)    arranging surveys associated with the commercial operation of the Vessel.

Manager shall meet the following minimum performance standards for Commercial Management:

Calendar year 2022:  Minimum charter revenue of $15mm.

Calendar year 2023:  Minimum vessel EBITDA of $5mm.

**7.    Insurance Arrangements**

13

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

(*only applicable if agreed according to Box 11*).

The Managers shall arrange insurances in accordance with Clause 10 (Insurance Policies), on such terms as the Owners shall have instructed or agreed, in particular regarding conditions, insured values, deductibles, franchises and limits of liability.

14

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

| Section 3 – Obligations |
| --- |

8.     **Managers' Obligations**
(a)     The Managers undertake to use their best endeavours to provide the Management Services as agents for and on behalf of the Owners in accordance with sound ship management practice and to protect and promote the interests of the Owners in all matters relating to the provision of services hereunder.

Provided however, that in the performance of their management responsibilities under this Agreement, the Managers shall be entitled to have regard to their overall responsibility in relation to all vessels as may from time to time be entrusted to their management and in particular, but without prejudice to the generality of the foregoing, the Managers shall be entitled to allocate available supplies, manpower and services in such manner as in the prevailing circumstances fair and reasonable.  With respect to management services or business dealings with respect to vessels not affiliated with Pennantia, Manager: (i) shall all times undertake to avoid conflicts of interest with Pennantia vessels and business, (ii), shall not discriminate against or treat Pennantia vessels or business any less favorably than any other managed vessel or business, and (iii) with respect to vessel business commercially suitable to be performed by Pennantia vessels, shall give Pennantia vessels and business first priority for such business.

(b)     Where the Managers are providing technical management services in accordance with Clause 4 (Technical Management), they shall procure that the requirements of the Flag State are satisfied and they shall agree to be appointed as the Company, assuming the responsibility for the operation of the Vessel and taking over the duties and responsibilities imposed by the ISM Code and the ISPS Code, if applicable.

9.     **Owners' Obligations**
(a)     The Owners shall pay all sums due to the Managers punctually in accordance with the terms of this Agreement.  In the event of payment after the due date of any outstanding sums the Manager shall be entitled to charge interest at the rate stated in Box 13.

(b)     Where the Managers are providing technical management services in accordance with Clause 4 (Technical Management), the Owners shall:

(i)     report (or where the Owners are not the registered owners of the Vessel procure that the registered owners report) to the Flag State administration the details of the Managers as the Company as required to comply with the ISM and ISPS Codes;

(ii)     procure that any officers and ratings supplied by them or on their behalf comply with the requirements of STCW 95; and

(iii)     instruct such officers and ratings to obey all reasonable orders of the Managers (in their capacity as the Company) in connection with the operation of the Managers' safety management system.

(c)     Where the Managers are **not** providing technical management services in accordance with Clause 4 (Technical Management), the Owners shall:

(i)     procure that the requirements of the Flag State are satisfied and notify the Managers upon execution of this Agreement of the name and contact details of the organization that will be the Company by completing Box 5;

(ii)     if the Company changes at any time during this Agreement, notify the Managers in a timely manner of the name and contact details of the new organization;

(iii)     procure that the details of the Company, including any change thereof, are reported to the Flag State administration as required to comply with the ISM and ISPS Codes.  The Owners shall advise the Managers in a timely manner when the Flag State administration has approved the Company; and

(iv)     unless otherwise agreed, arrange for the supply of provisions at their own expense.

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

(d)      Where the Managers are providing crew management services in accordance with Sub-clause 5(a) the Owners shall:

(i)      inform the Managers prior to ordering the Vessel to any excluded or additional premium area under any of the Owners' Insurances by reason of war risks and/or piracy or like perils and pay whatever additional costs may properly be incurred by the Managers as a consequence of such orders including, if necessary, the costs of replacing any member of the Crew.  Any delays resulting from negotiation with or replacement of any member of the Crew as a result of the Vessel being ordered to such an area shall be for the Owners' account.  Should the Vessel be within an area which becomes an excluded or additional premium area the above provisions relating to cost and delay shall apply;

(ii)     agree with the Managers prior to any change of flag of the Vessel and pay whatever additional costs may properly be incurred by the Managers as a consequence of such change.  If agreement cannot be reached then either party may terminate this Agreement in accordance with Sub-clause 22(e); and

(iii)    provide, at no cost to the Managers, in accordance with the requirements of the law of the Flag State, or higher standard, as mutually agreed, adequate Crew accommodation and living standards.

(e)      Where the Managers are **not** the Company, the Owners shall ensure that Crew are properly familiarized with their duties in accordance with the Vessel's SMS and that instructions which are essential to the SMS are identified, documented and given to the Crew prior to sailing.

16

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

| Section 4 - Insurance, Budgets, Income, Expenses and Fees |
| --- |

**10.      Insurance Policies**

The Owners shall procure, whether by instructing the Managers under Clause 7 (Insurance Arrangements) or otherwise, that throughout the period of this Agreement:

(a)      at the Owners' expense, the Vessel is insured for not less than its sound market value or entered for its full gross tonnage, as the case may be for:

(i)      hull and machinery marine risks (including but not limited to crew negligence) and excess liabilities;

(ii)      protection and indemnity risks (including but not limited to pollution risks, diversion expenses and, except to the extent insured separately by the Managers in accordance with Sub-clause 5(b)(i), Crew Insurances;

*NOTE: If the Managers are not providing crew management services under Sub -clause 5(a) (Crew Management) or have agreed not to provide Crew Insurances separately in accordance with Sub -clause 5(b)(i), then such insurances must be included in the protection and indemnity risks cover for the Vessel (see Sub-clause 10(a)(ii) above).*

(iii)      war risks (including but not limited to blocking and trapping, protection and indemnity, terrorism and crew risks); and

(iv)      such optional insurances as may be agreed (such as piracy, kidnap and ransom, loss of hire and FD & D) (see Box 12)

Sub-clauses 10(a)(i) through 10(a)(iv) all in accordance with the best practice of prudent owners of vessels of a similar type to the Vessel, with sound and reputable insurance companies, underwriters or associations ("the Owners' Insurances");

(b)      all premiums and calls on the Owners' Insurances are paid by their due date;

(c)      the Owners' Insurances name the Owners, the Managers and, subject to underwriters' agreement, any third party designated by the Managers as a joint assured, with full cover.  It is understood that in some cases, such as protection and indemnity, the normal terms for such cover may impose on the Managers and any such third party a liability in respect of premiums or calls arising in connection with the Owners' Insurances.  If obtainable at no additional cost, however, the Owners shall procure such insurances on terms such that neither the Managers nor any such third party shall be under any liability in respect of premiums or calls arising in connection with the Owners' Insurances.  In any event, on termination of this Agreement in accordance with Clause 21 (Duration of the Agreement) and Clause 22 (Termination), the Owners shall procure that the Managers and any third party designated by the Managers as joint assured shall cease to be joint assured and, if reasonably achievable, that they shall be released from any and all liability for premiums and calls that may arise in relation to the period of this Agreement; and

(d)      written evidence is provided, to the reasonable satisfaction of the Managers, of the Owners' compliance with their obligations under this Clause 10 within a reasonable time of the commencement of the Agreement, and of each renewal date and, if specifically requested, of each payment date of the Owners' Insurances.

