# Holland & Knight

787 Seventh Avenue, 31st Floor | New York, NY 10019 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

Michael Frevola, Partner
212.513.3516

August 22, 2025

Honorable Sidney H. Stein
United Stated District Judge
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY

**Re:    25-cv-5904, Pennantia, LLC v. Rose Cay Maritime, LLC and Dove Cay, LLC**
**<u>Response to Dove Cay Letter Seeking Court's Order Directing Payment [Doc. 48]</u>**

Your Honor,

One of the most well-known legal aphorisms is "he who comes into equity must come with clean hands."  *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945).  As explained by the Supreme Court,

> This maxim is far more than a mere banality.  It is a self-imposed ordinance that closes the doors of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the [opponent].  That doctrine is rooted in the historical concept of [a] court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith.

*Id.*

The letter filed by Defendant Dove Cay, LLC ("DC") late yesterday [Doc. 48] seeks relief under this Court's equitable powers.  *See id.* at 1.  To put it mildly, DC's hands are filthy.

Before even addressing DC's actions warranting a denial of the equitable relief sought, however, Plaintiff Pennantia, LLC ("Pennantia") provides several reasons related to recent proceedings in this matter why this Court should not even address the merits of DC's request:

First, these issues are before the mediator and a draft agreement was circulated ***<u>yesterday</u>*** – the day that counsel for DC filed its letter – by the mediator that includes a payment provision with respect to the crewing issues.  As the Court has said previous times with respect to Pennantia's arguments, this should be an issue for the mediator.  *See*, *e.g.*, Hearing Transcript, August 12,

2 –  Honorable Sidney H. Stein
     August 22, 2025

2025, at 36:22-36:25 (noting that discussion of merits issues are for the mediation) (a copy of the August 12, 2025 hearing transcript accompanies this letter).

Second, DC's assertion that Pennantia funds were not available for August expenses is based on the same self-serving, one-page statement attached to its letter as Exhibit 3, which DC previously submitted in this proceeding that purports to show Pennantia owing DC an invoice balance of $20,913.43. As already explained by the Declaration of Christopher Crescenzo dated August 10, 2025 [*see* Doc. 42, ¶¶ 64-81], the statement at Exhibit 3 is not accurate and specifically does not reflect all of the recent payments RCM made to DC from Pennantia funds, which included payments of $4.7 million more than reflected on the statement through July 31, 2025 (when the official agreement was terminated). *See id.* ¶ 81 (concluding that rather than Pennantia owing DC an invoice balance of $20,913.43 at the end of July 2025, the accounts received data "should instead reflect a positive credit balance [in Pennantia's favor] of at least between $4,703,158 to $4,760,127.57"). If DC used those funds for other purposes, and DC apparently admits to having allocated to other debts, DC's decision to do so does not mean that Pennantia did not pay DC for August 2025 expenses, and then some, nor does it support DC's application to principles of equity to require Pennantia to pay DC yet again. Should this proceeding continue to trial, DC is free to litigate whether it was entitled to divert Pennantia payments for crew expenses to other purposes.[1]

Third, DC offers unsupported arguments of counsel claiming that Pennantia "negligently failed to engage a replacement manager" and has "in the meantime taken advantage of DC's continued services to the Pennantia fleet without providing any funding under the Court's Order." DC's own representations and actions bely those assertions. RCM and DC have continued to obstruct efforts to orderly turn over the vessels, including arresting the two vessels in Panama despite representing to the court, and to counsel in writing, that the vessels and cargo would be delivered to California. Pennantia admits in its letter that it has been removing crew from vessels, and as detailed further below, doing so in violation of Coast Guard regulations and this Court's orders, while at the same time refusing to hand over the vessels and demanding at least 45 days-notice to hand over, during which time DC is demanding millions in additional payments.

