1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   PENNANTIA LLC,

4                   Plaintiff,

5           v.                              25 Civ. 5904 (SHS)

6   ROSE CAY MARITIME LLC
    and DOVE CAY,
7                                           Conference

8                   Defendants.

9   ------------------------------x
                                            New York, N.Y.
10                                          July 25, 2025
                                            11:15 a.m.
11
    Before:
12
                        HON. SIDNEY H. STEIN,
13
                                            District Judge
14
                            APPEARANCES
15
    HOLLAND & KNIGHT LLP
16       Attorney for Plaintiff
    BY:  MICHAEL J. FREVOLA
17
    WATSON FARLEY & WILLIAMS, LLP
18       Attorney for Defendant Rose Cay Maritime
    BY:  JOHN KISSANE
19
    LENNON MURPHY & PHILLIPS
20       Attorney for Defendant Dove Cay
    BY:  PATRICK LENNON
21

22

23

24

25

```
 1                    (In open court; case called)
 2                    DEPUTY CLERK:  Counsel, please state your names for
 3   the record.
 4                    MR. FREVOLA:  Good morning, your Honor.
 5                    Michael Frevola, Holland & Knight, counsel for
 6   plaintiffs.  I have with me Joshua Trump, who is actually the
 7   declarant in the TRO in case the Court has some factual
 8   questions.
 9                    THE COURT:  Thank you.  Welcome.
10                    Mr. Trump, I take it no relation?
11                    MR. TRUMP:  That is correct.
12                    MR. LENNON:  Good morning, your Honor.
13                    Patrick Lennon, Lennon Murphy & Phillips for the
14   defendant Dove Cay.
15                    MR. KISSANE:  John Kissane from Watson Farley &
16   Williams for Rose Cay Maritime.
17                    THE COURT:  Good morning to all of you.  Please be
18   seated.
19                    I called you in here because I normally like to hear
20   all sides on an order to show cause.  I received what's
21   captioned an emergency order to show cause for a preliminary
22   injunction, and it contains requests for a temporary
23   restraining order, so I got an order out setting this and
24   setting a date for -- of the summons and complaint.
25                    I've read your materials.  I have some questions.  I
```

```
 1   have a preliminary point of view as well, and I want to ask a

 2   few of my questions up front, and then I'll let you tell me

 3   whatever want to tell me.

 4            First of all, I assume there is no issue of

 5   jurisdiction.  It's admiralty jurisdiction everyone agrees?

 6            MR. FREVOLA:  Yes, your Honor.  On top of that, with

 7   respect to the disputes between Pennantia and Rose Cay, there

 8   is a venue clause as well there is some argument that that

 9   venue clause may roll across to Dove Cay because essentially,

10   your Honor, they are literally the same personnel.

11            THE COURT:  Let me stop you.  Is the defendant raising

12   a lack of venue?  Let me hear from the defense.

13            MR. KISSANE:  For RCM Maritime, no, we're not raising

14   lack of venue.

15            THE COURT:  And Dove Cay?

16            MR. LENNON:  No, your Honor, we are not raising lack

17   of venue.

18            THE COURT:  Then there's no issue.  By waivable,

19   you're saying there's jurisdiction.  Defendants are not

20   contesting jurisdiction, correct?

21            MR. KISSANE:  We believe there's subject matter

22   jurisdiction.

23            THE COURT:  Then that's clearly out of the way.  I

24   take it, defendant, you have been served with a summons and

25   complaint?  Or, rather, you've received a copy of the summons
```

1    and complaint.

2          Are either of you contesting service of the summons

3    and complaint?

4          MR. LENNON:  Your Honor, we're not contesting that

5    they sent us the summons and complaint, in accordance with your

6    order, by email.

7          THE COURT:  That's not what I'm asking.

8          Are you going to contest adequacy of the service of

9    the summons and complaint?

10         MR. LENNON:  No, we will not be contesting that.

11         THE COURT:  Sir?

12         MR. KISSANE:  We wouldn't mind having a copy handed to

13    our client.  That would be appropriate in the circumstances.

14         THE COURT:  By whom?  By you?

15         MR. KISSANE:  By a process server.  No.  If I get a

16    copy in the mail, I'll probably accept service, yeah.

17         THE COURT:  Plaintiff, send the gentlemen a copy.  And

18    if you're smart, you'll have duplicate copies here, and you can

19    actually hand it to them.  So I think we've cleared away some

20    of that underbrush.

