P8CBPENC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

PENNANTIA, LLC,

                    Plaintiff,

            v.                          25 Civ. 5904 (SHS)

ROSE CAY MARITIME, LLC and
DOVE CAY, LLC,

                    Defendants.                Conference

------------------------------x

                                        New York, N.Y.
                                        August 12, 2025
                                        11:00 a.m.

Before:

                    HON. SIDNEY H. STEIN,

                                        District Judge

                          APPEARANCES

HOLLAND & KNIGHT LP
     Attorneys for Plaintiff
BY:  MICHAEL J. FREVOLA

WATSON FARLEY & WILLIAMS LLP
     Attorneys for Defendant Rose Cay Maritime, LLC
BY:  CELINDA J. METRO

LENNON, MURPHY & PHILLIPS, LLC
     Attorneys for Defendant Dove Cay LLC
BY:  PATRICK F. LENNON
     KEVIN J. LENNON
     ELLIOTT T. WILLIAMS, IV

Also Present:  Joshua Trump, Plaintiff

P8CBPENC

1          (Case called; appearances noted)

2          THE COURT:  Thank you.  Good morning, please be

3     seated.  I have some questions to begin with, and I'd

4     appreciate exploring those for a few moments, and then I'll

5     listen to any presentations that the parties want to make.

6          First, Mr. Frevola, what is it that you're seeking

7     here, and the reason in this preliminary injunction.  As I

8     understand it originally, you were seeking an order directing

9     the defendants not to stop work on the vessels.  And I think

10    that was taken care of in our conference where the defendants

11    stated, they're not going to stop work on the vessels.  You

12    also were seeking a preliminary injunction directing that the

13    defendants not obstruct access to the vessels.  And similarly,

14    I think in one of our prior conferences the defendants agreed

15    that they were not going to obstruct access to the vessels, and

16    that leaves only the request for a direction to defendants not

17    to pursue the liens.  And I take it at this point, an

18    injunction prohibiting them from enforcing the liens, which may

19    be the same thing.  Am I right?

20         MR. FREVOLA:  Yes, your Honor, in terms of the way you

21    stated it.  Since we had that hearing, your Honor, we have had

22    basically RCM and DC basically say they're stopping work on the

23    vessel.  They have wound up last night writing that they're

24    essentially going to let the insurance lapse on the vessels.

25         THE COURT:  This entire case has been a moving target

P8CBPENC

1   for me to try to figure out what's at issue since day one.  I

2   take it this is not in your papers.  Is that right?

3       MR. FREVOLA:  It isn't, your Honor, because this

4   literally, in terms of the insurance, was raised yesterday,

5   your Honor.  And it's all about the banging of the drum. We

6   haven't been paid.  We want to get out of here, et cetera, et

7   cetera, your Honor.

8       And if you look at Mr. Kissane's letter that was

9   submitted to the Court on July 24, which is one of our exhibits

10  I believe in our complaint, your Honor.  I can track it down if

11  you'd like.  Actually, it might not be in our complaint.

12      THE COURT:  What's the point?

13      MR. FREVOLA:  The point is, your Honor, when they're a

14  talking about terminating, your Honor.  One of the things that

15  was said is that, Importantly RCM wishes to cooperate to assure

16  continued insurance coverage for the vessels, to protect the

17  crew, environment, and financial interest in the vessels. RCM

18  is also willing to cooperate in the safeguarding the vessels on

19  a temporary basis should Pennantia wish, but only if adequate

20  funding is provided.  However, RCM is not willing to continue

21  holding the vessels on its document compliance for more than 30

22  days.  So we're a couple weeks in here, your Honor, I guess

23  from that.  And we're being told that they're talking to the

24  insurer about dropping the insurance.

25      THE COURT:  But that's not in the papers.  I'm not

P8CBPENC

1    going to handle that on this preliminary injunction.  Again,

2    it's a constantly moving target.  Where I was going with my

3    question was, up to this point, and what I was saying, you were

4    seeking a direction that the defendants not pursue the liens?

5             MR. FREVOLA:  That's right, your Honor.

6             THE COURT:  In terms of your reply memorandum, I think

7    you changed that.  Your conclusion says you request the Court

8    to grant its application to order DC to withdraw its notices

9    filed with the coastguard against the vessels.  I take it

10   that's the lien?

11            MR. FREVOLA:  Yes, your Honor.

12            THE COURT:  Two, order Dove to terminate the *in rem*

13   arrest in Panama.  Three, order defendants to comply with

14   Pennantia's orders regarding the vessels; and four, order

15   defendants to turn over all documents and records.  I take it

16   all of that, apart from the documents and records, is the same

17   thing that is the validity of the lien.  Am I right?

18            MR. FREVOLA:  The access, your Honor, is essentially

19   sort of like the -- not obstruct access.  In other words,

20   remember when we were saying --

21            THE COURT:  Yes, but the defendants have agreed

22   they're not going to obstruct access.

23            MR. FREVOLA:  They've agreed in court, but it doesn't

24   always happen, your Honor, in principle that it happens.

25            THE COURT:  Okay.  Let me turn to Mr. Lennon.

P8CBPENC

1    Mr. Lennon, I gather there's no issue, but that you're not

2    going to stop work on the vessels and that you're not going to

3    obstruct access to the vessels.  Is that right?

4            MR. LENNON:  We were pretty clear when we were here

5    that we're going to allow the inspection of the vessel.  I take

6    exception to Mr. Frevola that it doesn't always happen because

7    --

8            THE COURT:  I'm not concerned about that.

9            MR. LENNON:  My point is, it has happened. There's no

10   issue with inspection of the vessel.  They've done all the

11   inspection.

12           THE COURT:  What about stopping work?

13           MR. LENNON:  As your Honor will recall before we were

14   here the last time, the contracts were terminated.

15           THE COURT:  And?

16           MR. LENNON:  When we're talking about stopping work,

17   or not stopping work --

18           THE COURT:  You say you're going to comply with all

19   requirements of the coastguard in terms of safety and health.

20           MR. LENNON:  That's correct.  And that's what we've

21   done.

22           THE COURT:  All right.  Thank you.  I think both of

23   you gentleman have been before me previously.  And, you know, I

24   don't tend to hide the ball or play games here.  I think this

25   ultimately will resolve itself on the existence or nonexistence

P8CBPENC

1    of irreparable harm on the papers so far.  So let me focus on

2    that.

3              Let me ask, Mr. Frevola, to make the best argument you

4    can for why there's irreparable harm in the absence of a

5    preliminary injunction here.  And let me precede that with, I

6    think what you're arguing in your papers is, this really is a

7    money damage case, as I've said before, because your causes of

8    action are all breaches of contract.  I think your position is,

9    this is a money damage case, except for the likelihood that if

10    there is a money damage award here in your favor, you believe

11    the defendants are judgment proof, and you won't be able to

12    obtain the money judgment.  Am I right that that's your

13    argument?

14              MR. FREVOLA:  It is in part, your Honor.

15              And the Dove Cay's opposition papers suggest that

16    there has not been any type of evidence or any submission on

17    that issue.  And I point your Honor to the Trump declaration

18    which is docket 9, July 21, 2005.  It's the declaration that

19    was submitted as part of our initial moving papers.  And

20    specifically at paragraph 40 Mr. Trump says, Upon information

21    and belief, the sole or material principal business of the

22    defendants is managing Pennantia's vessels and defendants have

23    no other significant business assets.  As such, upon the sale

24    of the Pennantia's fleet to a third party, the defendant will

25    no longer have sufficient business to continue operations and

P8CBPENC

1  will have no material assets of significant value.  Indeed, if

2  discussions between --

3        THE COURT:  Mr. Frevola, I'm going to ask you, when

4  you read, slow down, because our reporter needs to take down

5  what you're saying.  Everybody speeds up when they read.

6        MR. FREVOLA:  I'm sorry, your Honor.  I was actually

7  going my slower speed.  I can go slower.  Indeed, in

8  discussions between CCM and defendants as to resolving these

9  disputes, RCM has raised the issues of, and sought compensation

10  for, winding down the business in addition to seeking severance

11  for terminating crew contracts, at least to the extent that

12  crew severance is not mitigating by cooperating to arrange

13  follow-on employment for the crews of the vessels by a buyer of

14  the vessels.

15        Now, in the DC opposition brief, they want windup

16  saying in their irreparable harm section that there's been

17  nothing submitted with regards to the issue of inability to

18  collect.  Mr. Trump was actually talking with these companies,

19  RCM and DC, about what they're doing in terms of what's going

20  to happen.  And they're asking, can we pay these things off.