**11.      Income Collected and Expenses Paid on Behalf of Owners**

(a)      Except as provided in Sub-clause 11(c) all monies collected by the Managers under the terms of this Agreement (other than monies payable by the Owners to the Managers) and any interest thereon shall be held to the credit of the Owners in a separate bank account (the "*Vessel Revenue Account*") designated by Owners.

(b)      All monies collected by the Managers under Clause 6 (Commercial Management) shall be paid into the Vessel Revenue Account in the name of the Owners or as may be otherwise advised by the Owners in writing.

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

**12.    Management Fee (Annex E component parts)**

(a)    The Owners shall pay to the Managers (or its designee if permitted pursuant to  Annex E (4)(e)) the management fees and any true ups as stated in Box 14/Annex E for their services as Managers under this Agreement, which shall be payable in accordance with the terms, time and frequency set forth in Annex E.  Payments to the Mangers shall be payable to the Managers' nominated account stated in Box 15, or to such different account as Managers may nominate in writing to Owners from time to time, and payments to a permitted designee pursuant to Annex E(4)(e) shall be to such account as designated by Managers to Owners from time to time.

(b)    The management fee shall be subject to review and audit of expenditures and supporting documentation upon the reasonable request of Owners pursuant to Clause 13.

(c)    The Managers shall, at no extra cost to the Owners, provide their own office accommodation, office staff, facilities and stationery.

(d)    [Intentionally Omitted]

(e)    Save as otherwise provided in this Agreement, all discounts and commissions obtained by the Managers in the course of the performance of the Management Services shall be credited to the Owners.

**13.    Management of Funds**

(a)    The Managers shall at all times maintain and keep true and correct accounts, as detailed in Clause 11, *supra*,  in respect of the Management Services in accordance with GAAP or such other standard as the parties may agree, including records of all costs and expenditure incurred, and produce a summary or breakdown of actual expenditure of the Vessel in such form and at such intervals as shall be mutually agreed.  The Managers shall make such accounts available for inspection and auditing by the Owners and/or their representatives in the Managers' offices or by electronic means, provided reasonable notice is given by the Owners.

(b)    Except as expressly provided for herein, the Managers use or commitment of their own funds to finance the provision of the Management Services shall in no circumstances relieve the Owners of their obligations hereunder to reimburse the Managers.

(c)    Managers shall not commingle funds in the respective accounts required under this Agreement. Excepting the Management Fee Account, all accounts required under this agreement shall be subject to account control agreements at the discretion of Owner and or any lender of Owner.

18

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

| Section 5 – Legal General and Duration of Agreement |
| --- |

**14.    Trading Restrictions**

If the Managers are providing crew management services in accordance with Sub-clause 5(a) (Crew Management), the Owners and the Managers will, prior to the commencement of this Agreement, agree on any trading restrictions to the Vessel that may result from the terms and conditions of the Crew's employment.

**15.    Replacement**

If the Managers are providing crew management services in accordance with Sub-clause 5(a) (Crew Management), the Owners may require the replacement, at their own expenditure, at the next reasonable opportunity, of any member of the Crew found on reasonable grounds to be unsuitable for service. If the Managers have failed to fulfil their obligations in providing suitable qualified replacement Crew within the meaning of Sub-clause 5(a) (Crew Management), then such replacement shall be at the Managers' expense.

**16.    Managers' Right to Sub-Contract**

The Managers may not assign this Agreement without the prior written consent of the Owners, which may be withheld or granted in Owners' sole discretion.  The Managers may subcontract Management Services or obligations hereunder with the prior written consent of the Owners, which may be withheld or granted in Owners' reasonable discretion.  In the event of such a sub-contract the Managers shall not be relieved of their obligations to perform under this Agreement.

**17.    Responsibilities**

*(a)    Force Majeure*

Neither party shall be liable for any loss, damage or delay due to any of the following force majeure events and/or conditions to the extent that the party invoking force majeure is prevented or hindered from performing any or all of their obligations under this Agreement, provided they have made all reasonable efforts to avoid, minimize or prevent the effect of such events and/or conditions:

(i)        acts of God;

(ii)        any Government requisition, control, intervention, requirement or interference;

(iii)        any circumstances arising out of war, threatened act of war or warlike operations, acts of terrorism, sabotage or piracy, or the consequences thereof;

(iv)        riots, civil commotion, blockades or embargoes;

(v)        epidemics/pandemics,  including  COVID-19;

(vi)        earthquakes, landslides, floods or other extraordinary weather conditions;

(vii)        strikes, lockouts or other industrial action, unless limited to the employees (which shall not include the Crew) of the party seeking to invoke force majeure;

(viii)        fire, accident, explosion except where caused by negligence of the party seeking to invoke force majeure; and

(ix)        any other similar cause beyond the reasonable control of either party.

*(b)    Liability to Owners*

(i)        Without prejudice to Sub-clause 17(a), the Managers shall be under no liability whatsoever to the Owners for any loss, damage, delay or expense of whatsoever nature, whether direct or indirect, (including but not limited to loss of profit arising out of or in connection with detention of or delay to the Vessel) and howsoever arising in the course of performance of the Management Services UNLESS same is proved to have resulted solely from the negligence, gross negligence or willful default of the Managers or their

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

employees or agents, or sub-contractors employed by them in connection with the Vessel, in which case (save where loss, damage, delay or expense has resulted from the Managers' personal act or omission committed with the intent to cause same or recklessly and with knowledge that such loss, damage, delay or expense would probably result) the Managers' liability for each incident or series of incidents giving rise to a claim or claims shall never exceed the total of three (3) times the monthly management fee payable hereunder for the individual Vessel involved in the incident.

(ii)     *Acts or omissions of the Crew* - Notwithstanding anything that may appear to the contrary in this Agreement, the Managers shall not be liable for any acts or omissions of the Crew, even if such acts or omissions are negligent, grossly negligent or willful, except only to the extent that they are shown to have resulted from a failure by the Managers to discharge their obligations under Clause 5(a) (Crew Management), in which case their liability shall be limited in accordance with the terms of this Clause 17 (Responsibilities).

(c)     Indemnity
Except to the extent and solely for the amount therein set out that the Managers would be liable under Sub-clause 17(b), the Owners hereby undertake to keep the Managers and their employees, agents and sub-contractors indemnified and to hold them harmless against all actions, proceedings, claims, demands or liabilities whatsoever or howsoever arising which may be brought against them or incurred or suffered by them arising out of or in connection with the performance of this Agreement, and against and in respect of all costs, loss, damages and expenses (including legal costs and expenses on a full indemnity basis) which the Managers may suffer or incur (either directly or indirectly) in the course of the performance of this Agreement.

(d)     "Himalaya"
It is hereby expressly agreed that no employee or agent of the Managers (including every sub-contractor from time to time employed by the Managers) shall in any circumstances whatsoever be under any liability whatsoever to the Owners for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on his part while acting in the course of or in connection with his employment and, without prejudice to the generality of the foregoing provisions in this Clause 17 (Responsibilities), every exemption, limitation, condition and liberty herein contained and every right, exemption from liability, defense and immunity of whatsoever nature applicable to the Managers or to which the Managers are entitled hereunder shall also be available and shall extend to protect every such employee or agent of the Managers acting as aforesaid and for the purpose of all the foregoing provisions of this Clause 17 (Responsibilities) the Managers are or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of all persons who are or might be their servants or agents from time to time (including sub-contractors as aforesaid) and all such persons shall to this extent be or be deemed to be parties to this Agreement.