Turning to equitable principles, DC asks this Court to act in fairness to its position when it has done the following over the last several weeks:

---

[1] The $4.7 million in funds identified by Mr. Crescenzo are far more than are needed to cover August 2025, but DC admits to having allocated those funds to other debts. Those debts were unmatured, [*see* Doc. 41, at 6 (citing *F.H. McGraw & Co. v. Milcor Steel Co.*, 149 F.2d 301, 306 (2d Cir. 1945))], disputed, *see id.* (citing, *inter alia*, Restatement (Second) of Contracts § 259(2)(c) (1981)), and the funds at issue were earmarked for other designated purposes – namely paying the August 2025 expenses. *See id.* at 5-6 (multiple citations omitted). As explained in Pennantia's reply brief (Doc. 41), the law does not permit DC to misallocate funds to unmatured debts, to disputed debts, and/or funds earmarked for other invoices, and now claim that they have been "unpaid."

3 –   Honorable Sidney H. Stein
      August 22, 2025

- As explained in the Crescenzo Declaration, RCM essentially paid DC twice for crew in July 2025, with DC pocketing the second payment of approximately $2.3 million. [*See* Doc. 42, ¶¶ 71-76 & Ex. 13] (explaining that RCM's payment to DC on July 11, 2025 in amount of $2,323,907 "reflects RCM's advance payment of DC's August 2025 crewing and technical management expenses"). Rather than applying that payment to an invoice posted to Bill.com for August 2025 crewing expenses, however, "it is not clear what RCM or DC used the funds for." *Id.* ¶ 76.

- At the court conference on July 25, 2025, counsel DC told the Court that DC needed $1.6 million to address debts to current third-party vendors during the upcoming August 2025 time period, first stating that amount would be needed to bridge the time period until the 30-day post termination window expired in late August 2025, then later reducing that time period to August 1, 2025. These funds were not posted through Bill.com as all other payments in the parties' relationship had been processed. Rather, the $1.6 million "was ***wired by RCM to DC directly*** . . . ***without any indication of its use or allocation***. *Id.* ¶ 78 (emphasis added). Once again, DC apparently has pocketed these funds with no trail of where they went or for what purposes they were used. But misallocation of millions of dollars is not all that DC has been up to.

- Counsel for both RCM and DC represented to this Court that they would not terminate their services for 30 days (quoted below from July 25 – RCM's counsel – and August 12 – DC's counsel – court conference transcripts):

  > MR. KISSANE [counsel for RCM]: No. We've terminated the contract. ***We have certain requirements under Coast Guard regulations, and since we are the holder of the documents of the vessels, we have to comply with those until we're relieved of that.***

  > THE COURT: I see. And what are those requirements? In other words, I gather that the Coast Guard -- you know what? I shouldn't do that. What are the Coast Guard requirements?

  > MR. KISSANE: Well, the biggest one at issue here, I think, would be minimum manning requirements, and those could be different depending on how the vessel is being used. Obviously, if the vessel is operating, it has to have a full complement of crew. If it's tied up, you can have less of a crew on board.

  > THE COURT: That's one: You have to meet minimum manning requirements.

  > MR. KISSANE: Right.

  > THE COURT: Anything else I should know?

  > MR. KISSANE: There's safety requirements inspecting the vessel making sure there's no problems with the vessel as far as fire, pollution, hazard.

  > THE COURT: ***And you intend to maintain those obligations?***

4 –  Honorable Sidney H. Stein
August 22, 2025

> MR. KISSANE: ***We said we would do it for up to 30 days.***
>
> THE COURT: ***Up to 30 days from last night?***
>
> MR. KISSANE: ***Correct.***

Hearing Transcript, July 25, 2025, at 7:23-8:24 (emphasis added) (for the Court's reference, "last night" was July 24, 2025, hence the parties are still within that 30 day period) (a copy of the July 25, 2025 hearing transcript accompanies this letter).

> THE COURT:  Okay. Let me turn to Mr. Lennon. Mr. Lennon, I gather there's no issue, but that ***you're not going to stop work on the vessels*** and that you're not going to obstruct access to the vessels. Is that right?
>
> \*    \*    \*
>
> THE COURT: What about stopping work?
>
> MR. LENNON [DC's counsel]: As your Honor will recall before we were here the last time, the contracts were terminated.
>
> THE COURT: And?
>
> MR. LENNON: When we're talking about stopping work, or not stopping work --
>
> THE COURT: ***You say you're going to comply with all requirements of the coastguard in terms of safety and health.***
>
> MR. LENNON: ***That's correct. And that's what we've done.***
>
> THE COURT: All right. Thank you.

Hearing Transcript, August 12, 2025, at 4:25-5:22 (emphasis added).