21         Now, plaintiff, cutting through this, it's a contract

22    action.  You have four claims for relief which are contract

23    claims, and you have a claim for declaratory judgment which

24    simply says the liens aren't really liens.  You are essentially

25    seeking monetary damages in addition to this injunctive relief.

1        But at the end of the day, it's a contract action,

2   straightforward.  I mean, the facts in it may be a bit

3   convoluted, and I still need to focus more on the difference

4   between Rose Cay and Dove Cay and the relationship of Rose Cay

5   to Pennantia, but put that aside.

6        And regardless of whether there's a TRO here, this

7   case will go forward as a -- a preliminary injunction, the case

8   will go forward as a contract action.  So what's before me, as

9   they say, is an order to show cause.  So I need to look at the

10  likelihood of success on the merits, one, whether there's an

11  irreparable harm absent the issuance of injunctive relief and

12  the balance of equities.

13       Now obviously I'm going to give the defendants an

14  opportunity to put in papers because they haven't had that

15  opportunity yet.  I'll set a schedule for opposition papers or

16  reply papers, and then perhaps an oral presentation.  But let

17  me hone in on irreparable harm.

18       Plaintiffs are quite forthcoming, and I appreciate it.

19  In the memorandum, you say on page 25 -- and you spend two

20  pages on irreparable harm.  You say, "Although monetary damages

21  typically do not raise irreparable harm issues, courts will

22  find irreparable harm where the moving party provides evidence

23  of damages that cannot be rectified by financial compensation

24  alone."

25       So I appreciate your being forthcoming by saying

1    "monetary damages typically do not raise irreparable harm

2    issues," and, as I say, I see this issue as -- this case,

3    really, as a straight contract action.

4          So tell me, plaintiff, give me your best argument as

5    to where there's irreparable harm.  As I understand your

6    argument, it's simply that -- I shouldn't say simply.  It's

7    that the defense have threatened to stop work on the vessels,

8    and in some way that would cause you irreparable harm, and you

9    also think at the end of the day when you receive a money

10   judgment, the defendants will be judgment proof and go into

11   insolvency.  So I want you, plaintiff, to focus me on

12   irreparable harm.  But having said that, let me turn to

13   defendants.

14         It doesn't sound like the threat of stopping -- well,

15   I'll withdraw it.  Are the defendants -- do the defendants have

16   a current intention of stopping work on the vessels?

17         MR. KISSANE:  Your Honor, about the same for Rose Cay

18   Maritime.  Last night Rose Cay sent a termination notice based

19   on the failure to pay receivables of approximately $5 and a

20   half million.

21         THE COURT:  Speak up, sir.  You sent a -- Rose Cay --

22         MR. KISSANE:  Sent a termination notice under the

23   contract based upon the fact that there are $5.5 million in

24   receivables and other amounts, but -- and admitted $5.5 million

25   default in payment by Pennantia.

```
 1              Additionally, the vessel operating account which funds
 2    the vessel operations has not been funded by Pennantia as well,
 3    leaving RCM with little - and that's Rose Cay Maritime; we say
 4    RCM sometimes - little in the way of avenues to proceed.  In
 5    the termination notice, we stated that we are happy to organize
 6    a turnover of the vessels.  We're not going to leave the
 7    vessels abandoned.  The vessels are currently on @Rose Cay's
 8    document @of compliance with the Coast Guard, and we would
 9    eventually like to have them removed from that.
10              THE COURT:  I don't understand that last phrase.
11    Something about the Coast Guard.  You said that you are not
12    going to leave the vessels -- what was your word unattended?
13              MR. KISSANE:  Correct.
14              THE COURT:  All right.  Go ahead.  And what about the
15    Coast Guard where they are?
16              MR. KISSANE:  Yeah.  The vessels are under the Rose
17    Cay document of compliance since they are the operator, and we
18    have certain manning requirements that we have to meet.
19              THE COURT:  When you say it's "under," you mean it's a
20    contract, and you have certain requirements under that contract
21    and you intend to fulfill those requirements.  Is that what
22    you're saying?
23              MR. KISSANE:  No.  We've terminated the contract.  We
24    have certain requirements under Coast Guard regulations, and
25    since we are the holder of the documents of the vessels, we
```

 1   have to comply with those until we're relieved of that.