21  We don't have other people to work for.  If you look at Mr.

22  Parker's --

23        THE COURT:  Wait.  We don't have other people to work

24  for --

25        MR. FREVOLA:  We don't have other corporate clients

P8CBPENC

1    that we're going to manage vessels for.  There's no one else

2    that we're managing vessels for.

3            THE COURT:  Where is that in paragraph 40 of the

4    Trump?

5            MR. FREVOLA:  In terms of when he's talking about, the

6    first sentence talking about, I don't think they have this

7    follow-on business.  And the reason why --

8            THE COURT:  That's on information and belief.

9            MR. FREVOLA:  And the reason why is because when I've

10   talk to them about these things, they're talking about winding

11   up their company, and letting the crews go.  They're not

12   putting the crews on other vessels.  They're saying, we need to

13   sever the crews and pay people off so that we can terminate.

14   That to me, your Honor, suggest that they're going to wind

15   their business up.

16           THE COURT:  Let's go back.  Am I correct that your

17   best argument that there's irreparable harm in the absence of a

18   preliminary injunction is that they will not, the defendants

19   will not be able to meet any monetary award that may be awarded

20   to Pennantia.  Is that your argument?

21           MR. FREVOLA:  In part, your Honor.

22           THE COURT:  What's the other part?

23           MR. FREVOLA:  If I may finish on the first thing.

24   Mr. Parker, Dove Cay's principal, his declaration that he put

25   in, an 11-page declaration, he does not refute the fact that

P8CBPENC

1    they don't have any other clients.

2              THE COURT:  He doesn't speak to it, does he?

3              MR. FREVOLA:  He doesn't at all.

4              THE COURT:  So there's no evidence there.

5              MR. FREVOLA:  Right.

6              THE COURT:  In this record.

7              MR. FREVOLA:  In our reply brief, your Honor, we also

8    mention --

9              THE COURT:  And the evidence you have is the evidence

10   on information and belief based on a conversation in which the

11   defendants were talking about the fact that they were

12   considering or were going to windup, am I right?

13             MR. FREVOLA:  We do have correspondence, your Honor,

14   if you want to see it about this.

15             THE COURT:  I want to know what's in the record, sir.

16             MR. FREVOLA:  What's in the record is Mr. Trump's

17   statement and no repudiation by Mr. Parker.  The other portion

18   of this, your Honor, in a way this has become more of a

19   significant thing since the Panamanian arrest, which happened

20   after we put our initial papers in if I'm remembering this

21   correctly --

22             THE COURT:  Go ahead.

23             MR. FREVOLA:  -- is the other portion here on a

24   monetary issue, your Honor.  There are times when it's going to

25   be difficult to basically windup quantifying what the damages

P8CBPENC

1    will be, and we now have a $100 million vessel.

2            THE COURT:  Let me stop you there.  If your position

3    is it would be difficult to quantify monetary damages, I'm not

4    going to take issue with that.  That's different from the

5    proposition that monetary damages are not adequate.

6            MR. FREVOLA:  Absolutely, your Honor.  A second prong

7    has arisen since our initial filing of our papers, your Honor.

8    In that what's happening in Panama could cause the charter with

9    PBF to fail.  And while that potentially is quantifiable, what

10   is much more difficult to quantify, your Honor, is a purchaser

11   of the fleet looking at the value of the fleet, one of the

12   things they will look at is whether vessels are permitted to

13   work.

14           THE COURT:  I understand that.  But again, I don't

15   want to pushback too hard, but it seems to me that that goes to

16   the process of determining what the monetary damages are and

17   it's difficulties, but not to the issue of whether or not you

18   can be adequately compensated by monetary damages, regardless

19   of what the amount is.

20           MR. FREVOLA:  Again, your Honor, I think in terms of

21   us trying to basically explain this intangible damage that

22   could result from the sale value of the fleet, from the fleet

23   being sold with a charter and without a charter may be

24   difficult, your Honor.

25           THE COURT:  Okay.  Understood.

P8CBPENC

1          MR. FREVOLA:  The last thing I would say, your Honor,

2    is that the injunction test typically when you're looking at

3    the prongs of injunction test, it's typically a bit of a

4    sliding scale.  If you've got more of one, you need less than

5    another.  I will say, your Honor, in terms of this --

6          THE COURT:  Again, I don't mean to pushback on

7    everything, but I'm not quite sure that's true.  You have the

8    burden as the movant to prove by a preponderance four elements

9    of preliminary injunction.

10         MR. FREVOLA:  Your Honor, I've seen a number of courts

11   that actually say that more of one can mean less than the

12   other.  And the point being here, your Honor, if you look at --

13   amongst other things, we have the outside bookkeeper.  I think,

14   your Honor, a little bit of the movie the Untouchables.  But

15   we've got the bookkeeper here in terms of talking about the

16   numbers here, your Honor.  And the numbers that we're talking

17   about here using the actual contractual documents that now have

18   finally been found show that these claims are not founded on

19   anything, your Honor.  It appears that using the documents that

20   they use as to contract in Panama, by only introducing the

21   one-page CTMA, and not producing anything else.  They got an

22   arrest down in Panama using a one-page document saying, here's

23   the contract, your Honor, down there.

24         And the reason why they introduced that document in

25   Panama, your Honor, is because you need in Panama to show

P8CBPENC

1    documents.  Here, Mr. Parker's declaration at page -- sorry, at

2    paragraph I believe is 47.

3              THE COURT:  What ECF number is it?  I have some of the

4    documents printed out.

5              MR. FREVOLA:  ECF 33, your Honor, page nine.

6              THE COURT:  Go ahead.

7              MR. FREVOLA:  Paragraph 47, Mr. Parker says, as of

8    April 14, 2022, RCM, exercising its authorities under the ship

9    management contract and power of attorney, retained Dove Cay,

10   the day-to-day technical management of the Pennantia vessel.

11   And I think that probably should say --

12             THE COURT:  I got it.  Go ahead.

13             MR. FREVOLA:  So anyway, if you look then at the CTMA,

14   your Honor, and there's a copy of is at Mr. Trump's declaration

15   which is 43-1 is the document.

16             THE COURT:  Yes.  Go ahead.

17             MR. FREVOLA:  This is the document that was --

18             THE COURT:  This is the one pager that was introduced

19   in Panama.

20             MR. FREVOLA:  Exactly right, your Honor.

21             THE COURT:  And that you had trouble getting and

22   ultimately received.

23             MR. FREVOLA:  Right.  Now, Mr. Parker does not attach

24   this document to his declaration.  He just talked about there

25   was an April 14th, agreement.  Okay, your Honor.

P8CBPENC

1          THE COURT:  What do you want me to know from the

2     paragraph that you just read that talks about the retention of

3     the manager?

4          MR. FREVOLA:  Well, if you look at paragraph four of

5     the CTMA, it basically incorporates as a whole, the crew

6     technical management agreement that initially was existing

7     between Foss, the outside initial entity, and RCM.

8          THE COURT:  And Rose.

9          MR. FREVOLA:  Exactly.  So the initial Foss LOA has

10    certain terms in it that have been referenced to in terms of

11    trying to base the claim amounts that have been assessed by or

12    been asserted by DC.  But these numbers did not include the

13    fact that all of these -- this contract was modified by

14    amendment eight.  And amendment eight, your Honor, if you stay

15    with the Trump declaration and you go to exhibit two, and it's

16    document 43-2 --

17         THE COURT:  Yes.  Go ahead.  I have it.

18         MR. FREVOLA:  And it's pages 20 to 25 of that document

19    where the amendment eight is.

20         THE COURT:  You're talking about the ECF numbers,

21    right?

22         MR. FREVOLA:  Yes, your Honor.

23         THE COURT:  Okay.  I have it.

24         MR. FREVOLA:  And so on this document if you go, for

25    example, to paragraph or clause 10, which is on ECF page 22 of

P8CBPENC

1    document 43-2.

2              THE COURT:  Yes.

3         MR. FREVOLA:  And if you look at the second to last

4    paragraph, all of the above all inclusive rates include wages,

5    fringe, travel, lodging and meals of all contractor's

6    employees, and contractor being Dove Cay in this situation

7    since they --

8              THE COURT:  Yes, I got it.

9         MR. FREVOLA:  Mariners and shoreside staff, the above

10   all inclusive rates include a $250 vessel a day management fee.

11   Your Honor may recall that there's a 10 percent management fee

12   markup they're basically saying is customary in the industry.

13   Your Honor, there is a contract that sets the management fee.

14   They didn't reveal that to us.  They didn't reveal it to the

15   court in Panama.