(e) Shipyard Liability
Managers shall not be liable whatsoever to Owners for claims (including attorneys' fees and costs), and Owners shall indemnify Managers against such claims (including attorneys' fees and costs), arising from pollution, damage to, or loss or destruction of, any vessel or property, as well as for any personal injuries, including death, suffered when a vessel managed under the terms of this Agreement is at a shipyard or other vessel maintenance facility under the control of the operator of such facility.

**18.     General Administration**
(a)     The Managers shall keep the Owners and, if appropriate, the Company informed in a timely manner of any incident of which the Managers become aware which gives or may give rise to delay to the Vessel or claims or disputes involving third parties.

(b)     The Managers shall handle and settle all claims and disputes arising out of the Management Services hereunder, unless the Owners instruct the Managers otherwise.  The Managers shall keep the Owners appropriately informed in a timely manner throughout the handling of such claims and disputes.

(c)     The Owners may request the Managers to bring or defend other actions, suits or proceedings related to the Management Services, on terms to be agreed.

(d)     The Managers shall have power to obtain appropriate legal or technical or other outside expert advice in relation to the handling and settlement of claims in relation to Sub-clauses 18(a) and 18(b) and

20

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

disputes and any other matters affecting the interests of the Owners in respect of the Vessel, unless the Owners instruct the Managers otherwise.

(e)        On giving reasonable notice, the Owners may request, and the Managers shall in a timely manner make available, all documentation, information and records in respect of the matters covered by this Agreement either related to mandatory rules or regulations or other obligations applying to the Owners in respect of the Vessel (including but not limited to STCW 95, the ISM Code and ISPS Code) to the extent permitted by relevant legislation.

On giving reasonable notice, the Managers may request, and the Owners shall in a timely manner make available, all documentation, information and records reasonably required by the Managers to enable them to perform the Management Services.

(f)        The Owners shall arrange for the provision of any necessary guarantee bond or other security.

(g)        Any direct costs incurred by the Managers in carrying out their obligations according to this Clause 18 (General Administration) shall be reimbursed by the Owners.

19.    **Inspection of Vessel**
The Owners may at any time after giving reasonable notice to the Managers inspect the Vessel for any reason they consider necessary.

20.    **Compliance with Laws and Regulations**
The parties will not do or permit to be done anything which might cause any breach or infringement of the laws and regulations of the Flag State, or of the places where the Vessel trades.

21.    **Duration of the Agreement**
(a)        This Agreement shall come into effect at the date stated in Box 2 and shall continue for so long as Pennantia owns a vessel(s) under management on the Commencement Date, absent the occurrence and continuation of an event of default, unless terminated earlier, in accordance with Clause 22 (Termination).

(b)        Where the Vessel is not at a mutually convenient port or place on the expiry of such period, this Agreement shall terminate on the subsequent arrival of the Vessel at the next mutually convenient port or place.

22.    **Termination**
(a)        *Owners' or Managers' default*
If either party fails to meet their obligations under this Agreement, the other party may give notice to the party in default requiring them to remedy it.  In the event that the party in default fails to remedy it within a reasonable time to the reasonable satisfaction of the other party, that party shall be entitled to terminate this Agreement with immediate effect by giving notice to the party in default.

(b)        *Notwithstanding Sub-clause 22(a):*

(i)        The Managers shall be entitled to terminate the Agreement with immediate effect by giving notice to the Owners if any monies payable by the Owners and/or the owners of any associated vessel, details of which are listed in Annex "D", shall not have been received in the Managers' nominated account within ten days (10) of receipt by the Owners of the Managers' written request, or if the Vessel is repossessed by the Mortgagee(s).

(ii)        If the Owners proceed with the employment of or continue to employ the Vessel in the carriage of contraband, blockade running, or in an unlawful trade, or on a voyage which in the reasonable opinion of the Managers is unduly hazardous or improper, the Managers may give notice of the default to the Owners, requiring them to remedy it as soon as practically possible.  In the event that the Owners fail to remedy it within a reasonable time to the satisfaction of the Managers, the Managers shall be entitled to terminate the Agreement with immediate effect by notice.

(iii)        If either party fails to meet their respective obligations under Sub-clause 5(b) (Crew Insurances) and Clause 10 (Insurance Policies), the other party may give notice to the party in default requiring them to

21

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

remedy it within ten (10) days, failing which the other party may terminate this Agreement with immediate effect by giving notice to the party in default.

(iv)    In the event of a Liquidity Event or a termination of this Agreement within the first twelve (12) months of this Agreement, Managers shall be paid the balance of the Fixed Management Fee that would have been payable through the 12th month of this Agreement absent such Liquidity Event or termination.    .

*(c)    Extraordinary Termination*
This Agreement shall be deemed to be terminated as to any one vessel in the case of the sale of such Vessel or, if the Vessel becomes a total loss or is declared as a constructive or compromised or arranged total loss or is requisitioned or has been declared missing.

*(d)    For the purpose of Sub-clause 22(c) hereof:*

(i)    the date upon which the Vessel is to be treated as having been sold or otherwise disposed of shall be the date on which the Vessel's owners cease to be the registered owners of the Vessel;

(ii)    the Vessel shall be deemed to be lost either when it has become an actual total loss or agreement has been reached with the Vessel's underwriters in respect of its constructive total loss or if such agreement with the Vessel's underwriters is not reached it is adjudged by a competent tribunal that a constructive loss of the Vessel has occurred; and

(iii)    the date upon which the Vessel is to be treated as declared missing shall be ten (10) days after the Vessel was last reported or when the Vessel is recorded as missing by the Vessel's underwriters, whichever occurs first.  A missing vessel shall be deemed lost in accordance with the provisions of Sub-clause 22(d)(ii).

(e)    This Agreement shall terminate on the sale of Pennantia, or the sale of all or substantially all of the assets of Pennantia (a "*Liquidity Event*").  In the event of a Liquidity Event, and notwithstanding the termination of this Agreement upon such Liquidity Event, the Owner shall calculate and pay Management Fees (including Profit Sharing Incentives) to the extent due and owing as a result of the Liquidity Event.

(f)    This Agreement shall terminate forthwith in the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of the Owner or Manager (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver or administrator is appointed, or if it suspends payment, ceases to carry on business or makes any special arrangement or composition with its creditors.

(g)    In the event of an Owners' default of its obligations under this Agreement resulting in termination, Owners shall pay Managers a sum equivalent to twelve (12) months of the Fixed Management Fee.

(h)    In addition, where the Managers provide Crew for the Vessel in accordance with Clause 5(a) (Crew Management):

(i) the Owners shall continue to pay Crew Support Costs during the said further period of the number of months stated in Box 19; and (ii) except in the case of termination resulting from default of the Managers, the Owners shall pay Severance Costs which may be incurred.  The Managers shall use their reasonable endeavors to minimize such Severance Costs.

(i)    On the termination, for whatever reason, of this Agreement, the Managers shall release to the Owners, if so requested, the originals where possible, or otherwise certified copies, of all accounts and all documents specifically relating to the Vessel and its operation, per the Severance Costs referenced in Box 20.

(j)    The termination of this Agreement shall be without prejudice to all rights accrued due between the parties prior to the date of termination.

**23.    Dispute Resolution Clause (See Box 21)**

This Agreement shall be construed and enforced in accordance with and governed by the General Maritime Law of the United States to the extent applicable and by the laws of the state of New York without giving effect to the conflicts of laws provisions thereof.