> Despite still remaining within the 30 day period mentioned above, and despite the parties being in the midst of mediating a potential settlement, DC has withdrawn crews below minimum manning levels, ***in some cases withdrawing all crewmembers from vessels and causing obstructions to port operations***.  This conduct resulted in a U.S. Coast Guard inquiry on August 16th (only 22 days after the clock started) that some vessels were unmanned and other undermanned, potentially hundreds of thousands of dollars of fines to Pennantia.  This was the culmination of a time period where Pennantia multiple times sought coordination from or assistance from DC and RCM to ensure compliance with vessel minimum manning regulations.

> On August 17, 2025, Sean Pribyl, Esq., a partner in our firm's Washington, D.C. office who formerly served as a U.S. Coast Guard officer and member of its Judge Advocate General department, contacted the U.S. Coast Guard in response to its inquiry with Pennantia the prior day.  Mr. Pribyl spoke with a Lieutenant Porrata (with the command having jurisdiction over the Port Arthur, Texas vicinity) that day with respect to the Coast

5 –   Honorable Sidney H. Stein
      August 22, 2025

Guard's concerns as to the manning status of the Pennantia vessel at issue in the Port Arthur vicinity. Lieutenant Porrata advised Mr. Pribyl that she preferred to speak to the owners of the vessel rather than their lawyers.

On Monday, August 18, 2025, Michael Ring, the Chief Operating Officer of Contrarian Capital Management, LLC, the majority beneficial owner of Pennantia, spoke with Lieutenant Porrata. Mr. Ring's notes of that telephone conference follow:

Spoke with Lt. Porrata:

1.   She confirmed Captain Chris[2] left the boat yesterday and she further stated this was known last week that he was vacating the boat on Sunday, and ***there is currently no crew on the boat***.

2.   She wants to know what our plan is going forward:

1.   Timing of manning the vessel to get back in compliance?

2.   Long term plans with vessel?

3.   She mentioned that yesterday she spoke with our legal counsel but prefers to speak directly to us in the capacity of owner/operator.

4.   ***She is starting her process of filing non-compliance***. That could take her a couple hours or a couple days.

1.   She said we need to get back to her in the next couple hours with an update.

5.   If she completes her paperwork it could result in:

1.   Deficiency – restrict the vessel from moving

2.   Fines – Large range depending on the amount of deficiencies, but ***I did ask for worst case scenario which she replied with daily fines of around $100k***.

To Pennantia's knowledge, other vessels than the Port Arthur vessel likewise are crewed below manning standards, including the tug/barge combination under arrest in Panama.

There are other actions that could additionally be recited, but we trust the foregoing makes the point. DC has received payments that not only could pay its August 2025 expenses, but in fact ***were intended*** to pay its August 2025 expenses. Yet:

---

[2] Pennantia is uncertain as to whom this person actually refers, as there is no "Captain Chris" to its knowledge in the Pennantia Fleet's crew personnel. We have provided Mr. Ring's notes as contemporaneously recorded. This appears to be either a scrivener's error, Mr. Ring having misheard the name, or erroneous information was provided by the U.S. Coast Guard.

6 –   Honorable Sidney H. Stein
      August 22, 2025

     (1) DC did not use the funds as it was supposed to (and as it represented to the Court it would use them);

     (2) DC misappropriated the funds received;

     (3) DC then terminated its crewmembers who were supposed to be manning the Pennantia vessels (as both counsel for RCM and DC represented to this Court their clients would do), as well as supporting shore support personnel, yet claims now that its needs to be paid for a full complement of crew and support staff in an amount of nearly $4 million.

     As mentioned at the beginning of this letter, even without looking at DC's inequitable conduct recited above, there are several reasons why DC's request should be denied. When viewed through the prism of the financial liberties taken by DC and RCM over the last few months, plus their outright reneging on their representations to this Court that the Pennantia vessels will remain manned consistent with U.S. Coast Guard regulations, DC's unclean hands should cause its request to fail even if legitimate reasons were not present to justify denial of DC's request.

     We look forward to receiving the Court's decision on this issue.

Respectfully submitted,

HOLLAND & KNIGHT LLP


  *s/ Michael J. Frevola*
Michael Frevola