 2          THE COURT:  I see.  And what are those requirements?

 3   In other words, I gather that the Coast Guard -- you know what?

 4   I shouldn't do that.

 5          What are the Coast Guard requirements?

 6          MR. KISSANE:  Well, the biggest one at issue here, I

 7   think, would be minimum manning requirements, and those could

 8   be different depending on how the vessel is being used.

 9   Obviously, if the vessel is operating, it has to have a full

10   complement of crew.  If it's tied up, you can have less of a

11   crew on board.

12          THE COURT:  That's one:  You have to meet minimum

13   manning requirements.

14          MR. KISSANE:  Right.

15          THE COURT:  Anything else I should know?

16          MR. KISSANE:  There's safety requirements inspecting

17   the vessel making sure there's no problems with the vessel as

18   far as fire, pollution, hazard.

19          THE COURT:  And you intend to maintain those

20   obligations?

21          MR. KISSANE:  We said we would do it for up to 30

22   days.

23          THE COURT:  Up to 30 days from last night?

24          MR. KISSANE:  Correct.

25          THE COURT:  All right.  So let me turn back to

 1   plaintiff.  Irreparable harm.

 2          MR. FREVOLA:  Thank you, your Honor.

 3          THE COURT:  It sounds like the threat to stop work

 4   is -- it's not imminent, but it may be in 30 days.  Is that

 5   fair?

 6          MR. FREVOLA:  No, your Honor.  It's imminent.  The

 7   reason it's imminent is that there is a vessel that was

 8   scheduled to load a $2 million cargo yesterday and, I was told

 9   by counsel for Dove Cay that loading -- he thought that loading

10   had begun.  And then what happened was when this conference was

11   going forward, basically this was -- are we doing this

12   conference?  If we are, the vessels can stop loading.  What

13   happened was is a dialogue happened.

14          THE COURT:  What's the connection between the

15   conference and whether or not the vessel is being loaded?

16          MR. FREVOLA:  Your Honor, these defendants, especially

17   RCM, if you saw the complaint --

18          THE COURT:  RCM is Rose Cay?

19          MR. FREVOLA:  Rose Cay, right.  You mentioned the fact

20   this is a contract action.  It is vis-a-vis Rose Cay.  Dove Cay

21   is not in privity with our client.  Dove Cay has asserted a

22   whole bunch of maritime lien items, which we will mention later

23   on, your Honor, which we think are ridiculous on its face, but

24   it is not a contract action.  It is, instead, a lien assertion

25   against the vessels claiming a maritime lien.  So it's kind of

1    a hybrid.  It's got two different parties, two different types

2    of claims.

3              THE COURT:  Go ahead.

4              MR. FREVOLA:  Moving on, your Honor, our concern was

5    that essentially there was going to be an action to shut down

6    the company's operations because, as your Honor may have seen,

7    there is a buyer waiting in the wings here, and any effort that

8    can be made to shut down a buyer in the wings was going to

9    preserve their life as a manager.  They have a financial

10   interest in a sale not happening.  Because when a sale was

11   going to happen, at that juncture they would lose their job.

12   And under the provisions of the sale management -- the

13   management contract, if a sale happens, my client walks away

14   with no financial obligation.

15             **Change the script.  Flip the script.  If there's a**

16   **termination event, RCM gets $3.3 million in management fees for**

17   **an entire year which they've demanded in their termination**

18   **letter last night.**

19             Now, with regards to what's going on here, your Honor,

20   you said in terms the of the various different irreparable

21   harms issues, the threat to stop work we were worried about, it

22   has occurred.  There's a vessel that's supposed to be loading a

23   $2 million cargo --

24             THE COURT:  It doesn't sound like it's occurred there.

25   Oh, I see.  Yes.  You are saying they're not doing anything in

1    regard to operating it.  All they're doing is maintaining the

2    minimum requirements of the Coast Guard.

3            MR. FREVOLA:  Yes, your Honor.

4            THE COURT:  But they're not handling operating

5    requirements for the ships being utilized, is that it?

6            MR. FREVOLA:  Absolutely, your Honor.

7            On top of that, in terms of these defendants, amongst

8    other things, RCM, Rose Cay, has asked that our client

9    essentially fund the severance packages of crew and various

10   other entities because they have no ongoing business once this

11   is over, which to us, your Honor, means they're going to turn

12   out the lights, shut the door, and there's no money at all,

13   which is why we're talking about the issue about judgment

14   proof, that's a Grupo Mexicano issue which we briefed.  Your

15   Honor, I've been down this road before.  I went to the Sixth

16   Circuit on this and won on this several years ago.  But that's

17   why we want to make sure your Honor realizes it.