16             THE COURT:  Again, it seems to me what you're arguing

17   is the amount of the lien.  You're contesting the 29 million

18   figure, and I think contesting the $13 million figure also.

19   That's what you're doing.

20        MR. FREVOLA:  Well, your Honor, using these numbers,

21   the bookkeeper never saw amendment eight to do calculations.

22   If you look at his declaration when he ran the calculations

23   using amendment eight --

24             THE COURT:  Yeah, but we're talking about a

25   preliminary injunction.  Again, as I go back to what I said

P8CBPENC

1    last time, this will all be worked out in the course of a

2    litigation in terms of the numbers.  You'll all be hiring

3    forensic accountants and everybody will have a field day going

4    through the numbers, but I don't think that goes to the issue

5    of the validity of the liens.  It may go to the issue of the

6    amount of the liens.  Where am I wrong?

7          MR. FREVOLA:  Your Honor, in terms of when

8    Mr. Crescenzo wound up running the numbers, the numbers after

9    you actually apply amendment eight, windup in a figure of $12.3

10   million that they were over paid, your Honor.

11         THE COURT:  No, I understand.  You think that the

12   liens really are not a positive amount.  You think in effect

13   they're a negative amount; that is, they owe you, Pennantia.

14   Pennantia doesn't owe them.  I understand that.

15         MR. FREVOLA:  I'll also go through a few other things,

16   your Honor, in terms of, there's a number of different points

17   here.  Another point is the fact, your Honor, that with regards

18   to the condition precedent.  Again, amendment --

19         THE COURT:  I want you to be focusing on

20   irreparability.

21         MR. FREVOLA:  I have, your Honor, and I'm trying to

22   actually point to you the fact that we believe that there are

23   so many reasons why the likely of success is so strong, that if

24   you feel that the irreparability is a little bit on the lower

25   side, if the strength --

P8CBPENC

1          THE COURT:  Okay.  We'll get to success on the merits.

2    Right now I just want to focus on irreparability.

3          Mr. Lennon.

4          MR. FREVOLA:  I gave you the two points on that.  In

5    other words, the difficulty of recovering, and also the

6    argument that quantifying it's going to be difficult to find.

7          THE COURT:  Right.

8          MR. FREVOLA:  Thank you, your Honor.

9          THE COURT:  Mr. Lennon, what do you want to tell me

10   about irreparability?

11         MR. LENNON:  What I'd like to tell you, your Honor, is

12   there is none.  You just had a long discussion asking

13   Mr. Frevola some questions about what the irreparable harm

14   would be given that monetary damages would compensate the

15   plaintiff, assuming it ever succeeded on its claims, and he

16   didn't really point you to anything.

17         THE COURT:  Yes.  He pointed me to the Trump

18   declaration that said, on information and belief -- and I don't

19   think I need to focus only on admissibility documentation here.

20   The point was, there's information in the record on information

21   and belief that there are no other assets to the defendants,

22   apart from the vessels.  And they're going to go out of

23   business if there's any monetary judgment against them.

24         MR. LENNON:  That's not quite what he said, your

25   Honor.  What he did say was that he didn't believe that the

P8CBPENC

 1    defendants, he lumped them into one, RCM and DC.  And here

 2    we're just talking about DC, Dove Cay, that they didn't have

 3    any additional business to do beyond the work that they're

 4    doing to service this fleet.  And from that they conclude we're

 5    going out of business and we're insolvent.  Neither of which is

 6    true.  There are valuable assets that exist within Dove Cay.

 7            THE COURT:  Is that in this record?

 8            MR. LENNON:  Well, there's been --

 9            THE COURT:  I have to deal with the record as it

10    exist.  Is there record evidence here that Dove has assets

11    additional assets?

12            MR. LENNON:  I don't believe I can point you to

13    anything in the record that says they have this asset holding

14    or that asset holding.  What I think is in the record is

15    evidence -- and I don't think it's disputed -- that they employ

16    the crews that operate these vessels.  Those are their

17    employees.  They have their own reputation having been built up

18    --

19            THE COURT:  You're talking about Dove now?

20            MR. LENNON:  Correct, Dove's employees, the crew.  In

21    this market, in this Jones Act market -- and there are people

22    sitting here in this courtroom who operate in that market by

23    the way -- the employees on these tugs are a scarcity.  It's a

24    valuable asset.

25            THE COURT:  That's not in this record.

P8CBPENC

1          MR. LENNON:  Well, what is in the record, your Honor,

2     is that we are the employer, and they desperately want to take

3     our employees, one of the reasons they were going on the

4     vessels.  So when you're asking me about what assets they have,

5     that's what I can point you to that I believe is undisputed in

6     the record, that we employ the crew, so that is an asset.  What

7     we do going forward -- and once this business is concluded --

8     is another question, but it is in evidence that we're going out

9     of business that we don't have other employment.  It also is in

10    evidence, other than Mr. Trump --

11         THE COURT:  Wait just a moment.  Go ahead, sir.

12         MR. LENNON:  I don't think there's anything in the

13    record, your Honor, besides Mr. Trump's hearsay statement that

14    the company is insolvent or it's going out of business.

15    There's just nothing in the record to support that.  And I

16    would go so far as to say, even if that were true, which it's

17    not, that doesn't support a finding of irreparable harm anymore

18    than when we make our claims.  We think they're going to go out

19    of business.  In fact, I would go so far as to say the reason

20    we're standing in this court today is because Pennantia is not

21    a going concern.  This company is unable to pay its debt as

22    they come due.  It's been going on for the entire time that

23    we've been managing this fleet.

24         That doesn't mean that we couldn't be compensated by a

25    money damage award against them for the purposes of an

P8CBPENC

1  injunctive application like the one you're hearing.  It's just

2  not irreparable harm.  It's almost a fundamental tenet of the

3  law that if money damages can compensate, there is no

4  irreparable harm for purposes of issuing an injunction.

5      THE COURT:  Well, the plaintiff agrees with you on

6  that black letter principle.

7      MR. LENNON:  And the only thing that they've cited are

8  cases where, in the absence of an injunction, a business would

9  be destroyed.  And the cases, at least one of them, talk about

10  franchise agreements where the franchise order terminates the

11  franchise.  And the plaintiff, who is the franchisee, is unable

12  to operate its business at all.  That will not happen.  That

13  cannot happen in this instance because of the exercise of

14  maritime liens, or any claims that Dove Cay have against

15  Pennantia because we can't take their fleet away.  They own the

16  fleet.  They will still own the fleet when this business is

17  done, assuming they don't sell it to a third party.  But

18  nothing about our liens deprives them of their assets.  It

19  doesn't deprive them of the ability to do business.

20      THE COURT:  All right.  Thank you.  I want to move on

21  to another area.  Pennantia, you keep on using the term; that

22  is, Mr. Frevola, you keep on using the term that Dove and Rose

23  are corporate doppelgangers.  I'm not quite sure that's a legal

24  concept, but I do understand the legal concept of alter ego.

25  It seems to me that you haven't shown the alter ego.  You

P8CBPENC

1    haven't shown the requirements that are necessary for me to say

2    Rose and Dove are alter egos.

3          As I understand the law on that, there has to be near

4    identity of the two entities going to -- doesn't have to be all

5    of these factors -- of employees, officers, directors, offices.

6    There really can't be any separate corporate existence.  I

7    don't think you've shown that; again, on this record.  So speak

8    to me about that, Mr. Frevola.

9          MR. FREVOLA:  Your Honor, if you notice in our reply

10   brief doesn't really harp on that because I think seeing these

11   documents between DC and -- sorry Dove Cay and RCM, for

12   example, that agreement they entered into, things like that,

13   show it being less of a just jumble up and we'll just bill

14   people for it.  It looks like they had a contract.  We're not

15   sure that contract is valid or not in terms of when it was

16   actually executed.  But for the record right now, your Honor,

17   there appears to be an arm length contract between the parties.

18   And, your Honor, I would note that, as a result of the fact

19   that they are separate entities, the idea that Dove Cay is

20   trying to use RCM's 3 percent penalty interest rate out of the

21   ship management agreement is kind of peculiar because they have

22   a contract that separates them.

23          So, your Honor, I think that we're not really making

24   that argument in the reply brief.

25          THE COURT:  All right.  That's helpful.

P8CBPENC

1          MR. FREVOLA:  I will say, your Honor, that if you look

2     at our argument about entities that are close to the vessel,

3     that are not strangers to the vessel, your Honor, I do think

4     that even in the Dove Cay situation, if you look at the case

5     law, the parties that are supposed to get liens are what you'd

6     you call a special agent as opposed to a general agent I

7     believe the two terms, your Honor.