22

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

Any action or proceeding arising from, related to, under, or in connection with this Agreement must be brought solely and exclusively in the federal courts, and state courts only when federal courts are not available for such action or proceeding, located in the County of New York in the State of New York.  Each party hereto irrevocably (i) submits to the exclusive jurisdiction of such New York courts, and (ii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum.  The parties irrevocably and unconditionally waive any right they have to a trial by jury in respect of any legal action arising out of or relating to this Agreement.

The parties may agree, however, at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Agreement:

(i)      In the case of a dispute in respect of which litigation has been commenced the following shall apply:

(ii)      Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(iii)     The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator may be appointed promptly by the court ("the Tribunal") or such person as the Tribunal may designate for that purpose.  The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, in New York County in the State of New York.

(iv)     If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal.

(v)      The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(vi)     Either party may advise the Tribunal that they have agreed to mediation.  The litigation procedure shall continue during the conduct of the mediation, subject to the discretion of the Tribunal, and the Tribunal may take the mediation timetable into account when setting the timetable for steps in the litigation.

(vii)    Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(viii)   The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the litigation.

*(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.)*

**24.**    **Notices**

(a)      All notices given by either party or their agents to the other party or their agents in accordance with the provisions of this Agreement shall be in writing and shall, unless specifically provided in this Agreement to the contrary, be sent to the address for that other party as set out in Boxes 22 and 23 or as appropriate or to such other address as the other party may designate in writing.

A notice may be sent by registered or recorded mail, facsimile, electronically or delivered by hand in accordance with this Sub-clause 24(a).

(b)      Any notice given under this Agreement shall take effect on receipt by the other party and shall be deemed to have been received:

(i)      if posted, on the third (3rd) day after posting;

(ii)      if sent by facsimile or electronically, on the day of transmission; and

23

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

(iii)      if delivered by hand, on the day of delivery.

And in each case proof of posting, handing in or transmission shall be proof that notice has been given, unless proven to the contrary.

**25.    Entire Agreement**
This Agreement constitutes the entire agreement between the parties and no promise, undertaking, representation, warranty or statement by either party prior to the date stated in Box 2 shall affect this Agreement. Any modification of this Agreement shall not be of any effect unless in writing signed by or on behalf of the parties.

**26.    Third Party Rights**
Except to the extent provided in Sub-clauses 17(c) (Indemnity) and 17(d) (Himalaya), no third parties may enforce any term of this Agreement.

**27.    Partial Validity**
If any provision of this Agreement is or becomes or is held by any arbitrator or other competent body to be illegal, invalid or unenforceable in any respect under any law or jurisdiction, the provision shall be deemed to be amended to the extent necessary to avoid such illegality, invalidity or unenforceability, or, if such amendment is not possible, the provision shall be deemed to be deleted from this Agreement to the extent of such illegality, invalidity or unenforceability, and the remaining provisions shall continue in full force and effect and shall not in any way be affected or impaired thereby.

**28.    Interpretation**
In this Agreement:

*(a)      Singular/Plural*
The singular includes the plural and vice versa as the context admits or requires.

*(b)      Headings*
The index and headings to the clauses and appendices to this Agreement are for convenience only and shall not affect its construction or interpretation.

*(c)      Day*
"Day" means a calendar day unless expressly stated to the contrary.

**29.    MLC Clause for SHIPMAN 2009**
For the purposes of this Clause:

"MLC" means the International Labour Organisation (ILO) Maritime Labour Convention (MLC 2006) and any amendment thereto or substitution thereof.

"Shipowner" shall mean the party named as "shipowner" on the Maritime Labour Certificate for the Vessel.

(a)      Subject to Clause 3 (Authority of the Managers), the Managers shall, to the extent of their Management Services, assume the Shipowner's duties and responsibilities imposed by the MLC for the Vessel, on behalf of the Shipowner.

(b)      The Owners shall ensure compliance with the MLC in respect of any crew members supplied by them or on their behalf.

(c)      The Owners shall procure, whether by instructing the Managers under Clause 7 (Insurance Arrangements) or otherwise, insurance cover or financial security to satisfy the Shipowner's financial security obligations under the MLC.

**30.      MISCELLANEOUS RIDER PROVISIONS**

(a)      Each of Owners and Managers represent and warrant that it is a citizen of the United States for the purpose of engaging in Coastwise Trade within the meaning of 46 U.S.C. § 50501 (a "Coastwise

24

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

Citizen"), and covenants that during the term of this Agreement it shall remain a Coastwise Citizen, qualified (as to citizenship) for the purpose of operation of Vessels in the Coastwise Trade, and Manager shall not suffer or permit anything to be done which might injuriously affect the entitlement of the Vessels under the laws and regulations of the United States to be so documented for use in the Coastwise Trade.

(b)        Publicity and Confidentiality

    (i)    Release of Information.  Manager agrees it will not divulge information concerning this Agreement to anyone without the Owners' prior written consent, which shall not be unreasonably withheld, provided that Manager may disclose information as necessary to the appropriate governmental authority in an application for a permit, approval or clearance.  Manager will retain all information belonging to Owners in the strictest confidence and will neither use it nor disclose it to others without the prior written consent of Owners.  Manager will require any sub consultant engaged by it pursuant to this Agreement to comply with the terms and provisions of this Clause.  These requirements will survive the termination or expiration of this Agreement.

    (ii)    Confidentiality/No Promotion.  Manager agrees that it or its employees may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is proprietary or confidential to Owner.  Any and all non-public information of any form obtained by Manager and its subcontractors, and their respective employees, in the performance of this Agreement will be deemed confidential and proprietary information.

    (iii)    Confidentiality. Each party agrees to hold such information in strict confidence and not to disclose such information to third parties or to use such information for any purpose whatsoever during the Term of this Agreement and for a period of five (5) years thereafter without the written consent of the other party except as necessary for: (a) the performance of the services under this Agreement; (b) to advise each of its employees who may be exposed to such proprietary and confidential information of their obligations to keep such information confidential; (c) compliance with professional standards of conduct for the performance of the services and/or related matters; (d) compliance with any law, regulation, ordinance, court order or governmental directive or other legal mandate; and/or (e) protection of the parties against claims or liabilities arising from the performance of services under this Agreement.  In the event of any disclosure by a party under subparagraphs (c), (d) or (e), the disclosing party will give the other party fourteen (14) days advance notice of such disclosure.  This obligation will not apply to information previously in a party's possession or in the public domain, or information lawfully acquired on a non-confidential basis from others.  This provision will survive termination of this Agreement.

    (iv)    Manager agrees that it will review the terms and conditions of Clause 30(b) of this Agreement with all subcontractors it engages and that it will obtain the written agreement of each subcontractor to comply with the terms of this Clause.

| | |
|---|---|
| **From:** | Alex Parker <AJPARKER@rcmaritime.com> <AJPARKER@rcmaritime.com> |
| **Sent:** | Wednesday, May 18, 2022 6:55 PM |
| **To:** | Josh Trump |
| **Cc:** | Joel Fine <JJFine@rcmaritime.com>; Andrew McAllister <APMcAllister@rcmaritime.com> |
| **Subject:** | Re: Pennantia - RCM - Shipman |

Josh - thank you for your note and understand. We 100% agree with you and that was the intent and instructions.

Both George and Joel reviewed to be executable to remove ANY of those "closing" items.

Joel please advise immediately to have these issues addressed tomorrow?

Thank you Josh, our apologies for any oversights.