18           And also, your Honor, the other thing here is that the

19   prevention of access to the vessel.  The termination letter

20   does not say we're going to have access to the vessels.  And

21   yesterday, your Honor, when we were talking about the court

22   conference, when there was such a pushback from opposing

23   counsel telling us -- and, again, to Mr. Lennon's credit -- I

24   haven't spoken really with Mr. Kissane at all on this, but Mr.

25   Lennon and I go back 20 plus years.  We've been in these

 1    courtrooms a lot, your Honor, together, usually on opposite

 2    sides of the fence.  But he came in, I think he was part of the

 3    solution, your Honor.  I think we were working and moving

 4    towards things getting better.

 5            THE COURT:  Who was speaking before, sir?

 6            MR. KISSANE:  My name is John Kissane.

 7            THE COURT:  You're Mr. Kissane.

 8            MR. FREVOLA:  Anyway, so with regards to what was

 9    happening this week --

10            THE COURT:  So you said you were talking to Mr. Lennon

11    and progress was being made.

12            MR. FREVOLA:  Right.  And we got up to the point

13    yesterday, your Honor -- sorry -- Wednesday, where my client

14    made an offer to resolve all those receivables.  It's an offer

15    that was made previously at least once, and I think more than

16    once.  It was made in early June, and the offer was reiterated,

17    and a sweetener was even added to that, your Honor, of a

18    percentage success fee depending on whether the sale wound up

19    getting over a certain amount of sale for the fleet.

20            So the idea that we're not addressing this credit

21    receivables amount, your Honor, is -- it's a phantom menace.

22    It's something that's being made up.  And so what happened then

23    yesterday is we basically -- Mr. Lennon says there's a court

24    conference -- the vessel is loading.  Can we put the court

25    conference off.  And I basically asked my client what their

1    thought is, and they said we want to go forward with it because

2    typically if we let these guys have any room on the leash, they

3    do bad things.  And, your Honor, I know that for a fact because

4    there is that Rule D action we brought before Judge Merchant in

5    Eastern District to seize vessels, and we had a custodian on a

6    tug and a barge in Staten Island for a few weeks' time.  The

7    opposition, RCM's maritime lawyers, Freehill Hogan & Mahar

8    wound saying can you take the custodian off?  We did, and

9    immediately the obstructiveness started again.  So it's almost

10   like we need a judge looking over their shoulder on this and

11   that's why we wound up doing this.

12          Now with regards to --

13          THE COURT:  That was the Staten Island case involving

14   Rose Cay?

15          MR. FREVOLA:  Yes.  Actually, your Honor, it was

16   technically our client arresting our own vessels so we could

17   get physical access on the vessels because RCM would not let

18   our reps and inspectors on to inspect the vessels to have the

19   sale go through.

20          THE COURT:  Well, if I understood what Mr. Kissane was

21   saying, that the right of inspection still exists, and they are

22   going to let inspection take place.

23          Didn't you say that, under the Coast Guard

24   requirements, sir?

25          MR. KISSANE:  Yes, your Honor.

1              THE COURT:  All right.

2              MR. FREVOLA:  Well, your Honor, I would love for you

3     to have an order issued today saying the vessels will be

4     inspected next week, your Honor, because what we tried to do

5     yesterday is we came to a proposal to Mr. Lennon saying, it

6     looks like the 270, the barge that needs to load for

7     California, this vessel was supposed to load and stopped

8     loading, it looks like we got that going, so the stop work

9     issue we're less concerned about.  So if we can approach Judge

10    Stein and say, Judge, we believe that we've had a peace break

11    out a little bit here, we think we can adjourn this conference.

12    We've got a vessel loading and that's going forward.  And we

13    also proposed to Mr. Lennon we also want the Court to endorse

14    the so order the fact that vessels in the Pennantia fleet would

15    be inspected by the imminent purchaser next week so we can get

16    this sale done.  And Mr. Lennon said let me check with my

17    client.  And he came back about an hour later and said I got

18    bad news for you.  They're terminating.

19             Now why -- asking for the Court to just so order an

20    inspection for sale purposes has caused a termination of the

21    contract is beyond me, your Honor.  We were actually working

22    together very capably, but for some reason Mr. Lennon's client

23    had a real problem with us being in court here today and with

24    the idea of vessels that my client owns being inspected so my

25    client could sell those vessels.  That's a problem, your Honor,

1   and that's why we need an order from your Honor so we can get

2   on the vessels.