8          THE COURT:  Well, you want the lienor to be not an

9     owner.  You want it to be a stranger to the vessel.

10          MR. FREVOLA:  And so if a vessel pulls into Haifa,

11     Israel, for example, and a local agent windups procuring

12     bobbers and food and stuff like that for the ship.  And they

13     get it all to the ship and they load it on the ship and the

14     ship disappears down the Mediterranean and it's gone.  It turns

15     out, they don't get paid for that.  There is a policy allowing

16     them to lien the vessel where they can find it to get paid.  As

17     the cases that we cited to your Honor in our reply brief show

18     though, when you got a situation where you got someone who's

19     managing a vessel in a continuity over years and a fleet of

20     ships, that falls away because they have control.  They have --

21     they're essentially insiders in terms of knowing what the ship

22     owner's finances are.  And they clearly say they know what the

23     ship owner's finances are.

24          THE COURT:  Wait. You can't be making the argument

25     that if a supplier of necessaries knows how things work on the

P8CBPENC

1   particular vessel and what the corporate relationship is that

2   they are, therefore, owners unable to assert liens.

3           MR. FREVOLA:  No, I'm not saying that, your Honor.

4   Remember, the claims here are for management fees.  They're not

5   for necessaries.

6           THE COURT:  Yeah, we need to get into that.  Let me

7   ask.  Let me switch to Mr. Lennon on that.  Mr. Lennon, is your

8   argument -- I guess I got a twofold question here.  Is your

9   argument that the credit receivables are necessaries?  That's

10  one thing I want you to go down.  And do you have a basis for

11  the liens apart from the credit receivables?

12          MR. LENNON:  Yes.

13          THE COURT:  Answer each of those.

14          MR. LENNON:  Your Honor, there basically are two

15  components to the claims that my clients have against

16  Pennantia.  One is the credit receivables that you touched

17  upon.  Those credit receivables are made of things that

18  constitute necessaries.  So calling them credit receivables

19  simply puts a generic label on what the amounts are for.  The

20  amounts arose as a result of necessaries that gave rise to

21  maritime.

22          THE COURT:  I don't understand that.  The credit

23  receivable arises from a capital infusion by Contrarian Capital

24  Management and Rose Cay.  So this is an indebtedness to those

25  who gave the capital infusion; and for some reason that you

P8CBPENC

1    guys call it credit receivable.  But it's an obligation from a

2    loan or a credit infusion.  It's not because of necessaries.

3    It's not because of crew wages.  It's the repayment of a loan.

4              MR. LENNON:  That's not correct, and that's my point

5    about putting that label on what we're talking about.  And I

6    believe the label that is being used is intended to refer to

7    the fact that these receivables, Dove Cay's receivables, some

8    of them, when Pennantia couldn't pay down those amounts, some

9    of the Dove Cay's receivables were purchased by Contrarian, the

10   parent of Pennantia, and a receivables purchase agreement

11   transaction, actually a series of receivable purchase agreement

12   transactions.

13             THE COURT:  Is that in this record?

14             MR. LENNON:  It is in the record, your Honor.

15             THE COURT:  Where?

16             MR. LENNON:  There are references I believe.  I don't

17   know it by gospel, but in the declaration of the accountant, at

18   least he talks about the receivables.  And I believe in Alex

19   Parker's declaration, which let me just find it for you, your

20   Honor.  I'm being told it's also in Mr. Trump's second

21   declaration.

22             THE COURT:  All right.  I have the Parker declaration

23   33.  What do you want to show me?

24             MR. LENNON:  Let me just sparse through that, your

25   Honor.  Give me one moment.

P8CBPENC

1          Your Honor, if you look starting on page 10 at --

2   really starting at paragraph 54 and carrying on, Mr. Parker

3   discusses --

4          THE COURT:  Let me read it.

5          MR. LENNON:  Sure.

6          THE COURT:  No.  All he is talking about is the

7   indebtedness due to the capital infusion and that things were

8   underfunded.  That doesn't tell me that the credit receivables

9   were based on necessaries.

10         MR. LENNON:  If you look at paragraph 57 he breaks it

11  down.

12         THE COURT:  Well, Parker is saying that $13 million is

13  crew wages, correct?

14         MR. LENNON:  Well, he's saying 16.4 which is --

15         THE COURT:  Well, let me focus just on the 13 million

16  in B.  13 million in Dove Cay crew wages, right?

17         MR. LENNON:  Correct.

18         THE COURT:  But in your opposition brief at page 12

19  you have 13 million in unpaid invoices and accrued interest.

20  Those sums are the same.

21         MR. LENNON:  Correct.  But if you look he refers or

22  cited --

23         THE COURT:  Are we talking about the 13 million being

24  crew wages, which my simpleminded way of looking at it says

25  those are necessaries; or are we talking about the 13 million

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P8CBPENC

1 being accrued interest in unpaid invoices.  Who knows what the

2 unpaid invoices are for.

3          MR. LENNON:  This was my point, your Honor.  You see

4 the reference on page 12 of the brief to Mr. Parker's

5 declaration at paragraph 57, which is what we were just looking

6 at.

7          THE COURT:  Yes.

8          MR. LENNON:  And he refers to 13 million being crew

9 wages.  That 13 million is made up of the amounts paid to the

10 crew that were never reimbursed, plus accrued interest.  That's

11 how we get to 13 million.  On that score, your Honor, I believe

12 it isn't really disputed between the parties what those amounts

13 relate to.  It never has been.  In fact, those are the amounts

14 that they admit are owing.  Mr. Trump refers to --

15          THE COURT:  But I'm focusing on what's a necessary and

16 what isn't.  Because as I understand the requirement of a lien,

17 you need a necessary supply to the vessel.

18          MR. LENNON:  Correct.  The crew wages are the

19 principal amount in the $13 million.  And there's some dispute

20 between the parties as to whether it's less than $5 million or

21 more than six, but there's no dispute about what it is.

22          THE COURT:  Mr. Frevola, do you agree with that, that

23 we're talking about four to six million of the 13 million in

24 crew wages?

25          MR. FREVOLA:  Your Honor, we agree --

P8CBPENC

1        THE COURT:  Yes or no?

2        MR. FREVOLA:  We agree, your Honor, that there is a

3   charge of about -- it was about 4.9 million in principal in

4   February of 2025.  After $600,000 was paid -- I'm sorry, the

5   first week of March 2025.  And we agree that one percent

6   interest per month has agreed on that number since then, your

7   Honor.  That number comes out to I believe right around $5.7

8   million, your Honor.  And not only did Dove Cay's invoices

9   throughout this time period, your Honor, include crew.  About

10  20 percent of it included shoreside personnel, your Honor, so

11  it wasn't all crew.

12        THE COURT:  No, but I assume both of those categories

13  are necessaries.

14        MR. FREVOLA:  Shoreside personnel are not, your Honor.

15  That's under *Piedmont & St. George's Creek Coal Company*, I

16  believe that would not be considered a lien.

17        With regards to this number, the principal number,

18  your Honor, there is an agreement that somewhere in the

19  mid-five million range was an amount outstanding on the credit

20  receivables.  If you look at Mr. Crescenzo's declaration, it

21  appears that since that time period with the 4.7 million that

22  has been received by Dove Cay and applied to their debt, it

23  looks like, your Honor, there's about a million dollars left on

24  the credit receivables claim, so long as you don't windup

25  charging this 36 percent interest rate retroactively that came

P8CBPENC

1    out of nowhere, your Honor.

2            If you use the one percent interest rate from April 1,

3    2024, onwards, our position is with the 4.7 that they received

4    recently, there is $1,038,262.57.  I can pass something up and

5    pass around to counsel.  It is a tables figure that was run by

6    Mr. Crescenzo this morning on this interest issue.

7            THE COURT:  No, I don't need it.

8            MR. FREVOLA:  Your Honor, though, in terms of the

9    principal issue, I would --

10           THE COURT:  It sounds like there's an agreement or a

11   concession that a material part of the credit receivables are

12   due are from necessaries.  Is that accurate?

13           MR. FREVOLA:  No, your Honor.  Actually, I was going

14   to point out something. I'm talking about, there's an agreement

15   that there is a debt owed --

16           THE COURT:  Yes.

17           MR. FREVOLA:  -- on that figure.  Whether or not it

18   constitutes as necessary, your Honor, is definitely disputed.

19           THE COURT:  No.  But aren't you not disputing that a

20   material amount of that is crew wages or am I wrong?

21           MR. FREVOLA:  No, your Honor, it's not crew wages.  In

22   fact, if you look at Mr. Trump's second declaration and you

23   look at exhibit 5, which is document 43-5.