My best, Alex


Alex Parker
Managing Partner | Rose Cay Maritime
1321 Upland Drive, Ste. 20183, Houston, TX 77043
T: +1 (833) ROSE-ATB; M: +1 (508) 524-0331

E: AJPARKER@rcmaritime.com<mailto:%7BE-mail%7D>; www.rcmaritime.com<https://protect-us.mimecast.com/s/DtitC31Oz4SRpnYOCqmGDC?domain=rcmaritime.com/>


Please consider the environment before printing this email
On May 18, 2022, at 20:52, Josh Trump <jtrump@contrariancapital.com> wrote:


I appreciate you want to do this quickly to protect any perceived legal exposure you may have and I'm not trying overly complicate it but as it stands the document calls for a cash and stock payment to RCM due on the commencement date of April 30, 2022. You have taken the time to amend certain sections of this document but not others and it leaves inconsistencies. I'd request that you address the compensation section in some way as well to avoid any confusion. If you want to strike it completely you can just rely on the LLC agreement which spells everything out until we amend again following the return of the 270.


Sent from my iPad

On May 18, 2022, at 8:43 PM, Alex Parker <AJPARKER@rcmaritime.com> wrote:


Josh - I request we do an amendment that enables us to operate for the coming days under required legalese as suggested by counsel.

Joel can do a more wholesome review and markup for when the 270 is flipped to RCM which addresses Dove Cay the OA Etc with counsel.

Please advise on the immediate need as it is time sensitive per our conversations last week. If you would like a call with counsel we should promptly arrange.

Many thanks, Alex

1

Alex Parker
Managing Partner | Rose Cay Maritime
1321 Upland Drive, Ste. 20183, Houston, TX 77043
T: +1 (833) ROSE-ATB; M: +1 (508) 524-0331

E: AJPARKER@rcmaritime.com<mailto:%7BE-mail%7D>; www.rcmaritime.com<https://protect-us.mimecast.com/s/bIfyC4x4A5s7BXAqFB0Cb9?domain=nam10.safelinks.protection.outlook.com>


Please consider the environment before printing this email
IMPORTANT NOTICE: This transmission and any attachments are intended solely for the use
of the individual or entity to which it is addressed and may contain information that is
privileged, confidential, proprietary, or otherwise protected from disclosure. If you are
not the intended recipient, you are hereby notified that any dissemination, distribution,
copying or other use of this transmission or its attachments is strictly prohibited. If
you have received this transmission in error, please notify the sender immediately and
permanently delete this transmission and any attachments from your system.
_____

On May 18, 2022, at 20:33, Joel Fine <JJFine@rcmaritime.com> wrote:


Josh, I will take a shot at amending the Shipman to reflect the requested changes.

Thanks,
Joel


Joel Fine
Counsel | Rose Cay Maritime
1321 Upland Drive, Ste. 20183, Houston, TX 77043
T: +1 (833) ROSE-ATB; M: +1 (832) 388-3013

E: JJFine@rcmaritime.com<mailto:%7BE-mail%7D>; www.rcmaritime.com<https://protect-us.mimecast.com/s/bIfyC4x4A5s7BXAqFB0Cb9?domain=nam10.safelinks.protection.outlook.com>


Please consider the environment before printing this email
IMPORTANT NOTICE: Information contained in this transmission and any attachments is
private and protected by legal privilege. This transmission and any attachments are
intended solely for the use of the individual or entity to which it is addressed and may
contain information that is confidential, proprietary, or otherwise protected from
disclosure. If you are not the intended recipient, you are hereby notified that any
dissemination, distribution, copying or other use of this transmission or its attachments
is strictly prohibited. If you have received this transmission in error, please notify
the sender immediately and permanently delete this transmission and any attachments from
your system.
_____
From: Josh Trump <jtrump@contrariancapital.com>
Sent: Wednesday, May 18, 2022 10:59 AM
To: Joel Fine <JJFine@rcmaritime.com>
Cc: Alex Parker <AJPARKER@rcmaritime.com>
Subject: RE: Pennantia - RCM - Shipman

Since we put all the economics in the LLC agrmt I think we should eliminate them from
this agreement (especially the stuff that calls for payments on the Commencement Date
which has now changed.  Can you take a shot at amending it to reflect that.  Or perhaps
you could just reference the LLC agreement when it comes to economics?

From: Joel Fine <JJFine@rcmaritime.com<mailto:JJFine@rcmaritime.com>>
Sent: Wednesday, May 18, 2022 10:10 AM
To: Josh Trump <jtrump@contrariancapital.com<mailto:jtrump@contrariancapital.com>>
Cc: Alex Parker <AJPARKER@rcmaritime.com<mailto:AJPARKER@rcmaritime.com>>
Subject: RE: Pennantia - RCM - Shipman

Mimecast Attachment Protection has deemed this file to be safe, but always exercise
caution when opening files.

_____

Josh,

The Shipman was incorporated in the Operating Agreement at year end, but our proposed
changes are intended to reflect the removal of Foss (which was not contemplated when the
OA was executed).  For your reference, attached is the Word version of the Shipman that
Gerald provided.

Please let us know if you have any questions or if you would like to discuss.

Thanks,
Joel


Joel Fine
Counsel | Rose Cay Maritime
1321 Upland Drive, Ste. 20183, Houston, TX 77043
T: +1 (833) ROSE-ATB; M: +1 (832) 388-3013

E: JJFine@rcmaritime.com<mailto:%7BE-mail%7D>; www.rcmaritime.com<https://protect-
us.mimecast.com/s/bIfyC4x4A5s7BXAqFB0Cb9?domain=nam10.safelinks.protection.outlook.com>
Please consider the environment before printing this email
IMPORTANT NOTICE: Information contained in this transmission and any attachments is
private and protected by legal privilege. This transmission and any attachments are
intended solely for the use of the individual or entity to which it is addressed and may
contain information that is confidential, proprietary, or otherwise protected from
disclosure. If you are not the intended recipient, you are hereby notified that any
dissemination, distribution, copying or other use of this transmission or its attachments
is strictly prohibited. If you have received this transmission in error, please notify
the sender immediately and permanently delete this transmission and any attachments from
your system.

_____

From: Josh Trump <jtrump@contrariancapital.com<mailto:jtrump@contrariancapital.com>>
Sent: Tuesday, May 17, 2022 5:31 PM
To: Joel Fine <JJFine@rcmaritime.com<mailto:JJFine@rcmaritime.com>>
Cc: Alex Parker <AJPARKER@rcmaritime.com<mailto:AJPARKER@rcmaritime.com>>
Subject: RE: Pennantia - RCM - Shipman

Thanks for this joel.  Did we not amend the shipman concurrent with the shareholders
agreement we signed at year end?

From: Joel Fine <JJFine@rcmaritime.com<mailto:JJFine@rcmaritime.com>>
Sent: Thursday, May 12, 2022 11:33 PM
To: Josh Trump <jtrump@contrariancapital.com<mailto:jtrump@contrariancapital.com>>
Cc: Alex Parker <AJPARKER@rcmaritime.com<mailto:AJPARKER@rcmaritime.com>>
Subject: Pennantia - RCM - Shipman

Your attachments have been security checked by Mimecast Attachment Protection. Files
where no threat or malware was detected are attached.

_____

Josh,

Please find attached the draft Shipman Agreement (clean and blackline showing changes
against executed version).

For your convenience, copied below is a list of the revisions.