3          And right now the ship management contract covers the

4   entire fleet, all 18 vessels wherever they are around the

5   country, which means if you issue an order, your Honor, to RCM,

6   and they fail to do it, I can seek contempt against them for

7   anything to do around the country, and right now, your Honor,

8   it's at that point.

9          And they just basically what they did they just

10  doubled down and shoved all their chips into the middle of the

11  table last night with the termination letter.  I'll be happy to

12  talk about those issues when we get there.

13         But the final bit of irreparable harm, your Honor, is

14  we may lose the sale for the fleet.  What's going on right now

15  is that there have been a couple of interested buyers, and

16  there's been a lot of obstruction so they can't get on ships.

17  This buyer, there's a letter of intent, your Honor, that's been

18  signed that we're happy to show you the unredacted version, and

19  we offered to show a redacted version to counsel to show that

20  there is a buyer waiting, and we're hoping to get this done by

21  July 31, but the inspection delays are going to probably cause

22  that to be a problem.  And that's why we're here, your Honor.

23         But that's the irreparable harm.  We lost the sale,

24  the potential loss of Pennantia's business and we can't sell to

25  anybody because the vessel has a black mark on it because it

1    says we don't want to deal with this fleet they're problem

2    children, and in fact we can't even recover our damages

3    afterwards because everybody turns out the light and runs.

4              THE COURT:  Because why?

5              MR. FREVOLA:  Because everybody turns out the light

6    and runs and everybody is judgment proof because they've got no

7    money.

8              THE COURT:  I see.

9              MR. FREVOLA:  Thank you, your Honor.

10             THE COURT:  This is a whole different issue than what

11   was presented in the papers.

12             Let me turn to Mr. Kissane.

13             Is the loading of the single vessel we're talking

14   about going forward or not?

15             MR. KISSANE:  The last I heard of about 7:30 or 8:00

16   last night the vessel was being loaded and was going to proceed

17   on its voyage, so I don't know when their information was from,

18   but that's what I advised my clients they were doing.

19             THE COURT:  Your voice dropped off.  That's what you

20   advised your client --

21             MR. KISSANE:  To do and they said they were complying.

22             THE COURT:  In other words, if I understand you, sir,

23   you advised Rose Cay to permit this vessel to load and they

24   said it was loading?

25             MR. KISSANE:  Yes.  We wanted to avoid any -- I mean,

1    obviously that's a breach of a contract with a third party.

2    It's going to be millions of dollars in damages, which we're

3    trying to avoid.

4        THE COURT:  All right.  Let's keep our heads.  It's

5    all good so far.  I mean, what you're telling me is good so

6    far.

7        MR. FREVOLA:  Your Honor, if I may, also --

8        THE COURT:  Just -- just a minute.

9        What is this vessel's name, sir?

10        MR. KISSANE:  RCM 270, 270.

11        THE COURT:  RCM 270.  A poetic name.

12        Yes, Mr. Frevola, you wanted to add something?

13        MR. FREVOLA:  Actually, I wanted to say, I actually go

14    way back with Mr. Kissane.  I have no problem whatsoever with

15    counsel here at all.  If he says that's happening, then that --

16    you know, I'll take his representation that's happening.  We

17    were not aware of that.

18        THE COURT:  Good.  I know the admiralty bar is

19    relatively small.  I go way back with it too in my cases.  I

20    remember well the Haight Gardner firm, and I had a good friend

21    who was an admiralty lawyer as well.  I think the

22    representations each of you give to the others are normally

23    valid.

24        So from the standpoint of the Court, the RCM 270 is

25    being loaded.  That's one point of agreement here.

 1                    Now let's talk about inspection by the purchaser.

 2            Mr. Kissane, I want to hear from you, but it seems to

 3    me that it's in your client's interest to have a potential

 4    purchaser inspect these vessels.

 5            MR. KISSANE:  Potentially.  Can I give you a little

 6    background on that?

 7            THE COURT:  Yes, sir.  I'm trying to have peace

 8    breakout here.

 9            MR. KISSANE:  You know, I think my client has valid

10    concerns.  Pennantia is owned by a hedge fund.  They bought

11    these distressed assets out of a bankruptcy in order to sell

12    them.

13            THE COURT:  I saw that.

14            MR. KISSANE:  Yeah.  And now it's coming time for the

15    sale.  The vessels are heavily mortgaged.  A lot of debt

16    everywhere.