24           THE COURT:  Yeah, I don't have it.  Go ahead.

25           MR. FREVOLA:  Now, your Honor can see, this is to

P8CBPENC

1   Pennantia from Dove Cay signed by Mr. Parker.  And if you look

2   at the first paragraph, your Honor, at the end of the second

3   sentence talks about a financing charge.  And then the third

4   sentence in the middle, this vendor financing.  It's not

5   necessaries.  It's not crew.  It's vendor financing.  Your

6   Honor made the part that essentially this is capital finance.

7   And, your Honor, that's what it was.  The way it was

8   memorialized in their records was they essentially kept

9   essentially invoices being less than 90 days payable.  That's

10  the way they reflected it on their books.  But every single

11  time that a necessary, a crew wage invoice went into Bill.com,

12  your Honor, the exact amount was paid for that invoice.

13       Now, Mr. Trump can't control when the money comes into

14  Dove Cay's books, if they decide to say, oh, thanks.  I'm going

15  to pay it for something else, or I'm going to charge you a 36

16  percent finance charge, which is not memorialized in any of our

17  agreements anywhere.  I mean, someone could do that to you.  A

18  credit card company could do it to you, your Honor.  It doesn't

19  mean that the debt is legit.

20       And this is why, your Honor, we spent a lot of time on

21  the allegation issue in the reply brief because it's an

22  important issue.  Every time a crew wage claim, an invoice came

23  in for wages and shoreside personnel from Dove Cay, the exact

24  amount went out to pay that invoice every time.  Mr. Crescenzo

25  vouches for that as well.  This is something where the device

P8CBPENC

1    that was used was to keep some invoices open in the amount of

2    about 5.5 million.  Everybody accepted what that was.  But like

3    your Honor said, it was a vendor financing issue.

4           And quite frankly, your Honor, if you're talking about

5    this is like a mortgage, even if it was considered to try to be

6    a mortgage, you need to register mortgages on vessels and

7    things like that.  So under the Ship Mortgage Act, they

8    couldn't even get a lien as a mortgage on this because they

9    didn't record it, if that's what it was suppose to be, and it

10   wasn't.  Your Honor's got this right.  It's vendor financing.

11   It's capital financing to the companies.  It was treated like

12   that by everybody until the end of '24, early '25, when all of

13   a sudden this number starts popping up saying, we're charging

14   you this, and we're charging back interest.

15          THE COURT:  Thank you.  Let me go back to Mr. Lennon.

16          Mr. Lennon, I understand your position that a material

17   part of the credit receivable is necessaries, that is the crew

18   wages.  Apart from that argument, do you have any necessaries

19   that you can point to that support the lien?

20          MR. LENNON:  Are we still talking about the 13 million

21   alone?

22          THE COURT:  No.  Let's talk about the 29.

23          MR. LENNON:  Right.  So the 29, if you, again, going

24   back to -- you had pointed to page 12 of our opposition brief

25   where paragraph one talks about the 16.4, which is one

P8CBPENC

1    component of the 29.  That was for technical and crew and

2    services.  And I think it's important here to take a brief

3    pause to think about the position that Pennantia is advocating

4    before the Court.  What they're really saying, aside from what

5    I think is a misnomer to call this vendor financing.  It wasn't

6    vendor financing.  It war for crew wages.  That's what

7    Mr. Parker's testified to in his affidavit.

8           To accept their position as to assume that Dove Cay

9    was created and went through all the time and effort to replace

10   the prior manager Foss with their knowledge and consent, and

11   did it without the goal of making any money as a going

12   business.  Because what they're basically saying is we agreed

13   to simply charge the costs for the crew, the other necessaries

14   that were supplied to the vessel, operate those vessels, and

15   make no money while doing it.  That's their position. That's

16   what they're really telling you, and it's preposterous.  I

17   mean, no business does that.  This business is not a

18   not-for-profit.

19          But coming back to your question, your Honor, the 16.4

20   million is exactly what he says. It's for the technical

21   management of vessel which has never been paid.  Never been

22   paid.  And we can get into all the detail that you'd like on

23   the likelihood of success on the merits because I have answers

24   to every one of points they've made about whether or not the

25   technical manager that Dove Cay is, is entitled to a lien.

P8CBPENC

1          THE COURT:  Let me go back to the receivables, the

2    credit receivables.  What is the basis for your contention that

3    the credit receivables are due and owing; when, as I understand

4    the underlying documents, there seems to be an agreement that

5    the credit receivables will seem to be carried, that there's no

6    point at which they're due and owing.  Am I right about that?

7    I don't have the document in mind, but I have a picture in my

8    mind of the statement in a document, in a contract that they'll

9    continue on infinitum as an open item.

10          MR. LENNON:  I don't think you'll find that in any

11   contract, your Honor.  What I do think you'll find is

12   Mr. Trump's own testimony that it was an understanding that

13   this amount would be deferred until certain triggering events

14   happened.

15          THE COURT:  That's exactly what I'm referring to.

16          MR. LENNON:  And the triggering events were that the

17   company was making sufficient revenue to pay down that amount,

18   or there was a sale of the fleet.

19          THE COURT:  And neither of those, at least in this

20   record, has occurred.  There hasn't been a sale, and there

21   hasn't been a statement as to the former requirement.

22          MR. LENNON:  Well, there has been operating revenue.

23   That's for certain.  They are operating part of the fleet.

24   They never operated the complete fleet for reasons that don't

25   make any sense to me, but they have operated parts of the fleet

P8CBPENC

1    and generated revenue.  And so if you recall when we were here

2    last we had a big discussion about the $2.3 million payment

3    that Rose Cay paid to Dove Cay on some of these outstanding

4    receivables. And that's why the amount kept changing on what

5    we're calling it as a misnomer, credit receivables.  But that

6    was out of operating revenue.  There was all sorts of operating

7    revenue.  There continues to be operating revenue.

8             THE COURT:  What was the first requirement that you

9    just pointed me to in terms of Mr. Trump's affidavit?  There

10   were two requirements.

11            MR. LENNON:  One was that there be a sale of the

12   fleet.

13            THE COURT:  Right.  I'm not talking about that one.

14            MR. LENNON:  The first point I mention was that there

15   would be sufficient operating revenue.

16            THE COURT:  But there's never been a determination of

17   that, correct?

18            MR. LENNON:  Right.  But what he's saying is, this is

19   the course of the dealing.  This is what the parties sort of

20   did, but there's no document to tell you what the determination

21   is or who makes the determination.  So it's not -- I think

22   they'd like you to believe --

23            THE COURT:  And, therefore, the determination has not

24   been made.

25            MR. LENNON:  Well, it's certainly been made by Dove

P8CBPENC

1    Cay and Rose Cay to that extent.

2            THE COURT:  So you unilaterally declared them due and

3    owing credit receivables on that basis?

4            MR. LENNON:  Yes.

5            THE COURT:  All right.

6            MR. LENNON:  For who reasons.

7            THE COURT:  Mr. Frevola, what is your response?

8            MR. LENNON:  For two reasons, your Honor.  One is that

9    there was operating revenue; and two, they have had this fleet

10   for sale, up for sale, the triggering event for going on a

11   year.

12           THE COURT:  So what.  There's nothing in the contract

13   that I've seen that talks about any time period.

14           MR. LENNON:  This is my point.  There's no contract

15   that talks about any of this.  There is no contract.  I can't

16   point and they cannot point to you a contract that says, this

17   is how we will deal with this so-called credit receivable, and

18   this is when it gets repaid.

19           THE COURT:  All right.  Mr. Frevola, what's your

20   response to Mr. Lennon's point that Dove Cay is decided there's

21   sufficient operating revenue to trigger that first requirement

22   in Mr. Trump's affidavit.

23           MR. FREVOLA:  Well --

24           THE COURT:  Everyone agrees there's been no sale.

25           MR. FREVOLA:  I think it's quite funny, your Honor, in

P8CBPENC

1    that they -- out of one side of their mouth, they're talking

2    about how, they're getting out of this business with Pennantia

3    because Pennantia is cash starving them and doesn't have money

4    and we have to get out of it. That's what they're saying on one

5    side.  On the other side they're saying, there's been enough

6    cash in the company to take this multimillion dollar payment

7    out because there's enough revenue.  I mean, which is it?  It

8    can't be both.  That's item one, your Honor.  I got a couple of

9    items here that I'd like to point out.