* Page 1, Box 1: updated for today's date (May 12, 2022)
* Page 1, Box 2: updated for April 30, 2022 (date RCM took over for Foss)
* Page 1, Box 5: replaced Foss with RCM
* Page 1, Box 9: removed 1-year limitation on charters
* Page 2, Box 12: added standard insurances
* Page 2, Box 23: updated RCM address (Upland Dr mailing rather than Winston & Strawn office); replaced John Parrott with Joel Fine; replaced Barbara Holland with George Chalos
* Date of Agreement updated to today's date on Annexes "A," "B," "C," and "D"
* Annex "A": updated list of vessels to reflect new names; all vessels included except Lynne M. Rose and RCM 270
* Annex "C": deleted clause (c) and revised clause (e) to make current
* Page 10, Part II, Para 2: amended clause (a) to remove references to the bankruptcy and reference Box 2 for the "Commencement Date"; deleted clauses (b) and (c) related to the bankruptcy

Let us know if you have any questions or if you would like to discuss tomorrow.

Thanks,
Joel


Joel Fine
Counsel | Rose Cay Maritime
1321 Upland Drive, Ste. 20183, Houston, TX 77043
T: +1 (833) ROSE-ATB; M: +1 (832) 388-3013
E: JJFine@rcmaritime.com<mailto:%7BE-mail%7D>; www.rcmaritime.com<https://protect-us.mimecast.com/s/bIfyC4x4A5s7BXAqFB0Cb9?domain=nam10.safelinks.protection.outlook.com>
Please consider the environment before printing this email

IMPORTANT NOTICE: Information contained in this transmission and any attachments is private and protected by legal privilege. This transmission and any attachments are intended solely for the use of the individual or entity to which it is addressed and may contain information that is confidential, proprietary, or otherwise protected from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying or other use of this transmission or its attachments is strictly prohibited. If you have received this transmission in error, please notify the sender immediately and permanently delete this transmission and any attachments from your system.

_____


_____


This communication (including any attachments) is intended only for the named recipient(s) above. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this communication in error, please immediately notify the sender and delete the message and any attachment(s) from your system.


_____


This communication (including any attachments) is intended only for the named recipient(s) above. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this communication in error, please immediately notify the sender and delete the message and any attachment(s) from your system.


_____


This communication (including any attachments) is intended only for the named recipient(s) above. If you are not the intended recipient, you are hereby notified that

any dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this communication in error, please immediately notify the sender and delete the message and any attachment(s) from your system.

| | |
|---|---|
| **From:** | Alex Parker <AJPARKER@rcmaritime.com> <AJPARKER@rcmaritime.com> |
| **Sent:** | Monday, May 23, 2022 5:04 PM |
| **To:** | Josh Trump |
| **Cc:** | Charles Bocquentin <CVBocquentin@rcmaritime.com>; Andrew McAllister <APMcAllister@rcmaritime.com> |
| **Subject:** | RE: reviewed model |
| **Attachments:** | Pennantia Simplified - LIVE - reviewed.xlsx |

Your attachments have been security checked by Mimecast Attachment Protection. Files
where no threat or malware was detected are attached.
_____

Alex Parker
Managing Partner | Rose Cay Maritime
1321 Upland Drive, Ste. 20183, Houston, TX 77043
T: +1 (833) ROSE-ATB; M: +1 (508) 524-0331

E: AJPARKER@rcmaritime.com<mailto:%7BE-mail%7D>; www.rcmaritime.com<https://protect-
us.mimecast.com/s/6VikCyPMq0uyNjZBUMS5cN?domain=rcmaritime.com/>

Please consider the environment before printing this email
IMPORTANT NOTICE: This transmission and any attachments are intended solely for the use
of the individual or entity to which it is addressed and may contain information that is
privileged, confidential, proprietary, or otherwise protected from disclosure. If you are
not the intended recipient, you are hereby notified that any dissemination, distribution,
copying or other use of this transmission or its attachments is strictly prohibited. If
you have received this transmission in error, please notify the sender immediately and
permanently delete this transmission and any attachments from your system.
_____
From: Alex Parker
Sent: Monday, May 23, 2022 7:50 PM
To: Josh Trump <jtrump@contrariancapital.com>
Cc: Charles Bocquentin <CVBocquentin@rcmaritime.com>; Andrew McAllister
<APMcAllister@rcmaritime.com>
Subject: reviewed model

**From:**        Joel Fine <JJFine@rcmaritime.com> <JJFine@rcmaritime.com>
**Sent:**        Wednesday, June 15, 2022 4:48 PM
**To:**          Josh Trump
**Cc:**          Alex Parker <AJPARKER@rcmaritime.com>
**Subject:**     Pennantia / RCM - AR Shipman
**Attachments:** Pennantia - RCM - AR SHIPMAN (Draft 6.14.2022).docx


Your attachments have been security checked by Mimecast Attachment Protection. Files
where no threat or malware was detected are attached.
_____
Josh,

Attached for your review is the revised AR Shipman Agreement between Pennantia and Rose
Cay Maritime.
This draft has been reviewed and approved by Winston & Strawn.
Please let us know if you have any questions or concerns.

Thanks,
Joel


Joel Fine
Counsel | Rose Cay Maritime
1321 Upland Drive, Ste. 20183, Houston, TX 77043
T: +1 (833) ROSE-ATB; M: +1 (832) 388-3013

E: JJFine@rcmaritime.com<mailto:%7BE-mail%7D>; www.rcmaritime.com<https://protect-
us.mimecast.com/s/AEoOC0ROw1hrmMGJuDRH3l?domain=rcmaritime.com/>


Please consider the environment before printing this email
IMPORTANT NOTICE: Information contained in this transmission and any attachments is
private and protected by legal privilege. This transmission and any attachments are
intended solely for the use of the individual or entity to which it is addressed and may
contain information that is confidential, proprietary, or otherwise protected from
disclosure. If you are not the intended recipient, you are hereby notified that any
dissemination, distribution, copying or other use of this transmission or its attachments
is strictly prohibited. If you have received this transmission in error, please notify
the sender immediately and permanently delete this transmission and any attachments from
your system.
_____

**From:**          Alex Parker <AJPARKER@rcmaritime.com> <AJPARKER@rcmaritime.com>
**Sent:**           Friday, July 1, 2022 11:51 AM
**To:**              Josh Trump
**Subject:**       Dove invoice to Pennantia
**Attachments:**   We sent you safe versions of your files; Dove to Pennantia 2022-07 v3.pdf


Mimecast Attachment Protection has deemed this file to be safe, but always exercise
caution when opening files.
─────────────────────────────
See attached per call

Alex Parker
Managing Partner | Rose Cay Maritime
1321 Upland Drive, Ste. 20183, Houston, TX 77043
T: +1 (833) ROSE-ATB; M: +1 (508) 524-0331

E: AJPARKER@rcmaritime.com<mailto:%7BE-mail%7D>; www.rcmaritime.com<https://protect-
us.mimecast.com/s/u0xlCQWvoQiNoD9YHP-7EB?domain=rcmaritime.com/>


Please consider the environment before printing this email
IMPORTANT NOTICE: This transmission and any attachments are intended solely for the use
of the individual or entity to which it is addressed and may contain information that is
privileged, confidential, proprietary, or otherwise protected from disclosure. If you are
not the intended recipient, you are hereby notified that any dissemination, distribution,
copying or other use of this transmission or its attachments is strictly prohibited. If
you have received this transmission in error, please notify the sender immediately and
permanently delete this transmission and any attachments from your system.
─────────────────────────────

## Schisel-Meslin, Jody M (SEA - X54044)

| | |
|---|---|
| **From:** | postmaster@contrariancapital.com <postmaster@contrariancapital.com> <postmaster@contrariancapital.com> |
| **Sent:** | Friday, July 1, 2022 11:52 AM |
| **To:** | Josh Trump |
| **Subject:** | We sent you safe versions of your files |

[Logo]

We sent you safe copies of the attached files

If you want the originals, you can request them.