17            THE COURT:  Not unusual.

18            MR. KISSANE:  Not unusual at all.  And they're not

19    paying their manager what they admit is due.

20            THE COURT:  You're talking about the 5 million?

21            MR. KISSANE:  The 5 million.  There's other amounts as

22    well.  But they're leaving us holding the bag, and we have no

23    security whatsoever as to the payment of the receivables and

24    the payment of continued operating costs.  We're footing the

25    bill now, so --

1          THE COURT:  You're putting the --

2          MR. KISSANE:  Footing the bill.  Paying the bill.

3          THE COURT:  Okay.

4          MR. KISSANE:  These receivables were a kind of a

5   complex matter where --

6          THE COURT:  That's the 5.5?

7          MR. KISSANE:  Yeah, the parent of Pennantia,

8   Contrarian Capital purchased receivables or agreed to purchase

9   receivables in order to get them off the books of the business

10  so it wouldn't be a default under the covenants of the loan

11  documents, and we don't want to come to the end, there's a sale

12  and we are stuck holding the bag.

13         THE COURT:  Fair enough.  Okay, I understand.

14         MR. FREVOLA:  Your Honor, the settlement offer we made

15  last night or, sorry, Wednesday was to pay 2.5 million upfront

16  for purposes of knocking down that amount and having at the

17  closing a check basically cut for the remainder of that amount,

18  which is going to be somewhere in the area of 6.3 million.

19         THE COURT:  We'll go off the record.

20         (Off the record)

21         THE COURT:  Mr. Lennon, Mr. Frevola says that he was

22  denied the ability to inspect the RCM 270 on July 15 and 16.  I

23  gather you don't know anything about that.

24         MR. LENNON:  I wasn't part of whatever communications

25  he's referring to, your Honor.

```
 1              THE COURT:  All right.  You said here that you don't

 2    have any objection to Pennantia being able to inspect the

 3    vessels, the 18 vessels, correct?

 4              MR. LENNON:  I said that today.

 5              THE COURT:  Yes.

 6              MR. LENNON:  And I said that during our call that the

 7    four of us were on.

 8              THE COURT:  Yes.  So part of what I do today will be

 9    to direct that Pennantia shall be given access to the 18

10    vessels to inspect them, and that defendant shall be notified

11    in advance of where the inspections shall take place and at

12    what time and who shall be doing the inspection.

13              Mr. Frevola, is there any objection to that from the

14    plaintiff?

15              MR. FREVOLA:  None at all, your Honor.

16              THE COURT:  Any objection to that from the defendants?

17              MR. LENNON:  I think the only -- it's not an

18    objection, your Honor.  The only clarification I would make to

19    that is, you know, the location is something that's going to

20    have to be discussed because it would be -- Mr. Frevola says

21    all the vessels are tied up, and that's partly true.  Some of

22    them are.  Some of them are in the shipyard.  But they've also

23    been kicked out of one of the shipyards because the shipyard

24    hasn't been paid by Pennantia, and --

25              THE COURT:  I thought you'd add that, yes.
```

 1              MR. LENNON:  And arrangements were made by our clients
 2    to find a new home for these vessels that we presented the
 3    contract for Pennantia to sign, which they refused to do
 4    because they want a month-to-month arrangement which the yard
 5    is not willing to do.
 6              THE COURT:  I can't get into those details.
 7              MR. LENNON:  My point is a very practical one.  There
 8    needs to be some dialogue discussion about where the
 9    inspections will take place.
10              THE COURT:  All right.  Mr. Frevola.
11              MR. FREVOLA:  That's fine.  And like I said, Pat and
12    I've worked together a lot over the years.  I don't think
13    that's going to be a problem.  If there is, we'd appreciate
14    writing a letter to you, your Honor, to try to sort that out.
15              THE COURT:  Absolutely.  You'll have access to me at
16    any point.
17              So that order will stand.  I am going to also direct
18    the parties to continue their negotiations to attempt to
19    resolve this.  What do the parties want in that regard?  You've
20    indicated -- everybody has indicated you deal with each other
21    in good faith over a long period of time.  I can leave you to
22    your own devices or I can direct that you have mediation with
23    the magistrate assigned to this case or you can hire a
24    mediator.  What's your pleasure?  For this we'll go off the
25    record again.

1              (Off the record)

2              (Adjourned)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25