10            THE COURT:  Go ahead.

11            MR. FREVOLA:  Amongst other things, your Honor, in

12    April of this year, Contrarian had to put another $4 million

13    into the company, into the fleet, because of cash burn on the

14    fleet.  So, in other words, there was an addition to the CCM

15    receivables in April of $4 million.  So in terms of the company

16    being flush, the company is not flush.  So the idea that that

17    was something that -- there was revenue to go around, your

18    Honor, just isn't true.

19            Moving on in this.  In terms of -- Mr. Lennon made the

20    point about -- earlier about Dove Cay not getting into this

21    business for free.  I'll point a couple of things out to your

22    Honor.  First of all, there was a hundred thousand dollars a

23    month extra charge for technical management, things like that.

24    That's $1.2 million above and on top of paying the crew and the

25    shoreside personnel.  In other words, you're talking about all

P8CBPENC

1    employees, everybody's contracts, their employment agreements

2    paid, and 1.2 million being paid to Dove Cay on the management

3    side.  And remember, Dove Cay is basically doing a subsidiary

4    role for RCM, which is got their shipment management agreement

5    as well.  So Mr. Parker's got a company up here and a company

6    here.  And the one down here got a $1.2 million fee their

7    making over the course of a year.  So there is profit there.

8            On top of that, your Honor, if you look at the timing

9    of the agreements here, the amendment eight to the Foss MOA.

10   The one where apparently there are slave wages that Mr. Parker

11   would never agree to doing this.  That document was signed six

12   days before the CTMA.  In other words, Mr. Parker was aware

13   that the Foss amendment eight was signed cause he signed it

14   less than a week before he then agreed to the CTMA where the

15   Foss documents, the Foss contract would be incorporated into

16   it.  In other words, he made the deal.  And, your Honor, I

17   mean, I had Monroe Freedman for contracts out in Hofstra talked

18   about the case, considerations is consideration, and a

19   peppercorn could be consideration.

20           Your Honor, there's no question that consideration was

21   being exchanged.  If they don't like the deal that they cut,

22   that's not grounds to rewrite the deal, your Honor.  There's

23   contracts here.  And they didn't produce the contracts here,

24   your Honor, because we're now using the contract against them;

25   as opposed to this amorphous, a 10 percent management fee is

P8CBPENC

1    fair in the industry.  The management fee is in amendment

2    eight, and it says exactly what it is, and it says it's an all

3    inclusive charge.  You don't get to throw extra changes in on

4    that.  So that's the issue in terms of, not in it for free,

5    your Honor.

6              With regard to the sale of the fleet.  There have been

7    offers to basically take care of this credit receivables thing

8    at the closing, your Honor.  My client would -- I think

9    Mr. Trump would go on the record here right now saying, your

10   Honor, at closing, we will do this, and agree to that.  Would

11   you not, Mr. Trump?

12             THE COURT:  Wait.  Wait.  Wait.  Wait.  What is the

13   relevance of that to this record on a preliminary injunction?

14             MR. FREVOLA:  There's an issue in terms --

15             THE COURT:  It seems to me that's for your mediator,

16   not for me.

17             MR. FREVOLA:  But there's been concern about fear

18   about getting paid, about somehow they're not going to get

19   paid.  DC is going to get paid on the receivables number at the

20   one percent from April 1st onwards, April 1, 2024, one percent

21   a month interest rate.

22             THE COURT:  Again, this is for the mediation.  This is

23   for your ultimate determination of who owes what to whom.  It's

24   not for me now on the preliminary injunction if the mediation

25   is successful.  It may be for this case.  But right now the

P8CBPENC

 1    focus has to be the requirements of a preliminary injunction

 2    and nothing more.

 3            MR. FREVOLA:  Sorry, your Honor.  I think I've

 4    answered your question on the revenue issue, the sufficient

 5    revenue, and I did raise that one issue I wanted to previous

 6    about the contract, so I think I'm done on my side.

 7            THE COURT:  Do you view this, your request, as a

 8    mandatory or a prohibitory injunction?  In other words, are you

 9    simply trying to prevent something from happening, or are you

10    requiring asking me to require Dove Cay do something

11    affirmative?

12            MR. FREVOLA:  We are asking for something affirmative,

13    your Honor.

14            THE COURT:  What is it?

15            MR. FREVOLA:  We're asking for them to pull the

16    notices of lien from the U.S Coastguard, to have them remove

17    from the National Vessel Documentation Center.

18            THE COURT:  Okay.

19            MR. FREVOLA:  We're also asking, your Honor, that you

20    order them to release the arrest in Panama.  And the reason

21    being, they're here before you, your Honor.  They're subject to

22    your jurisdiction.  You can order them to do that.

23            THE COURT:  Well, isn't the arrest based on the lien?

24    And so if a lien falls, then the arrest has to be withdrawn by

25    somebody in Panama, not by me.

P8CBPENC

1      MR. FREVOLA:  Well, your Honor, again, Dove Cay is the

2  one who arrested in Panama.  If you tell them here that they're

3  enjoined from doing that arrest, I guess they could not do it,

4  your Honor, but they would then suffer consequences here, your

5  Honor.

6      THE COURT:  I understand.  That makes sense to me.

7  Thank you.  Is there anything else you wanted to say,

8  Mr. Frevola?

9      MR. FREVOLA:  Actually, your Honor, yes.  There was

10  one thing I did want to -- this is just ministerial.  In the

11  haste to try to get the papers in, there were two errors on our

12  papers.  One is on page two of our brief, document 41.

13      THE COURT:  Just a moment.  Yes, sir.

14      MR. FREVOLA:  If you look down at the second to last

15  line on that page.

16      THE COURT:  What page?

17      MR. FREVOLA:  It's the second page of our brief, but

18  it is page six of 20.

19      THE COURT:  Yes, I have it.

20      MR. FREVOLA:  Down at the bottom it says 15 million.

21  That should be 12.3 million, your Honor.

22      THE COURT:  In the Penn ultimate line?

23      MR. FREVOLA:  Yes, your Honor. That was kind of like a

24  holding number when we had Mr. Crescenzo doing his number and

25  screwed it up.  If you look a few pages back.  This one is more

P8CBPENC

 1  substantive in terms of cause it's a cite to the record.  If

 2  you look at page eight of our brief which is ECF page 12 of 20.

 3          THE COURT:  Yes.

 4          MR. FREVOLA:  At the very top there is a cite at the

 5  end of the first line into the second line.  It says Trump

 6  declaration.

 7          THE COURT:  Yes.

 8          MR. FREVOLA:  That actually should be Crescenzo

 9  declaration paragraph 16 to 23.  And if I may, your Honor, the

10  reason why that's important, if you look at the Crescenzo

11  declaration, which is document 42.

12          THE COURT:  Yes, I have it.

13          MR. FREVOLA:  This goes to the interest rate.  If you

14  look at exhibit 1, that is March 1, 2024.

15          THE COURT:  I don't have the exhibits to Crescenzo.

16  Go ahead.

17          MR. FREVOLA:  It is an exhibit which is the exhibit

18  that was first put onto Bill.com when this invoice was rendered

19  back in -- just before March of 2024.  And at the bottom of

20  it -- I'm sorry.  I take it back.  Exhibit 1 is what's on

21  Bill.com right now.  If you look at exhibit 3 of the Crescenzo

22  declaration, you've got the same invoice, same date, but there

23  is no footer on that invoice.  That was the invoice that was

24  originally issued in 2024.  This new one came up on the system

25  in May of '25.  Similarly, exhibits 2 and 4, show the same

P8CBPENC

1    thing.  That's why I wanted to make sure your Honor had that

2    cite right, cause you can actually compare the invoices showing

3    that this whole 36 percent interest, three percent per month

4    that they have on invoices are on invoices that were backdated

5    and only put onto Bill.com in the last couple of months, and

6    never were being notified of this back when they were actually

7    being issued.

8              THE COURT:  I understand.  Mr. Lennon, is there

9    anything you wanted to add to tell me?

10             MR. LENNON:  I do, your Honor.

11             THE COURT:  Speak to likelihood of success on the

12   merits for a moment, then tell me whatever you want.

13             MR. LENNON:  Can you repeat that, your Honor.

14             THE COURT:  I said speak to likelihood of success on

15   the merits to the extent you haven't already addressed it.

16             MR. LENNON:  I think there's a lot to say about the

17   likelihood of the success on the merits, your Honor, and most

18   of it is addressed in our papers.  But first of all what I

19   would say is, unequivocally the amounts that we're claiming,

20   just putting aside the interest components to those amounts,

21   are necessaries.  They, under Simla, are entitled to lien

22   treatment.  The arguments they've made that Dove Cay isn't a

23   stranger to the vessel and they're a general agent are

24   factually inaccurate.  There is no relationship directly

25   between Pennantia and Dove Cay.  Mr. Trump admits that they're

P8CBPENC

1    not a party to any agreements with Dove Cay.