Files

Dove to Pennantia 2022-07 v3.pdf (24.3 KB)

Message Details

From

"Alex Parker" <ajparker@rcmaritime.com>

Subject

Dove invoice to Pennantia

Sent

01 Jul 2022 14:51

Request Files<https://protect-us.mimecast.com/s/ZfVECR6wpRFg5KQOSNG1GZ>

[https://static-us.mimecast.com/mimecast/resources/images/notifications/powered-mimecast-logo-278x28.png]

© 2015 - 2018 Mimecast Services Limited.

**Dove Cay, LLC**

**INVOICE**

BILL TO
Pennantia LLC

| | |
|---|---|
| INVOICE | DC20220627 |
| DATE | 6/27/2022 |
| TERMS | Upon Receipt |
| DUE DATE | 6/27/2022 |

*Covering payrolls due:* 7/1/2022 and 7/15/2022

| LINE ITEM | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| Anna Rose | # days | 28 | $8,646 | $242,100 |
| Jordan Rose | # days | 28 | $6,000 | $168,000 |
| Lynne M Rose | # days | 28 | $9,121 | $255,400 |
| Rebekah Rose | # days | 14 | $9,121 | $127,700 |
| Rebekah Rose (2 weeks with 2 ppl) | # days | 14 | $2,864 | $40,100 |
| Susan Rose | # days | 28 | $6,000 | $168,000 |
| RCM 270 | # days | 28 | $3,489 | $97,700 |
| RCM 262 | # days | 28 | $1,782 | $49,900 |
| RCM 252 | # days | 28 | $1,782 | $49,900 |
| RCM 250 | # days | 28 | $2,596 | $72,700 |
| RCM 245 | # days | 14 | $3,486 | $48,800 |
| RCM 245 (2 weeks with 2 ppl) | # days | 14 | $1,943 | $27,200 |
| RCM 225 | # days | 28 | $2,596 | $72,700 |
| **Total Crew incl. Benefits, Travel & Grub** | | **308** | **$4,611** | **$1,420,200** |
| | | | | |
| Operations | # employed | 2 | $18,700 | $37,400 |
| Engineering Lead | # employed | 1 | $24,000 | $24,000 |
| Engineering Manager | # employed | 1 | $19,000 | $19,000 |
| Dispatch | # employed | 1 | $17,700 | $17,700 |
| DPA | # employed | 1 | $17,900 | $17,900 |
| Bookkeeper | # employed | 2 | $8,050 | $16,100 |
| HSEQ | # employed | 1 | $16,000 | $16,000 |
| Compliance | # employed | 1 | $14,400 | $14,400 |
| Purchasing | # employed | 1 | $11,000 | $11,000 |
| Tank Barge Manager | # employed | 1 | $9,900 | $9,900 |
| Admin | # employed | 1 | $9,200 | $9,200 |
| Crewing | # employed | 1 | $9,000 | $9,000 |
| **Technical Team** | | **14** | **$14,400** | **$201,600** |
| | | | | |
| **Provision for T&E Expenses** | | **1** | **$45,000** | **$45,000** |
| | | | | |
| **Admin Expenses** | | **1** | **$55,000** | **$55,000** |
| | | | | |
| **Invoice Amount** | | | | **$1,721,800** |
| | | | | |
| Previous Balance | Invoice 1002 | | | $63,268 |
| **Balance Due** | | | | **$1,785,068** |

**From:**        Alex Parker <AJPARKER@rcmaritime.com> <AJPARKER@rcmaritime.com>
**Sent:**        Friday, July 1, 2022 8:46 AM
**To:**          Joel Fine <JJFine@rcmaritime.com>; Andrew McAllister <APMcAllister@rcmaritime.com>
**Cc:**          Josh Trump
**Subject:**     Re: Pennantia / RCM - AR Shipman

Looping in Andy too!


Alex Parker
Managing Partner | Rose Cay Maritime
1321 Upland Drive, Ste. 20183, Houston, TX 77043
T: +1 (833) ROSE-ATB; M: +1 (508) 524-0331

E: AJPARKER@rcmaritime.com<mailto:%7BE-mail%7D>; www.rcmaritime.com<https://protect-us.mimecast.com/s/f6pDCADARwF1EJByT8gja4?domain=rcmaritime.com/>


Please consider the environment before printing this email
IMPORTANT NOTICE: This transmission and any attachments are intended solely for the use
of the individual or entity to which it is addressed and may contain information that is
privileged, confidential, proprietary, or otherwise protected from disclosure. If you are
not the intended recipient, you are hereby notified that any dissemination, distribution,
copying or other use of this transmission or its attachments is strictly prohibited. If
you have received this transmission in error, please notify the sender immediately and
permanently delete this transmission and any attachments from your system.
_____

On Jul 1, 2022, at 11:38, Joel Fine <JJFine@rcmaritime.com> wrote:


Hi Josh,

Are you available for a quick call with me and Alex today at 1pm ET to discuss your
questions and the open items in the AR Shipman?

Thanks,
Joel

Joel Fine | Counsel | Rose Cay Maritime
1321 Upland Drive, Ste. 20183, Houston, TX 77043
T: +1 (833) ROSE-ATB; M: +1 (832) 388-3013

E: JJFine@rcmaritime.com<mailto:%7BE-mail%7D>; www.rcmaritime.com<https://protect-us.mimecast.com/s/IDpyCBBQVxTl8J0QUNqaKZ?domain=nam10.safelinks.protection.outlook.com>


Please consider the environment before printing this email
IMPORTANT NOTICE: Information contained in this transmission and any attachments is
private and protected by legal privilege. This transmission and any attachments are
intended solely for the use of the individual or entity to which it is addressed and may
contain information that is confidential, proprietary, or otherwise protected from
disclosure. If you are not the intended recipient, you are hereby notified that any
dissemination, distribution, copying or other use of this transmission or its attachments
is strictly prohibited. If you have received this transmission in error, please notify

the sender immediately and permanently delete this transmission and any attachments from
your system.

_____


_____
From: Josh Trump <jtrump@contrariancapital.com>
Sent: Thursday, June 30, 2022 11:58:15 AM
To: Joel Fine <JJFine@rcmaritime.com>
Cc: Alex Parker <AJPARKER@rcmaritime.com>
Subject: RE: Pennantia / RCM - AR Shipman


Hi guys,

Thanks for this.  A few things:

  1.  Dove cay:
      *   Dove cay is affiliate of owner, yet owner is being asked to fund:

                                              i.      Pass-through
expenses

                                              ii.      Overhead for dove
cay

                                              iii.      Mark-up for dove cay
operations

      *   Can you please provide an operating budget for dove cay with comparison to Foss
actuals
      *   Please provided expected profit margin to be considered "market rate"
      *   Why would discounts and commissions not be credited back to owner if being asked
to cover entire cost structure?
  1.  Do we want to include some reference in here to the OA when it comes to the
incentive plan since there is so much more detail in OA?  This isn't super critical but I
assumed there would be some reference.
  2.  There was an agrmt to provide quarterly attestation that there are no defaults, no
liens etc from offices of the manager.  This has been changed to annual?  Why?  I would
prefer to keep this as quarterly.
  3.  I would put back the deletion of paying for RCM overhead, office space, utilities,
office supplies.  Not sure why it would get removed here.