2         Dove Cay was engaged by Rose Cay Maritime to replace

3    Foss as the technical manager.  There was a big dispute between

4    these parties about the Foss agreement, and Foss was claiming

5    maritime liens against the vessels.  There was a big concern

6    for Pennantia that the vessels not get arrested because of

7    those liens. This is just chapter two of the same story. And

8    the genesis of both stories is, the underperforming

9    underpayment by Pennantia of their contractural obligations

10   under the Ship Man contract.  They have never lived up to that

11   contract by funding the business properly.  It was never done,

12   and that's where you get to this so-called trade receivable

13   issue that we talked about before.

14         But on the likelihood of success.  We've satisfied all

15   of the elements to show that we're entitled to lien status.

16   They have the burden to showing that it's more likely than not

17   that we're not, and they failed to do that in several different

18   ways.  The arguments that they're making now in desperation --

19   and I should add with some emphasis -- in their reply papers

20   are not arguments that they featured whatsoever in their moving

21   papers.  All of these arguments came out in the reply papers.

22   Almost all of the evidence --

23         THE COURT:  But some of that was due to the moving,

24   the underpinning facts that came to light through the time the

25   motion was already made.

P8CBPENC

1          MR. LENNON:  I would disagree with that, your Honor.

2     I don't think there's anything that we put in our papers -- and

3     there certainly wasn't anything they put in the scant seven

4     pages of their main brief that touch on the issues we're here

5     to discuss today that relate to the issues that they're now

6     arguing expansively on in their reply; of which we had

7     virtually no time to really assess this evidence, this

8     affidavit from the accountant that was jointly utilized by both

9     parties.

10         THE COURT:  I know you asked for an adjournment of

11    this conference and to put in more papers, but I wanted to hear

12    these matters now.

13         MR. LENNON:  And I understand and appreciate that,

14    your Honor, because I think on the two most important aspects

15    of what we have discussed here today, their application for an

16    injunction fails.  And it fails most importantly because of the

17    irreparable harm issue.

18         There is a point I wanted to add.  You asked me what

19    assets my clients have.  And that one thing that I forgot to

20    point out was that --

21         THE COURT:  What assets your clients have that are in

22    the record.  That's what I asked.

23         MR. LENNON:  Yes, in the record.  And in the record,

24    both with I think in Mr. Trump's own declaration and the

25    declaration of the accountant that we received less than 48

P8CBPENC

1    hours ago, they both talk about the receivables that are owed

2    to Dove Cay.  That is an asset.  Those receivables that are not

3    disputed.  Mr. Frevola did an amicable job of trying to

4    distinguish and lower the amount, but he still couldn't get it

5    anywhere close to less than a million dollars.  We obviously

6    dispute that, and don't accept that they put in any actual

7    evidence that undermines the amounts that we're claiming.  So

8    that is something I did want to add just so your Honor

9    understood my response earlier when you asked me about what

10   assets they have.  Those receivables are also assets.

11           On the likelihood of success.  This argument that

12   Mr. Frevola just recounted to you about the one-page commercial

13   management or technical management agreement between Rose Cay

14   and Dove Cay that incorporates by reference the Foss agreement.

15   He has harped in his papers and here today on amendment number

16   eight.  And I made a point a moment ago talking about the

17   dispute between Foss and Rose Cay, and in the background

18   Pennantia, over that technical management agreement.  Amendment

19   eight was made in the context of resolving those disputes.  And

20   if you read from start to finish, that document talks about

21   transitioning from Foss's management to a third party, another

22   technical manager's document of compliance.  That's what that

23   agreement was for.

24           And that agreement specifically provides for certain

25   mechanisms between the parties about liens and not exercising

P8CBPENC

1  liens, but not waiving liens.  It expressly says that.  It also

2  provides for arbitration; which if they're right, and they're

3  trying to claim that they're somehow entitled to enforce those

4  provisions in that agreement, we shouldn't be here.

5          THE COURT:  I did see that, yes.

6          MR. LENNON:  There would be no jurisdiction here.  But

7  that agreement --

8          THE COURT:  But nobody's asking for that here.  You're

9  not.  They're not.

10          MR. LENNON:  Well, we just saw it, the argument.  And

11  what I'm saying to your Honor is, if that document is found to

12  somehow be dispositive of any of the issues we're talking about

13  here today, we very much would raise that issue; because I

14  think it goes to the Court's subject matter jurisdiction to

15  hear these disputes.  We don't think we're bound by it for the

16  reasons I'm going to explain.  That that document terminated by

17  its own force and effect.  Once the vessels were delivered from

18  Foss to somebody else and they're to return them pursuant to a

19  protocol of delivery and acceptance.

20          THE COURT:  Why does that one pager incorporate the

21  Foss agreement if it had already terminated?

22          MR. LENNON:  Because the point of that agreement is

23  effectively shorthand.  The parties well-understood. It was

24  Pennantia, and Mr. Trump was intimately involved in these

25  discussions about how to replace Foss, and was relying on Rose

P8CBPENC

1    Cay to do that.  And the understanding was that they couldn't

2    come to a separate agreement, and so that Dove Cay would

3    basically operate an invoice pursuant to the terms in the LOA.

4    Not the amendment number eight, which I just pointed out

5    terminated made by its own force and effect, but that was the

6    operational structure.  So that's why there's a one pager,

7    because they went to the Foss agreement and said we're going to

8    basically bill on those same terms.

9            So that's where you get this whole argument about the

10   interest and whether they're entitled to interest or not and

11   the uplift of the 10 percent and necessaries.  That all comes

12   out of the LOA.  But all we're talking about when we talk about

13   all these things is the quantum of the lien plan, not the

14   actual validity of the lien plan.  We spent all this time

15   talking about quantum and the accountant and how much is this

16   and how much is that.  But as we discussed a moment ago, there

17   are certain amounts that are totally undisputed.  And the

18   evidence is in the record, and Mr. Parker has said, these are

19   for crew wages and necessaries, fuel, grub that was supplied to

20   the vessels, transportation of the crew to and from the vessels

21   when they're on and off work.  All of those things constitute

22   as necessaries.

23           So in terms of their burden of carrying -- or carrying

24   their burden of proving a likelihood of success on the merits,

25   they just simply fail to do so on this record.  There's just

P8CBPENC

 1    not sufficient evidence to show that we're not entitled to a

 2    lien.  There's not sufficient evidence to show that we don't

 3    have certain amounts that are entitled to claim liens on.  And

 4    again, the irreparable harm, I think is in my view the most

 5    important factor here.

 6            THE COURT:  All right.  Thank you. I appreciate it.

 7            MR. FREVOLA:  Your Honor, may I respond?

 8            THE COURT:  Yes.

 9            MR. FREVOLA:  Your Honor, like I said, the one-page

10    document speaks for itself. I mean it says that not only the

11    Foss LOA, the original Foss LOA, but as well as any subsequent

12    extensions and amendments to the LOA with their respective

13    appendices are hereby incorporated by reference into this

14    agreement and shall be considered part of this agreement and

15    shall be performed subject to the terms and conditions therein,

16    eight days afterwards, or six days afterwards.

17            THE COURT:  What do you do then with Mr. Lennon's

18    point, if that's true, then there has to be mediation and

19    arbitration and not litigation.  That's how I read the Foss

20    agreement.

21            MR. FREVOLA:  Your Honor, the Foss LOA is between RCM

22    and DC.  It's not between Pennantia.  The whole condition

23    precedent, your Honor, that exist, is that DC feels they

24    haven't been paid under the CTMA by RCM.  They're supposed to

25    mediate and arbitrate, your Honor, not us.

P8CBPENC

1        And, your Honor, you also heard Mr. Lennon say about

2   Foss was threatening maritime liens on the vessel, and that's

3   why amendment eight came out.  So there was a knowledge.  There

4   was a reason why those preconditions about not seizing vessels

5   were put in it.  And Mr. Parker agreed to that six days before

6   the CTMA, and now none of those preconditions have been taken

7   care of, your Honor.  There's been no mediation between these

8   companies.  There's been no arbitration between these

9   companies, but they put $29 million of liens on my client's

10  vessels, and they seized a $100 million vessel in Panama

11  without fulfilling a condition precedent.  And, your Honor,

12  people can waive liens. They do it all the time.  This is

13  essentially a conditional waiver.