Happy to discuss

thanks




Joshua Trump

Contrarian Capital Management

411 West Putnam Avenue

Greenwich, CT 06830 Suite 425

(o) 203-769-8336

(c) 917-721-5299

From: Joel Fine <JJFine@rcmaritime.com>
Sent: Wednesday, June 15, 2022 7:48 PM
To: Josh Trump <jtrump@contrariancapital.com>
Cc: Alex Parker <AJPARKER@rcmaritime.com>
Subject: Pennantia / RCM - AR Shipman


Your attachments have been security checked by Mimecast Attachment Protection. Files
where no threat or malware was detected are attached.

_____

Josh,


Attached for your review is the revised AR Shipman Agreement between Pennantia and Rose
Cay Maritime.

This draft has been reviewed and approved by Winston & Strawn.

Please let us know if you have any questions or concerns.

Thanks,

Joel


Joel Fine
Counsel | Rose Cay Maritime
1321 Upland Drive, Ste. 20183, Houston, TX 77043
T: +1 (833) ROSE-ATB; M: +1 (832) 388-3013

E: JJFine@rcmaritime.com<mailto:%7BE-mail%7D>; www.rcmaritime.com<https://protect-
us.mimecast.com/s/IDpyCBBQVxTl8J0QUNqaKZ?domain=nam10.safelinks.protection.outlook.com>

Please consider the environment before printing this email

IMPORTANT NOTICE: Information contained in this transmission and any attachments is
private and protected by legal privilege. This transmission and any attachments are
intended solely for the use of the individual or entity to which it is addressed and may
contain information that is confidential, proprietary, or otherwise protected from
disclosure. If you are not the intended recipient, you are hereby notified that any
dissemination, distribution, copying or other use of this transmission or its attachments
is strictly prohibited. If you have received this transmission in error, please notify
the sender immediately and permanently delete this transmission and any attachments from
your system.

_____


_____

This communication (including any attachments) is intended only for the named
recipient(s) above. If you are not the intended recipient, you are hereby notified that
any dissemination, distribution or copying of this e-mail and any attachment(s) is
strictly prohibited. If you have received this communication in error, please immediately
notify the sender and delete the message and any attachment(s) from your system.

| From: | Charles Bocquentin <CVBocquentin@rcmaritime.com> <CVBocquentin@rcmaritime.com> |
|---|---|
| Sent: | Friday, July 22, 2022 11:32 AM |
| To: | Alex Parker <AJPARKER@rcmaritime.com>; Josh Trump; Andrew McAllister <APMcAllister@rcmaritime.com> |
| Subject: | RE: 13 Week |
| Attachments: | Rose Cay 13 Week Cash Flow - 2022-07-22 v2.xlsx; Dove vs Foss - 2022-07-22 v1.xlsx |

Your attachments have been security checked by Mimecast Attachment Protection. Files where no threat or malware was detected are attached.

---

Charles Bocquentin
Director FP&A | Rose Cay Maritime
1321 Upland Drive, Ste. 20183, Houston, TX 77043
T: +1 (833) ROSE-ATB; M: +1 (929) 378-7879

E: CVBocquentin@rcmaritime.com<mailto:%7BE-mail%7D>; www.rcmaritime.com<https://protect-us.mimecast.com/s/KMGTCZ6pA3FoD0DOTjkeus?domain=rcmaritime.com/>

Please consider the environment before printing this email
IMPORTANT NOTICE: This transmission and any attachments are intended solely for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise protected from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying or other use of this transmission or its attachments is strictly prohibited. If you have received this transmission in error, please notify the sender immediately and permanently delete this transmission and any attachments from your system. Any views or opinions presented are solely those of the author and do not necessarily represent those of Rose Cay Maritime or any of its affiliates.

---
-----Original Appointment-----
From: Alex Parker <AJPARKER@rcmaritime.com>
Sent: Friday, July 22, 2022 2:31 PM
To: Josh Trump; Andrew McAllister; Charles Bocquentin
Subject: 13 Week
When: Friday, July 22, 2022 2:30 PM-3:30 PM (UTC-05:00) Eastern Time (US & Canada).
Where: Microsoft Teams Meeting

---
Microsoft Teams meeting
Join on your computer or mobile app
Click here to join the meeting<https://protect-us.mimecast.com/s/GQ-IC1wQ02SEklkvTpiSkQ?domain=nam10.safelinks.protection.outlook.com>
Meeting ID: 290 017 032 787
Passcode: C6gSqD
Download Teams<https://protect-us.mimecast.com/s/sjdmC2kOy3SERgRnT2wNRv?domain=nam10.safelinks.protection.outlook.com> |
Join on the web<https://protect-us.mimecast.com/s/pb9-C31Oz4SRGOGLfQMAAS?domain=nam10.safelinks.protection.outlook.com>
Or call in (audio only)
+1 914-359-6901,,780358563#<tel:+19143596901,,780358563#>   United States, Yonkers
Phone Conference ID: 780 358 563#

Find a local number<https://protect-
us.mimecast.com/s/RiejC4x4A5s7mqmLTMbCE2?domain=nam10.safelinks.protection.outlook.com> |
Reset PIN<https://protect-
us.mimecast.com/s/X7kPC5y3B6sWx2xqhNEyiJ?domain=nam10.safelinks.protection.outlook.com>
Learn More<https://protect-
us.mimecast.com/s/C1RlC682DgsG1q1Qc2d9NX?domain=nam10.safelinks.protection.outlook.com> |
Meeting options<https://protect-
us.mimecast.com/s/JSfEC73OEjtWQwQ3hAd5J7?domain=nam10.safelinks.protection.outlook.com>

_____

**From:**         Alex Parker <AJPARKER@rcmaritime.com> <AJPARKER@rcmaritime.com>
**Sent:**         Friday, July 29, 2022 12:04 PM
**To:**           Josh Trump
**Subject:**      Updated budget for auditors
**Attachments:**  Pennantia Budget 2022-23 - 2022-07-29 vFinal.xlsx


Your attachments have been security checked by Mimecast Attachment Protection. Files
where no threat or malware was detected are attached.
_____
Josh – we updated the model to simplify some of the functionality and provided the
analysis requested by Moss Adam's based on the attached.

Shabbat Shalom, AJP

Alex Parker
Managing Partner | Rose Cay Maritime
1321 Upland Drive, Ste. 20183, Houston, TX 77043
T: +1 (833) ROSE-ATB; M: +1 (508) 524-0331

E: AJPARKER@rcmaritime.com<mailto:%7BE-mail%7D>;  www.rcmaritime.com<https://protect-
us.mimecast.com/s/-SCfCxk9pPSQDr9oSvpEs6?domain=rcmaritime.com/>


Please consider the environment before printing this email
IMPORTANT NOTICE: This transmission and any attachments are intended solely for the use
of the individual or entity to which it is addressed and may contain information that is
privileged, confidential, proprietary, or otherwise protected from disclosure. If you are
not the intended recipient, you are hereby notified that any dissemination, distribution,
copying or other use of this transmission or its attachments is strictly prohibited. If
you have received this transmission in error, please notify the sender immediately and
permanently delete this transmission and any attachments from your system.
_____