14        Now, Mr. Lennon basically decried our reply papers

15  raising lots of things.  Your Honor, the one thing that we

16  raised new that was an additional argument was the Laches

17  argument.  And I put that in there because you realize that if

18  you run from amendment number eight, it runs right into Laches

19  because they currently have an excuse for why they didn't act

20  on our liens.  And the excuse is, there was condition precedent

21  that they had to fulfill before they acted on the liens.  If

22  that falls away, your Honor, we got a Laches problem because

23  there's -- the two elements of Laches we believe have been met,

24  your Honor.  And if you want to have them brief that if it

25  turns out we're going that way, let them brief it.  But, your

P8CBPENC

 1  Honor, we think we win that as well.  I don't think we get

 2  there, your Honor, because we got the contracts.

 3          To bring up the concept of judicial estoppel for a

 4  second, your Honor.  In Panama, they went into court.  They

 5  produced the CTMA and they told the judge in Panama, we have

 6  this agreement.  We want you to arrest the vessel, and they got

 7  affirmative judicial conduct on that.  They got something of

 8  value.  We're now here, your Honor.  They can't walk away from

 9  the CTMA and the terms of the CTMA.  That would be unjust, but

10  that's what they're trying to do right here, your Honor.  So

11  that's item one.

12          With regards to the issue of necessaries.  If you look

13  at -- I'll have you go back -- well, you don't have the

14  exhibit.  The Crescenzo exhibits, if you look at the invoices

15  that -- do you have the first Trump declaration by chance?

16          THE COURT:  Yes.

17          MR. FREVOLA:  Do you have exhibits on that?  Cause

18  that might have an invoice that I can show you, your Honor.

19          THE COURT:  I got the exhibits to the second Trump,

20  not the first.

21          MR. FREVOLA:  That might work.

22          THE COURT:  Just tell me what they say.

23          MR. FREVOLA:  If you look at exhibit eight of the

24  Trump declaration.

25          THE COURT:  That one I don't have.

P8CBPENC

1            MR. FREVOLA:  Let me see if I have it in the first

2     one.

3            THE COURT:  No, 43-1 is the CTMA.  Just read to me

4     what it is you wish.

5            MR. FREVOLA:  43-8, your Honor, is one of the

6     exhibits.  And on the exhibit is an invoice from Dove Cay to

7     Pennantia, and it's one of these monthly crew charts.  It's

8     their monthly invoice.

9            THE COURT:  Yes.

10           MR. FREVOLA:  And it's got line items, and it's got

11    line items of all of the ships in the fleet, well the active

12    ships in the fleet I should say.  And then it's got operations,

13    engineering, bookkeeper, HSEQ, regulatory purchasing and

14    personnel for the shoreside team.  They got a provision for

15    T&E, travel and entertainment expenses.  They got a provision

16    for added expenses.  That's it.  That's all they charge for.

17    The idea in terms of necessaries, as Mr. Crescenzo mentioned,

18    necessaries all got billed directly to Pennantia, or actually

19    to RCM and Pennantia funded the payment, and those are paid

20    directly.  Dove Cay didn't have anything to do with necessaries

21    in that regard, your Honor.  It's not on any of their invoices.

22           So I just wanted to make that point in terms of when

23    they keep saying necessaries, necessaries, there is a crew wage

24    issue here.  And all the crew wages were paid.  But even if you

25    somehow decided that the credit receivables issue meant there

P8CBPENC

 1   were delays on payments on those invoices.  At this juncture,

 2   that amounts to about $1 million.  That's the total amount of

 3   assets they've got right now is $1 million from what it sounds

 4   like.

 5          In terms of the issue with the other issues in the

 6   reply papers, your Honor.  I don't know if you're a tennis fan,

 7   but I'm sorry if the reply brief was like an Andre Agassi

 8   return to serve.  I mean, they wound up giving us stuff and

 9   said certain things, your Honor, and we're allowed to rebut or

10   reply to those.  For example, Mr. Parker talking about April

11   14, 2022, being the date when this agreement was met, and

12   there's no agreement.  We brought the agreement in, and we

13   brought the Foss agreement in, which is all consequences of

14   that statement replying to him.  And that's why it's in there.

15   Was it a lot of stuff?  It was, your Honor, but it's all

16   replying to what they --

17          THE COURT:  I understand your point.

18          MR. FREVOLA:  Moving along.  With regards to this

19   issue in terms of the -- when I say about the amount left is

20   about $1 million, at the end of the Crescenzo declaration, your

21   Honor, paragraphs 64 through 81, he walks through the

22   bookkeeping exercise since about mid-June 2025 to present, your

23   Honor.  And what he basically concludes is that there's $4.7

24   million that really hasn't been applied anywhere.  And he

25   actually asked Mr. Trump, how do I account for that.  And the

P8CBPENC

1   answer is, your Honor, is that 4.7 was applied to the DC credit

2   receivables.  That's why there's only $1 million left on that

3   if that's how it's applied.  They talk about continuing not

4   having enough money to deal with this kind of bleed over of

5   operational time.  Quite frankly, your Honor, they ought to pie

6   some of that 4.7 to things they need to charge and then charge

7   Pennantia for it.  Pennantia would be fine with that, but they

8   keep crying, we're going to shut the fleet down.  We don't have

9   money.  Shouldn't be doing that.

10          THE COURT:  Why don't you conclude, sir.

11          MR. FREVOLA:  I am just about to.  With regards to the

12   Trump correspondence when they're talking about RCM about

13   bringing in someone after Foss.  That's exhibit 4 to the second

14   Trump declaration.  So that period of correspondence is ECF

15   43.4.  It's about 80 pages long.  That's all the correspondence

16   when they were talking about what to do when Foss is on its way

17   out.  And there was no conversation about including the Foss

18   LOA.  What happened was, these two parties decide to include

19   it.  And now once we realized they included it, we're just

20   holding them to that contract.  And that's it.

21          One last thing, your Honor.  I'm sorry.  The last

22   thing is on the issue of interest.  Because the length of our

23   brief, we only had one line citing one district court case down

24   in Louisiana on the issue of interest and contractual interest.

25   What I'd like to do is, I'd like to give you the full quote

P8CBPENC

1    from that case because it's important, your Honor.

2              THE COURT:  Go ahead.

3              MR. FREVOLA:  This particular dispute --

4              THE COURT:  For the record, what's the case?

5              MR. FREVOLA:  *Liverpool and London Steamship*

6    *Protection and Indemnity Association Limited v. The M/V Abra*

7    The cite is 295 F.Supp. 2d 674.  The quote is at page 692 from

8    the Middle District of Louisiana.  And the quote starts,

9    there's an entity Interforce, which I believe was what they

10   call a member basically insured for the Liverpool and London

11   Maritime P&I Club.

12             THE COURT:  Yeah.

13             MR. FREVOLA:  So Interforce argues that if interest is

14   assessed at all on any portion of its lien claim, only the

15   statutory rate may be imposed, not the contractual rate.

16   *Liverpool and London* Rule 32C provides for interest to accrue

17   on a member's deck at LIBOR plus 5 percent.  Interforce asserts

18   that this provision is inapplicable in the present case, and

19   that any interest imposed should be done so at the lower

20   statutory rate.  This court agrees.  The general rule is that

21   in admiralty cases prejudgment interest should be awarded

22   unless exceptional circumstances exist.  However, the

23   contractual rate of interest is inapplicable when lien

24   claimants are recovering on an *in rem* claim, rather than an

25   *in personam* claim.

P8CBPENC

1          In this case, Liverpool and London is attempting to

2    recover the debt based on an *in rem* necessaries lien claim for

3    insurance; therefore, in the present case, any prejudgment

4    interest is awarded at the lower statutory rate.  In other

5    words, your Honor, 36 percent, no way.  12 percent, no way.

6    The statutory rate is what it is with the Wall Street Journal

7    right now.  We're talking about a much more modest number.

8          The Liverpool and London case, they were citing Inland

9    Credit Corp v. the M/T Bow Egret.  All capital letters there.

10   552 F.2d 1148 at 1155, note nine. 5th Circuit 1977.  And a

11   recent case that's almost 20 years later that just came out in

12   the Southern District of Florida a few years ago kind of

13   recites this and cites a bunch of other cases from different

14   districts.

15          THE COURT:  What's that cite?

16          MR. FREVOLA:  *Robbie's of Key West v. M/V Komedy, III*,

17   470 F.Supp. 3d 1264 at 1270, 1271 that is the Southern District

18   of Florida 2020.  And like I said, your Honor, it's several

19   paragraphs citing a number of different cases also all on this

20   very issue.

21          THE COURT:  All right. Thank you. I'll look it up.

22   We're off the record now.

23          (Adjourned)

24

25